COPY

1 | COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2 | WILLOW E. RADCLIFFE (200087)
ELI R. GREENSTEIN (217945)
3 | 100 Pine Street, Suite 2600
San Francisco, CA 94111
4 | Telephone: 415/288-4545
415/288-4534 (fax)
5 | wradcliffe@csgrr.com
egreenstein@csgrr.com
6 |     – and –
STACEY M. KAPLAN (241989)
7 | 9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
8 | Telephone: 310/859-3100
310/278-2148 (fax)
9 | skaplan@csgrr.com

10 | Lead Counsel for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT

APR 17 2009
3:08

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA

13 | WESTERN DIVISION

| | |
|---|---|
| In re DOWNEY SECURITIES LITIGATION | Master File No. CV-08-03261-JFW(RZx) |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | Demand for Jury Trial |

1

# TABLE OF CONTENTS

2

**Page**

3   I.     INTRODUCTION AND OVERVIEW ................................................................ 1

4   II.    JURISDICTION AND VENUE ..................................................................... 13

5   III.   THE PARTIES ........................................................................................... 14

6   IV.    SOURCES OF ALLEGATIONS ................................................................... 16

7   V.     DEFENDANTS' FRAUDULENT SCHEME ................................................. 27

8          A.   False and Misleading Statements Regarding Downey's Lending
               Practices, Loan Quality, Underwriting Standards and Credit
9              Risk Controls .................................................................................. 27

10         B.   Reasons Why Defendants' Statements Regarding Downey's
               Lending Practices, Loan Quality, Underwriting Standards and
11             Credit Risk Controls Were Knowingly Materially False and
               Misleading When Issued ................................................................. 30

12
               1.   Downey Turns to Option ARMs to Inflate Its Revenue
13                  and Earnings, a Practice the OTS Found Unsafe and
                   Unsound ................................................................................ 31

14
               2.   Defendants Deliberately Misled Downey's Investors
15                  About the Quality of the Loans on Downey's Books ............. 34

16                     a.   Percipient Witnesses Aver that Defendants
                           Participated in Setting Downey's Unsound
17                         Underwriting Guidelines ............................................ 37

18                     b.   Multiple Sources Detail that Defendants' Tracked
                           Downey's Lending Practices ....................................... 38
19
                       c.   Downey's $11-15 Billion Loan Portfolio Was
20                         Premised on Unsound Underwriting ............................ 43

21                     d.   Percipient Witnesses Aver that Defendants
                           Deliberately Misled Borrowers to Originate More
22                         Loans ........................................................................ 56

23                     e.   Witnesses Confirm that Defendants Routinely
                           Granted Exceptions to Downey's Already Loose
24                         and Unsafe Underwriting Guidelines ........................... 59

25                     f.   Victims of Downey's Toxic Lending Practices
                           Corroborate Defendants' Unsafe and Predatory
26                         Lending Practices in Pleadings and Complaints ........... 64

27                     g.   Multiple Sources Detail the Vast Incentives Given
                           by Defendants that Drove the Volume of Toxic
28                         and Predatory Option ARMs on Downey's Books ........ 73

C.  Defendants' False and Misleading Statements Concerning Subprime Lending ..................................................................... 78

D.  Reasons Why Defendants' Statements Regarding Downey's Subprime Lending Were Knowingly Materially False and Misleading When Issued ......................................................... 79

E.  False and Misleading Statements Concerning Downey's Financial Results, Allowances for Loan and Credit Losses, Non-Performing Assets, Negative Amortization and Capital Position ............................................................................ 83

1.  False Statements: Downey's Financial Results (3Q06-FY07), GAAP Compliance and Internal Controls ................. 83

2.  False Statements Concerning Credit and Loan Loss Allowances and Risk Controls .......................................... 84

3.  False Statements Concerning Downey's Capital Position ....... 88

F.  Reasons Why Defendants' Financial Results and Statements Concerning Allowances for Loan and Credit Losses, Non-Performing Assets, Negative Amortization, Credit Risk Exposure and Capital Position Were False and Misleading .............. 91

1.  Rosenthal and Côté Directly Participated in Downey's Internal Asset Review Committee and Issued Reports to Downey's Audit Committee that Reflected Inadequate Reserves ............................................................... 92

2.  GAAP Provisions Violated by Defendants in Accounting for Credit and Loan Loss Reserves .......................................... 93

3.  SEC Rules Violated by Defendants in Accounting for Loan Loss Reserves ................................................... 95

4.  OTS Provisions Violated by Defendants ............................... 96

5.  Defendants Violated GAAP, SEC Rules and OTS Regulations by Intentionally Manipulating the Company's Reserves and Provision for Loan Losses to Conceal Loan Impairment and by Willfully Disregarding Known Adverse Facts and Red Flags .......................................... 97

6.  Defendants Intentionally Reduced Downey's Loan Loss Provision to Fraudulently Inflate Earnings and Conceal Downey's Rapidly Increasing Risk and Impairment of Loans ........................................................................ 115

7.  Defendants' Overstatement of Assets Rendered Defendants' Statements Regarding Downey's Capital Position Knowingly False .................................................. 120

8.    Defendants' Vehement Opposition to and Subsequent Failure to Follow Regulatory Guidance Underscores Falsity and Scienter ............................................................. 122

9.    Defendants Further Increased Downey's Risk by Relying on Option ARMs to Hedge Risk ............................................. 125

G.    False and Misleading Statements in 3Q07 Regarding Troubled Debt Restructurings and the Quality of Downey's Loan Portfolio that Resulted in Nearly $100 Million in Restated Loans ............................................................................................. 127

H.    Reasons Why Downey's 3Q07 Financial Statements Were Knowingly False ........................................................................... 129

I.    False and Misleading Statements Regarding Compliance with Interagency Guidance ...................................................... 136

J.    Reasons Why Defendants' Statements Regarding Compliance with Interagency Guidance Were Knowingly Materially False and Misleading When Issued ............................................... 136

K.    Defendant McAlister's September 17, 2007 Misrepresentations Regarding the Mortgage Crisis and Its Impact on Downey's Business ................................................................................... 139

L.    Reasons Why Defendant McAlister's September 17, 2007 Statement Was Knowingly Misleading When Issued ...................... 140

M.    The End of the Class Period ............................................................ 141

VI.    ADDITIONAL ALLEGATIONS SUPPORTING A STRONG INFERENCE OF MOTIVE AND SCIENTER ......................................... 146

A.    The Magnitude and Nature of the Restatement Reinforces Scienter ............................................................................................. 146

B.    SEC Filing Signatures and Sarbanes-Oxley Act Certifications Are False and Demonstrate Knowledge ........................................ 148

C.    GAAP, SEC Statements and Downey's SEC Filings Confirm Defendants' Scienter .................................................................... 150

D.    OTS Regulations Required that Defendants Review Trends that Informed Them of Downey's Risky and Fraudulent Practices ........ 154

E.    Downey's Regulatory Violations and the OTS Consent Decree Reinforce Scienter .......................................................................... 156

F.    Turnover and Termination of Top Officers and the Closure of Downey's Wholesale Lending Department Reinforces Scienter ..... 161

VII.    LOSS CAUSATION/ECONOMIC LOSS ................................................. 163

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
       FRAUD-ON-THE-MARKET DOCTRINE.................................................. 181

IX.  NO STATUTORY SAFE HARBOR EXISTS FOR DEFENDANTS'
     STATEMENTS .......................................................................................... 182

FIRST CLAIM FOR RELIEF
     For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
     Against Individual Defendants Rosenthal, Côté and McAlister................. 182

SECOND CLAIM FOR RELIEF
     For Violation of Section 20(a) of the 1934 Act Against Individual
     Defendants Rosenthal, Côté and McAlister................................................. 183

X.  CLASS ACTION ALLEGATIONS ........................................................... 184

XI.  PRAYER FOR RELIEF ............................................................................ 185

XII.  JURY DEMAND ..................................................................................... 185

# I.    INTRODUCTION AND OVERVIEW

1.    Court-appointed lead plaintiff Waterford Township General Employees Retirement System brings this federal securities class action pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 on behalf of itself and all persons who purchased or otherwise acquired the common stock of Downey Financial Corporation ("Downey," "DSL" or the "Company") between October 16, 2006 and March 14, 2008 (the "Class Period"), against Downey's former Chief Executive Officer ("CEO") and Vice Chairman of the Board of Directors (the "Board") Daniel D. Rosenthal ("Rosenthal"), its co-founder and former Chairman of the Board Maurice L. McAlister ("McAlister"), and Chief Financial Officer ("CFO") Brian E. Côté ("Côté") (the "Individual Defendants") and Downey[1] (collectively, "defendants").

2.    Defendants Rosenthal, McAlister and Côté participated in a scheme to defraud investors by concealing Downey's "unsafe and unsound" lending practices and making false representations regarding, *inter alia*, (1) Downey's lending, underwriting and credit risk practices and the quality of Downey's loan portfolio, (2) Downey's financial disclosures, including revenues, earnings, assets, capital position, level of Non-Performing Assets ("NPAs"), overall financial condition and its accounting for credit and loan losses, (3) Downey's purported compliance with regulatory requirements and guidance set forth by generally accepted accounting principles ("GAAP"), the SEC and the U.S. Office of Thrift Supervision ("OTS"), (4) Downey's exposure to "subprime" mortgages, and (5) the overall impact of the housing and credit crises on Downey's business.  Defendants' scheme artificially

---

[1]    Downey filed Chapter 7 bankruptcy proceedings in November 2008 after this litigation was initiated.  Accordingly, the action and any claim as to relief is stayed as to Downey during the pendency of the bankruptcy proceedings.

1  inflated Downey's stock price to a high of nearly $75 per share during the Class
2  Period.  Downey's stock is now worthless and no longer trades.

3        3.    The house of cards that Downey built upon a foundation of liar's loans
4  has crashed to the ground.  On September 5, 2008, Downey revealed that it had been
5  served with an Order to Cease and Desist by the OTS ("OTS Order") concluding that
6  Downey and the Individual Defendants had engaged in "*unsafe and unsound*
7  *practices*" in virtually every aspect of Downey's business.  The OTS Order set forth a
8  startling laundry list of improper practices concerning the most fundamental areas of
9  Downey's business, including "earnings," "asset quality" and "management":

10             Based on findings set forth in the Report of Examination of
11       [Downey] issued on August 7, 2008, the OTS finds that [Downey] *has*
12       *engaged in unsafe and unsound practices.  Specifically, the asset*
13       *quality, earnings, liquidity planning, management, and projected*
14       *capital levels of [Downey] are not satisfactory and require*
15       *strengthening*.

16  Ex. 2 at 205.[2]

17        4.    The OTS Order required that Downey cease certain improper activities,
18  "[e]ffective immediately," including that Downey "*shall not resume Payment Option*
19  *Adjustable Rate Mortgage (Option-ARM) or Stated Income lending*."  *Id.* at 213.
20  Because Option ARMs comprised up to 90% of Downey's business, the OTS Order
21  effectively forced Downey to shut down its mortgage lending business.

22        5.    Additionally, the OTS ordered Downey to submit a "Management Plan"
23  to "*strengthen executive management*" in order to "*ensure that [Downey] is*
24  *operated in a safe and sound manner and in compliance with applicable laws and*
25  *regulations*."  *Id.* at 212.  Notably, just days before the OTS Examination Report was

26  ───────────────────────

27  [2]      All Exhibits ("Ex.") are attached hereto and described at 188-190.

28

- 2 -

1   issued, both McAlister and Rosenthal suspiciously "resigned" and Downey's
2   President (Rick McGill) was terminated.

3       6.    The *Los Angeles Times* later quoted Bert Ely, a veteran banking
4   consultant, in a September 6, 2008 article acknowledging that McAlister's departure
5   was likely linked directly to the OTS examination: "This is probably what led to
6   McAlister's departure – it was a consequence of that examination by the OTS . . . ."
7   "So.  What's coming out now is really what's been in the pipeline."

8       7.    Not surprisingly, once defendants Rosenthal and McAlister were ousted
9   and the OTS ordered Downey to stop its predatory Option ARM lending practices and
10  "compl[y] with applicable laws and regulations," the Company folded – its savings
11  and loan business was taken over by the Federal Deposit Insurance Corporation
12  ("FDIC") and it filed for liquidation in bankruptcy court leaving shareholders with
13  nothing.  According to bankruptcy filings, both the SEC and the FDIC are currently
14  interviewing Downey's employees and the FDIC has been given until October 30,
15  2009 to file any claims in bankruptcy court.

16      8.    Before Downey filed for bankruptcy and had its assets seized by the U.S.
17  Government, it was a holding company for Downey Savings & Loan Association,
18  F.A. ("Downey Savings"), a mortgage lending thrift that originated and invested in
19  billions of dollars of residential mortgages.  Downey's flagship product beginning in
20  the late 1990's was the now-infamous "Option ARM" loan, also called a "liar's loan,"
21  because of the dishonest practices associated with the product.  Downey's Option
22  ARMs were adjustable rate mortgage loans with artificially low "teaser" introductory
23  interest rates as low as 1% (one of the lowest in the industry) designed to lure
24  borrowers into loans they otherwise could not afford.  In subsequent months and
25  years, the loans would "recast" to a much higher rate, beginning just one to three
26  months after origination and continuing to increase, on average, 4%-6% per year,
27  causing monthly payments to double or triple and borrowers to default on the
28  payments.  To keep borrowers trapped in Downey's predatory loans, the Company

1  charged huge "pre-payment" penalties and fees to prevent borrowers from refinancing
2  to more conservative fixed-rate loans or getting out of the Downey loan entirely to
3  find a less predatory loan at another bank.

4        9.     Before and during the Class Period, Option ARM loans were the
5  lifeblood of Downey's business – comprising up to $15 billion dollars and up to **90%**
6  of Downey's total portfolio.  Up to 90% of Downey's residential one-to-four unit
7  loans were either underwritten based on borrower's "stated income" without proper
8  income or asset verification ("stated income" or "low-doc" loans) or underwritten
9  with "no verification of either borrower income or assets" ("no-doc" loans).  In recent
10  testimony to Congress, former Commissioner of the SEC, Christopher Cox, expressly
11  referred to these "no-doc" loans as a prime example of the collapse of lending
12  standards that led to the current mortgage crisis.  Ex. 1 at 193.

13        10.    Further, because Downey's predatory Option ARM loans allowed
14  borrowers to make monthly payments that were even ***less*** than the monthly interest
15  accruing on the loan, loan balances actually ***increased*** by hundreds or thousands of
16  dollars per month due to "negative amortization" ("NegAm"), *i.e.*, interest piling up
17  on the original loan balance.  Once the amount of NegAm on Downey's loans reached
18  a certain threshold (typically 10-15% of the loan balance), it triggered an automatic
19  recast often leaving stunned borrowers with a payment two or three times the amount
20  of the original monthly payment.

21        11.    The OTS, Downey's primary regulator, repeatedly warned lending
22  institutions, including Downey, that "***a strong indicator of potential credit risk is the***
23  ***number of an institution's option-AR[M] loans that actually negatively amortize***."
24  Ex. 27 at 825.  Defendants blatantly ignored the OTS.  At the start of the Class Period,
25  the amount of Downey's income from NegAm was ***83% of its total earnings*** before
26  taxes and had experienced rapid double-digit growth every quarter immediately
27  preceding the Class Period.  Further, more than 85% of borrowers of residential loans
28  were utilizing NegAm; this level increased to approximately 90% in 3Q07, a quarter

1   in which Downey was later forced to **restate nearly $100 million** in troubled debt that

2   had been misrepresented to investors as sound assets.

3         12.    According to numerous percipient witnesses, OTS findings, Company

4   admissions, internal Downey documents, and other factual sources, Downey's lending

5   practices were deliberately reckless – Downey did not adequately monitor credit risk,

6   verify borrowers' ability to repay loans, and Downey's underwriting practices were

7   deficient and, in many cases, virtually non-existent.  Option ARM loans were

8   repeatedly given to borrowers who were not creditworthy, without proper income and

9   credit verification and with FICO scores as low as 580-600, far below the "subprime"

10   standard used in the industry.  In fact, as set forth in the lawsuits filed by victims of

11   defendants' predatory lending practices, borrowers' incomes were frequently inflated

12   and loans were granted to borrowers whose monthly payments after the teaser rate

13   expired exceeded their entire monthly income.  Downey's practices preyed upon

14   unsophisticated borrowers and violated numerous OTS guidelines regarding Option

15   ARM and non-traditional lending.  Yet, defendants falsely told investors during the

16   Class Period that the Company was "in line with regulatory guidance."  The OTS

17   found that it was not.

18         13.    Other witnesses reported that "exceptions" were frequently used during

19   the Class Period to grant loans to borrowers who did not meet proper underwriting

20   guidelines.  Indeed, Confidential Witness ("CW") 21,[3] indicated that exceptions to

21   Downey's already unsound underwriting guidelines were granted to 50% of the loans

22   originated in Southern California and that Rosenthal personally overrode CW21's

23   decisions to deny inadequately underwritten loans, and directed such exceptions to be

24   granted during the Class Period.

25

26

27   [3]     CWs referenced herein are generically referred throughout the Complaint as male regardless of their gender.

28

1    14.    Numerous former Downey employees also confirmed that Downey's

2 improper and reckless lending and underwriting guidelines for Option ARM loans

3 were set by Downey's Board which, was headed by Chairman McAlister and Vice

4 Chairman Rosenthal (McAlister's former son-in-law).  Defendant McAlister, who co-

5 founded the Company, was the well-known "mastermind" of Downey's movement to

6 predatory Option ARM loans and controlled the Company's operations and its

7 executives.    Indeed, according to *The New York Times*, former Downey Board

8 member Dennis Aigner reported that "Mr. McAlister, known as Mac, was clearly

9 behind the drive to move into option ARM loans." *The New York Times* also reported

10 that ***no later than 2003***, Board members, including Michael Abrahams and Lester

11 Smull, as well as representatives from the OTS, were already pressuring McAlister to

12 reduce Downey's exposure to Option ARM loans, but McAlister was reluctant to do

13 so.

14    15.    These facts were confirmed by a report in *Forbes* dated December 3,

15 2008, which stated that Board members warned McAlister in 2003 that negative

16 amortization loans sounded "dodgy," but McAlister "dismissed their concerns":

17              ***Board Members warned him.  Employees warned him.  Even***

18              ***mortgage brokers – not a class of people winning any citizenship***

19              ***awards this year – thought to double check the math.  But Maurice***

20              ***"Mac" McAlister would not be denied***. . . . [H]e knew what his own

21              bank needed to compete with the Countrywides of the world:  fee-heavy,

22              negative-amortization loans on huge houses in the party-till-you-drop

23              California real estate market.

24    16.    *Forbes* also reported that the OTS sent McAlister "***letters beseeching***

25 ***Downey to stop lending to deadbeats and start raising capital***."   But McAlister

26 ignored the OTS.  As *Forbes* reported: "Downey investors would have had a tough

27 time stopping McAlister. ***He never held conference calls with Wall Street analysts***.

28 McAlister hired and fired chief executives every 18 months on average, finally

- 6 -

1  picking his former son-in-law [Rosenthal] for the post. ***Downey's board included his***

2  ***daughter and personal physician***."

3      17.    In 2005, the OTS recognized the dangerous proliferation of Option ARM

4  loans and other "non-traditional" mortgage products and published proposed lending

5  guidance to curb abusive practices in underwriting, monitoring and reserving for

6  Option ARMs.  Not only were defendants well aware of the OTS proposed guidance,

7  they issued a formal comment letter to the OTS on March 29, 2006, vigorously

8  opposing virtually every aspect of the proposed guidance.  Ironically, the letter argued

9  that many of the new restrictions were "***unnecessary***" because Downey already had

10 adequate controls and procedures in place.  For example, in response to the new

11 guidance on underwriting, Downey acknowledged that "prudent underwriting

12 standards [were] necessary to manage and mitigate any credit risks associated with

13 Option ARMs."  Ex. 28 at 834.  Yet it took the position "***that such standards and***

14 ***expectations are already covered in existing guidance and regulation***." *Id.* Over 25

15 witnesses reported, however, that Downey's underwriting standards were anything but

16 "prudent."

17      18.    Defendants also represented that the OTS need not strengthen restrictions

18 on Downey's notorious "stated income" and "no-doc" loans with reduced

19 documentation (which comprised up to 90% of Downey's loan portfolio during the

20 relevant period), because those loans "***perform as good, or better, than full***

21 ***documentation loans***." *Id.* at 835.

22      19.    Downey also argued that the OTS need not implement new requirements

23 on "recasting" loans because it was better handled by "management":

24      We believe that potential payment shock due to early recasting is ***better***

25      ***handled by management through prudent monitoring and loan***

26      ***servicing practices***, which would include the development of accurate

27      and timely reports and strategies to deal with those borrowers who make

28      the minimum payment.

- 7 -

1   *Id.* at 837.   According to numerous witnesses and Downey's own internal data,

2   however, defendants did not prudently monitor, and deliberately ignored, recasting

3   payment shock, and even reduced loan loss reserves despite their knowledge in 2006

4   that $1.4 billion in loans were projected to recast in 2007.

5       20.   Finally, Downey argued against improved capital requirements ("we are

6   troubled by the guidance's suggestion to maintain sufficient capital to reflect the effect

7   of stressed economic conditions" (*id.* at 838)) and admitted that Downey's

8   management was responsible for its own risk control reporting:

9       [W]e believe that ***each institution is responsible for developing***

10      ***appropriate reports as part of its credit risk management program***.

11      Reports should be tailored to the institution and meaningful to the user.

12  *Id.*

13      21.   Despite Downey's attempt to oppose the OTS guidance, on September

14  25, 2006, nearly a month before the Class Period, the OTS published its "Final

15  Guidance on Nontraditional Mortgage Lending." Ex. 9. The 2006 Guidance required

16  Downey to follow strict guidelines for Option ARM lending, underwriting, reporting

17  for reserves and credit controls.

18      22.   For three straight quarters after the 2006 Guidance was published,

19  defendants misled the market by asserting they were "still assessing" the impact of the

20  new Guidance on Downey's business – even though defendants clearly had closely

21  analyzed and then vigorously opposed each specific provision of the Guidance in their

22  March 2006 letter.  Then, defendants falsely told the market on August 1, 2007, that

23  "***as of July 1, 2007, our loan underwriting guidelines are in-line with regulatory***

24  ***guidance.***"  The OTS Cease and Desist Order found otherwise and determined that

25  Downey employed "unsafe and unsound practices" in virtually every aspect of its

26  business. Ex. 2.

27      23.   To counteract the losses and conceal the increased risk in Downey's loan

28  portfolio due to inadequate underwriting and improper lending practices, defendants

1  also executed a scheme to "modify" nearly $100 million in troubled loans in 3Q07 and

2  falsely reported and accounted for those loans as "performing" assets, *i.e.*, assets that

3  generated stable income and profits.  Defendants' accounting improprieties materially

4  understated the amount of Downey's NPA's, which concealed severe problems and

5  risk in Downey's loan portfolio and inflated its earnings.  Downey later admitted the

6  "modification" scheme was improper, and defendants were forced to restate close to

7  $100 million in loans and book them as "non-performing" assets on Downey's books.

8  Defendants' restatement disclosures admitted that the modification accounting

9  decision was intentional – defendants admitted that they "did not perform th[e]

10  additional steps" required by GAAP, and "[i]nasmuch as *we chose not to perform*

11  *these additional measures, we are now required to [restate]*."  Ex. 5.

12      24.      Defendants also intentionally manipulated and *reduced* Downey's loan

13  loss reserves and provision at a time when they were required by GAAP, SEC Rules

14  and OTS regulations to *increase* those reserves.  Despite known red flags and

15  numerous data showing that every risk factor in Downey's business was increasing

16  exponentially – including skyrocketing loan delinquencies, exploding negative

17  amortization balances, increasing NPAs and sharply higher foreclosures (see chart

18  below) – defendants deliberately *reduced* Downey's loan loss provision from 3Q06 to

19  1Q07.

| ($ IN MILLIONS) | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|
| Negative Amortization in Loan Balance | 277 | 321 | 358 | 377 | 388 |
| 30+ Days Delinquent Loans | 101.2 | 144.5 | 173.1 | 259.9 | 386.5 |
| Non-Performing Assets | 66.5 | 110.4 | 143.4 | 227.4 | 323.9 |
| Foreclosure Settlements | 5.8 | 8.5 | 17.2 | 29.9 | 59.8 |
| **Provision for Credit Losses** | **9.6** | **0.2** | **0.6** | **9.5** | **81.6** |
| **Allowance for Loan Losses** | **60.8** | **60.9** | **60.8** | **69.1** | **142.2** |
| **Allowance for Loan Losses as a % of Non-Accrual Loans** | **100.0%** | **59.8%** | **48.1%** | **35.0%** | **39.2%** |

25      25.      In other words, at a time when Downey was facing obvious signs of loan

26  losses and impairments in its Option ARM portfolio, it intentionally concealed its

27  financial condition by lowering its reserves and loan loss provision, thereby inflating

28  its income and earnings by millions of dollars during the Class Period.

26.     As illustrated in the chart above, defendants also fraudulently understated Downey's loan loss "allowance" during the Class Period, which is set each quarter for probable loan losses.  In the four consecutive quarters preceding the Class Period, Downey's allowance for loan losses had been 104.7%, 115.6%, 134.5% and 100.0% of its "non-accrual loans" (loans that do not generate income because of the likelihood of failure to pay). Inexplicably, in 4Q06, defendants **reduced** the allowance for loan loss from 100% to **59.8%** of non-accrual loans even though Downey's loan quality was further impaired.  In 1Q07 and 2Q07, when NegAm and delinquencies continued to skyrocket, defendants **reduced** the allowance further from 59.8% to 48.1% and from 48.1% to 35.0%, respectively.

27.     Subsequently, Downey's fraudulent under-reporting of loan loss reserves caused Downey's credit problems to compound and its provision for credit losses jumped by **1,483%** in 2Q07 (from $600,000 to $9.5 million), **759%** in 3Q07 (from $9.5 million to $81.6 million) and **168%** from 3Q07 to the end of the Class Period (from $81.6 million to $218.4 million).

28.     Additionally, defendants fraudulently concealed Downey's exposure to "subprime" borrowers (those with a FICO score below 660) and blatantly misled investors stating that "***[d]uring the first quarter of 2006, we ceased offering option ARM products to our subprime borrowers, but continue to offer them to our prime borrowers***." Ex. 6 at 328.  According to Downey's own internal loan solicitations and numerous witnesses, defendants' statements on subprime exposure were unequivocally false.  Senior Downey Underwriters and other employees who actually reviewed and granted Option ARM loans to subprime borrowers, universally confirmed that Downey was still issuing Option ARMs to subprime borrowers with FICO scores as low as 580 ***after 1Q06*** and throughout the Class Period.  One Senior Underwriter who had personal knowledge of Downey's subprime lending practices during the Class Period stated that defendants' November 1, 2006 statement quoted above was absolutely, unequivocally, without question – false.  He knew that it was

1  false because during his employment at Downey the minimum FICO score was 580

2  (and most borrower FICO scores were in the 580 to 620 range) and this did not change

3  before he left on July 21, 2007.

4       29.    Defendant McAlister ignored objections by Downey's Board regarding

5  negative amortization loans because he knew what "his own bank needed to compete

6  with the Countrywides of the world." CW20 indicated that Downey's management

7  waited to see what Countrywide and Washington Mutual did, then made changes to

8  their programs to keep pace. According to CW20, Downey management did rate

9  surveys every week to see how Downey compared to competitors. CW12, Downey's

10  head broker secretary until October 2008, explained that things at Downey really

11  began to get out of control after Rosenthal took the reins of the Company. CW12

12  stated that Downey was consistently trying to keep up with the loans originated by

13  Washington Mutual.

14       30.    To keep up with the funding of loans by other non-traditional mortgage

15  lenders, defendants engaged in unsafe and unsound lending practices. Specifically,

16  defendants embarked on a scheme whereby they ignored the OTS and the SEC as well

17  as GAAP, originated loans with no reasonableness check on the ability of borrowers

18  to repay, and relied solely on improper practices and a housing bubble (particularly in

19  Southern California) to keep their scheme alive.

20       31.    By the start of the Class Period, defendants knew, based on Board

21  discussions and OTS proposed guidance in 2005, as well as trends which they were

22  required to review, that the wave of profits and earnings that they had seen from 2000-

23  2005 was coming to an end. Indeed, defendants had announced that they were

24  increasing the "start rate" or teaser rate of Downey's Option ARM loans months prior

25  to the Class Period. Defendants' attempts at reform, however, would be short lived as

26  defendants saw an opportunity to sell the Company for an inflated profit. Instead,

27  defendants proceeded during the Class Period to *lower* their start/teaser rate to lure in

28  borrowers with unsound lending practices and underwriting guidelines and failed to

- 11 -

1   take necessary loan loss reserves in the face of known risk.  Further, to keep the

2   sinking ship afloat and the possibility of sale alive, as its competitor Countrywide

3   would publicly derail in July 2007, defendants created a "Mod Squad" to attempt to

4   modify impaired loans to hide Downey's drastically increasing NPAs.

5       32.     Immediately preceding the Class Period, in the summer 2006, defendants

6   saw the founders of Golden West Financial Corporation sell that company, with

7   nearly all of its loans having adjustable rates, for $25 billion; the founders had a 10%

8   stake in the company.  Analysts estimated that Downey could fetch $2.6 billion, or

9   35% higher than its market value at the time; McAlister had roughly a 20% stake in

10  the Company.  By July 2006, Downey had an estimated $90.00 per share price sale

11  value, well above its then current share price of roughly $64.00-$69.00 per share.

12      33.     By this time, however, defendants knew that the Company's portfolio of

13  Option ARMs was severely impaired.  Defendants concealed this knowledge from the

14  investing public by keeping these loans as "performing" assets on their books and not

15  taking sufficient reserves, thereby artificially inflating Downey's NPA's earnings and

16  stock price to a Class Period high of $75.  Defendants' scheme, however, was slowly

17  derailed by the declining housing market, which did not allow defendants to get out

18  from under these bad loans and their own predatory lending practices which had

19  simply delayed the inevitable – borrowers did not have the ability to repay these loans.

20      34.     On the heels of the announcement that Downey expected to incur an

21  operating loss for 3Q07, Hilltop Holdings Inc. announced that it had taken a 6.8%

22  stake in Downey and that it was considering a business combination with Downey.

23  Analysts at Keefe, Bruyette & Woods reported that they "believe[d] the pressures on

24  the California home market could provide an incentive for the company to find a

25  partner."

26      35.     The *Orange County Business Journal* noted, however, on or about

27  December 3, 2007, that previous speculation about the sale of Downey did not "come

28  to pass largely because of cofounder and Chairman Maurice 'Mac' McAlister, who

1   owns 20% of the company."   Subsequently, two of Downey's Board members

2   resigned.

3          36.    By the time defendants finally began to reveal to investors the toxic

4   quality of the Company's loan portfolio and its crumbling profits, however, it was too

5   late – Downey's stock price collapsed from a Class Period high of nearly $75 per

6   share to $18.82 by the end of the Class Period, and eventually to $0 after further

7   details of the economic consequences of defendants' fraud seeped into the market and

8   destroyed the Company.  As the SEC's Chief Accountant Lynn E. Turner testified

9   before Congress, the U.S. financial crisis was due to:

10          [e]xecutives engaging in ***unsound, if not illegal***, business practices when

11          they made loans that had a high risk of not being repaid.  ***Predatory***

12          ***lending practices*** and the making of loans in which lenders fail to

13          determine if the borrowers have sufficient income to repay the loan, are

14          not what American capitalism is about.  ***If reasonable lending practices***

15          ***had been followed, much of this crisis quite simply would not have***

16          ***occurred***.

17          37.    In other words, not only did defendants' misconduct bankrupt the

18   Company, defraud Downey shareholders, and cost taxpayers billions in losses after

19   the FDIC had to cover Downey's losses, the fraud also contributed significantly to the

20   catastrophic housing meltdown that is still plaguing U.S. markets today.

21   **II.     JURISDICTION AND VENUE**

22          38.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted

23   herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.  The

24   amount in controversy, exclusive of interest and costs, exceeds the jurisdictional

25   minimum of this Court.

26          39.    Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false

27   and misleading statements were made in or issued from this District.  Downey has a

28   substantial presence in California and is headquartered in Newport Beach, California.

1    Many of the acts and transactions giving rise to the violations of law complained of

2    herein occurred here.

3        40.    In connection with the acts alleged herein, defendants, directly or

4    indirectly, used the means and instrumentalities of interstate commerce, including, but

5    not limited to, the mails, interstate telephone communications and the facilities of the

6    national securities markets.

7    **III.    THE PARTIES**

8        41.    Plaintiff Waterford Township General Employees Retirement System

9    purchased Downey common stock as described in the certification filed with the Court

10   on May 16, 2008 and incorporated by reference herein and was damaged thereby.

11   Waterford Township General Employees Retirement System was appointed lead

12   plaintiff in this action on August 14, 2008.

13       42.    Downey operated as the holding Company for Downey Savings, which

14   provides various financial services to individual and corporate customers. Leading up

15   to and during the Class Period, Downey primarily originated and invested in loans,

16   such as residential real estate mortgage loans, investment securities and mortgage-

17   backed securities, and originated and sold loans to investors in the secondary markets.

18   This action is currently stayed against Downey as a result of Downey filing for

19   bankruptcy.

20       43.    Defendant Daniel D. Rosenthal was at all relevant times Vice Chairman

21   of the Board and CEO of Downey and Downey Savings. After being appointed Chief

22   Operating Officer in August 1998, less than four months later, Rosenthal, a then 23-

23   year veteran of Downey, became Downey's CEO in November 1998 – the fifth CEO

24   in ten years under the leadership of Downey's Chairman of the Board and Rosenthal's

25   former father-in-law, McAlister. Rosenthal served as President and CEO of Downey

26   from November 1998 until January 2004 and September 2004 until October 2007. He

27   served solely as the CEO from October 2007 to July 2008. Rosenthal was a director

28   of Downey from 1998 to July 2008. During the Class Period, defendant Rosenthal

- 14 -

served on the Executive Committee of the Board.  In addition, at all relevant times, defendant Rosenthal served on Downey's Internal Asset Review ("IAR") Committee. In 2005, Rosenthal received a base salary of $550,000 and an incentive bonus of $950,000.  In 2006, Rosenthal received a base salary of $605,000 and an incentive bonus of $940,896.  In 2007, Rosenthal received a base salary of $650,000.

44.    Rosenthal participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings. ***Rosenthal signed and certified every SEC Form 10-Q and Form 10-K filed by Downey during the Class Period.***  Rosenthal "resigned" suddenly in July 2008.

45.    Defendant Maurice L. McAlister was at all relevant times Chairman of the Board of Downey.  The consensus in the market was that nobody doubted that it was McAlister, Downey's co-founder, who ultimately called the shots at the thrift. McAlister co-founded Downey Savings.  McAlister served as President of the bank from 1967 until September 1991.  In addition, McAlister is a director and President of McAlister Investments, Inc., a privately held company focusing on real estate and other investment opportunities.  During the Class Period, defendant McAlister served on both the Executive Committee and the Nominating and Corporate Governance Committees of the Board.  In 2006, defendant McAlister received total compensation of $563,017.  In 2007, McAlister received compensation of approximately $703,362 (including a $97,500 change in pension value and non-qualified deferred compensation earnings).

46.    McAlister participated in the issuance of improper statements, including the preparation of improper press releases and SEC filings. ***McAlister signed both the 2006 and 2007 SEC Forms 10-K filed by Downey.***  McAlister "resigned" suddenly in July 2008.

47.    Defendant Brian E. Côté was at all relevant times Executive Vice President and CFO of Downey, a position he was appointed to in March 2006.  At all relevant times, defendant Côté served on Downey's IAR Committee.  In 2006, Côté

- 15 -

1  received $220,881 (from a base salary of $275,000), a signing bonus of $25,000 and

2  an incentive bonus of $123,750.  In 2007, Côté received a base salary of $310,000.

3      48.    Côté participated in the issuance of false and misleading press releases

4  and SEC filings.  *Côté signed and certified every SEC Form 10-Q and Form 10-K*

5  *filed by Downey during the Class Period.*

6  **IV.    SOURCES OF ALLEGATIONS**

7      49.    Plaintiff's allegations are based upon the investigation of plaintiff's

8  counsel and on information contained in SEC filings by Downey, regulatory filings

9  and reports, securities analysts' reports and media regarding the Company, bankruptcy

10  filings, press releases, the pleadings and complaints in other lawsuits and other public

11  statements issued by the defendants as well as other sources of information about the

12  Company.  The allegations contained herein are also based upon first-hand accounts

13  of former Downey officers and employees, including those identified below.  Plaintiff

14  believes that substantial, additional evidentiary support will exist for the allegations

15  set forth herein after a reasonable opportunity for discovery.

16      50.    John Gatzke is Downey's former Chief Lending Officer ("CLO"), a

17  member of Downey's Executive Management Group and an officer of the Company.

18  Gatzke left Downey in July 2006.

19      51.    Robert J. Corbin ("Corbin") was in the lending industry for over 20 years

20  and was Downey's Director of Wholesale Lending until July 24, 2006.

21      52.    John Mullen ("Mullen") was a Regional Production Manager at Downey

22  until September 2006.

23      53.    Downey, in a complaint filed on August 7, 2007, in Orange County

24  Superior Court, *Downey Sav. & Loan Ass'n, F.A. v. Chevy Chase Bank, F.S.B., et al.,*

25  No. 06CC11885 (Cal. Super. Ct.), concedes that Gatzke, Corbin and Mullen would

26  have had access to and knowledge of the information to which they testified under

27  oath.  The complaint alleges that Gatzke and Corbin, as officers of the Company, and

28  Mullen, in the course and scope of his job duties, had access to "methods, procedures

- 16 -

1  and expertise regarding strategies to set up and organize a loan production business";

2  "[i]nternally developed techniques, formulas and specifications for products"; "[c]ost

3  and pricing information, as well as other strategic business information"; and

4  "[i]nformation concerning confidential business plans and strategies, including but not

5  limited to implementation techniques and future anticipated developments."

6  54.    CW1 was a mortgage broker whose company brokered loans with

7  Downey between 2004 and early 2006.[4]  CW1 has been in the mortgage lending

8  business for 20 years, and has served in various positions including underwriter,

9  broker and real estate agent.  CW1 is a licensed California Real Estate Broker and

10  Mortgage Broker with experience that includes loan processing, quality control, loss

11  mitigation, underwriting, and loan origination.

12  55.    CW2 worked as an escrow administration manager and customer service

13  team lead in Downey's Newport Beach corporate office between August 2001 and

14  February 2008.  CW2's department handled taxes, insurance, and foreclosed

15  properties. CW2 reported to Paula Bevany.  Bevany reported to John Amador, who in

16  turn reported to Cliff Piscitelli, an Executive Vice President at Downey since

17  December 2006.  Prior to that appointment, according to Downey's SEC filings, he

18  served as an Executive Vice President, Director of Secondary Marketing from January

19  2006 to December 2006 and Senior Vice President, Director of Secondary Marketing

20  from November 2004 to January 2006.

21

22

23

_____

24  [4]    To put this witness's testimony in context, Corbin, a former officer of Downey,
in his deposition, explained that brokers were the primary source of business for

25  Downey's wholesale lending practice during his time at Downey.  Downey sold its
loans primarily through wholesale loan representatives who obtained loans from

26  mortgage brokers. According to Downey's annual filings with the SEC, during 2004,
88% of its residential home loans were purchased in this manner, approximately 91%

27  in 2005, 81% in 2006, and 65% in 2007.

28

1       56.   CW3 was an Account Executive ("AE") on the wholesale side in

2 Downey's Cupertino office from 2005 to 2007.[5] CW3 has nine years of experience in

3 the lending business with his career beginning at Countrywide.  As an AE, CW3

4 maintained over 30 mortgage broker accounts from the Fresno to Bakersfield,

5 California territory, funding an average of $5-20 million per month of broker business.

6 CW3 explained that this required him to make cold calls to brokers and to interview

7 broker applicants. CW3 further described his job as acting as the liaison between the

8 brokers, loan officers, underwriters, and escrow agents.  In other words, taking care of

9 a loan from start to finish.  His responsibilities included pre-underwriting prospective

10 loans before submission and marketing the Company's services and products to high

11 net-worth broker accounts. CW3 reported to Connie Taylor, Regional Loan Manager

12 for Cupertino, who reported to Gatzke, Downey's former Chief Lending Officer.

13 CW3 met with Taylor on a weekly basis to review numbers from an Activity Report.

14       57.   CW4 was a senior underwriter in Downey's Scottsdale, Arizona

15 operations center from 2004 until July 21, 2007, when the Operations Center was

16 closed.  Prior to working at Downey, CW4 worked in the industry for 16 years,

17 including his previous job at Wells Fargo.  As a senior underwriter, CW4 reviewed

18 and analyzed residential and investment mortgage loans.  CW4 dealt daily with

19 Downey's Empower system.  According to CW4, senior underwriters were required to

20 work six to eight files per day, but hitting that goal was never a problem as,

21 realistically, they handled approximately 15 files a day at the peak.  CW4 described

22 the volume of loans every day as a mass frenzy.  CW4 was also called upon to handle

23 overflow work from Southern California and explained that he had to handle loans

24 from the corporate office every day.  CW4 reported to credit manager Antoine "Andy"

25

26 _____

[5]     To put this witness's testimony in context, on July 8, 2008, Mel Foster, an AE

27 at Downey for 14 years, testified in deposition that an AE's responsibility was: "To bring in loans."

28

1  Mason and, upon his departure, credit manager Annette Peterson.  If CW4 denied a

2  loan, he was required to fill out an exceptions report on the Empower system and give

3  it to his supervisor.

4      58.    CW5 was a wholesale operations manager at Downey's Scottsdale,

5  Arizona operations center from December 2005 until it closed in July 2007.  CW5 has

6  an accounting background.  CW5's operations center covered Arizona, Nevada and

7  Southern California (when they had spillover).  CW5 reported to Vicki Fox,

8  Underwriting Manager, and Denise Moeller, Director of Lending in Downey's

9  corporate office, who reported directly to Chief Lending Officer Gatzke and defendant

10 Rosenthal.  CW5's primary means of communicating with these superiors was

11 through e-mail.  As the operations manager, CW5 oversaw a staff of 25-35 employees,

12 including the underwriters, loan processors, sales staff, shippers and funders.  CW5

13 estimates that the average volume out of the Scottsdale office was $4-5 million/month.

14     59.    CW6 was a senior underwriter at Downey's Mission Viejo branch from

15 January 2005 until January 2007.  CW6 reported to credit managers Diane Stewart

16 and Sue Deek, who, in turn, reported to Regional Underwriter for Southern California

17 Casey Nichols and Director of Lending Denise Moeller.  CW6's primary job

18 description was to input, manage and utilize data, including applicant loan data, into

19 Empower, Downey's automated underwriting system, to underwrite for conforming,

20 jumbo, Alt A, and multistate loans, and to assist brokers, AEs and loan funders

21 regarding underwriting questions and completing loan packets.  Additionally, CW6

22 personally reviewed/maintained investor guidelines, and met daily loan quotas which

23 were updated by his credit managers.  CW6 had quotas of loans, approximately six to

24 eight, that he was required to process for every eight-hour work day.  He also

25 reviewed/signed off on conditions of loans.

26     60.    CW7 was a branch manager at Downey's Pittsburg, CA branch from

27 September 2001 to August 2006.  CW7's responsibilities included sales, operation

28 oversight and administration of the Pittsburg branch.   They also included

- 19 -

1  responsibility for the sales processing and servicing of home loans.  CW7 reported

2  directly to a Regional Manager.  Every day CW7 printed out a spreadsheet containing

3  the goals that employees in the branch were expected to reach concerning, for

4  example, deposits and loan originations.  The spreadsheet was sent from the corporate

5  office and also included actual results.

6      61.    CW8 was employed at Downey for approximately 12 years from 1995

7  until June 2007.  He served the bulk of his tenure as a wholesale administrative

8  supervisor.  CW8 worked out of Downey's corporate office and was in charge of

9  mortgage broker approvals and AEs.  CW8 reported directly to the director of

10  wholesale lending, who in turn reported directly to defendants Rosenthal and

11  McAlister.  CW8 reported there was a rotating door in the director of wholesale

12  lending position but that the most change happened in 2006, when he had six different

13  bosses in seven months.  CW8 recalls reporting to Director Jane Wolfe, CLO Gatzke,

14  Director of Wholesale Lending Corbin, Northern California Regional Manager Tim

15  Kepler, Executive Vice President (EVP") of Wholesale Lending Ned Altemus, and

16  Director of Wholesale Lending Ed McAdams.  CW8 also ran reports for weekly Pre-

17  Price Meetings attended by defendant Rosenthal, Director of Asset Management Cliff

18  Piscatelli, Chief Appraiser Herb Cuesta, and whoever held the director of wholesale

19  lending position at the time.  The reports generated by CW8 for this meeting included

20  the Week-to-Date, Month-to-Date and Year-to-Date Reports, as well as the Loans

21  Funded, Loans Submitted, DSL Rate Sheets, Competitor's Rate Sheets and

22  Asset/Liability Committee ("ALCO") Reports.

23      62.    CW9 was an SEC Reporting Analyst in Downey's finance department

24  from approximately February 2006 to April 2007.  His responsibilities included

25  assisting in preparing and filing Forms 10-Q, 8-K, and 10-K with the SEC and

26  preparing internal financial reports and supporting schedules for, among other things,

27  non-performing assets.  CW9 also prepared press release financials and supporting

28  schedules and described his work on those as taking rolled-up financials and

describing them in paragraph form.  He also performed Thrift Financial Reporting to the Office of Thrift Supervision.  CW9 worked directly with Director of Financial Reporting Steve Tucker and Controller Kent Smith.  At the direction of Smith and Tucker, CW9 was responsible for reviewing italicized items in draft SEC filings and providing confirmation regarding the accuracy of the final numbers before the text was sent to the SEC.  CW9 also worked with Smith to produce monthly financial highlights and 30-page Monthly Board Reports (which contained all of Downey's internal audit findings for each month), distributed to Downey's Board (which included defendants Rosenthal and McAlister) and also worked with Downey's external auditors KPMG LLP ("KPMG").  CW9 worked at Downey's Newport Beach headquarters and attended monthly meetings there with 10-12 of the Company's top executives, including defendant Côté, former CEO Thomas Prince, Controller Kent Smith, and members of Downey's Board of Directors.

63.    CW10 was employed at Downey from April 2000 until July 2005 as a financial analyst and then a senior business analyst.  CW10 worked first in Downey's Loan Accounting Department and then as accounting support in the IT Department.  CW10 was responsible for tracking and resolving issues related to the Business Unit's general ledger accounts.  He also performed regression testing on larger projects and conducted impact analysis for a change in scope from the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley"), OTS or Financial Accounting Standards Board ("FASB").  CW10 explained that there were various business units and he conducted meetings with each unit to gather business requirements (specific requests from each department).  CW10 further explained that he then analyzed data/work flows and processes from these ledger accounts through the Empower origination system and the Miser accounting and servicing system.  CW10 explained that due to his ability to speak both languages and understand both financial analysis and the computer systems, he acted as a liaison between the departments, including the Lending and Loan Servicing Departments.

1      64.     CW11 was a wholesale AE in Downey's San Diego office from 2005 to

2   October 2008, when he was laid off because of the closure of Downey's wholesale

3   loan department.  CW11 reported to AE Andrew Scheftel, who reported to the

4   Regional Sales Manager, Tony Younis.  CW11's job consisted of selling mortgage

5   products to brokers who, in turn, would sell to borrowers.

6      65.     CW12 worked for Downey in Southern California for 15 years until

7   October 2008, when he was laid off because of the closure of Downey's wholesale

8   loan department.  CW12 was Downey's broker approval head secretary for all six

9   Downey regions.  CW12 indicated that he was in charge of broker approvals and used

10   the Empower database for a major part of his job functions.  CW12 worked directly

11   for Wholesale Administrative Supervisor Marla McGinnis, aiding in processing and

12   approving packets for mortgage brokers. CW12 explained that he would have two

13   computer screens up all day; on one, he would have the Downey inter-office e-mail,

14   and on the other he would be running the Empower program, in which he maintained

15   the mortgage broker table.

16      66.     CW13 was a senior financial analyst in the financial department for at

17   least five years, ending in November 2007.  CW13 reported to Bill Verret, who

18   attended ALCO meetings and reported directly to the CFO.  CW13 was responsible

19   for completing the asset/liability analyses of Downey's interest rate risk and also

20   worked on forecasting on a high level.  In the course of forecasting, he would follow

21   trends based on balance sheets and income statements and would then be told by

22   higher-ups (mostly Verret, who received his orders from the CFO, Prince, then

23   subsequently Côté) whether or not to adjust numbers.  In the course of his forecasting

24   duties, CW13 used Downey's Sendero forecasting software to compile and pull

25   reports.

26      67.     CW14 was employed at Downey from 1999 to October 2008.  From May

27   2001 to October 2008, CW14 worked as an administrative assistant for Downey's

28   Broker Support Department.  CW14 was let go in October 2008 when Downey closed

1   its Wholesale Loan Department.  CW14's job description entailed monitoring and
2   maintaining mortgage broker fraudulent activities, verifying and updating broker
3   license agreements, answering broker calls and assisting brokers on website issues,
4   such as uploading loans and users.  Regarding the monitoring of mortgage broker
5   fraudulent activities, CW14 explained that if there was a loan that had been
6   foreclosed, the broker would be investigated by Downey.  Additionally, CW14
7   generated monthly reports on the Empower database regarding broker support calls,
8   including, for example, how many calls they took per month, what kind of calls and
9   from where.  CW14 reported primarily to Wholesale Administrative Supervisor Marla
10  McGinnis until 2007.  In 2007, Downey began downsizing his department and toward
11  the end, the department consisted only of himself and one other, but before that time
12  there were up to five others in his department.

13      68.    CW15 was an underwriter in Downey's San Diego office from
14  November 2004 to July 2007.  CW15 received loans from different production
15  assistants who had already logged the loan application and the customer's credit
16  report.  Upon receipt, CW15 would enter the information into Downey's semi-
17  automated computer program.  Once he entered the information, he would see a drop
18  down option menu from which he could exclude different conditions or change the
19  conditions necessary (for example, appraisals) for a loan to go through.

20      69.    CW16 was an underwriter at Downey's Cupertino, CA branch for
21  approximately one year in 2007/2008.  CW16 reported to Underwriting Manager
22  Vicki Fox.

23      70.    CW17 was employed by Downey from 1987 to 2000 and then again from
24  2004 to 2007.  From 1987 to 2000, he was a trainer in the corporate office supporting
25  branch employees and corporate employees across all departments.  CW17 designed
26  all training materials for technical and management courses and became a member on
27  all "conversation teams" (talking to various retail and wholesale departments
28  regarding necessary updates to banking software based on their needs).  Upon his

1    return to Downey in 2004, CW17 helped to facilitate the change-over to the Empower

2    system and later worked in the Retail Department.

3        71.    CW18 was a Wholesale AE at a Downey office in San Diego for

4    approximately 10 years (from 1998 to October 26, 2008), when he was laid off

5    because of the closure of Downey's Wholesale Loan Department.  CW18 sold loan

6    products to brokers, who then sold them to the public.  CW18 had anywhere between

7    30 and 40 brokerage accounts at a time and sold the brokers primarily Option ARM

8    and portfolio loans (which were subject to portfolio investors approved guidelines).

9        72.    CW19 was an AE in Downey's Rancho Bernardo, CA office for

10    approximately 11 years (from 1997 until October 18, 2008) until Downey closed its

11    wholesale loan department.  CW19 sold a variety of wholesale products to outside

12    mortgage brokers and estimated that he had 35 different brokerage accounts in San

13    Diego.

14        73.    CW20 was a production assistant ("PA") and a Wholesale AE in

15    Downey's Newport Beach corporate office from September 2002 to April 2006.

16    CW20 explained that Downey's corporate offices include a North Tower and a South

17    Tower.  As a PA, CW20 worked in the North Tower.  When CW20 was promoted to

18    AE, he moved to the South Tower.  CW20 explained that the broker's job was to

19    collect the information directly from the loan applicant.  As a PA, CW20 worked as a

20    go-between for the brokers, the AEs and the underwriters, collecting information for

21    loan applications, passing it along to the necessary persons, and entering the

22    information into the Empower system.   As an AE, CW20 sold loan packages to

23    brokers who were on DSL's approved broker list.  CW20 reported to VP of Loan

24    Origination Ken Parsley, EVP of Wholesale Lending Ned Altemus and Director of

25    Wholesale Lending Corbin.

26        74.    CW21 was employed at Downey from January 1997 to December 2006.

27    He began his tenure at Downey as an AE in Downey's Walnut Creek office and sold

28    wholesale loan products to mortgage brokers until he was promoted to district

1    manager in 2003.  As a wholesale production manager he managed a sales production
2    staff of 125, including AEs, PAs, underwriters and funders.  While at Downey the
3    Company's monthly production for his area increased by 400%.  As part of his
4    responsibilities he communicated sales incentive ideas to upper management and
5    reported to them on the status of business.  In January 2004, Downey split its Northern
6    California region and CW21 was promoted to a regional manager responsible for
7    Alameda, Contra Costa and Solano counties, as well as the Northeast Region up to
8    Sacramento.

9        75.    CW21 reported to Gatzke, the CLO, who, in turn reported to defendant
10   Rosenthal.  CW21 also worked closely with Corbin, Director of Wholesale Lending,
11   and Ned Altemus, Executive Vice President of Wholesale Lending.  CW21 indicated
12   that he, Corbin, Altemus and Gatzke were supposed to have conference calls every
13   Monday but that they usually occurred closer to every few weeks.  CW21 also had in-
14   person meetings with the corporate office every few months and attended certain
15   meetings at Rosenthal's house.

16       76.    CW22 was a wholesale account executive at Downey's Newport Beach
17   corporate office from 2004 until the Wholesale Department closed in October 2008.
18   CW22 was responsible for selling loan products (primarily Option ARMs) to
19   approximately 25 to 30 different approved mortgage brokers throughout Southern
20   California.  CW22 recalls that mortgage brokers had to continue to sell and perform to
21   stay on Downey's approved broker list.

22       77.    CW22 worked in the South Tower of the corporate offices.  According to
23   CW22, the South Tower contained mostly production staff, which included his
24   manager, the Director of Wholesale Lending, Tony Younis.  CW22 recalls that the
25   Director of Wholesale Lending position changed hands several times, with Gatzke,
26   Ned Altemus, Ed Adams, John Rissling and Younis all holding the position during his
27   tenure.  According to CW22, the North Tower housed Downey's retail staff and
28   executive management, including Rosenthal and McAlister.

78.    CW23 was employed at Downey from 1999 to July 2007.  CW23 became an AE in Northern California around 2004 and later became a Regional AE Manager. CW23 reported to Northern California Regional Manager Tim Kepler, who reported directly to Chief Lending Officer Gatzke and Director of Wholesale Lending Corbin, then to EVP of Wholesale Lending Ned Altemus and defendant Rosenthal beginning in fall 2006.  CW23's primary job responsibility as an AE was to sell loans to mortgage brokers.  As a regional manager, CW23 was also the go-between with outside sales representatives and his manager, Tim Kepler, Regional Loan Manager Connie Taylor and Underwriting Manager Vicki Fox.

79.    CW24 was a Senior Business Analyst in the IT Department in Downey's Newport Beach corporate office from January 2006 to June 2008.  CW24's duties included supervising several Senior Business Analysts who supported the Loan Servicing Department by developing functional specifications, user manuals, SQL scripts and Access queries to validate test results.  CW24 reported to Mr. Itomi, who was the manager of the Loan Servicing Center, who in turn reported to Mario Chang, who in turn reported to IT Manager Steve Wolfe (Director Jane Wolfe's son).

80.    CW25 was employed at Downey's Los Alamitos, CA location for 23 years until Downey closed its Wholesale Lending Department on October 16, 2008. CW25 held several positions, including those in the Real Estate Owned ("REO") Department and the Loan Processing Department.  In 2000, CW25 became a wholesale AE, reporting to Bob Curry.  As an AE, CW25's primary job responsibility was to sell loans, including Option ARM loans, to outside mortgage brokers. According to CW25, he was in constant contact with his manager.  CW25 also used the Empower system to check the status of his loans and the borrower's application.

81.    CW26 was a loan funder at Downey's Walnut Creek location from October 2000 to July 2007.  CW26 reported to funding manager Sara Phelps and later to funding manager Nene Bautista, both of whom reported to the Northern California regional manager.    CW26 believed that his managers as well as the senior

1  underwriting manager for CW26's branch and the Cupertino regional office, Linda

2  Tellez, had contact with upper management in the corporate office.  CW26 was

3  responsible for drawing loan documents for home loans for both new purchases and

4  refinancing.  CW26 was responsible for the final review of loan documents once

5  everything was signed off on and the loan was sent to title.  Specifically, CW26 was

6  responsible for making sure all of the conditions were met and signed off on.  CW26

7  explained that after this process, the funding manager would request a wire transfer

8  from whatever bank they were using to Downey, the title company, and the seller.

9       82.    CW27 was a wholesale account executive at Downey's Newport Beach

10 corporate office from March 2007 to October 2008.  CW27 worked in the South

11 Tower with approximately ten other AEs under his supervisor, Tony Younis.  CW27

12 was responsible for selling loans to 30-40 mortgage brokers throughout Southern

13 California.  CW27 recalls that he was expected by upper management to fund at least

14 one million dollars in loans per month, which he estimated was equivalent to 3-4 loans

15 per month.

16 **V.    DEFENDANTS' FRAUDULENT SCHEME**

17     **A.    False and Misleading Statements Regarding Downey's**

18         **Lending Practices, Loan Quality, Underwriting Standards**

19         **and Credit Risk Controls**

20     83.    Defendants McAlister, Rosenthal and Côté participated in, approved,

21 signed and issued false and misleading statements in Downey's FY06 and FY07

22 Forms 10-K on March 1, 2007 and February 29, 2008, respectively, regarding the

23 quality of the loans held in Downey's portfolio:

24         ***In the approval process for the loans we originate or purchase,***

25         ***we assess both the value of the property securing the loan and the***

26         ***applicant's ability to repay the loan***.  Qualified staff appraisers or

27         outside appraisers establish the value of the collateral through appraisals

28         or alternative valuation formats that meet regulatory requirements. . . .

1      ***We obtain information about the applicant's income, financial***
2      ***condition, employment and credit history.  Depending on the loan***
3      ***product type, borrower credit history, [loan-to-value ratio]***[6] ***and other***
4      ***underwriting criteria and judgment, we may not deem it necessary to***
5      ***verify stated borrower income and/or reported assets***.
6  Ex. 3 at 222, Ex. 4 at 271.

7      84.    Defendants also falsely told investors throughout the Class Period,
8  including in Downey's 3Q06, 1Q07, 2Q07 and 3Q07 Forms 10-Q and FY06 and
9  FY07 Forms 10-K that:

10      ***We permit adjustable rate mortgage loans to be assumed by qualified***
11      ***borrowers***.
12  Ex. 3 at 221, Ex. 4 at 271, Ex. 6 at 328, Ex. 10 at 429, Ex. 11 at 461, Ex. 12 at 489.

13      85.    Downey's FY06 and FY07 Forms 10-K also contained the following
14  false and misleading statements:

15          ***Our business could be hurt by a downturn in real estate markets***
16      ***from a concentration of loan products offered associated with***
17      ***particular underwriting guidelines related to income and asset***
18      ***verifications***. . . .  ***To the extent borrowers overstated their income***
19      ***and/or assets, the ability of borrowers to repay their loans may be***
20      ***impaired, which could adversely affect the quality of our loan portfolio,***
21      ***business, financial condition, results of operations, cash flows and***
22      ***prospects***.
23  Ex. 3 at 227, Ex. 4 at 275.

24      86.    In each of the Forms 10-Q and 10-K filed with the SEC during the Class
25  Period, defendants also falsely represented that:

26  _____

27  [6]    This language is only included in Downey's 2007 Form 10-K.

28

> *Downey [controls/manages] the credit risk of its commitments to*
> *originate loans held for investment through credit approvals, limits*
> *and monitoring procedures. The credit risk involved in issuing lines*
> *and letters of credit requires the same creditworthiness evaluation as*
> *that involved in extending loan facilities to customers. Downey*
> *evaluates each customer's creditworthiness*.

Ex. 3 at 256, Ex. 4 at 300, Ex. 6 at 323, Ex. 10 at 425, Ex. 11 at 456, Ex. 12 at 484.

87.     Further, defendants falsely stated that despite the fact that 89% of Downey's residential one-to-four unit loans at the start of the Class Period were either "underwritten based on borrower stated income and asset verification" (stated income loans) or "were underwritten with no verification of either borrower income or assets" (no-doc loans), defendants effectively "mitigated" that risk by instituting purported credit controls: "***We mitigate those risks during loan underwriting through the establishment of various minimum borrower credit requirements and maximum loan-to-value limitations***." Ex. 6 at 330. Virtually identical false statements were made in Downey's quarterly Forms 10-Q on May 4, 2007, August 1, 2007, November 1, 2007, and its yearly Forms 10-K on March 1, 2007 and February 29, 2008. Ex. 3 at 234, Ex. 4 at 282, Ex. 10 at 430, Ex. 11 at 462, Ex. 12 at 491.

88.     In Downey's quarterly SEC filings on November 1, 2006, May 4, 2007, and August 1, 2007 (3Q06, 1Q07 and 2Q07), defendants Rosenthal and Côté also falsely stated that lowering Downey's "teaser" interest rate or "start" rate for its Option ARM loans would result in additional volume of loans while "limiting" credit risk:

> In September 2006, we increased the competitiveness of our option
> ARM pricing by lowering the start rate for borrowers who have high
> FICO credit scores and low loan-to-value ratios, with the goal of
> stimulating additional loan production for our portfolio, ***while at the***
> ***same time limiting our portfolio credit exposure***.

1    Ex. 6 at 331, Ex. 10 at 431, Ex. 11 at 463.

2          89.    Defendants also falsely stated that the terms of Downey's Option ARM

3    loans were clearly defined in the quarterly and annual SEC filings filed during the

4    Class Period:

5              *[Option ARM] payment options are clearly defined in the loan*

6              *documents signed by the borrower at funding and explained again on*

7              *the borrower's monthly statement.*

8    Ex. 3 at 236, Ex. 4 at 270, Ex. 6 at 327-328, Ex. 10 at 428.

9              *Payment options, including the required minimum monthly loan*

10             *payment, are clearly defined in the loan documents signed by the*

11             *borrower at funding and explained again on the borrower's monthly*

12             *statement.*

13   Ex. 11 at 460, Ex. 12 at 488.

14   **B.    Reasons Why Defendants' Statements Regarding Downey's**

15          **Lending Practices, Loan Quality, Underwriting Standards**

16          **and Credit Risk Controls Were Knowingly Materially False**

17          **and Misleading When Issued**

18         90.    Defendants deliberately misled investors when they told the market that:

19   (i) Downey assessed an applicant's ability to repay a loan; (ii) borrowers were

20   qualified or creditworthy for the loans funded; (iii) defendants were unaware that

21   Downey's loan portfolio was impaired; and (iv) Downey's lending terms for its

22   Option ARMs were clearly spelled out to borrowers.  Contrary to defendants'

23   statements in ¶¶83-89, percipient witnesses confirm a scheme to defraud where

24   virtually all of Downey's business was premised on the funding of toxic Option ARM

25   loans based on loose underwriting guidelines that were dictated by defendants

26   Rosenthal, McAlister and Côté, as well as other officers and directors of the

27   Company, which were controlled by these defendants.

28

1    91.    Defendants' risky lending practices and toxic loans were so egregious
2  that the OTS would eventually find the Company's practices unsafe and unsound and
3  order Downey to stop selling Option ARMs in September 2008. Ex. 2. Defendants'
4  predatory and fraudulent business practices that generated billions of dollars on
5  Downey's balance sheet are corroborated by more than 20 percipient witnesses
6  (including the sworn deposition testimony of former officers and management of
7  Downey and the statements of confidential witnesses), as well as the pleadings in
8  lawsuits brought against Downey for predatory lending practices and defendants' own
9  admissions of an almost exclusive concentration of business in Option ARMs and
10  inadequate underwriting in Downey's SEC filings.

11    1.    **Downey Turns to Option ARMs to Inflate Its Revenue**
12        **and Earnings, a Practice the OTS Found Unsafe and**
13        **Unsound**

14    92.    Downey's SEC filings demonstrate that during the relevant time period,
15  Downey's Option ARMs were up to 90% of Downey's loan portfolio, generating the
16  vast majority of the Company's income. Because of the concentration of Downey's
17  business in Option-ARM lending, defendants were directly responsible for Downey's
18  mortgage-related business and loan portfolio.

19    93.    Based on a Report of Examination of Downey issued on August 7, 2008,
20  the OTS found that Downey had engaged in unsafe and unsound practices, including
21  that the asset quality and management of the Company were not satisfactory and
22  required strengthening. Ex. 2. The OTS's Cease and Desist Order forbade Downey
23  from making the very Option ARM loans that constituted the vast majority of the
24  Company's balance sheet, earnings and income during the Class Period and ordered
25  Downey to create a strategy to reduce Downey's Option ARM portfolio. *Id*. As set
26  forth in ¶¶102-103, 105, defendants knew more than two years prior to the OTS Order
27  that Downey's Option ARMs were horrible loans and that the Company should no
28  longer offer them. Defendants also knew that the concentration in Option ARMs was

1  extremely risky – OTS guidance had directed Downey and other thrifts in 2006 to

2  diversify.  *See* Ex. 9.  Downey had told the OTS on March 29, 2006 with respect to

3  the OTS's then-proposed guidance, that Downey "oppose[d] the guidance's call for

4  concentration limits" and that the concentration limits may impact Downey's ability to

5  "maintain a viable business strategy."  *See* Ex. 28 at 838.

6       94.    Downey's foray into Option ARMs began in the late 90s.  In 1998,

7  Downey made more home loans than ever before but it sold them for a slim profit of

8  0.5%.  In November 1998, Rosenthal took over as CEO and Downey's mortgage

9  lending practices began to change.  In 1999, about 18% of Downey's loans were

10 considered subprime, with Downey's primary focus shifting to the origination of

11 adjustable rate single-family loans.  As a result, the Company reported record earnings

12 in both 1999 and 2000.

13      95.    By September 30, 2001, Downey's Option ARM portfolio consisted of

14 $1.6 billion – 16.6% of its total mortgage portfolio.  A significant majority of the

15 borrowers of these loans, however, were considered middle and upper income.  This

16 would change.

17      96.    From January 1, 2002 through December 31, 2004, Downey originated or

18 purchased 19,232 residential mortgage loans, totaling $4.4 billion, within the low and

19 moderate income census tract.  An OTS exam report specifically noted that Downey's

20 loans utilizing nonconforming/non-traditional underwriting standards (*i.e.* Option

21 ARMs) were loans that addressed the needs of low and moderate income individuals

22 and geographies.

23      97.    Downey's reliance on Option ARMs was at the direction of McAlister.

24 As *The New York Times* reported on September 6, 2008:

25     ***Mr. McAlister, known as Mac, was clearly behind the drive to move***

26     ***into option ARM loans***, recalled Dennis Aigner, the former dean of the

27     graduate school of management at the University of California, Irvine,

28     who served on the Downey board from 1994 to 1998. So active was the

1    bank in that sector that by 2003, option ARM loans accounted for 73

2    percent of the bank's single-family lending portfolio, which accounted

3    for the vast bulk of the bank's loans.

4        98.    *The New York Times* further reported that, **no later than 2003, Board**

5    **members**, including Michael Abrahams and Lester Smull, **as well as representatives**

6    **from the OTS, were already pressuring McAlister to reduce Downey's exposure to**

7    **Option ARM loans**.  McAlister, however, was reluctant to do so.

8        99.    As reflected in Downey's 2Q05 Form 10-Q, by June 30, 2005, $12

9    billion or 87% of the Option ARMs held for investment in Downey's portfolio were

10   Option ARMs with borrowers incurring $72 million in additional balances from

11   negative amortization as a result of choosing to make the minimum monthly

12   payments.  At this time, 20% of Downey's earnings consisted of profits from negative

13   amortization, an increase of an amortization balance of $51 million in the first quarter

14   alone, and $37 million in 4Q04.  Thus, negative amortization interest income, for

15   which there was no cash payment, was increasing by 40% each quarter and grew to

16   83% of Downey's total earnings in 1Q06, 93% in 4Q06 and 117% in 2Q07.

17       100.    By the middle of 2005, defendant Rosenthal was told by Downey's then-

18   CLO Gatzke that the loans Downey offered were in fact worse than interest only

19   loans.  Gatzke testified in deposition that:

20       **Dan [Rosenthal] came to me in – oh, in the middle of '05 and said,**

21       **"Do we do any" – there was an article in the paper about interest-only**

22       **loans, and he said, "Do we do any interest only loans?"  And I said,**

23       **"Very few."  I looked at him and said, "But, my God, we do the**

24       **granddaddy of all of them.  We do the option ARM."  And he looked at**

25       **me and said, "Oh, don't worry, they didn't mention that loan in this**

26       **article."  And I said, "They will**."  So his knowledge of the product –

27       **they were just worried about what was being said, and they didn't want**

28

1    *to do the product any longer.  They didn't believe in it*.  And that was

2    okay with me.

3        101.    A little over three years before the OTS would order Downey to cease its

4    sale of Option ARMs, Downey's then-CFO, Thomas Prince, told the market in August

5    2005 that concerns about ARMs were exaggerated and that "I'm not particularly

6    concerned about it."

7                **2.    Defendants Deliberately Misled Downey's Investors**

8                       **About the Quality of the Loans on Downey's Books**

9        102.    Months before the beginning of the Class Period, Downey's Board of

10    Directors (which included defendants Rosenthal and McAlister) had discussions with

11    officers of the Company which demonstrate that the defendants knew of the toxic and

12    unsafe loans that "supported" the billions of toxic assets on Downey's balance sheet.

13    Gatzke, a former officer in charge of lending, testified under oath on October 23, 2007

14    that before he left Downey in July 2006, he had a disagreement with Downey as

15    follows: "*They – we had been selling the option ARM for 25 years, and over the last*

16    *year before I left everyone wanted to stop selling the option ARM.  Pretty much*

17    *denied that we ever sold it.  I mean it was – all of a sudden it had become a very*

18    *horrible loan . . . .*"

19        103.    Gatzke also testified as to defendants' knowledge that Downey's

20    portfolio contained billions of dollars of toxic loans:

21            I don't believe they understood the option ARM, and how to – what we

22            have done, and they were backing away from a loan that I had been

23            selling for 20 years at Downey Savings, and now all of a sudden *I was*

24            *being told* to – that this was not a great loan for a borrower.  *It wasn't a*

25            *good loan*.  That we shouldn't be selling it as much.  And we should be

26            selling the fixed rate and the hybrid products.  It was very frustrating.

27            The board needed someone to come in and explain what the option ARM

28            was to them.

104.   Gatzke also testified as to internal discussions evidencing that the defendants had knowledge that they should cease their lending practices – a fact that defendants kept from investors throughout the Class Period:

> ***Downey Savings no longer wanted the volume that they wanted in option ARMs.***  Like I had said before, they had basically trained a large group of people to do option ARMs, and now were backing off of that type of volume.

105.   Defendants' knowledge of the toxic loans sitting on Downey's books is corroborated by the October 16, 2007 deposition testimony of a second Downey officer, Corbin, who testified that it was communicated to him that "***the Board [which included McAlister and Rosenthal] was not comfortable with the Option ARM product***."  He further testified that ***one Board member had said, "'I would never take that loan.   Why would I take that loan?'"***  He also testified that the Board was becoming more cautious about the Option ARM product, and they were tightening up the guidelines.

106.   Other former Downey employees testified in deposition that internally they were telling people to sell their Downey stock in 2006 as a result of changes which would affect Downey's stock price.  Mullen, a regional production manager at Downey, testified in deposition on January 29, 2008, that on August 24, 2006, he told the manager of the savings branch downstairs from his office that she should think about selling her Downey stock because:

> The mortgage business, which is a big money maker, was slowing down considerably at Downey.  ***The recent changes we had made were going to change – lower our volume considerably***, and it was apparent that the market had started to shrink and slow down.  ***And so the huge amount of volume and the huge earning gains from mortgages probably would not be forthcoming in the near future, which would probably have a negative effect on stock prices.***

- 35 -

1     107.   During his January 29, 2008 deposition, Mullen also testified with

2   respect to an e-mail to Downey employee Marla McGinnis, dated August 30, 2006,

3   which stated in pertinent part: "'***You heard it here first.  If I had any Downey stock I***

4   ***would sell it today.***'"   At the end of e-mail it said, "'***Please destroy this E-mail***.'"

5     108.   When asked how much Downey was cutting back on the Option ARMs

6   Gatzke testified: "Well, you're talking about a company that did 15 billion dollars two

7   years in a row, and whatever it was that – ***a large percentage of it, over 90, was***

8   ***option ARMs, and then I was told that they wanted to bring it down to basically a***

9   ***third***."

10     109.   Consistent with these percipient witnesses' sworn deposition testimony,

11   in May 2006 Downey announced in its 3Q06 Form 10-Q that it was increasing its start

12   rate for Option ARMs because of greater credit risk as a result of increased market

13   rates, flat home prices and changes in the residential market.  By increasing the start

14   or teaser rate for Downey's Option ARMs, these loans became less attractive to

15   borrowers, and as a result, fewer loans would be originated.  After Gatzke and Corbin

16   left in July 2006, however, defendants would ***lower*** the teaser rate for Downey's

17   Option ARMs as set forth in ¶¶88 in order to increase (not decrease) Downey's

18   portfolio of Option ARMs.  Further, Downey's own broker solicitations, as set forth in

19   ¶¶171-173, 231-233, evidence that defendants were aggressively seeking to originate

20   ***more*** toxic Option ARMs by touting Downey's loose underwriting and ***not***, as

21   defendants knew was prudent and safe (as well as required to mitigate Downey's

22   credit risk), decreasing Downey's risky and predatory lending practices, which were

23   concentrated in Option ARMs.

24

25

26

27

28

1
2
3

**a.    Percipient Witnesses Aver that Defendants
Participated in Setting Downey's Unsound
Underwriting Guidelines**

4    110.    As described by confidential witnesses, defendants, as well as other

5    Downey senior executives and Board members, set the loose guidelines that funded

6    Downey's toxic loans.

7    111.    CW6 explained that underwriting guidelines came from Downey's Board

8    of Directors (which included defendants Rosenthal and McAlister).  According to

9    CW6, underwriting guidelines at Downey changed frequently, and he would be

10    informed of changes through e-mails that instructed him to check guideline updates.

11    112.    CW7 explained that, as a branch manager, he never had the final say

12    about what loans would be granted, as final underwriting decisions were all made at

13    the Newport Beach corporate office.

14    113.    CW15 confirmed that Downey's underwriting guidelines were sent from

15    the Newport Beach corporate office.  The corporate office also distributed funding

16    goals monthly and sales goals yearly.

17    114.    CW14 explained that any changes in lending guidelines came from

18    Downey's Board of Directors who met in Downey's corporate office multiple times

19    per month.

20    115.    CW19 confirmed that the underwriting guidelines came down from the

21    Board of Directors (which included defendants Rosenthal and McAlister) and

22    explained that they changed often.

23    116.    CW8 explained that defendant McAlister lived in Bullhead, Arizona and

24    would come to the corporate office approximately once a month for Board meetings.

25    CW8's statement is corroborated by a September 2007 *Orange County Business*

26    *Journal* article, which indicated that McAlister came to Orange County monthly for

27    Board meetings.

28

117.  Consistent with other witnesses statements regarding changing guidelines, CW23 explained that employees at Downey never knew exactly what the rules were because guidelines, exceptions and standards were always changing.

118.  CW27 confirmed that the underwriting guidelines and any changes to them came directly from Janet Peterson in the form of an e-mail, as well as via hard copy.  According to CW27, Peterson and the upper management team, including Tony Younis, John Rissling and Ed Adams, met with Rosenthal to decide on underwriting guidelines.  CW27 recalls that underwriting guidelines changed frequently during his tenure at Downey.

### b.  Multiple Sources Detail that Defendants' Tracked Downey's Lending Practices

119.  Witnesses and documents filed by Downey with the OTS and SEC detail that defendants were kept apprised of Downey's business and the quality of assets in Downey's loan portfolio through access to Downey's Empower system, the receipt and review of various internal and external reports and regularly scheduled meetings.

120.  OTS guidance provides that Downey have systems in place as follows:

> Management information systems (MIS) reports ***should enable management and the board***  of directors to assess the performance of each loan product type (LTV, credit score, originating office, loan officer, geographic location, and profitability); and the performance of the portfolio as a whole.

Ex. 27 at 828-829.

121.  Thus, defendants were required to track information to assess Downey's portfolio of toxic Option ARMs.  As witnesses describe, the Empower system was an underwriting system used to track loan information.

122.  CW4 explained that Downey's underwriting guidelines changed constantly and were posted in a weekly policy book or e-mailed on Downey's intranet system.  CW4 explained that underwriters worked off of the matrix for each type of

- 38 -

product, looking at the FICO and loan-to-value- ("LTV") ratio and trying to make it all fit to approve the loan. CW4 described the underwriting process: an AE would sell Downey products to a mortgage broker. The broker would then try to sell the loans to the borrower. The AEs and their production assistants (PAs) would input the borrowers' information into Downey's automated underwriting Empower system. Downey also had a specific Desktop Underwriting system for Fannie Mae loans. At this time, the underwriters would be able to view the file through the system. CW4 explained that the loans sat in a queue until the underwriters got to them. The underwriter would then check the loan to see if it met Downey's underwriting guidelines. The loan would either be approved, denied or given a counter (for example, sent back to the AE for more information). If the loan was denied, CW4 was required to fill out an exceptions report on the Empower system and give it to his supervisor. As described in ¶¶188-203, exceptions to Downey's already inadequate guidelines were routinely given, including by Rosenthal himself.

123.    According to CW4, any senior underwriter could override the Empower system to fund a loan. The Empower system had a dropdown menu that allowed the underwriter to choose from a list of justifications if he wanted to make an exception to any loan. CW4 explained that he could not override funding on a loan that had been approved, but, with a supervisor's approval, he could override the system that denied the loan initially. According to CW4, some examples of justifications were low LTV, derogatory credit (for example, choosing "medical collections" made the credit problem look better), all current for 24 months, greater than two years old, and an "other" category for the underwriter to write a note for the supervisor.

124.    CW6 corroborated that as a senior underwriter he could manually override the automatic guidelines in the system if he went through a manager.

125.    CW6 explained that all of the underwriters, funders and upper management had access to the Empower system. CW6 explained that the system included drop-down menus with contemporaneous Company underwriting guidelines,

1  such as credit scores, and that he could log on to view any borrower's information.
2  CW6 occasionally saw reports run by the managers, including reports related to
3  overall loans funded and the number of loans in the pipeline.

4      126.   According to CW14, who frequently used the Company's Empower
5  system, every department at Downey had access to various parts of the Empower
6  system, but only upper management had access to all of the data in every department
7  at Downey.   CW14 used the Empower system to input activities and information
8  relating to brokers and AEs into the system. CW14 recalls generating monthly reports
9  on the Empower database regarding broker support calls including, for example, how
10  many calls they took per month, what kind of calls, and from where.   CW14 also
11  reported that the Empower system generated monthly information concerning every
12  account, number of loans and total sales for any given AE.   CW14 confirmed that
13  Downey's upper management received reports from the Empower system.

14      127.   CW12, Downey's broker approval head secretary until October 2008,
15  indicated that top management had access to all portions of the Empower database and
16  also to reports regarding programs and pricing, which were very guarded.   CW12
17  recalls that Downey's foreclosures were rising rapidly after 2005 (they were up to 830
18  by the time he left), but that, despite the problems, Downey continued to flip programs
19  and push through properties.   According to CW12, even after the problems began,
20  there were daily and weekly bulletins from Janet Peterson explaining product,
21  guideline, LTV, and incentive changes.   CW12 recalls that there was a corporate
22  committee (he believes that it was called ALCO) that met at least twice a month to
23  discuss these issues and that at least Tom Prince and Rosenthal attended these
24  meetings.  Côté was also a member of the ALCO Committee.  According to Downey's
25  2006 Form 10-K, ALCO was responsible for the Company's interest rate risk
26  management.   It also was charged with reviewing, *inter alia*, economic conditions,
27  interest rate exposure, operating results and capital.  *See* Ex. 3 at 235.  CW12 also
28  stated that McAlister attended meetings in the corporate office at least quarterly.  As

- 40 -

1  described in ¶116, other sources clarify that McAlister attended monthly meetings at
2  the corporate office.

3      128.   CW8 indicated that senior executives also had a weekly meeting on either
4  Monday or Tuesday called the Pre-Price Meeting, ***which was attended by defendant***
5  ***Rosenthal***, Director of Asset Management Cliff Piscatelli, Chief Appraiser Herb
6  Cuesta, and the then-current Director of Wholesale Lending.  CW8 ran the reports for
7  these meetings, which were generated from the internal systems department and
8  included the Week-to-Date, Month-to-Date and Year-to-Date Reports as well as the
9  Loans Funded, Loans Submitted, DSL Rate Sheets, Competitor's Rate Sheets, and
10  ALCO Reports.  CW8 explained that senior executives had access to all of the reports
11  that the corporate office ran daily.

12      129.   According to CW20, Rosenthal was directly involved in Downey's
13  underwriting guidelines.  CW20 referred to his supervisors, Parsley, Altemus and
14  Corbin, as the Wholesale Production Management and indicated that he personally
15  observed that they met every week with Rosenthal, McAlister and Jane Wolfe at
16  Downey's corporate headquarters.  CW20 recalled that sometimes their meetings were
17  in the Wholesale Department.  CW20 recalled that he would consistently receive a
18  new rate sheets and expanded guidelines shortly after these meetings.  The rate sheets
19  were e-mailed to CW20 by management.

20      130.   CW20 also had weekly sales meetings with Parsley, Altemus and Corbin
21  at which they passed down sales goals and underwriting guidelines.  CW20 explained
22  that underwriting guideline changes, which were discussed at the meetings, came in
23  the form of memos from the Operations Management Team, which included Valerie
24  Gann, Janet Peterson and Denise Mueller.  According to CW20, Gann, Peterson and
25  Mueller met often with Rosenthal, McAlister and Wolfe.  Based on these observations
26  and from the way that Rosenthal and Wolfe spoke to each other and others in the
27  office, CW20 believed that Rosenthal and Wolfe were making the major decisions on
28  the guidelines.

1    131. CW20 also explained that Downey's main competitors were

2 Countrywide and Washington Mutual. CW20 recalled that Downey's management

3 would wait to see what Countrywide and Washington Mutual did, then made changes

4 to their programs to compete. During his employment, CW20 reported to

5 management about the concerns and options that his brokers had with competitors. If

6 brokers could get a better deal elsewhere, CW20 would report that information to his

7 management group. According to CW20, Downey management did rate surveys

8 every week to see how Downey compared to competitors.

9    132. CW21 personally spoke to officers of the Company about upper

10 management's refusal to put underwriting guidelines in writing and the constant

11 change in guidelines.

12    133. CW22 recalls that Rosenthal and McAlister met often with the Board of

13 Directors. CW22 knew when the Board met because he would receive a

14 memorandum with any changes to the business, including underwriting guidelines,

15 right after the meetings. CW22 received the underwriting guidelines through an

16 e-mailed memorandum from Janet Peterson.

17    134. CW22 elaborated that changes in the underwriting guidelines had to go

18 through two committees – the ALCO (Assets and Liabilities Committee, whose

19 meetings were, according to CW12, attended by both Rosenthal and ALCO member

20 Côté) and the Pricing Committee. Additionally, according to CW22, any Company-

21 wide news came in the form of an e-mailed memorandum from Rosenthal and the

22 then-current President of Downey.

23    135. CW25 confirmed CW22's recollection that changes to underwriting

24 guidelines came through e-mail from Janet Peterson in the corporate office and

25 changed often. These witnesses' statements are also corroborated by the deposition

26 testimony of Janet Peterson, who testified on July 8, 2008, that she had been

27 Downey's lending administrator for 13 years and was responsible for product

28 management, new product administration, contract administration, BSA

1    administration, money laundering administration as well as relationships between
2    investors, mortgage insurance companies and updates of product guidelines.
3    Additionally, CW25 explained that underwriting guidelines were posted on the
4    Internet for brokers to review. CW25 understood that underwriting exceptions needed
5    to be approved by a group of executives, including defendant Rosenthal and Denise
6    Moeller.

7        136. CW26 also used the Empower system to input loan information in order
8    to draw documents and fund loans. CW26 explained that the system had a drop down
9    menu and that certain conditions were automatically in the system and that he could
10    click on a specific condition when it was added and enter the date that the condition
11    was signed off on. CW26 would also enter a note about where the information was
12    and, when it cleared title, a hard copy would go into the file. Once everything was
13    funded, CW26 would ship the original file to corporate, where it was "filmed" (put on
14    microfiche). CW26 explained that both the deed and note were filmed and he could
15    access these loan documents from the Empower system.

16        137. Further, Côté, as CFO, was ultimately responsible for the Company's
17    financials, as described in ¶414. Because Downey's financials were almost
18    exclusively premised on Option ARMs that were funded as a result of Downey's
19    policies, Côté was required to have knowledge of the Company's policies and
20    practices that resulted in the toxic loans on Downey's balance sheet.

21            **c.**      **Downey's $11-15 Billion Loan Portfolio Was**
22                   **Premised on Unsound Underwriting**

23        138. Thirteen percipient witnesses (CW1, CW4, CW5, CW6, CW9, CW11,
24    CW12, CW15, CW16, CW20, CW21, CW22 and CW23), including four underwriters
25    and two witnesses with accounting backgrounds, all confirm defendants' pattern and
26    practice of failing to ensure through proper underwriting or even common sense that
27    borrowers could repay the loans given to them by Downey.

28

1    139.   These witnesses' statements stand in direct contrast to Downey's

2  statement to its primary regulator, the OTS, acknowledging that prudent underwriting

3  standards were required to mitigate credit risks:

4      Consistent with regulatory standards and expectations, Downey Savings

5      *has adopted and implemented appropriate underwriting measures to*

6      *mitigate credit risk associated with Option ARMs . . . .   Downey*

7      *Savings' underwriting procedures require an assessment of the*

8      *borrower's ability to repay the debt without resorting to the liquidation*

9      *of the collateral*.

10  Ex. 28 at 834.

11    140.   Defendants' knowledge that Downey's practices were unsound is

12  corroborated by Downey's letter to the OTS in March 2006, in which Downey told

13  regulators that it "typically requires a better credit history (higher FICO scores) and

14  lower LTV ratios" for Option ARM products. *Id*. at 835.  As numerous witnesses and

15  Downey's own broker solicitations describe, contrary to Downey's recognition that

16  borrowers should have better credit histories, loans were given to borrowers with poor

17  credit histories (*i.e.*, subprime ICO scores) and LTVs of up to 90%.  *See* ¶¶141-173,

18  231-245.

19    141.   CW1, a mortgage broker, indicated that because most loans were done on

20  "stated income" without consideration for a borrower's ability to repay once a loan

21  recasts, most borrowers simply could not afford the fully indexed, fully amortized

22  payment.  CW1 explained that Downey made it incredibly easy for borrowers to

23  qualify for Option ARMs, including giving loans to high risk and unseasoned

24  borrowers.  Even after new guidance from the OTS in September 2006, Downey's

25  underwriting guidelines stayed loose and got even looser from 2006 to 2007.

26    142.   Further, according to CW1, ***Downey did not do reasonableness tests on***

27  ***stated incomes.***  CW1 explained that Downey would have learned that the borrowers

28  did not have the income to qualify and that the servicing logs and servicing histories

1    in Downey's customer files would make clear that Downey was aware they did not

2    have (and never had) the income to qualify for the loans.

3        143.    CW4, a former Downey senior underwriter in Arizona who worked in the

4    industry for 16 years, including a previous job at Wells Fargo, explained that Downey

5    had extremely loose underwriting guidelines and was one of the loosest lenders in the

6    industry.  Throughout CW4's time at Downey, the Company used using stated income

7    as an underwriting guideline with the cutoff for loans being a FICO score of 580 (a

8    score below 660 is considered subprime by industry standards).  CW4 recalled that the

9    highest FICO score he saw during his time at Downey was 640, at best.  CW4 stated

10   that he was shocked to see this when he arrived at Downey in 2004, especially

11   considering that the loans were stated income loans.

12       144.    CW4 recalled when he first started working at Downey in 2004, he was

13   pressured by his credit manager to pass bad loans through the underwriting

14   department.  CW4 recalls complaining to his credit manager about the bad loans being

15   passed through but felt the complaints were not heard because everyone was making

16   so much money that doing the right thing was not a priority.  CW4 recalls that,

17   although the Operations Center was following guidelines, *the guidelines allowed*

18   *borrowers with low credit scores and very little proof of income to be approved for*

19   *Option ARM loans, loans that the borrowers clearly would not be able to afford*

20   *once the loans adjusted*.  According to CW4, if you had stated income (based on

21   verbal authorization) you could be approved for a home loan and that 75% of the

22   loans that had verbal authorization were approved.  During CW4's time at Downey

23   (until July 2007), the amount of approvals did not lessen and he felt that Downey's

24   motto was quantity over quality.

25       145.    CW4, in the course of his responsibilities as an underwriter, was called

26   upon to handle overflow work from the Southern California region (where Downey

27   concentrated its lending, according to its SEC filings) and was shocked at how loose

28   and constantly changing Southern California's underwriting guidelines were, even

1  compared to Arizona's own loose regional guidelines.  CW4 explained that he had to

2  handle loans from the corporate office every day.  From this personal experience,

3  CW4 knew that the underwriting at the corporate office and Southern California was

4  very lax.

5      146.    CW4 provided a specific example of Downey's loose underwriting.  He

6  recalled a loan applicant that was a self-employed landscaper stating that he made

7  $10,000 per month.  CW4 was required to approve the loan because it met Downey's

8  underwriting guidelines.  CW4's recollection is corroborated by CW9, as described in

9  ¶156, who indicated that it was an internal joke at Downey that another guy who

10  mows lawns was just given a million-dollar loan.

11      147.    CW4 explained that when the new credit manager was hired in his office

12  in approximately 2006, he had an accounting and auditing background.  According to

13  CW4, the new credit manager was shocked at the loose guidelines and the loans that

14  were being processed.  The new credit manager immediately began conducting

15  internal audits and complaining to the corporate offices.  CW4 explained that there

16  were AEs who knew how to work the system and who would go around the

17  underwriters and credit managers to get loans approved.

18      148.    CW4 further explained that Downey's underwriters were not properly

19  trained.  When CW4 was hired by Downey, he attended a four day training session in

20  the corporate office and was told that the meeting was for sales because the corporate

21  office did not have an underwriting department.  CW4 stated that the training was

22  three days of learning about Option ARM loans and some additional training on how

23  to input data into the system.

24      149.    According to CW4, because he came from an underwriting background,

25  he was able to get by without real training.  CW4 recalls that in 2006, his cousin

26  needed a refinance and CW4 sent the loan application to a senior underwriter in the

27  corporate office to review because of the conflict of interest.  According to CW4, the

28  application came back to him with the income calculated incorrectly.  When CW4

1    called the underwriter, he realized that the underwriter had taken the income number

2    from the first page of his cousin's sole proprietor tax return and never went to the

3    Schedule E page.    According to CW4, this is the first rule of thumb for any

4    underwriter to follow when calculating income from a self-employed applicant. CW4

5    was shocked because he knew that *half of Downey's funded loans went to self-*

6    *employed borrowers*.    Upon investigating, CW4 learned that underwriters in the

7    corporate office did not have worksheets to follow and were *given no formal training*

8    *on how to calculate income*.  CW4 explained that he had to personally teach the other

9    senior underwriter in the Arizona because she had no underwriting experience. CW4

10    recalled a lot of turnover in the underwriting department because those with

11    experience would go elsewhere as a result of the loose guidelines, the lack of training

12    and the lack of documentation.

13        150.    A second former Downey underwriter, CW6, explained that from his

14    time at Downey (January 2005 to January 2007), *FICO scores in the low 600's were*

15    *considered high*.  CW6 explained that he generally followed the guidelines that were

16    passed down to him, but that occasionally he would not put his name on what he

17    considered a bad loan.  According to CW6, his manager would give him a hard time

18    about this.  In order to decline a loan, CW6 was required to fill out a Submit to

19    Decline form to his manager with short reasons why he declined the loan.   CW6

20    explained, however, that even if he declined a loan the ultimate decision was made by

21    upper management. CW6 stated that some of the loans that he had originally declined

22    that came back from the corporate office approved were surprising.

23        151.  CW15, a third former Downey underwriter, described his time at

24    Downey (November 2004 to July 2007) as a frenzy of Option ARM/NegAm loans and

25    estimated that 90% of the loans he underwrote were from borrowers wanting to

26    refinance their homes.  CW15 explained that the average loan involved the borrower

27    putting no money down and *Downey relying on the equity in the customer's home*.

28    CW15's account is at odds with what Downey told the OTS in its comment letter that

1   it mitigated credit risk associated with Option ARMs by assessing the borrower's

2   ability to pay without resorting to liquidation of the collateral. Ex. 28.

3       152.   CW16, a fourth former Downey underwriter, separately indicated that

4   Downey's Option ARM loans were bad loans because they would recast and

5   borrowers would not be able to pay them back. CW16 indicated that even though

6   borrowers were passing Downey's underwriting guidelines, he was well aware that

7   borrowers would not be able to make their loan payments based on the income they

8   earned. When CW16 first began working at Downey, he recalled that the Company's

9   underwriting guidelines required applicants to have a minimum FICO score of 620-

10  625 but that there were differences between the borrower's FICO score that he

11  received and the number that the AEs gave to him.

12      153.   CW5, a wholesale operations manager in Arizona with an accounting

13  background, explained that he could not believe how loose Downey's underwriting

14  standards were when he arrived in 2005. CW5 confirmed that 85-90% of the loans

15  that Downey funded were Option ARMS. CW5 recalls that when he arrived at

16  Downey, only 2% of the loans had income verification and that loans were approved

17  based primarily on FICO scores and stated income. *CW5 explained that Downey was*

18  *using FICO scores as low as 580 when he arrived; later, FICO scores of 620 were*

19  *used with 100% stated income. CW5 explained that this was the bulk of the*

20  *guidelines when he was there.* Defendants knew these practices were inadequate to

21  mitigate risk associated with Option ARMs, as acknowledged in Downey's comment

22  letter to the OTS. Ex. 28.

23      154.   CW5 also provided multiple examples of the failure of Downey's

24  underwriting guidelines to provide any reasonableness check on a borrower's ability

25  to repay a loan. CW5, a former wholesale operations manager, explained that he

26  attempted to put systems in place and began turning down loans because of common

27  sense. For example, *CW5 recalls receiving a mortgage loan application for a stated*

28  *income Option ARM loan for a McDonald's employee claiming to make $8,500 per*

- 48 -

*month*. *CW5 refused the loan because it was obvious to him that the income was overstated. According to CW5, when this happened and he refused a clearly bad loan, the AEs would go over his head to get exceptions. Generally, according to CW5, he would get a call from Moeller (who reported to Rosenthal) of the corporate office telling him that they were good loans* and instructing him to manually override the automated system. *When CW5 argued the facts with Moeller, Moeller would tell him to follow the guidelines for stated income loans and put the loan through*.

155. CW5 also recalled, as another example, an application from a nail technician claiming to make $10,000-$12,000 per month. When CW5 looked into it, he found that the nail shop had only been open for two months, and there was no proof of income on the borrower prior to his employment there. CW5 recalls that several other applications came through his desk that were almost exactly the same – all of them were nail technicians applying for $600,000-$700,000 loans. CW5 was extremely suspicious because all of the applications came through from the same broker. After several of the requests came across CW5's desk, he asked the underwriters whether or not they had seen any more of them, and the underwriters started pulling case after case out of their drawers. CW5 took all of the cases to Moeller and told her that he did not want loans like these. Despite the obvious, Moeller informed CW5 that the loans would not necessarily be denied but that they would be looked into. CW5 indicated that after this confrontation, Downey funded even more of these loans. CW5 filled out at least a dozen Suspicious Activity Report ("SAR") forms regarding this issue and sent them on to Downey's Compliance Department.[7]

---

[7]    An SAR is a report regarding suspicious or potentially suspicious activity, filed with the Financial Crimes Enforcement Network ("FinCEN"), an agency of the United States Department of the Treasury. FinCEN requires an SAR report to be filed by a financial institution when the institution suspects insider abuse by an employee, violations of the law, potential money laundering, violations of the Bank Secrecy Act, etc.

1    156.   Another confidential witness with an accounting background, CW9, a

2  former Downey SEC Reporting Analyst, explained that it was well known at Downey

3  that Downey's underwriting was lax.  As an example, CW9 indicated that it was a

4  joke among the underwriters that another guy who mows lawns just qualified for a

5  million-dollar loan.

6    157.   CW11, a former wholesale AE at Downey, recalls that underwriting

7  guidelines were relatively loose when he began working at Downey in 2005 and that

8  the guidelines did not tighten up until the market demanded it.  Specifically, CW11

9  recalls that as foreclosures began to increase rapidly, Downey began to have concerns

10  about safer loans.

11    158.   A second former AE, CW18, recalled, during 2004 or 2005, it was very

12  easy for anyone to get a loan.  For instance, an underwriter passed through a loan in

13  which a borrower's credit report showed him working at McDonalds for the past three

14  years but he had stated that he was an attorney on his loan application.  CW18

15  explained that this was common practice at Downey during the time.  CW18 first

16  started to observe borrowers defaulting on their Downey loans as early as 2004.

17    159.   CW12, a Downey former head broker secretary, was aware that he was

18  nicknamed the "Wicked Witch of the West" by some Downey employees because he

19  was very strict in following the guidelines and various check lists for getting a broker

20  approved.  According to CW12, he routinely turned down brokers who were then

21  approved by Downey's corporate office.  CW12 recalls that there was a report called

22  MARY (he believed that it stood for mortgage asset reporting but could not recall

23  what the Y stood for) that reflected all approved brokers as well as brokers who were

24  turned down.  During the mid-2000s, CW12 was expected to process broker approvals

25  within an hour in order to get loans through, although he believed that it required more

26  time to adequately review applications.  CW12 recalls a refinancing frenzy in 2005

27  and 2006 when underwriting guidelines were very loose.

28

160.    CW12, Downey's head broker secretary until October 2008, explained that things at Downey really began to get out of control after Rosenthal took the reins of the Company. CW12 stated that Downey was consistently trying to keep pace with the loans originated by Washington Mutual. CW12 recalls that top management had incentives for selling MTA loans and, as a result, sold many of them to make more money. In the early 2000s, Downey accepted credits scores as low as 580. By 2005 or 2006, as a result of OTS crackdowns, Downey moved its minimum FICO score up to 620 for most, but not all, of its loans.

161.    CW17, who worked in the Retail Department, recalls that in his early years with Downey the culture was much more conservative but explained that after Rosenthal took over the culture definitely shifted. CW17's experience with Rosenthal is consistent with CW12's recollection that greed began to rule the Company when Rosenthal took over. CW17's experience with Rosenthal was that he wanted to take the money and run. According to CW17, middle management was very frustrated because they felt torn between doing what was best for customers and following orders passed down to them to push sales. CW17 knew several frustrated regional managers who were trying to do things by the book but who were pressured by upper management to just make more and more sales.

162.    CW18, a former Downey AE, recalled that AEs were given sales goals on a monthly basis and that they came down from Valerie Gann, the VP of Underwriting at Downey's corporate office. According to CW19, a former Downey AE, Downey's portfolio underwriting guidelines were more flexible because the bank did not have to answer to investors, making it easier for them to allow borrowers to qualify for loans than banks that sold the majority of their loans to investors. Because Downey's underwriting guidelines were relaxed compared to other banks, which could not allow the flexibility so easily, CW19 found it easier to sell Downey products.

163.   CW20, a former production assistant and then AE for Downey, stated that Option ARM loans were Downey's specialty and that its fixed rate loans were not competitive in the industry.   CW20 recalled that demand for Option ARMs grew as home values rose.   According to CW20, Downey's Option ARM loans were very desirable to brokers because Downey's underwriting guidelines were so liberal and brokers knew to call Downey when they wanted to sell a loan.   Specifically, CW20 explained that Downey's low credit score limits and high loan amount limits allowed brokers to easily get loans funded for borrowers.   CW20 recalled that Downey's specific underwriting guidelines changed often.

164.   CW21 was frustrated while at Downey because upper management would not put their guidelines in writing and were always changing their guidelines. He and a top producing AE in 2004-2005, Milo Wiseheart, asked numerous times to get the guidelines in writing and upper management refused on the basis that if the guidelines were in writing then exceptions could not be made.   Wiseheart was fired shortly after he complained to upper management and asked them to provide more firm guidelines; CW21 recalls that there was no other reason to fire him (*i.e.*, performance) other than his complaints about the lack of firm underwriting guidelines. CW21 personally spoke to Gatzke, Corbin and Altemus (officers of the Company) about firming up the guidelines to no avail.

165.   According to CW21, the average FICO score during his tenure was 600-620 and it was 580-600 for Alt-A paper and that the highest he saw was 620 for "anything A paper," which would include Downey's portfolio A-100 and A-141 loans.

166.   According to CW22, in 2004 Downey's underwriting guidelines required a minimum FICO score of 540.   CW22 confirmed that Downey's minimum FICO score until the end of 2007 was 600.   By the time CW22 left at the end of October 2008, the minimum FICO score had increased to 680, and other credit quality standards had also been tightened, including requirements that 75% of all credit items

1  be paid, no consecutive 30-day late payments and no 60-day late payments. By the
2  time CW22 left, he recalls that Downey was only approving loans for borrowers with
3  FICO scores of 740-750 with full documentation.

4       167.    According to CW23, things went downhill when Rosenthal took over the
5  Company. According to CW23, the average FICO score at Downey was 620. CW23
6  confirmed that because Downey had lower requirements than its competitors, it was
7  able to get more loans pushed through. For example, Downey would approve loans
8  for borrowers with a bankruptcy on file so long as the charge had been off the
9  borrower's record for two years, but all the other banks required four years.

10      168.    CW25 confirmed that Downey was offering Option ARM loans to
11  borrowers with FICO scores of 620 and 640 through 2007 and 2008. CW25 recalls
12  that Downey eventually raised the requirement to 660 when it closed the Wholesale
13  Loan Department in October 2008.

14      169.    CW26 recalls underwriting guidelines changing and stated that they were
15  at their lowest in 2006. ***CW26 felt that absolutely anyone could get a loan*** and, on
16  many occasions, he would question a loan that did not make sense and bring it to the
17  attention of his manager, Batista. CW26 recalls that almost all of the loans he funded
18  during his tenure at Downey were to borrowers with stated income. CW26 saw many
19  loans that shot up a red flag because the borrower's job title and income did not make
20  sense to him. For example, CW26 recalls an auto mechanic with a stated income of
21  $7,000 per month. Because CW26 has an auto mechanic in his family, he knew that
22  there was no way that the borrower's income was that high. CW26 immediately
23  brought the matter to his supervisor, Batista. According to CW26, management was
24  not receptive to his complaints and he was told that it was not his responsibility and
25  that his only responsibility was to enter everything correctly for a loan and not to
26  question it. CW26 recalls that this happened many times during his tenure at Downey
27  and he felt that management did not care. In addition, CW26 felt that underwriters

28

1   were not doing their jobs.  CW26 explained that underwriters were responsible for

2   verifying the conditions needed to fund a loan but that this did not always happen.

3       170.   CW26 also recalls numerous occasions where a broker on Downey's

4   approved broker list engaged in actions that were deceptive and corrupt.  For example,

5   CW26 saw brokers charging unfair prices to borrower and inflating borrowers'

6   incomes.  Specifically, CW26 remembers a broker on Downey's approved broker list

7   charging a borrower $1,500 for a credit report.  CW26 brought the matter to his

8   manager at the time, Phelps, who forced the broker to charge only what it had cost to

9   run the credit report ($15).  According to CW26, the broker made up for the difference

10  by charging more points on the loan, increasing it from 2 points to 2.5 points.  CW26

11  explained that Downey allowed this.

12      171.   These witnesses' accounts are corroborated by Downey's own

13  solicitations to brokers which told brokers that defendants had actually relaxed their

14  guidelines in 2007.  In April 2007, Downey sent brokers the following solicitation:

15      In an effort to help you partner with Downey Savings, we have done

16      away with our "Approved Appraiser List" for all portfolio and

17      conforming fixed rate loans.  ***While other lenders are tightening their***

18      ***guidelines, Downey Savings is taking great strides to ease the loan***

19      ***process*** and give you a lender that you can team up with for all your

20      future business.

21      172.   In May 2007, Downey continued to market extremely risky loans with

22  increased risk, sending the following solicitations to brokers:

23      Good Morning, we still do not offer any 100% financing, but check our

24      purchase AND rate/term guidelines from 90% LTV to 95% LTV:

25      A-100, COFI Option ARM, ***Stated Income Guidelines***: ***90% LTV***,

26      $500K loan amount, purchase or rate/term: 3.00% Option ARM start rate

27      ***with no MI***!  LPMI is built into the rate!

28

1       A-141, MTA Option ARM, Stated Income Guidelines: 95% LTV,

2       $500K loan amount on Purchases: 2.375% (over 40-years) with PMI.

3       90% LTV, $862,500 loan amount on Purchases: 2.375% (over 40-years)

4       with PMI.

5       80/15 Purchases available to 95% CLTV. $750K 1st with Downey with

6       an outside 2nd.

7       A-350, 5-Year I/O, Stated Income Guidelines: 90% LTV, $500K loan

8       amount, on Purchases or rate/term: As low as 6.375% at PAR with LPMI

9       already built into the rate!

10      173.  As reflected in the above, defendants were offering in May 2007 an A-

11 100 COFI Option ARM product with a teaser rate of 3% on the basis of "stated

12 income" with an LTV ratio of 90% and no requirement of private mortgage insurance

13 ("PMI"), rather, Downey was assuming the risk by providing Lender-Paid Mortgage

14 Insurance ("LPMI").  This offering is in direct contrast to prudent underwriting

15 standards required for credit risk mitigation, as Downey had acknowledged to the

16 OTS in 2006.  *See* Ex. 28 at 834.

17      174.  These loans were given to borrowers who defendants, based on the

18 accounts of numerous percipient witnesses as described in ¶¶138-170, knew could not

19 afford to repay the loans as a direct result of Downey's (i) failure to prudently

20 underwrite loans which comprised the billions on Downey's balance sheet during the

21 Class Period; (ii) deliberate act of lowering the start rate for Downey's Option ARMs

22 in **September 2006** in order to originate more loans after defendants had

23 acknowledged to percipient witnesses that these loans were unsafe; and

24 (iii) intentional solicitation of additional risky loans during the Class Period based on

25 "easing" guidelines.

26      175.  Downey's failure to properly underwrite is further evidenced by

27 defendants' admissions in Downey's SEC filings of having to repurchase loans

28

1    previously sold as a result of improper underwriting.  For example, according to

2    Downey's 3Q07 Form 10-Q

3    　　　Downey recorded repurchase or indemnification losses *related to defects*

4    　　　*in the origination process* of $0.5 million and *repurchased $15 million*

5    　　　*of loans*. Included in the repurchased loans were $8 million of one-to-

6    　　　four single family residential loans from Fannie Mae, *due to loans being*

7    　　　*outside Fannie Mae's underwriting guidelines*.

8    Ex. 12 at 484.

9    　　　　　**d.　　Percipient Witnesses Aver that Defendants**

10   　　　　　　　　**Deliberately Misled Borrowers to Originate**

11   　　　　　　　　**More Loans**

12   　　　176.   More than seven witnesses with percipient knowledge of Downey's

13   lending practices also confirm that borrowers were not given a clear picture of the

14   shock payments and rapidly increasing monthly payments called for by Downey's

15   Option ARM loans as represented by defendants to investors in ¶89.

16   　　　177.   Gatzke, Downey's former Chief Lending Officer, testified that the Board

17   questioned him about the Option ARM product prior to July of 2006:

18   　　　　　They asked about the neg am and what happened to it when it

19   　　　recast, and *it appeared that nobody appeared to truly understand the*

20   　　　*recast*, what would happen if it recast and if there was a prepayment

21   　　　penalty on there.  They didn't seem to know the details of the loan.

22   　　　178.   CW1, a mortgage broker, considers Option ARMs the most toxic product

23   he has ever seen.  According to CW1, Downey did not disclose to potential borrowers

24   the risks involved with the Option ARM product.  In 2007, CW1 informed Downey,

25   in writing, that the loan brochures that it had provided to borrowers were misleading

26   because they contained no warnings regarding the risk of recast.

27   　　　179.   CW3, a former Downey AE, explained that the small print on Downey's

28   Option ARM loans was very hard for consumers to understand and the majority of

borrowers did not know what they were getting into.  CW3 also explained that because Downey is a portfolio lender, it writes its own guidelines and standards for lending.  CW3 recalls that ***Downey's underwriting guidelines were very vague and that mortgage brokers and AEs took advantage of this to get loans passed through***.  According to CW3, everyone from the top down at Downey knew what was happening with the subprime and high risk loans.  He explained that there was so much fraud in the industry it was ridiculous, everyone just turned the other cheek because of the amount of money that was flowing through.

180.  According to CW7, branch managers held meetings with the regional manager in Sacramento at which training on Option ARM or NegAm loans occurred.  CW7 recalls that at the first few meetings where training on NegAm loans occurred, the branch managers had many questions because it was a new product and was more complicated than most of the loans that they originated.  In addition, CW7 recalls that at one of these early NegAm training meetings, Senior Vice President Richard Grout traveled up from Downey's corporate office and explained that NegAm loans were the direction that Downey was going and that all of the banks were doing it.

181.  According to CW7, he and many of his employees were uncomfortable with Option ARMs and NegAm products because "people trust us" and the loans were not in the best interest of the borrowers.  When employees in his office complained to him about not wanting to push NegAm loans, CW7 told them just to wait it out and that "the tide would change."  However, CW7 recalls that some employees quit because they were uncomfortable pushing NegAm loans and that others were not successful in pushing the loans as a result of their discomfort with the product.

182.  In direct contrast to defendants' statements (at ¶89) to investors that the terms of loans were clearly spelled out, CW12, Downey's head broker secretary in charge of broker approvals for six regions, indicated that Downey had a policy that if a borrower signed the paperwork then the borrower understood the loan, despite evidence to the contrary.  For example, CW12 recalls a Hispanic family that did not

1    read English well and thought that they were in a fixed rate loan. CW12 recalls that
2    the family was shocked when the interest rate jumped and could not pay their loan or
3    refinance due to tightening guidelines.

4          183.    CW20 explained that historically Option ARM loans were meant to be
5    used for investment property by savvy investors who needed to float money for a short
6    period of time. CW20 stated that Option ARMs were not intended to be used by the
7    average Joe. CW20 compared the minimum payment option of Downey's Option
8    ARM loans to a drug. CW20 explained that the average customer generally would not
9    pay anything down on their loan and basically just paid a fee every month to have the
10   loan. CW20 stated that this resulted in the accrued interest being added to the loan
11   principal. According to CW20, often Downey's borrowers were given a loan that they
12   could not afford due to the changing interest rate, which would adjust their minimum
13   payment month to month. CW20 explained that a lot of Downey's brokers did not
14   explain the terms of Downey's Option ARM to the borrowers. According to CW20,
15   employees at Downey were asked to sell the Option ARM loans to everyone.

16         184.    CW22 felt that people selling loans at Downey did not care about
17   borrowers and were greedy. CW22 recalls that both stated income and stated retired
18   were commonly used at Downey. CW22 explained that he wished Downey had not
19   offered Option ARM loans because **elderly people did not understand what they were**
20   **agreeing to**. CW22 felt that Option ARMs were not appropriate for retired people.
21   CW22 explained that the borrower would make the minimum payment and over time
22   the loan balance would become more than the house was worth. CW22 compared the
23   Option ARM product to reverse mortgages at other banks and explained that once the
24   person passed away, the house would belong to the bank.

25         185.    CW23 confirmed that many Downey borrowers did not understand that
26   the start rate on the Option ARM loan was not the pay rate and that many borrowers
27   flat out did not understand that their monthly payment could triple in a matter of a

28

1   month.   CW23 recalls that everyone was making money hand-over-fist, so the

2   borrowers would often get overlooked.

3   186.   By the time he left in 2007, CW26 had received many calls from

4   borrowers who were upset and confused about exorbitant increases in their loan

5   payments.  CW26 stated that the borrowers called him because he had funded the loan

6   and his name was on the loan documents.   CW26 explained that Downey had an

7   Option ARM loan with a variable rate that often changed monthly, affecting a

8   borrowers payment drastically during 2006 and 2007.  According to CW26, generally

9   brokers did not explain to borrowers that the payment originally quoted was only a

10   partial payment and that it would not remain that way.

11             **e.      Witnesses Confirm that Defendants Routinely**

12                     **Granted Exceptions to Downey's Already Loose**

13                     **and Unsafe Underwriting Guidelines**

14   187.   Multiple witnesses, including those who had direct contact with

15   defendant Rosenthal, describe the exceptions granted under the already inadequate

16   guidelines described in ¶¶141-175.

17   188.   Gatzke, a former Downey officer, further testified that before he left in

18   July 2006, Rosenthal and the Board no longer wanted to give exceptions to borrowers

19   who did not meet the guidelines.  Gatzke stated ***for a long time he was able to run***

20   ***and report about 5-6% exceptions a month*** and that the percentage was brought down

21   to zero before he left because Downey in general was tightening up credit.   As

22   witnesses in ¶¶189-203 describe, however the practices continued.

23   189.   CW21 explained that the exceptions rate on loans increased dramatically

24   in Southern California when Gatzke and Rosenthal were at the helm.  ***CW21 recalls***

25   ***that Northern California made exceptions to approximately one out of ten loans***

26   ***denied and Southern California made exceptions on 50% of their loans, with the top***

27   ***AEs having the most exceptions***.  According to Downey's 3Q06 10-Q, 89% of loans

28   were secured by properties in California, with the properties principally located in

Southern California.  Thus, a vast majority of the loans on Downey's books were a result of exceptions being granted to Downey's already loose or non-existent underwriting.

190.    Further, according to CW21, there were three types of exceptions granted at Downey: policy, pricing and Board.  For policy, CW21 gave the example of Downey giving an exception for a borrower whose FICO score was 590 when Downey's minimum was 600.  For pricing, CW21 explained that when Downey was trying to match a competitor's price to make a sale, it could waive, for example, the extra .5% fee for a loan over $1 million.  For Board exceptions, CW21 explained that these exceptions usually had to do with a loan over $1 million.  For example, the Board would need to approve a loan request for a $1.3 million loan if the borrower did not meet all of the loan criteria.  According to CW21, ***Board exceptions occurred frequently during his tenure at Downey***.

191.    CW21 explained that when Gatzke left in 2006, Rosenthal became the sole point person regarding communications with regional managers such as CW21. ***Rosenthal gave AEs a blank check to pass loans through*** instead of tightening guidelines.  CW21 recalls a meeting in September 2006 when top producing AE, Mel Foster, complained to CW21 that his loans were being denied.  The next time CW21 saw Foster in approximately late October or early November 2006 he informed CW21 that he had spoken directly to Rosenthal and that as a direct result Foster had a stack of loans signed off on that did not meet the Company's lending criteria.  Foster explained to CW21 that Rosenthal called Moeller and told her to pass the loans through and that they were passed through.  CW21 had been directly involved in previously denying several of these loans and recalls that consistent with what Foster had told him the loans were subsequently processed and funded.  CW21 indicated that he resigned as a result.

192.    CW4 also provides a detailed account of defendant Rosenthal's involvement in granting exceptions.  CW4 recalled that the Scottsdale office's top

producing AE, Steven Borges, made an average of $40,000 per month and had connections in upper management.  For example, CW4 stated that there were at least 25 loans that were applied for by nail technicians named "Wen" who were self-employed and claiming to make $15,000 per month.  According to CW4, these loans were all from the same mortgage broker and were very suspicious.  CW4 recalled that Downey kept approving the loans, over the objections of the new credit manager.  According to CW4, when he worked at Downey, approximately 50% of its borrowers were "self-employed."  CW4 stated that in late 2006/early 2007 when the credit manager began to question many of Borges' loans, he went directly over her head to defendant Rosenthal to get approval.  CW4 recalled that he and the credit manager had denied many of Borges' loans but later saw that they had been approved and heard Borges bragging that he had gone to Rosenthal to get approval.

193.   CW4 stated that from his work on loan overflow, he saw that the level of exceptions (meaning that a borrower who did not qualify under guidelines was given a loan) in Southern California was even higher and the loan quality was even lower than in Arizona.  CW4 also knew that Southern California had more exceptions from the Quarterly Errors Report from the Operations Department.  According to CW4, these Reports showed that Southern California consistently had more errors than any other region.  Based on his experience as an underwriter, CW4 estimated Arizona's errors to be at least 25-30%.

194.   CW4 stated that there was usually an easy way to push through an exception.  The exceptions were driven by FICO scores.  For example, if a borrower had a 610 FICO score the underwriter could simply lower the LTV ratio.  CW4 indicated that a borrower might be asked to bring more cash to the table, but it was well known at Downey that at times a mortgage broker would deposit funds in the borrower's bank account (and then later be refunded) after the deal was approved.  CW4 heard brokers discussing this and had also seen instances, from borrower's bank statements, where deposits were made into the borrower's account the day before the

1  application was processed.  CW4 explained that all of the other banks that he had

2  previously worked for (which include Wells Fargo) had required looking at bank

3  statements for three months prior to granting a loan but that Downey required only

4  one month.

5  195.  CW5, who after joining Downey in late 2005 as a wholesale operations

6  manager, began turning down loans because of common sense, explained that either

7  Fox or Moeller (who reported to Rosenthal) would review almost every denial. **CW5**

8  **corroborates CW21's description of rampant exceptions being granted explaining**

9  **that 70-80% of the loans that he strongly disagreed with (and outright denied) came**

10  **back to him from upper management as approved**.  CW5 stated that as Downey kept

11  pushing the envelope, the exception became the rule.  **CW5 recalls butting heads with**

12  **Moeller and Fox often because he did not believe in the bad loans but he was told**

13  **that it did not matter**.

14  196.  For example, when CW5 denied the loan described in ¶154 where the

15  application indicated that a McDonald's employee made $8,500 per month, and when

16  he spoke to Moeller about how ridiculous it was, Moeller speculated that maybe the

17  borrower worked a second job, or maybe he had other income Downey was not aware

18  of.  CW5 inquired of Moeller why the other sources of possible income were not

19  checked but he was told that it was not his problem.  CW5 stated that he e-mailed

20  Moeller and Fox repeatedly asking about the SAR forms, or if they ever heard back, to

21  which they replied that it was not his business.

22  197.  CW5 explained that management was often unhappy with him because

23  he would refuse to put his name on bad loans.  Even after the credit crunch began in

24  2006 (and into 2007), CW5 remembers that Downey continued to pass the bad loans

25  through.  According to CW5, Downey was not clamping down on underwriting before

26  he left in 2007.  CW5 explained that he attempted again to be more stringent, but AEs

27  knew who to call to pass the loans through.

28

1    198.   CW15, a former underwriter, explained that AEs in the corporate office,

2    who worked on commission, pressured underwriters to get their loans pushed through.

3    CW15 recalled that the AEs were constantly challenging and questioning why he

4    might be denying a loan or questioning certain documents and if they were not

5    satisfied they would simply work their way up the chain to his manager.  If they did

6    not get anywhere with his manager, CW15 explained that the AEs would simply

7    bypass his department and go to the regional manager and/or the corporate office to

8    get approval.  CW15 confirmed that the regional managers and the corporate office

9    would make such exceptions.

10    199.   According to CW26, a loan funder, underwriters requested exceptions for

11    9 out of 10 loans.

12    200.   CW8, a wholesale administrative supervisor based out of Downey's

13    corporate office in charge of mortgage broker approvals and AEs, explained that he

14    attempted to adhere to strict guidelines regarding approved mortgage brokers but that

15    upper management, ***specifically defendant Rosenthal, would pass through whomever***

16    ***and whatever he wanted***.  He recalls numerous examples of brokers who he would

17    refuse to approve showing up on the approved broker list.  CW8 recalls that if there

18    was a loan on the table, upper management would approve a broker the same day just

19    to get the loan funded.  According to CW8, guidelines were often waived and

20    constantly changed to please specific needs.  CW8 tried unsuccessfully to update the

21    guidelines himself.

22    201.   CW4 and CW21 provide detailed accounts of McAlister's disregard for

23    prudent underwriting practices.  CW4 explained that all of the top executives at

24    Downey knew that dangerously loose underwriting was occurring, indicating as an

25    example that defendant McAlister had a home in Bullhead City, Arizona and that

26    everyone knew that any loan that came from Bullhead City was to be approved,

27    without verbal authorization and with no questions asked.  According to CW4,

28    underwriters were told that if a loan came from the Havasu Region (Bullhead City)

1    you had to make it work and, if you couldn't, then you had to pass it along to the

2    regional manager.  CW4 stated that these orders came from Denise Moeller, the SVP

3    and Director of Lending Operations who reported directly to defendants Rosenthal

4    and McAlister.  According to CW4, most of these Bullhead City loans were being

5    approved for mobile home parks where owners were required to live in the homes, but

6    that everyone knew that they were being illegally rented out as vacation properties.

7        202.   CW21 confirms CW4's report that all loans near where McAlister had a

8    home were to be approved.  He explained that one of the only written underwriting

9    rules at Downey was that all portfolio loans originating in Laughlin, NV were to be

10   approved – Bullhead City, Arizona is nine miles outside of Laughlin. CW21 indicated

11   that the rule was arbitrary but noted that McAlister had a ranch in Laughlin.  CW21

12   elaborated that the rule regarding Laughlin was written on Downey's A-100 loan

13   papers.

14       203.   Downey's former Chief Lending Officer, Gatzke, also testified in depth

15   regarding McAlister's knowledge of just how toxic Downey's Option ARMs were:

16       *[T]here was one incident where an option ARM was sold to a borrower*

17       *and Mr. McAlister got ahold of the borrower or [whomever] at the*

18       *branch, and resold him a non-option ARM loan, a fixed rate loan, and*

19       *– which I believe at the time he didn't qualify for.  And that's where it*

20       *had come to, to where he was questioning the loan agents, the AEs on*

21       *why they would sell this product*.

22           f.      **Victims of Downey's Toxic Lending Practices**

23                   **Corroborate Defendants' Unsafe and Predatory**

24                   **Lending Practices in Pleadings and Complaints**

25       204.   The complaints and pleadings in at least 30 lawsuits corroborate the

26   detailed accounts of witnesses and demonstrate the falsity of defendants' statements to

27   investors and that defendants deliberately misled investors when they told the market

28   that (i) Downey assessed an applicant's ability to repay a loan; (ii) borrowers were

1    qualified or creditworthy for the loans funded; (iii) defendants were unaware that
2    Downey's loan portfolio was impaired; and (iv) Downey's lending terms for its
3    Option ARMs were clearly spelled out to borrowers. Several of these suits were filed
4    before or during the Class Period, putting defendants on notice of Downey's
5    insufficient underwriting, risky loans and unsafe lending practices. The publicly
6    available complaints and pleadings in these actions detail the following:

7    • Harry Donald Fisher filed suit on April 8, 2008 in Sonoma County
8    Superior Court – Mr. Fisher was ensnared in a Downey Option ARM on
9    or about March 2005. *Mr. Fisher was 71 years of age at the time with*
10    *medical problems, retired and unemployed. His sole source of monthly*
11    *income was his retirement benefits and Social Security payments,*
12    *totaling $2,379.94 a month*. Mr. Fisher was offered a 1% mortgage on
13    his home on the promise that his monthly payments would be reduced
14    dramatically and he could receive several thousand dollars of equity out
15    of his house for his personal use. *Mr. Fisher maintains that his income*
16    *on his loan application was fraudulently increased to reflect $8,000 a*
17    *month qualifying him for the loan*. The broker received $21,009.68
18    from Downey that consisted of a $7,999.68 origination fee, $495
19    processing fee, $35 credit report fee and $12,480 rebate.

20    • Ornan Nwansi filed suit on August 30, 2006 in the Northern District of
21    California – On or about July 25, 2005, Mr. Nwansi, who represents at
22    the time he was legally blind, was given a loan in the amount of
23    $337,500 by Downey which set forth his monthly payments as $869.44,
24    indicating that the amount may change. The loan called for a
25    prepayment penalty of $9,051.53; his broker was given a rebate of
26    $10,125, or 3%. A mere eight weeks later, in October 2005, Mr. Nwansi
27    refinanced with Downey, this time in the amount of $360,000 with
28    monthly payments set at $1,242.44, indicating that the amount may

change.  Mr. Nwansi has asserted that he did not want to refinance, he wanted a second line of credit.  The broker was given a rebate of $11,700 or 3.250% for the loan by Downey.  Mr. Nwansi paid the $9,051.53 penalty for prepayment on his July 2005 Downey loan and $6,892.65 in settlement charges for his October 2005 Downey loan.  Downey did not contact Mr. Nwansi as to why he would seek to refinance his loan eight weeks after the original loan, despite Downey's right to contact the borrower under its Wholesale Agreement with the broker.  Mr. Nwansi was subjected to what is known as "loan flipping."[8]

- Reverend Will Hardeman filed suit on January 24, 2007 in Alameda County Superior Court – Reverend Hardeman is a 96-year-old widowed man with vision and hearing difficulties, and it is believed that he suffers from a mild form of dementia.  Reverend Hardeman owned his home for 34 years, *he had a fixed income of $1,300 per month, supplemented by periodic negligible donations for serving as a pastor*.  On or about April 21, 2006, Reverend Hardeman received a loan application from Downey for $322,006.50 with a 7.472% adjustable rate and monthly payments of $1,005.39 (increasing to $2,380.40 in 2009).  The loan origination fee to be paid to the broker was 2%.  Less than a week later, on or about April 26, 2006, another set of loan documents was prepared which set forth a loan in the amount of $340,509.10 with an adjustable rate of 8.674% with monthly payments of $2,350 for five years increasing to $2,802.58 and above.  The loan origination fee to be paid to the broker was 5%.

---

[8]    The Office of the Comptroller of the Currency, the OTS, the Board of Governors of the Federal Reserve System and the National Credit Union, the regulating bodies of Downey, identify this predatory lending practice as: "inducing a borrower to repeatedly refinance a loan in order to charge high points and fees each time the loan is refinanced" and required Downey to have sufficient internal controls to ensure compliance with applicable laws to avoid such practices.

*Mr. Hardeman's loan application for the second loan indicated that he had a monthly income of $5,382*.  The broker was paid a loan origination fee of $9,859.80 and a rebate of $6,168.75 from Downey. *Downey was notified of problems with the loan on or about July 25, 2006.  A loan specialist for Downey responded, indicating that Mr. Hardeman needed to pay the $2,350 monthly payment and on September 22, 2006, Downey began foreclosure proceedings*.

- Celedonio and Edith Rabe (the "Rabes") filed suit on June 12, 2007 in the Southern District of California – *the Rabes are 70-plus-year old, financially unsophisticated seniors who lived in their home in San Diego, California since 1978*.  In Spring 2005, the Rabes responded to a flyer advertising reverse mortgages, but instead of a reverse mortgage with fixed fees and commissions, the Rabes received a mortgage from Downey.  *The Rabes had a limited income of approximately $1,900-$2,100 per month*.  Their existing loan had a 6.5% fixed interest rate and payments of $1,200 per month with a prepayment penalty.  *The income application submitted by the Rabes' broker falsely stated that while the Rabes were elderly, retired and living on Social Security, they had a Social Security income of $7,048 per month*.  The Downey loan the Rabes received cost them $15,300 in fees on a $370,000 loan which also contained a prepayment penalty.  At the end of 2006, the Downey loan had climbed in principal balance from $370,000 to $390,549.44 with an 8.2075% interest rate and a 3.45% margin and with the interest only payment on the loan being $2,671.20.

- Lewis Gary Morris filed suit on April 19, 2007.  He is in his mid-60s and has been diagnosed with schizophrenia.  He purchased a condominium in 1986.  In April 2006, Mr. Morris entered into a refinance loan with Downey with a variable interest rate of 7.586%, which would adjust 30

- 67 -

days after the loan's inception and a prepayment penalty equal to six months of advance interest. The application stated that Mr. Morris made $100,000 annually or $9,200 a month when he actually made less than $20,000 annually with an income of only $1,350 a month.

- Gerald Porter filed suit on August 28, 2007. Mr. Porter was in his mid-70s with diminished cognitive ability and owned a home in Escondido, California. Despite Mr. Porter's contention that he signed no loan documentation, on or about May 19, 2007, he received a "Payoff" notice from his prior lender and notice that his loan had been refinanced with Downey. Mr. Porter then requested a copy of the loan documents from Downey, which reflected forged signatures. The loan documentation incorrectly stated that he received $1,800 in Social Security/Disability Income. The loan was a negative amortization loan with an interest rate of 7.21% (almost 2% higher than his existing loan) with total finance charges of $382,744.15, doubling his finance charges from his original loan and a three-year prepayment penalty upon any refinancing of the loan. Further, the broker was paid a $7,605 yield spread premium by Downey.

- According to their complaint, Ricardo and Araceli Bantog (the "Bantogs") had a combined monthly income of $5,400 per month. In December 2005, the Bantogs purchased a single family home for $622,000 with an Option ARM loan of $466,492 from Downey. The Option ARM had a teaser rate of 1.250% and a maximum rate of 10.95% with maximum negative amortization of 110% of the original principal. The negative amortization caused the loan to recast with monthly payments exceeding the Bantogs' income. To allay the Bantogs' concern of future payment shock and their inability to continue paying the loan, Downey promised the Bantogs that they could refinance

anytime "with a five minute phone call" "at absolutely no costs" to keep the loan affordable.  The Bantogs allege that Downey knew that they had no ability to pay the loan except through further refinancing.

- Evelyn and Ramon Bartolome (the "Bartolomes") filed suit on August 1, 2008.  According to the complaint, they had a net income of approximately $4,045 per month.  On August 30, 2005, the Bartolomes made an offer to purchase a single family home for $701,000, with 10% down and 90% financing provided by Downey for $563,667.04, payable by $1,502 per month at 6.75% adjustable monthly and Countrywide for $70,913, payable by $497 per month.  By September 2006 the Bartolomes began receiving monthly statements from Downey that their monthly payment had increased to $4,012.28, which they could not pay. The Bartolomes' efforts to refinance were denied and the loan sank deeper into delinquency and near the 110% negative amortization limit that would force a total recasting of the loan.  Downey foreclosed on the property on or about July 1, 2008.  By that time, the debt had increased nearly $100,000 to $659,885.25 from the original loan amount of $563,667.04.

- Blanca Cabral filed suit on November 26, 2008.  According to the complaint, in 2004, after Cabral's sister, Marie Soto, became ill and in danger of losing the home she had lived in for 33 years, Cabral took title to the property to attempt to help her sister stay in the home.  Cabral took a loan with Downey, but she was not informed of the specific terms of the loan, including the interest rate being charged or the fact that the loan had an adjustable rate (from an initial rate of 7.022% to a potential rate of 11.050%) rather than the fixed rate that she had requested or that the broker was paid a yield spread of three points ($8,550) that was amortized into the loan.  Cabral alleges that Downey's inequitable

1   actions increased the mortgage debt on the property over $60,000 from

2   the previous mortgage balance.  Downey also knew that Cabral's income

3   had been overstated by the broker and that her actual income was

4   insufficient to afford the mortgage payments.  On September 30, 2008,

5   Downey foreclosed on the property.

6   •   Art and Julia Manabat (the "Manabats") filed suit on August 6, 2008.

7   According to the complaint, Mr. Manabat, a custodian for 15 years for

8   the Channel Islands School District, and his wife Julia, a phlebotomist,

9   had lived in their home since 2000.  In September 2004, the Manabats

10   refinanced their home with Downey and were told that the new loan

11   would be payable at a fixed yearly 1.35% rate for five years, with

12   monthly payments of $1,400.  Downey did not request nor obtain a loan

13   application from the Manabats and failed to provide them with an early

14   Truth in Lending Disclosure Statement ("TILDS").  The Manabats did

15   not realize that on the middle of page 13 of the note it was disclosed that

16   after the first month the interest rate increased to 11.050%, that their

17   "minimum payments" were applied entirely to interest, or that unpaid

18   interest of more than double the "minimum" monthly payment was being

19   added to the principal each month.  Further, Downey did not disclose to

20   the Manabats that they immediately faced a monthly payment of

21   $4,073.78 just to pay interest or a monthly adjustment of around $6,500

22   when the loan hit 110%.

23   •   Robert E. Hernandez filed suit on October 27, 2008.  He had been a

24   cashier at Costco for 10 years.  At the time of his Downey loan, on

25   October 4, 2005, his monthly income was $2,300.  Hernandez's Option

26   ARM loan had a teaser rate of 1.1%.  For the first 12 months the

27   payment was $1,803.28 interest only with negative interest accruing at

28   more than $4,500 per month.  After 12 months, the monthly payments

- 70 -

increased to 3.550% over the LIBOR index, with 11.05% maximum interest over the life of the loan.  The loan had a 110% negative amortization cap as well as a prepayment penalty, although Downey misrepresented to Hernandez that he could refinance at an affordable cost with a five minute phone call and waive the prepayment penalty. Downey has now foreclosed on the property.

- Alexander and Jean Almazan (the "Almazans") filed suit on October 9, 2008.  According to the Complaint, Alexander was a Marine CPO for 23 years, and his wife, Jean, was employed in janitorial services.  The Almazans earned $5,500 per month net.  In April 2005, the Almazans purchased the subject property for $760,000 with a first loan of $608,000 from Downey (and a second loan from another lender).  The Downey loan had a 1% teaser rate jumping to 8.1633% with a maximum rate of 11.05%.  The Downey initial payment was $1,566.28 and jumped to $5,503.42.  Downey allayed the Almazans' concerns about payment shock with promises to refinance an affordable loan when needed with waiver of the prepayment penalty.  Downey has now foreclosed on the property.

- David and Meghan Weinshank (the "Weinshanks") filed suit on January 15, 2009.  According to the complaint, the Weinshanks entered into a $210,000 mortgage loan with Downey on June 23, 2004.  The Weinshanks allege that the initial monthly loan payments of $1,273 exceeded their entire combined income.  They also claim that Downey failed to explain or disclose the loan terms, including how the interest rate was calculated, what the payment schedule should be, prepayment penalties, fees, and the maximum amount the loan payment could rise to. The Weinshanks further allege that Downey fraudulently misrepresented that the loan was the best for them and that they could afford it and

1  falsified their income.    On March 28, 2008 Downey served the

2  Weinshanks with a notice of default.

3  • Eduardo and Perlita Deperio (the "Deperios") filed suit on December 16,

4  2008.  According to the complaint and other pleadings filed in the case,

5  the Deperios entered into a refinance mortgage loan with Downey on

6  April 28, 2005 for $700,000.  The Deperios claim that Downey failed to

7  disclose that the interest rate adjusted monthly (to 7.875% after the first

8  month) and that if they continued to pay the minimum monthly

9  payments, their loan would recast after two years and eight months,

10  leaving them with a payment more than 2.5 times greater ($5,902.40)

11  than the initial payment and higher than their combined income.  The

12  Deperios also allege that Downey misrepresented that they would be able

13  to refinance their mortgage, which was unlikely because negative

14  amortization was diminishing their equity.  The Deperios did not learn

15  until April 2007 that the interest rate was over 8% and that they were

16  accruing negative amortization.  The Deperios immediately tried to sell

17  their home but could not because the real estate market was starting to

18  decline and because of an undisclosed $20,000 prepayment penalty.  As

19  a result, the Deperios defaulted on the loan.

20  • Carlos and Gloria Rosales (the "Rosaleses") filed suit on October 27,

21  2008.  According to the complaint, Gloria was an accountant for the San

22  Diego Union-Tribune and her husband, Carlos, was a concrete finisher.

23  The Rosaleses earned $2,948 per month.  On June 16, 2006, they

24  refinanced their home with Downey for $412,000 to reduce their

25  monthly payments because Carlos's work had begun to slow down.  The

26  Rosaleses were told that the loan would be a fixed rate of 6% but at the

27  time of closing, it was 7.107%.  When the Rosaleses complained, they

28  were told to focus on the teaser payment of $1,397.32, which was based

1    on a start rate of 1.375%. The Rosaleses allege that they were told that
2    monthly payments would remain at $1,397.32 with maximum annual
3    payment increases of 7.5% for five years. The Rosaleses did not
4    understand that they would be accruing interest on their loan balance
5    every month and even if they had, they could not afford the higher
6    payments to avoid this scenario. The negative amortization on the
7    Rosaleses' loan caused recast and the Rosaleses, who could not afford
8    the higher payments, defaulted on their loan.

9    205. Additionally, a lawsuit was filed on November 21, 2008, in the United
10   States District Court for the Central District of California by a potential class of
11   thousands of Downey Option ARM borrowers (with some subclasses beginning as
12   early as May 25, 2003) for violations of the Truth in Lending Act, fraudulent
13   omissions and failure to make proper disclosure regarding interest rates, recast and
14   negative amortization in Option ARM loan documents.[9]

15       **g.    Multiple Sources Detail the Vast Incentives**
16            **Given by Defendants that Drove the Volume of**
17            **Toxic and Predatory Option ARMs on**
18            **Downey's Books**

19   206. Percipient witnesses, suits brought by victims of Downey's predatory
20   lending practices and Downey's SEC filings detail the vast incentives given to sell
21   Downey's unsafe and unsound loans. For example, as described in ¶204, in the case
22   of Mr. Nwansi who filed suit on August 30, 2006, his complaint details that he was
23   given two Downey loans in less than an eight-week period. Downey, for each of these

24

25   ───────────────────

26   [9]    In addition to the above complaints filed by borrowers, attached hereto at Ex.
     13, lists 14 additional complaints alleging improper underwriting of Downey loans as
27   well as allegations that loan terms were represented and proper disclosures were not
     made.

28

1  loans, paid the broker a 3% or more rebate on the loan totaling more than $10,000 for

2  each loan.

3      207.    Seven separate witnesses explain the compensation structure tied to

4  Downey's Option ARM loans.  Downey' own former CEO, Thomas Prince, who took

5  over when Rosenthal left, testified in deposition on June 12-13, 2008 that AE

6  commissions were directly tied to their production numbers.

7      208.    Other percipient witnesses corroborate that Downey rewarded those who

8  sold its toxic loans.  CW1 explained that Downey was actively soliciting brokers to

9  sell Option ARMs from 2004 to 2007 by offering high incentives to brokers for these

10  loans.

11      209.    CW3 indicated that Downey's commissions were higher for riskier loans

12  such as Option ARMs.  CW3 indicated that commission rate sheets were constantly

13  changing and that generally meant that Option ARM commissions would increase

14  while fixed rate commissions would drop.  CW3 recalls that his compensation

15  structure changed from a salary plus commission package to a 100% commission

16  package in late-2006.

17      210.    CW4 averred that everyone, including mortgage brokers, appraisers, AEs

18  and all the way up to senior executives, was riding the wave of profit that came from

19  Option ARM loans.  He recalls AEs making an average of $40,000 per month during

20  the height of it.  He was lured away from his existing position when Downey doubled

21  his current salary and offered a lucrative bonus structure.  CW4 recalls that quarterly

22  bonuses were based on the number of loans funded and the lowest number of audit

23  dings.  CW4 explained that Southern California was in his region and, because it had

24  the most exceptions on loans and the loosest guidelines, it received the largest

25  quarterly bonuses.

26      211.    CW5 indicated that high producing, aggressive AEs made approximately

27  $40,000 per month.  According to CW5, some of the more savvy AEs would "back

28  into" the loan process by structuring the paperwork to meet the loose guidelines.

1    CW5 felt that the AEs and brokers knew how to work the system and often the
2    completed paper was not based on true facts, but rather numbers they filled in to get
3    the loans funded.

4    212.    CW5, a former wholesale operations manager, complained to Downey's
5    director of lending, Moeller, on a regular basis because he felt there would be no way
6    that borrowers would be able to pay back their loans.    CW5 recalls conversations
7    where Moeller told him not to fight the process and that this is now how the Company
8    had always done things.    CW5 elaborated that if it was a battle of sales versus solid
9    operations that sales won out every time.    CW5 indicated that Moeller worked directly
10   with Rosenthal and met with him almost daily.    CW5 explained that Rosenthal was
11   very involved in the Company decisions.

12   213.    According to CW5, more stringent guidelines meant less originations,
13   dropping the branch's performance.    CW5 explained that the more he complained, the
14   more his underwriters were dinged in their bonuses.    CW5 felt that Downey was
15   punishing people who worked in Scottsdale for attempting to clamp down on bad
16   loans.

17   214.    CW7 stated that Downey's corporate office set goals that each branch
18   was expected to meet regarding deposits and loan originations.    According to CW7, it
19   was at meetings in Sacramento that goals for deposits and loan originations were
20   announced and that Option ARMs made up a large percentage of the loans that the
21   branches were pushed to originate.    In addition, CW7 recalled a document that set
22   forth the goals for his branch and elaborated that every day he printed (and posted for
23   his employees) a spreadsheet from the corporate office that included the goals
24   compared to actual results.    CW7 confirmed that employees' bonuses were based on
25   their ability to achieve the goals set by corporate.    According to CW7, employees who
26   were not successful at pushing NegAm loans, saw their bonuses suffer.    CW7
27   indicated that several branches in his area, including Hayward and Hercules, were
28   very successful at originating NegAm loans.

215.   CW19 confirmed that AE commissions were based on millions of dollars sold and explained that the commission structure had three tiers (tier 1: $0-4 million sold; tier 2: $4-8 million; tier 3: $8-12 million).   CW19 explained that commissions were paid out on points (percentage of the sale), with the rates differing depending on the type of loan.   According to CW19, AEs received a significant premium for selling portfolio loans (instead of Fannie Mae loans, with stricter underwriting guidelines). CW19 also recalled that he received a higher commission for loans that included a prepayment penalty.

216.   CW20 explained that brokers were motivated to sell Downey's Option ARMs because they received two points up front that allowed the broker to charge the borrower, then an additional three points paid by Downey.   CW20 stated that a full 5% of the loan could be paid up front to the broker in order to motivate them to sell Option ARMs.

217.   CW22 was paid on commission and recalls that the highest commissions were paid for the Subprime Alt-A loan, the second highest commissions were for the Option ARM loan and the lowest commission was for the Fannie Mae loan.

218.   CW25 explained that a higher commission was paid on Option ARM loans.   According to CW25, Downey's loan products changed often due to investor demand and the needs of the Company.

219.   Like other Downey employees, defendants' bonuses were dependent upon their ability to meet annual individual targets set by Downey's Board and Compensation Committee.   According to Downey's March 14, 2008 Proxy Statement, executive officers' cash bonuses under the Annual Incentive Plan were linked to: "The Adjusted Business Performance Percentage [which] is determined based solely on the consolidated net income of Downey for the prior fiscal year as compared to the consolidated net income target for Downey established by the Board for the year." Ex. 14.

220.    The incentives for defendants to commit fraud are borne out in the following chart, which shows exponentially increasing bonuses and salaries as defendants built a portfolio of toxic loans on the predatory and unsound lending practices described in ¶¶138-205, and the elimination of executives bonuses in 2007 when Downey was forced to restate:

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| CEO-Bonus | $126,000 | $403,200 | $691,200[10] | $950,400 | $940,896 | None |
| CEO-Salary | $350,000 | $350,000 | $385,641 | $550,000 | $605,000 | $650,000 |
| CFO-Bonus | $13,241 | $60,000 | $358,875 | $445,500 | $148,750 | None |
| CFO-Salary | $211,848 | $250,000 | $343,173 | $358,875 | $275,000[11] | $310,000 |
| McAlister | $428,259 | $491,648 | $470,518 | $494,869 | $563,017 | $703,362 |

Exs. 14-18, 39.

221.    In addition to defendants who benefited from increased income, Downey itself also had incentive to sell its toxic loans.  According to CW10, an employee in the Loan Accounting Department and who then provided accounting support to the IT Department from April 2000 to July 2005, Downey sold off a large chunk of its fixed-income loans and MTA loans (A-141) in the secondary market, but kept its Cost of Funds Index ("COFI") (A-100) loans in its own portfolio.  CW10 explained that the Secondary Marketing Department, headed by Ron Ross, created secondary market products and underwriting guidelines for those products.  CW10 recalls having a conversation with Ross in July 2005 because CW10 was concerned with the real estate market crashing and could not believe the amount of secondary market sales

---

[10]    This amount was what was paid to Rosenthal in 2004, the former President and CEO, Marangal Domingo, was paid a salary of $435,095 and other incentives and compensation of $1,333,333.  Ex. 16 at 525.

[11]    Côté would take over the position as the CFO in 2006 from Thomas Prince, who previously drew the above salaries and bonuses as CFO and COO.  As COO, Prince would continue to draw a salary and bonus for 2006 and 2007 – salary of $495,000 and $520,000 and bonus for 2006 of $588,060.  Ex. 14 at 510-511.

1   that were occurring.  When CW10 inquired as to what Ross was doing with all of the

2   loans, Ross replied: "We're selling the crap out of them!"

3       222.   The secondary market, however, would dry up in the summer of 2007,

4   and thus defendants would be forced to keep Downey's toxic loans on its books rather

5   than dispersing the risky loans to the secondary market.

6       **C.    Defendants' False and Misleading Statements Concerning**

7       **Subprime Lending**

8       223.   On November 1, 2006, defendants Côté and Rosenthal reviewed, signed

9   and certified Downey's quarterly Form 10-Q for 3Q06.  These defendants represented

10  to investors that Downey had ceased offering Option ARMs to its subprime borrowers

11  and was only offering Option ARMs to its prime borrowers as follows:

12      ***During the first quarter of 2006, we ceased offering option ARM***

13      ***products to our subprime borrowers, but continue to offer them to our***

14      ***prime borrowers.***

15  Ex. 6 at 328.

16      224.   On April 18, 2007, defendant Rosenthal issued comments in a Downey

17  press release that again misled investors about Downey's exposure to risky subprime

18  loans.  The press release stated:

19      Daniel D. Rosenthal, President and Chief Executive Officer,

20      commented, "Last year's challenging business environment,

21      characterized by a softening in the residential housing market and an

22      inverted yield curve, has carried into 2007 and contributed to further

23      declines in our loan portfolio.  In addition, there has been much publicity

24      this year about credit quality issues associated with subprime lending

25      that has lead to the closing of numerous subprime lenders and the

26      declaring of bankruptcy by others.  ***Downey has historically been***

27      ***involved in subprime lending and has had very few losses.  Our***

28

- 78 -

1    *subprime portfolio has declined and represents less than 6% of our*

2    *loan portfolio."*

3    Ex. 30 at 001.

4    **D.    Reasons Why Defendants' Statements Regarding Downey's**

5    **Subprime Lending Were Knowingly Materially False and**

6    **Misleading When Issued**

7    225.    E-mail solicitations, rate sheets, statements of confidential witnesses as

8    well as defendants' own admissions establish that Downey was continuing to offer its

9    Option ARM loans to subprime borrowers and that Downey's subprime portfolio

10    consisted of 30% not 6% of Downey's portfolio.

11    226.    According to Downey's 2006 Form 10-K, filed with the SEC on March

12    1, 2007, Downey's loan portfolio contained almost $4 billion in loans with FICO

13    scores under 660 at the end of 2006. Ex. 3. Under the mortgage industry definition of

14    subprime, subprime loans represented 30% of Downey's loan portfolio. Thus, the

15    April 18, 2007 statement that only 6% of Downey's loan portfolio represented

16    subprime loans was incredibly misleading to investors. Defendants did not disclose

17    on April 18, 2007 or in Downey's subsequent 2006 Form 10-K that its definition of

18    subprime deviated from industry standards or even define subprime.

19    227.    The FICO score is a key determinant of whether a given borrower will be

20    classified as "prime" or "subprime." There is a strong presumption in the mortgage

21    lending industry that a FICO score of 660 divides prime and subprime borrowers.

22    228.    The principal definition of "subprime" is found in the Expanded

23    Guidance for Subprime Lending Programs (the "Expanded Guidance"), issued jointly

24    on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board

25    of Governors of the Federal Reserve System, the FDIC and the OTS. Among the

26    credit risk characteristics listed in the Expanded Guidance that label a borrower as

27    "subprime" is a "[r]elatively high default probability as evidenced by, for example, a

28    credit bureau risk score (FICO) of 660 or below (depending on the product/collateral),

- 79 -

1  or other bureau or proprietary scores with an equivalent default probability

2  likelihood." Ex. 8. This definition is also set forth in §212 of the OTS Examination

3  Handbook ("OTS Handbook").

4      229.  According to Downey's own "Subprime Lending Guidelines" section in

5  its 2006 Form 10-K, "the federal banking regulatory agencies jointly issued

6  Interagency Guidelines on Subprime Lending in 2001." Ex. 3 at 225. Those 2001

7  subprime guidelines indicated that "subprime" borrowers are those with credit risk

8  characteristics that include FICO scores of "*660 or below*." Ex. 8 at 359. On June 29,

9  2007 in the Statement on Subprime Mortgage Lending, the OTS, FDIC, and OCC and

10  Board of Governors of the Federal Reserve reaffirmed this definition of subprime,

11  subsequently updated on June 29, 2007, and confirmed that credit risk characteristics

12  for subprime borrowers included borrower FICO scores of "*660 or below*." Ex. 9.

13      230.  Standard & Poor's, one of the principal securities rating agencies,

14  similarly states: "Standard & Poor's considers subprime borrowers to have a FICO

15  credit score of 659 or below." Conversely, "Standard & Poor's considers prime

16  borrowers to have a FICO credit score of 660 or above."

17      231.  Contrary to defendants' statements, in May of 2007, Downey was

18  blatantly marketing its relaxed underwriting standards to borrowers who were not

19  prime but rather had poor credit scores:

20      ***Go Stated with a 620-FICO!***

21      Cash-out on properties 3-months off the MLS with no seasoning!

22      ***Unlimited revolving and installment lates allowed!***

23      ***Easy Downey underwriting on this portfolio program***.

24      232.  By June 2007, Downey was still touting how easy it was to qualify, even

25  with stated income and low FICO score, sending brokers the following solicitation:

26      Why use the COFI Option ARM??

27      -Up to (3.75%) in rebate available!

28

1    -Unlimited revolving and installment lates allowed on this portfolio

2    program, easy to qualify.

3    -Go stated/stated with a FICO as low as 620!

4    233.    By the plain language of the June 2007 solicitation, in ¶232, Downey was

5    soliciting borrowers with poor credit (FICO as low as 620) and telling them they could

6    qualify for the loan with stated income and no asset or income verification

7    (stated/stated).  Defendants were also giving a 3.75% rebate on these loans as an

8    incentive to brokers to push these loans and allowing for unlimited revolving and

9    installment lates (*i.e.*, poor payment record with pattern of late payments).  These

10    solicitations stood in sharp contrast to what they were telling the market about the

11    quality of their loans and lending practices and what Downey had acknowledged in its

12    March 2006 letter to the OTS, that higher credit scores were required to effectively

13    mitigate credit risks for Option ARMs.  Ex. 28 at 834.

14    234.    Eleven percipient witnesses corroborate that Downey continued to sell

15    Option ARMs to subprime borrowers and not just prime borrowers despite

16    defendants' statement to investors to the contrary.

17    235.    CW1 confirms that throughout 2005, 2006 and 2007, Downey

18    encouraged brokers to sell subprime Option ARMs by offering 3.75% incentives on

19    Option ARMs with a FICO score of 620.

20    236.    CW4, a senior underwriter from 2004 until 2007, indicated as detailed in

21    ¶143 that the cut-off for loans was a FICO score of 580.  CW4 confirmed that

22    defendants' statement in November 2006 that "[d]uring the first quarter of 2006, we

23    ceased offering option ARM products to our subprime borrowers" was absolutely

24    untrue.  According to CW4, at the time most of Downey's Option ARM borrowers

25    had lower FICO scores and he estimated that 50% of the borrowers were self-

26    employed.  CW4 recalled that when he began his employment at Downey, FICO

27    scores were in the 580-620 range (possibly as high as 640).  CW4 recalls that this

28    range did not change during his employment at Downey.  Regarding Rosenthal's

1   April 18, 2007 statement that Downey's "subprime portfolio has declined and

2   represents less than 6% of our loan portfolio," CW4 also stated that there was no way

3   that the statement could be true based on his observations as a senior underwriter.

4        237.  CW5, a wholesale operations manager until July 2007, confirmed that

5   Downey was using FICO scores as low as 580 when he began at Downey and that

6   later Downey was still offering loans to those with FICO scores of 620 with 100%

7   stated income.

8        238.  A second senior underwriter, CW6, indicated that FICO scores in the low

9   600's were considered high while he was at Downey from January 2005 to January

10   2007.

11        239.  CW12, Downey's broker approval head secretary for all six Downey

12   regions, explained that in response to OTS crackdowns around 2005/2006, Downey

13   moved its minimum FICO score up to 620 but not for all of its loans.

14        240.  CW16, a third underwriter, indicated that the underwriting guidelines

15   called for borrowers to have minimum FICO scores of 620-625.

16        241.  CW21, who reported to Downey's CLO and then defendant Rosenthal,

17   indicated that the average FICO score was 600-620 and that for Downey's portfolio

18   Option ARMs, the highest score he ever saw was a FICO of 620.

19        242.  CW22, indicated that until the end of 2007 Downey's minimum FICO

20   score underwriting requirement was at or below 600.

21        243.  CW23 indicated that the average FICO score was 620.

22        244.  CW25 confirmed that in 2007 and 2008 Downey was offering Option

23   ARM loans to borrowers with FICO scores of 620 and 640.

24        245.  When CW27 first started at Downey in March 2007, he stated that the

25   minimum FICO score was 580.  According to CW27, Downey's minimum FICO

26   score later increased to 620 and then, by the time he left in October 2008, to 680.

27        246.  The accounts of these eleven witnesses, all of whom indicated that loans

28   were given to borrowers who were not prime, coupled with defendants' participation

1  in setting underwriting guidelines, demonstrate that defendants knew these statements
2  were false when issued.

3      **E.    False and Misleading Statements Concerning Downey's**
4            **Financial Results, Allowances for Loan and Credit Losses,**
5            **Non-Performing Assets, Negative Amortization and Capital**
6            **Position**

7      247.   During the Class Period, Downey and the Individual Defendants issued
8  quarterly (and year-end) earnings press releases and SEC filings that materially and
9  fraudulently overstated Downey's financial results and misrepresented Downey's
10 overall financial condition.  Each of the quarterly filings were reviewed, signed, and
11 certified under oath by defendants Rosenthal and Côté.  Each of the yearly Forms 10-
12 K were reviewed and signed by defendants Rosenthal, Côté and McAlister.  Further,
13 Côté and Rosenthal certified the Forms 10-K under oath.  Thus, each of the Individual
14 Defendants made, adopted, communicated and disclosed each statement to the market
15 and those statements are expressly attributable to the defendants.

16     **1.    False Statements: Downey's Financial Results (3Q06-**
17           **FY07), GAAP Compliance and Internal Controls**

18     248.   The following chart sets forth the false financial information issued by
19 defendants in Downey's press releases and SEC filings (and the date(s) of defendants'
20 disclosure of those statements to investors) during the Class Period:

| | 3Q06 | 4Q06 | FY06 | 1Q07 | 2Q07 | 3Q07 | 4Q07 | FY07 |
|---|---|---|---|---|---|---|---|---|
| Date of earnings release | 10/17/06 | 1/18/07 | 1/18/07 | 4/18/07 | 7/18/07 | 10/17/07 | 1/23/08 | 1/23/08 |
| Date 10-Q or 10-K filed with SEC | 11/1/06 | n/a | 3/1/07 | 5/4/07 | 8/1/07 | 11/1/07 | n/a | 2/28/08 |
| Net Income | $57.2m | $53.7m | $205.2m | $42.9m | $32.7m | ($23.4m) | ($108.8m) | ($56.6m) |
| Net Income per Share | $2.05 | $1.93 | $7.36 | $1.54 | $1.17 | ($0.84) | ($3.90) | ($2.03) |
| Net Interest Income | $130.2m | $130.2m | $518.7m | $125.1m | $111.5m | $98.0m | $89.3m | $423.8m |
| Provision for Credit Losses | $9.6m | $0.2m | $26.6m | $0.6m | $9.5m | $81.6m | $218.4m | $310.1m |

| Allowance for Loan Losses | $60.8m | $60.9m | $60.9m | $60.8m | $69.1m | $142.2m | $348.2m | $348.2m |
| Assets | $16.983b | $16.209b | $16.209b | $15.238b | $14.903b | $14.418b | $13.409b | $13.409b |
| Non-Performing Assets | $66.5m | $110.4m | $110.4m | $143.4m | $227.4m | $323.9m | $1,041.8m | $1,041.8m |

249.    Defendants also falsely represented in Downey's quarterly and year-end financial statements filed with the SEC during the Class Period that Downey's financial statements were prepared "in conformity with GAAP;" contained all adjustments necessary for a "fair" presentation of Downey's financial condition; and that defendants designed, reviewed and maintained effective internal controls over financial reporting to prevent misstatements. Ex. 3 at 252, 257, 261-262, 264, Ex. 4 at 296, 301, 304-305, 307, Ex. 6 at 338-339, Ex. 10 at 438-439, Ex. 11 at 469-470, Ex. 12 at 500-504.

250.    Specifically, Rosenthal and Cote repeatedly certified Downey's financial results quarter after quarter and falsely certified to investors that "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made***, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the financial statements, and other financial information included in this report, ***fairly present in all material respects the financial condition, results of operations*** and cash flows of [Downey] as of, and for, the periods presented in this report."

## 2.    False Statements Concerning Credit and Loan Loss Allowances and Risk Controls

251.    In addition to defendants' issuance of false financial results during the Class Period (3Q06-4Q07), defendants also made false and misleading statements in Downey's quarterly and annual SEC filings concerning Downey's allowance for credit and loan losses, its controls and practices for recognizing reserves, and its review of loan impairments and credit risk as follows:

1
2
3
4
5

> *We maintain a valuation allowance for credit and real estate losses to provide for losses inherent in those portfolios. . . . Management evaluates the adequacy of the allowance quarterly to maintain the allowance at levels sufficient to provide for inherent losses at the balance sheet date.*

6
7
8
9

> *We use an internal asset review system and loss allowance methodology [designed to/to] provide for timely recognition of problem assets and an adequate allowance to cover asset and loan-related commitment losses*.

10    Ex. 6 at 332, Ex. 10 at 432, Ex. 11 at 464, Ex. 12 at 494.

11
12
13
14
15
16

> *The allowance for [credit/real estate losses] . . . are maintained at amounts management deems adequate to cover inherent losses in the portfolios . . . . We use an internal asset review system and credit loss allowance methodology designed to provide for the detection of problem assets and an adequate allowance to cover credit [and real estate] losses*.

17    Ex. 3 at 231, Ex. 6 at 325, Ex. 10 at 427, Ex. 11 at 458, Ex. 12 at 486.

18    252.    Further, in 3Q06 and 1Q07, Downey's Forms 10-Q contained the
19    following false statements:

20
21
22
23

> *The unallocated allowance is more subjective and is reviewed quarterly to take into consideration estimation errors and economic trends that are not captured in determining the general valuation and allocated allowances*.

24    Ex. 6 at 332, Ex. 10 at 433.

25    253.    Downey's FY06 Form 10-K filed on March 1, 2007 and FY07 Form 10-
26    K filed on February 29, 2008 contained the following false and misleading statements
27    concerning Downey's allowance for credit and loan losses and its treatment of Non-
28    Performing Assets:

- 85 -

1    The allowance for credit losses reflects our estimate of the
2    probable losses in our portfolio of loans and loan-related commitments at
3    the relevant balance sheet date. *Our allowance for credit losses is based*
4    *on prior experience as well as an evaluation of the known risks in the*
5    *current portfolio, composition and growth of the portfolio and*
6    *economic factors*.

7    *    *    *

8    *It is our policy to take appropriate, timely and aggressive action*
9    *when necessary to resolve non-performing assets*.  When resolving
10   problem loans, it is our policy to determine collectibility under various
11   circumstances which are intended to result in our maximum financial
12   benefit.  We accomplish this either by working with the borrower to
13   bring the loan current or by foreclosing and selling the asset.  *We*
14   *perform ongoing reviews of loans that display weaknesses and*
15   *maintain adequate loss allowances for them*.

16   *    *    *

17
18   *This [expected] increase in delinquency is contemplated when*
19   *we analyze the adequacy of our [credit/loan] loss allowance*.
20   Ex. 3 at 229, 236-237, Ex. 4 at 276, 283, 284.
21   254.   Defendants also issued the following false and misleading statements in
22   Downey's FY06 and FY07 Forms 10-K concerning the risk and quality of Downey's
23   loans:
24   *We use an internal asset review system and loss allowance*
25   *methodology designed to provide for timely recognition of problem*
26   *assets and an adequate allowance to cover asset and loan-related*
27   *commitment losses.*
28

1

2

3

4

5

6

7

8

*Our Internal Asset Review Department conducts independent reviews to evaluate the risk and quality of all our loan and [real estate] investment assets. . . . The Audit Committee of the Board of Directors quarterly reviews the overall asset quality, the adequacy of valuation allowances on our loan and real estate investment assets, and our adherence to policies and procedures regarding asset classification and valuation through reports from the Director of Internal Asset Review and others.*

9   Ex. 3 at 238.  Virtually identical statements were made in Downey's 2007 Form 10-K.

10  Ex. 4 at 285.

11          255.   Further, in each of Downey's quarterly and yearly Forms 10-Q and 10-K

12  during the Class Period, defendants issued false and misleading statements regarding

13  the adequacy of credit losses and detection of problematic assets.

14

15

*Management believes that the allowances established for credit, real estate and MSRs losses are adequate . . . .*

16  Ex. 31 at 252, Ex. 4 at 296.

17

18

19

20

21

22

23

*The allowance for credit losses is maintained at an amount management deems adequate to cover inherent losses at the balance sheet date. . . . Downey has implemented and adheres to an internal asset review system and loss allowance methodology designed to provide for the detection of problem assets and an adequate allowance to cover credit losses. . . . Those amounts may be adjusted based on an analysis of macro-economic and other trends that are likely to affect*

24

25

26

27

28

- 87 -

1      ***the borrower's ability to repay their loan according to their loan***

2      ***terms***.[12]

3                          \*        \*        \*

4      ***In the opinion of management***, and in accordance with the credit

5  loss allowance methodology, ***the present allowance is considered***

6  ***adequate to absorb estimable and probable credit losses. Additions and***

7  ***reductions to the allowance are reflected in current operations***.

8  Ex. 3 at 239, 254, Ex. 4 at 297, 298.

9      256.  Defendants also made false and misleading statements throughout the

10  Class Period concerning Downey's Option ARM loans that were subject to negative

11  amortization.  In each of Downey's quarterly and yearly filings on Forms 10-Q and

12  10-K, defendants falsely represented that: "The amount of negative amortization had a

13  net increase of [\$48 million in 3Q06; \$187m in FY06; \$37m in 1Q07; \$20m in 2Q07;

14  \$11m in 3Q07; \$58m in FY07] during the current quarter, ***as borrowers took***

15  ***advantage of the flexibility of this product***."  Ex. 6 at 329, Ex. 3 at 254, Ex. 10 at 429,

16  Ex. 11 at 461, Ex. 12 at 494, Ex. 4 at 281.

17      **3.**      **False Statements Concerning Downey's Capital**

18                  **Position**

19      257.  In Downey's Forms 10-Q and FY06 and FY07 Forms 10-K, defendants

20  told investors that Downey's "capital levels are significantly above the 'well

21  capitalized' standards defined by the federal banking regulators of 5% for core capital

22  and 10% for its risk-based capital."  Defendants also caused Downey to falsely report

23  its capital position as follows:

24

25  _____

26  [12]      Substantially similar statements were made in Downey's quarterly Forms 10-Q

27  on November 1, 2006, May 4, 2007, August 1, 2007 and November 1, 2007.  Ex. 6 at
325, Ex. 10 at 427, Ex. 11 at 458, Ex. 12 at 486.

28

| Capital & Asset Ratios: | 3Q06 | FY06 | 1Q07 | 2Q07 | 3Q07 | FY07 |
|---|---|---|---|---|---|---|
| Tangible & Core Capital | 8.47% | 8.82% | 9.64% | 10.08% | 10.21% | 10.18% |
| Risk-Based Capital | 17.05% | 17.89% | 19.57% | 20.86% | 21.34% | 19.01% |

Ex. 6 at 324, Ex. 3 at 230, Ex. 10 at 426, Ex. 11 at 457, Ex. 12 at 485, Ex. 4 at 278.

258.   Further, during each quarter of the Class Period, defendants falsely told investors that Downey's regulatory capital far exceeded the established "well capitalized" requirements relating to core capital and risk-based capital and the minimum requirements relating to tangible capital.  The differences between the established well capitalized requirement ratios and Downey's calculated regulatory capital ratios was referred to as "excess" in Downey's SEC filings.  The stated excess was always substantial as shown in the following table which reflects the information reported in Downey's SEC filings:

|  | Tangible Capital | Core Capital | Risk-Based Capital |
|---|---|---|---|
| 9/30/2006 | 6.97% | 3.47% | 7.05% |
| 12/31/2006 | 7.32% | 3.82% | 7.89% |
| 3/31/2007 | 8.14% | 4.64% | 9.57% |
| 6/30/2007 | 8.58% | 5.08% | 10.86% |
| 9/30/2007 | 8.71% | 5.21% | 11.34% |
| 12/31/2007 | 8.68% | 5.18% | 9.01% |
| 3/31/2008 | 6.93% | 3.43% | 5.04% |
| 6/30/2008 | 6.07% | 2.57% | 4.31% |

Ex. 6 at 333, Ex. 3 at 241, Ex. 10 at 434, Ex. 11 at 466, Ex. 12 at 495, Ex. 4 at 286, Ex. 19 at 636, Ex. 20 at 744.

259.   Starting on January 18, 2007, and approximately every three months until January 23, 2009, defendants caused Downey to issue statements quoting defendant

- 89 -

Rosenthal (and in one instance included the statements in a quarterly SEC filing) reassuring the market of the strength of Downey's capital position in the face of adverse news, including softening in the residential housing market and unfavorable results, as follows:

- January 18, 2007 – "*[W]e enter the year with a strong capital position which will allow us to take advantage of any opportunities that may arise*."

- April 18, 2007 – "*We continue to have a strong capital position which will allow us to take advantage of any opportunities that may arise*."

- July 18, 2007 – "*[W]e continue to have a very strong capital position which will allow us to take advantage of opportunities as they arise*."

- October 10, 2007 – "[D]espite this quarter's unfavorable results, *Downey remains well positioned to continue funding quality loans because of our strong capital position and stable source of funds from our retail branch franchise*."

- October 17, 2007 [in Downey's press release announcing 3Q07 results] – "[D]espite this quarter's unfavorable results, *Downey remains well positioned to continue funding quality loans because of our strong capital position and stable source of funds from our retail branch franchise*."

- January 23, 2008 – "While we expect the environment to remain challenging in 2008, *we enter the year with a strong capital position* and stable funding sources from our retail branch franchise."

Exs. 21-25, 30.

1    **F.    Reasons Why Defendants' Financial Results and Statements**
2    **Concerning Allowances for Loan and Credit Losses, Non-**
3    **Performing Assets, Negative Amortization, Credit Risk**
4    **Exposure and Capital Position Were False and Misleading**

5    260.    Defendants' statements in ¶¶248-259 were false and deliberately reckless
6    for numerous reasons.  First, as the OTS found in its Cease and Desist Order, at the
7    time defendants made those statements, they were engaged in "unsafe and unsound
8    practices," including with respect to "*asset quality, earnings, liquidity planning,*
9    *management, and projected capital levels*" during the relevant time period. Ex. 2.  At
10   the time defendants' statements were made, up to **90%** of Downey's loans were
11   Option ARMs, **83%** of its total earnings were derived from NegAm income, **90%** of
12   its loans were based on reckless "stated income" or "no-doc" underwriting, and
13   defendants had already internally projected (in late 2006) that **$1.4 billion in loans**
14   were going to recast in 2007.

15   261.    Yet, in violation of GAAP, SEC rules and OTS regulations, defendants
16   failed to reserve for Downey's risky and impaired loans.  Defendants failed to increase
17   Downey's Allowances for Loan Losses ("ALL") and intentionally manipulated and
18   **reduced** Downey's loan loss provision to inflate earnings.  Had defendants properly
19   increased Downey's reserves for credit and loan losses as GAAP, SEC rules and OTS
20   regulations required, Downey would have been required to drastically reduce its net
21   income and earnings per share.  The failure to take adequate credit and loan loss
22   reserves inflated Downey's financial condition, its capital position, its net income,
23   assets, and earnings by millions of dollars each quarter.  Downey's "unsafe and
24   unsound practices" also rendered its qualitative statements about its reserves and
25   "internal asset review" procedures and controls materially false and misleading, as set
26   forth in detail below.

27
28

1     **1.     Rosenthal and Côté Directly Participated in Downey's**

2            **Internal Asset Review Committee and Issued Reports**

3            **to Downey's Audit Committee that Reflected**

4            **Inadequate Reserves**

5     262.   Defendants McAlister, Rosenthal and Côté were well aware of the

6 Company's manipulations of its Provision and Allowances for Credit Losses.

7 Rosenthal and Côté were members of the IAR Committee during the Class Period.

8 The IAR Committee met quarterly to "*review and determine asset classifications and*

9 *recommend any changes to asset valuation allowances*." Exs. 3, 4. In fact,

10 according to Downey's filings, "the classification of an asset, once established, can be

11 removed or upgraded *only upon approval of the Internal Asset Review Committee* or

12 the [Director of Internal Asset Review/Credit Risk Manager] *as delegated by the*

13 *Committee*." *Id.* The IAR Committee then prepared a report that went directly to the

14 Board's Audit Committee which "*quarterly reviews the overall asset quality, the*

15 *adequacy of valuation allowances on* [classified and non-classified asset/loan and

16 real estate investment assets], *and our adherence to policies and procedures*

17 *regarding asset classifications and valuation through reports from the [Director of*

18 *Internal Asset Review/Credit Risk Manager]* and others." *Id.* Thus, McAlister, who

19 was Chairman of the Board where the IAR Committee sat, and Rosenthal and Côté,

20 who were on the IAR Committee, were fully aware of, and participated in, the

21 Company's false manipulations and improper reporting of the Company's Allowance

22 and Provision for Credit Losses during the Class Period.

23     263.   In fact, as set forth by numerous CWs with personal knowledge of

24 Downey's lending policies and practices, *see* ¶¶110-118, Downey's Board, directed

25 by McAlister and under which the IAR Committee reported, was responsible for

26 setting Downey's underwriting loan guidelines, policies and procedures. Defendants

27 also made unequivocal admissions about their participation in reviewing their loan

28 portfolio and sought to assuage investors' fears about problematic credit problems by

affirmatively stating in Downey's FY06 and FY07 Forms 10-K that "[w]e require that our residential real estate loans be approved at various levels of management, depending upon the amount of the loan and credit risk it presents." Ex. 3 at 222, Ex. 4 at 271. Defendants further stated that "[i]n the approval process for the loans we originate or purchase, *we assess both the value of the property securing the loan and the applicant's ability to repay the loan*." Ex. 3 at 222, Ex. 4 at 271. Thus, defendants were well aware that their toxic Option ARM loans were based on inadequate underwriting that rendered those assets impaired and unlikely to be paid.

### 2. GAAP Provisions Violated by Defendants in Accounting for Credit and Loan Loss Reserves[13]

264. The two central accounting items related to defendants' fraudulent manipulation of Downey's loan loss reserves during the class period were the Reserve or ALL on the balance sheet (which reduces assets), and the corresponding Loan Loss Provision, which is a direct reduction of pretax earnings on Downey's income statement. The accounting for these items is governed by specific GAAP provisions, SEC rules and OTS guidance. Because there is a plethora of guidance on the subject, defendants were well informed of how to account for the ALL and Provision for loan losses during the Class Period. The rules that defendants violated are set forth below.

265. Section 9.19 of the Audit and Accounting Guide for Depository and Lending Institutions provides that financial institutions are responsible for "*maintain[ing] adequate controls to ensure the ALLL is consistently determined in*

---

[13]     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

1    *accordance with GAAP, stated policies and procedures, and relevant supervisory*

2    *guidance*."

3    266.    Section 9.04 of the same Accounting Guide for Depository and Lending

4    Institutions also provides: "***Management is responsible*** for estimating credit losses

5    . . . management must make careful judgments about collectibility and estimates of

6    losses.  ***Management's judgments should consider micro- and macro-economic***

7    ***factors; past, current, and anticipated events based on facts in evidence at the***

8    ***balance-sheet date***; and realistic courses of action it expects to take."

9    267.    Under GAAP, a loss contingency is an existing condition, situation, or set

10    of circumstances involving uncertainty as to possible loss.  *See* Statement of Financial

11    Accounting Standards ("SFAS") No. 5, ¶1.  The collectability of mortgage loans is an

12    example of a loss contingency.  GAAP requires that an estimated loss from a loss

13    contingency be accrued by a charge to income if both of the following conditions are

14    met: (a) ***information available prior to issuance of the financial statements indicates***

15    ***that it is probable that an asset had been impaired or a liability had been incurred at***

16    ***the date of the financial statements; and (b) the amount of loss can be reasonably***

17    ***estimated***.  *See* SFAS No. 5, ¶8.

18    268.    Even if no accrual is made for a loss contingency because one or both of

19    the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in

20    excess of the amount accrued, defendants were still required to disclose the

21    contingency when there is at least a "***reasonable possibility***" that a loss or an

22    additional loss may have been incurred.[14]  SFAS No. 5, ¶10.  The disclosure shall

23    indicate the nature of the contingency and shall give an estimate of the possible loss or

24    range of loss or state that such an estimate cannot be made.  *See* SFAS No. 5, ¶10.

25

26    _____

27    [14]    GAAP defines "reasonably possible" as "[t]he chance of the future event or
events occurring is ***more than remote but less than likely***."  SFAS No. 5, ¶3.

28

269.    The Audit and Accounting Guide for Depository and Lending Institutions §9.37 further provides that a loan loss should be taken immediately upon origination if, as in Downey's case, loan credit procedures are inadequate or overly aggressive: "Generally, a loan would be impaired at origination only if a faulty credit granting decision has been made or loan credit review *procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of loan origination*."

### 3.    SEC Rules Violated by Defendants in Accounting for Loan Loss Reserves

270.    The SEC provides explicit guidance on the proper accounting for loan losses that defendants were required to follow, but did not.  Staff Accounting Bulletin ("SAB") No. 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a *disciplined and consistently applied process*. . . .  A registrant's loan loss allowance methodology generally should . . . *[c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] [b]e based on current and reliable data*[.]

271.    SAB No. 102 also provides:

> Factors that should be considered in developing loss measurements includ[ing] . . . *[l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards*, and other changes in lending policies, procedures, and practices[.]

272.    The SEC further states that:

1   For many entities engaged in lending activities, ***the allowance and***
2   ***provision for loan losses are significant elements of the financial***
3   ***statements***.  Therefore, the staff believes it is appropriate for an entity's
4   management to ***review, on a periodic basis, its methodology for***
5   ***determining its allowance for loan losses***.

### 4.    OTS Provisions Violated by Defendants

6

7   273.   In addition to GAAP, SEC Rules and Downey's stated policy, OTS
8   guidelines mandate that "[s]avings associations that offer negatively amortizing
9   mortgages should establish[,] identify, measure, monitor and control the risks
10  associated with these loans."  Ex. 26 at 815.  The OTS states that in order to control
11  risk,

12      [A]ssociations should implement ***sound underwriting criteria and***
13      ***property valuation standards, as well as controls to monitor and***
14      ***manage the additional risks from negatively amortizing lending***.
15      Savings associations should also ensure that the borrowers are ***able to***
16      ***make the higher required payments after the loans are recast***.
17  *Id.*

18  274.   The OTS regulations also state that, in evaluating asset quality and
19  monitoring risk, some of the factors to be considered are "***delinquency and***
20  ***foreclosure trends, the level of nonaccrual or nonperforming loans***, and market
21  depreciation of securities."  *Id*. at 811.  In addition:

22      When assessing capital adequacy, you should evaluate the risks
23      associated with each lending and investment program.  Thrifts with
24      higher risk lending programs should ***maintain sufficient ALLL***
25      ***[Allowance for Loan and Lease Losses] to offset expected losses and a***
26      ***higher capital base to absorb unanticipated losses***.
27  *Id*.

28

1    275.   With respect to loans with negative amortization (*i.e.*, most of Downey's
2    profit), during the Class Period the OTS warned that:

3    Traditional credit quality monitoring reports of point-in-time
4    delinquency and default data ***may lag as indicators of asset quality***
5    ***problems*** because borrowers facing payment problems can opt to reduce
6    their monthly payments without causing the loan to go delinquent or
7    disrupting the income accrual on the loan. ***Therefore, a strong indicator***
8    ***of potential credit risk is the number of an institution's option – ARN***
9    ***[sic] loans that actually negatively amortize***.

10   Ex. 27 at 824-825.

11   276.   The OTS also instructs that:

12   [L]enders should ***track and monitor all loans with the NegAm option***
13   and quantify the borrowers' preferences regarding NegAm loan
14   payments. The choice of making the fully amortizing versus the
15   minimum payment is a borrower option, ***the exercise of which is a***
16   ***revealing indicator of a borrower's ability to service the loan***.

17   *Id.* at 825.

18            **5.    Defendants Violated GAAP, SEC Rules and OTS**
19                   **Regulations by Intentionally Manipulating the**
20                   **Company's Reserves and Provision for Loan Losses**
21                   **to Conceal Loan Impairment and by Willfully**
22                   **Disregarding Known Adverse Facts and Red Flags**

23   277.   Despite the statement in Downey's SEC filings that the majority of its
24   loans were evaluated for credit losses based on SFAS No. 5 and complied with
25   GAAP, OTS and SEC rules, Downey's accounting for problem loans – consisting of
26   the Provision for Credit Losses on the income statement and associated ALL on the
27   balance sheet – violated SFAS No. 5 for numerous reasons. First, as set forth in
28   ¶¶110-205, *supra*, defendants were directly and personally involved in pushing

1   reckless underwriting and lending guidelines and issuing millions of risky Option

2   ARM loans to borrowers who they knew would not be able to repay them.

3          278.   Second, as set forth immediately below, defendants were in possession of

4   hard facts and "information available" prior to their false SEC disclosures confirming

5   both that it was "probable that an asset had been impaired" **and** "the amount of the

6   loss could be reasonably estimated."  SFAS No. 5, ¶8.

7          279.   Third, even if defendants believed they could not reasonably estimate the

8   losses or that loan impairments were something less than "probable," they still were

9   required to disclose any "reasonably possible" contingent losses and provide the

10   market with an estimate of the possible losses or range of losses going forward.  SFAS

11   No. 5, ¶10.  Defendants did not make **any** such disclosures in blatant violation of

12   SFAS No. 5, ¶10.  As set forth below, defendants were well aware of hard facts, data

13   and shocking negative trends and red flags in connection with their loans that required

14   them to increase their reserves for loan losses.

15          280.   **Defendants knew in late 2006 that they had projected $1.4 billion in**

16   **Option ARM loans to recast in 2007**.  Defendants belatedly admitted in Downey's

17   2007 10-K that the Company internally projected at the end of 2006 that $1.4 billion

18   in Option ARM loans would "recast" in 2007.  This fact alone required defendants to

19   increase Downey's loan loss reserves at the end of 2006 or to at least disclose the

20   "reasonably possible" contingent losses that would arise from those recasts.  Indeed,

21   OTS regulations warned lenders like Downey that they "should [] ensure that the

22   borrowers are able to make the higher required payments **after the loans are recast**."

23   Ex. 26 at 815.  As set forth in ¶¶138-170, 187-204, according to numerous witnesses,

24   defendants' reckless system of lending and underwriting, and lack of credit risk

25   mitigation did not "ensure" that borrowers could make the higher required payments

26   after loans recast.  In fact, it was Company policy to "assess" a borrower's ability to

27   pay the monthly payment after the loan recast.

28

281.   In 2005, CW1, a mortgage broker, recalls that federal changes alerted him that there were going to be big problems with recasts and loans imploding.  At that time, CW1 and his business partners pulled the files on all of the Downey loans that they had brokered (approximately 10% of their business) to determine which loans were going to recast.  CW1 immediately began making calls and sending letters and e-mails to Downey requesting assistance in modifying the loans.  CW1 did this because he was aware that, upon recast, introductory period payment caps would no longer apply and monthly payments would double or triple.  According to CW1, Downey would have been aware of the recast problem as well.  According to CW1, Downey had recast charts showing when loans were going to recast and would contact borrowers via letter and phone in the period immediately before a loan was to recast. In addition, in March 2006, Downey began sending its clients letters encouraging them to apply their tax refunds to their balances in order to bring down loan balances (and avoid recast).

282.   According to CW1, in 2007, Downey was sitting on its hands regarding its recasting loans and hemorrhaging defaults.  When CW1 inquired in 2007, he was told by individuals in Downey's Loan Workout Department that *Downey did not have adequate reserves to repay the problem loans*.  CW1 recalls sending multiple e-mails, letters and making calls to Downey's Loan Workout Department in 2007 where he spoke to Anna Figueroa.  He also consistently contacted Beth McNally, the manager of Downey's Loss Mitigation Department, AE Andrew Sheftel, and his assistant Summer Smith, all based out of Downey's corporate office.  In 2007, CW1 was informed from these conversations that the increase in loan modification and short sale requests were too overwhelming for Downey and that *Downey could not modify the loans of all borrowers in trouble*.  CW1 explained that most of his Downey clients were defaulting and foreclosing in record numbers.

283.   **Defendants knew that negative amortization balances were skyrocketing**.  Defendants also were aware of obvious red flags with respect to

1   negative amortization, *i.e.*, the amount of interest piling up on borrowers' mortgages

2   above and beyond their initial loan balance.  As set forth above, the OTS warned

3   Downey that traditional data monitoring "may lag as indicators of credit quality," and

4   thus "***a strong indicator of potential credit risk is the number of an institution's***

5   ***option ARN [sic] loans that actually negatively amortize***."  Ex. 27 at 825.  Similar

6   warnings were included in proposed guidance issued by the regulatory agencies in

7   2005, finalized on September 25, 2006 and then incorporated into the OTS

8   Examination Handbook on March 21, 2007.  The OTS stated that "the exercise" of

9   NegAm options is "***a revealing indicator of a borrower's ability to service the loan***"

10  and that lenders should "***track and monitor*** all loans with the NegAm option."  *Id.*

11  Defendants were well aware from tracking and monitoring its loans with NegAm that

12  the number, amount and percentage of loans with NegAm on Downey's books was

13  increasing exponentially before and during the Class Period.

14      284.  Perhaps the most ominous sign of Downey's problematic financial

15  condition was that the percentage of Downey's total earnings before taxes that was

16  derived from NegAm profits skyrocketed from only 36% in 2005 to ***83%*** in 1Q06,

17  ***93%*** in 4Q06 and ***117%*** in 2Q07.  In other words, despite the extensive GAAP and

18  SEC rules and regulations and warnings from the OTS about NegAm risks, defendants

19  knew, based on hard evidence, that virtually ***all of Downey's earnings*** before taxes

20  was derived from NegAm profits.  Downey's Forms 10-K also demonstrated that the

21  percentage of loan interest from NegAm also increased drastically from 4% in 2004 to

22  16% in 2005, 27% in 2006 and 28% in 2007.  The following chart shows the increase

23  in NegAm during the relevant time period as reported by Downey to the SEC:

24

25

26

27

28

| ($000's) | Interest Capitalized on Loans from Negative Amortization | Total Loan Interest Income | Income Before Taxes ("EBT") | Interest from Negative Amortization as a % of Interest Income from Loans | Interest from Negative Amortization as a % of EBT |
|---|---|---|---|---|---|
| FY03 | 8,531 | 504,480 | 176,203 | 1.69% | 4.84% |
| FY04 | 22,949 | 540,138 | 176,867 | 4.25% | 12.98% |
| FY05 | 134,733 | 759,877 | 370,491 | 17.73% | 36.37% |
| 1Q06 | 64,827 | 255,345 | 77,537 | 25.39% | **83.61%** |
| 2Q06 | 71,175 | 275,233 | 85,772 | 25.86% | **82.98%** |
| 3Q06 | 76,742 | 277,974 | 92,579 | 27.61% | **82.89%** |
| 4Q06 | 80,205 | 272,239 | 86,123 | 29.46% | **93.13%** |
| FY06 | 292,949 | 1,080,791 | 342,011 | 27.11% | **85.65%** |
| 1Q07 | 77,796 | 252,172 | 76,542 | 30.85% | **101.64%** |
| 2Q07 | 67,088 | 230,383 | 57,119 | 29.12% | **117.45%** |
| 3Q07 | 54,498 | 208,314 | (43,232) | 26.16% | -126.06% |
| 4Q07 | 46,013 | 194,587 | (188,254) | 23.65% | -24.44% |
| FY07 | 245,395 | 885,456 | (97,825) | 27.71% | -250.85% |
| 1Q08 | 34,869 | 177,557 | (233,198) | 19.64% | -14.95% |
| 2Q08 | 24,421 | 161,157 | (254,404) | 15.15% | -9.60% |

285.   These indicators were an obvious red flag as the above chart reflects there was a severe change from Downey's pre-Class Period financial condition. Indeed, in 2004, Downey's overall negative amortization decreased by $11 million, indicating that borrowers were conservatively paying down loan balances and not opting to utilize the minimum payment option in their loans (Ex. 26).  By the end of 2005, however, Downey's negative amortization had increased by $96 million, indicating that large numbers of borrowers were opting to utilize the minimum payment option on their loans.  Likely as a result, at the beginning of 2006, defendants began to track the percentage of borrowers with loans subject to negative amortization who were actually utilizing the negative amortization option.  This statistic informed defendants, throughout the Class Period, that the utilization of negative amortization was increasing dramatically and adding huge amounts of risk to Downey's portfolio:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



286.   In addition, defendants were aware that borrowers utilizing negative amortization were allowing their loan balances to increase above the amount of the original loan balance, creating greater risk of loan default, which would cause Downey to sustain losses. Defendants also began tracking this statistic (percentage of borrowers with loans where negative amortization is an option whose balance is greater than the original loan amount) at the beginning of 2006 and it informed them, throughout the Class Period, that the risk in Downey's portfolio was increasing exponentially:



**% With Balance Greater Than Original Loan Amount**

287.   Additionally, the dollar amount and percentage of negative amortization in those loans subject to NegAm grew exponentially throughout the Class Period:

|  | **Negative Amortization Included in Loans Subject to Negative Amortization** | |
|---|---|---|
|  | ($ in millions) | % |
| 1Q06 | $182 | 1.3% |
| 2Q06 | $229 | 1.7% |
| 3Q06 | $277 | 2.3% |
| 4Q06 | $320 | 2.9% |
| 1Q07 | $358 | 3.6% |
| 2Q07 | $377 | 4.2% |
| 3Q07 | $388 | 4.7% |
| 4Q07 | $379 | 5.0% |
| 1Q08 | $375 | 5.4% |
| 2Q08 | $344 | 5.5% |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



288.    Given these alarming trends known to defendants concerning NegAm during the Class Period, defendants were required to increase their loan loss reserves and provision for credit loss – failure to do so was a violation of GAAP, SEC rules and OTS guidance.

289.    **Defendants knew that their use of "phantom revenue" from NegAm interest was misleading**.  Downey also exploited its use of Option ARM borrowers who utilized NegAm options by booking revenue based upon the highest possible monthly payment, including the future (but unpaid) capitalized interest on NegAm ("CINA").  Given that (i) Downey was issuing predatory Option ARM loans to up to 90% of its borrowers based on "stated income" and "no-doc" loans without proper underwriting or risk controls; (ii) borrowers during the Class Period were increasingly

only making the minimum payment on the monthly interest (or even lower than the interest for NegAm loans); and (iii) defendants, contrary to OTS guidance, were not taking into account borrowers' ability to repay loans with the added negative amortization interest. Defendants improperly booked millions in false "phantom revenue" or NegAm revenue that defendants had not collected and knew they would never collect in violation of GAAP. *See* FASB Statement of Concepts No. 6, "Elements of Financial Statements," ¶79, and SAB No. 104, topic 13A. Defendants' misleading use of "phantom revenue" from NegAm materially inflated Downey's earnings and income by millions of dollars each quarter during the Class Period and misrepresented Downey's financial results.

290. **Defendants knew that loan delinquencies and foreclosures were increasing drastically**. Defendants also were in possession of evidence and obvious red flags reported in Downey's Forms 10-Q and 10-K filed with the SEC showing that Downey's Option ARM loan portfolio was becoming increasingly "delinquent," *i.e.*, loans for which borrowers had not made payments for over 30 days:



- 105 -

291.   Multiple percipient witnesses detail the increasing delinquencies and foreclosures at Downey which required defendants to increase its loan loss allowances and provision for credit losses.

292.   Further, according to CW4, a senior underwriter at Downey until July 21, 2007, Downey misrepresented its delinquency rates by refinancing loans for delinquent borrowers that should have been completely rewritten as new loans. CW4 explained that if a borrower was delinquent on a loan, the mortgage loan officer ("MLO") would work with the mortgage broker and the borrower to refinance the loan.  As a result, according to CW4, the delinquent loan was treated as a refinance instead of a rewrite.  CW4 recalled that the broker would waive the prepay penalty and the loan would come through as a broker deal, allowing the MLO, broker and AEs to generate new commissions on the deal.

293.   CW4 further explained that Downey benefited because its books showed lower delinquency and foreclosure rates, allowing Downey to represent higher capital assets and lower reserves.  According to CW4, unlike normal refinance loans, loans being "refinanced" in this manner were taken completely away from the underwriters, and they never saw them again.  CW4 explained that he would see a loan come through on the system as a delinquency and pull and flag it.  At this time, the file would be taken off CW4's desk and sent to Janet Peterson in the corporate office to handle.  According to CW4, this happened to him approximately two or three times per month during his three years at Downey.   Additionally, CW4 recalls that sometimes underwriters would be pulling credit and see a file that way.

294.   According to CW2, a Downey escrow administration manager until February 2008, his department was extremely busy in 2007 and the beginning of 2008 as a result of the large number of foreclosures occurring at that time.  In addition, CW2 confirmed that Downey was aware of the huge volume of the recasts on the horizon at least several months in advance as a result of reports that were generated internally.  This is confirmed by Downey's admission in its 2007 Form 10-K that at

1    the end of 2006, defendants internally forecasted $1.4 billion in loans set to recast in

2    2007.

3        295.   This is also confirmed by CW3, who reported that based on his review of

4    weekly Activity Reports, to which everyone on the sales side had access to, more and

5    more people began defaulting on their loans in late-2006 and continuing through

6    2007.

7        296.   CW8, a wholesale administrative supervisor from 1995 to June 2007,

8    recalls that in the early to mid-2000s, the bulk of Downey's loans were Option ARM

9    loans. ***CW8 strongly believes that Downey did not adequately reserve for these loans***

10    ***in 2006 and 2007, based on the fact that there were a higher number of foreclosures***

11    ***and defaults starting in 2006***. As set forth in GAAP, SEC rules and OTS regulations,

12    the higher number of foreclosures and defaults warranted increased reserves. CW8

13    also recalled that, starting at this same time, AEs were not selling anything and

14    everyone at Downey was becoming increasingly concerned.

15        297.   CW12, Downey's broker approval head secretary, indicated that in late-

16    2007 or early-2008, Downey increased the delinquency date from 90 days late to 180

17    days late before it would start the delinquency process. CW12 believes that this was a

18    tactic used by Downey to make its books look better and that Downey's non-

19    performing assets were much worse than what it had been reporting.

20        298.   CW18, a former AE, explained that he first stared to observe borrowers

21    defaulting on loans as early as 2004.

22        299.   CW19 received "pipeline e-mails" from Downey's corporate office

23    which gave him the amount of loans funded daily. CW19 would also receive a

24    monthly e-mail from the corporate office with sales goals including overall production

25    numbers for his location. According to CW19, in November 2007 Downey laid off its

26    entire Processing Department. CW19 recalls that at this time, the REO Department

27    came in (an REO, or Real Estate Owned, is a property that goes back to the mortgage

28    company after an unsuccessful foreclosure auction). CW19 knew business was not

going well because he saw more and more people in the REO Department and they were always busy.  CW19 recalled Downey's underwriting guidelines becoming tighter around January 2008 and that Downey's management was trying to get the capital to fund the loans that he and the other AEs were bringing in.

300.    Additionally, as illustrated in the following table, both the amount of payments past due and still accruing as well as the amount of "non-accrual" loans soared to unprecedented highs throughout the Class Period and beyond:[15]

| Past Due Amounts ($ in thousands) | | | |
|---|---|---|---|
| Quarter | 30-89 Days Past Due | 90+ Days Past Due | Non-accrual |
| 1Q05 | $16,220 | $0 | $25,647 |
| 2Q05 | $18,601 | $0 | $22,620 |
| 3Q05 | $18,182 | $0 | $27,590 |
| 4Q05 | $21,930 | $0 | $34,297 |
| 1Q06 | $20,896 | $0 | $38,448 |
| 2Q06 | $26,125 | $0 | $37,987 |
| 3Q06 | $40,385 | $0 | $60,725 |
| 4Q06 | $54,024 | $0 | $101,735 |
| 1Q07 | $46,332 | $0 | $125,997 |
| 2Q07 | $68,965 | $0 | $196,355 |
| 3Q07 | $132,133 | $0 | $261,464 |
| 4Q07 | $203,198 | $0 | $874,245 |
| 1Q08 | $291,614 | $0 | $1,279,419 |
| 2Q08 | $331,853 | $0 | $1,527,195 |

Source: Schedule PD of Thrift Financial Reports from Office of Thrift Supervision.

301.    In spite of these increasing delinquencies and non-accrual loans warranting more reserves, Downey's ALL was radically ***decreasing*** as a percentage of

---

[15]    Non-accrual loans are defined in Downey's SEC filings as loans on which Downey has ceased accruing interest (i.e., they are not generating interest income). Non-accrual loans are one component of non-performing assets.

1    non-accrual loans.  For instance, at the start of the Class Period, the ALL was at least

2    100% of non-accrual loans.  Whereas for the period ended December 31, 2006, this

3    percentage *dropped to 59.8%,* and it further decreased subsequently as illustrated in

4    the following table:

| ($ in millions) | | | |
|---|---|---|---|
| **Filing Date** | **Non-accrual Loans** | **Allowance for Loan Losses** | **Allowance for Loan Losses as a Percentage of Non-accrual Loans** |
| 12/31/05 | $34.3 | ($35.9) | 104.7% |
| 3/31/06 | $38.5 | ($44.5) | 115.6% |
| 6/30/06 | $38.1 | ($51.2) | 134.5% |
| 9/30/06 | $60.8 | ($60.8) | **100.0%** |
| 12/31/06 | $101.8 | ($60.9) | **59.8%** |
| 3/31/07 | $126.2 | ($60.8) | **48.1%** |
| 6/30/07 | $197.4 | ($69.1) | **35.0%** |
| 9/30/07 | $264.2 | ($142.2) | 39.2%[16] |
| 12/31/07 | $926.1 | ($348.2) | 37.6% |
| 3/31/08 | $1,373.4 | ($546.8) | 39.8% |
| 6/30/08 | $1,696.3 | ($732.4) | 43.2% |

302.    Additionally, defendants were well aware of the increasing number of foreclosed properties.  According to CW12, Downey's broker approval head secretary until October 2008, Downey had six foreclosed properties in 2005.  That number would grow to over 800 foreclosed properties by October 2008.  Indeed, the account balance of "real estate acquired in settlement of loans" on Downey's balance sheet was increased over *49,000%* from 1Q06 to 1Q08 (from $385,000 to $189.1 million).  In Downey's 2Q07 Form 10-Q, defendants attribute part of the decline in net income

---

[16]    This includes the $99 million adjustment increasing non-accrual loans to account for the troubled debt restructurings from the borrower retention program in 3Q07.  In the 3Q07 Form 10-Q, Downey improperly reported this percentage as 53.8%.  Ex. 12 at 493.  Defendants continued to improperly state this percentage and other non-performing assets information relating to 3Q07 in its 1Q08 and 2Q08 Forms 10-Q, despite its announcement on January 14, 2008 restating such information.  Exs. 19-20.

1    to an "increase in operating expense due primarily to a ***higher number of foreclosed***

2    ***properties***." Ex. 11 at 459. Despite this knowledge, at the same time (2Q07), the

3    allowance for loan losses as a percentage of loans held for investment was kept

4    artificially low at only 0.6%. As of September 30, 2008, after the OTS came

5    knocking, that number grew to 6.6%, a shocking increase of over ***1,000%***. Downey's

6    internal data also showed huge increases in the number of loans in foreclosure. ¶¶24,

7    315 (charts).

8        303.   As the level of non-accrual loans in Downey's portfolio increased, the

9    ALL should have been substantially ***increased*** to keep pace with the impairment of

10   the loans, but was not as reflected in the following chart derived from Downey's SEC

11   filings.



12

13

14

15

16

17

18

19

20

21

22

23   304.   Because each one of the OTS indicators of risk was increasing

24   exponentially during the Class Period, and in particular because the number of Option

25   ARMs where the borrower was using the negative amortization option was increasing,

26   defendants were well informed that the risk associated with Downey's portfolio was

27   increasing. As a result, Downey was required under GAAP, SEC rules and OTS

28

1  guidance to increase its allowance for loan losses to account for the increase in risk.

2  However, Downey did not increase its allowance to adequately account for the risk, in

3  some quarters it actually *reduced* its allowances as set forth in ¶¶24, 315-318.

4      305.   Despite defendants' knowledge not only that the percentage of Downey's

5  borrowers utilizing negative amortization was near 75% and that over 60% of

6  borrowers had the alarming increase in balances higher than the original balance, but

7  also that these percentages were sharply rising, in March 2006 Downey vigorously

8  opposed more stringent underwriting standards being proposed by the OTS in 2005.

9  Ex. 28.  Contrary to the information in the Company's possession, defendants argued

10  to the OTS that Option ARMs should not be underwritten based on the assumption

11  that borrowers would make the minimum payment but instead should be underwritten

12  based on the original loan balance.  Downey wrote:

13      *[T]he borrower should be qualified based on the original loan balance,*

14      *rather than assuming the borrower makes only minimum payments.*

15      *As noted earlier, such an assumption is highly speculative and*

16      *unfounded based on historical experience*.

17  Ex. 28 at 837.  Of course, as defendants knew, the "assumption" that borrowers would

18  only make the minimum payments was not merely speculative – as reported by

19  Downey before it wrote the comment letter that more than 60% of borrowers were

20  utilizing NegAm, defendants' knowledge is confirmed by the skyrocketing NegAm

21  balances on Downey's loans during that same period.

22      306.   **Defendants knew real estate price growth was collapsing in the**

23  **markets that comprised up to 80% of Downey's loans**.  Because defendants'

24  business model was premised on predatory Option ARMs with high LTVs and

25  skyrocketing NegAm, most of which were based on inflated properties in Southern

26  California and Arizona, any decline in rising real estate prices in those markets was a

27  tell-tale sign of catastrophic losses and defaults in Downey's loan portfolio.  As prices

28  decreased and NegAm increased, the ratio between the amount of the loan and the

1   value of the property also began to increase, making the loan more risky and

2   increasing the likelihood that borrowers could not afford to pay back the loans. That

3   is exactly what happened leading up to and during the Class Period.

4        307.   According to the two main indices that track U.S. housing, including the

5   well-known "Case-Shiller" index and the Office of Federal Housing Enterprise

6   Oversight ("OFHEO") Housing Price Index, the rate of growth in prices in Southern

7   California and Arizona (which accounted for most of Downey's business) began to

8   decline right around August to October 2006 before the Class Period began, and prices

9   were dropping rapidly during 2007. Indeed, immediately prior to the Class Period on

10   September 5, 2006 the OFHEO released a press release entitled "HOUSE PRICE

11   APPRECIATION SLOWS: OFHEO House Price Index Shows Largest Deceleration

12   in Three Decades." In addition, on September 13, 2006, the Senate Committee on

13   Banking, Housing and Urban Affairs held a hearing entitled "THE HOUSING

14   BUBBLE AND ITS IMPLICATIONS OF THE ECONOMY," where various

15   economists from government agencies discussed the coming decline of the housing

16   market and its negative relation to subprime and Option ARM mortgages.

17        308.   Defendants had also acknowledged in Downey's Form 8-K filed in April

18   18, 2006 that they were beginning to se changes "in the residential market, such as an

19   increased level of unsold homes and relatively flat home prices on a sequential month

20   basis. . . ." Defendant also stated that "[w]e will continue to closely monitor the

21   trenda in the residential housing and lending markets. . . ."

22        309.   Thus, defendants were well aware that housing prices were declining and

23   as a result of their unsound underwriting guidelines and lending policies borrowers in

24   existing loans were not able to pay off their loans when they sold their homes that they

25   could ill afford in the first place. Defendants knew that Downey had to increase its

26   reserves for probable losses and defaults of their predatory Option ARM loans.

27        310.   Numerous former Downey employees confirmed, based on personal

28   knowledge, that Downey and its top executives, including Rosenthal, McAlister and

Côté, either were actually aware of the red flags, negative facts and adverse trends at Downey or were deliberately reckless in disregarding those trends. CW9, who attended monthly meetings with 10 to 12 of the Company's top executives, including Côté, as well as Rosenthal and McAlister, as members of the Board, stated that the attendees received Monthly Board Reports that were 30 pages in length and contained all of Downey's internal audit findings for each month. CW9 said that the portion of the report that he prepared, which included NPAs, was a one-page afterthought to which about 13 seconds of the meeting were devoted. CW9 also reported that the meeting attendees, including Côté and Downey's directors, received presentations regarding real estate trend analysis data and reports called Asset Management and Reserves Reports, which were prepared by the Asset Valuation Management Group.

311. CW9 explained that the Asset Valuation Management Group, which was located on the first floor of corporate headquarters along with the Controller, Finance and Accounting, was in charge of buying property and analyzing bad debt. CW9 reported that only assets that were in foreclosure were included in the Non-Performing Assets line item in Downey's SEC filings. CW9 knew this because he was involved in Downey's financial analysis and SEC reporting processes, attended the aforementioned meetings with Downey's Board members and top executives, including Côté, and received the data and information supplied at those meetings, as described above.

312. CW10, a former Downey Financial Analyst and then a Senior Business Analyst, recalls that there was a standard report run for the Board at least once a month regarding non-performing assets based on current delinquencies. CW10 stated that different departments were in charge of different numbers including, for example, reserves and modifications, and thought that these numbers were reported at least monthly. CW10 explained that there were people at Downey who got paid the big bucks to study trends. As a result of this, according to CW10, Downey and its senior

1  executives and Board would have known that the market and its loans were going to

2  implode.

3       313.  CW13, a former senior financial analyst in Downey's financial

4  department, indicated that in the course of forecasting, he would follow trends based

5  on balance sheets and income statements and would then be told by higher-ups

6  (mostly Verret, who received his orders from the CFO, Prince, and then subsequently,

7  Côté) whether or not to adjust numbers.  According to CW13, Verret also attended

8  and took minutes at ALCO meetings.  In the course of his forecasting duties, CW13

9  used Downey's Sendero forecasting software to compile and pull reports.  CW13

10  thought that Verret and upper management had access to Sendero.

11       314.  According to CW24, while Downey's origination and underwriting

12  personnel used the Empower system, the Loan Servicing Department, which

13  facilitated loans, collected and monitored payments and identified delinquent loans,

14  used Downey's archaic system.  CW24 explained that one of the problems with the

15  archaic system was that it did not have the capability to update loans with current

16  appraisal figures.  As a result, CW24 stated that each loan retained the same value that

17  it had at origination regardless of whether it had been funded three or ten years earlier.

18  This had been identified as a problem by Downey, and one of the projects that the

19  Loan Servicing Department had requested of CW24's department was to update the

20  system to allow for updates of the values of underlying properties.  According to

21  CW24, that update was not completed prior to his departure in June 2008.  As a result,

22  according to CW24, the Five Brothers Appraisal Company was contacted to do drive-

23  bys of properties that had delinquent loans.  CW24 explained that the purpose of the

24  drive-by was to update the appraisal information for the underlying properties.

25

26

27

28

1

2

3

4

### 6.   Defendants Intentionally Reduced Downey's Loan Loss Provision to Fraudulently Inflate Earnings and Conceal Downey's Rapidly Increasing Risk and Impairment of Loans

5    315.   Because defendants were in possession of facts and evidence of drastic

6 increases in NegAm profits, loans and percentages, and loan delinquencies and

7 foreclosures, defendants were well aware that they were required under GAAP, SEC

8 rules and OTS guidance to *increase* Downey's loan loss reserves and, thus, its loan

9 loss provision on its income statement. They did not.  In fact, they did the opposite –

10 defendants intentionally manipulated and inflated their income and earnings by

11 *reducing* the Company's provision for loan losses, thereby intentionally misleading

12 investors about their loan quality, profits and credit risk exposure as described in

13 ¶¶316-320.  This was a blatant and deliberate violation of GAAP, SEC rules and OTS

14 mandates, some of which defendants had (unsuccessfully) tried to block the OTS from

15 publishing in 2005.  The following charts derived from Downey's quarterly SEC

16 filings reflect trends that defendants were required to know under OTS guidance

17 during the Class Period.

18

19

20

21

22

| ($ IN MILLIONS) | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|
| Negative Amortization in Loan Balance | 277 | 321 | 358 | 377 | 388 |
| 30+ Days Delinquent Loans | 101.2 | 144.5 | 173.1 | 259.9 | 386.5 |
| Non-Performing Assets | 66.5 | 110.4 | 143.4 | 227.4 | 323.9 |
| Foreclosure Settlements | 5.8 | 8.5 | 17.2 | 29.9 | 59.8 |
| **Provision for Credit Losses** | **9.6** | **0.2** | **0.6** | 9.5 | 81.6 |
| **Allowance for Loan Losses** | **60.8** | **60.9** | **60.8** | 69.1 | 142.2 |
| **Allowance for Loan Losses as a % of Non-Accrual Loans** | **100.0%** | **59.8%** | **48.1%** | 35.0% | 39.2% |

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**Provision for Credit Losses**



16    316.    As set forth above, defendants began the Class Period with an allowance for loan losses of $61 million, and took a $9.6 million provision for credit losses in 3Q06.  For the next five quarters during the Class Period (4Q06, 1Q07, 2Q07, 3Q07, and 4Q07), every other significant indicator demonstrated that Downey's loan portfolio was catastrophically impaired, delinquencies were rising, non-performing assets were increasing, and negative amortization was increasing (*e.g.*, customers' debt was rising because they could not even afford to pay the interest on their mortgages).

24    317.    Instead of increasing their allowance for loan losses, knowing that their loans were likely impaired and during an obvious collapse in the market, however, defendants fraudulently ***reduced*** their provision for credit losses from ***$9.6 million*** in 3Q06 to only ***$200,000*** in 4Q06, and ***$600,000*** in 1Q07, thereby maintaining their ALL around $61 million for three straight quarters.  This was an intentional

1  manipulation of the Company's credit loss reserves which inflated Downey's earnings

2  and made its financial position seem much more favorable than it was.

3      318.  Notably, Downey's ALL only increased $159,000 – a mere 0.3%

4  increase – from September 30, 2006 to December 31, 2006, and the allowance

5  actually *decreased 0.3%*, or $185,000, from December 31, 2006 to March 31, 2007 to

6  a level lower than it was six months prior at September 30, 2006.  During the same

7  six-month period from September 30, 2006 to March 31, 2007, non-accrual loans

8  more than doubled by $65.4 million and loans that were past due and still accruing

9  increased 15%.  Thus, defendants' manipulation of Downey's ALL was obvious and

10  deliberate to conceal risk and inflate earnings.

11      319.  The blatant manipulation of Downey's loan loss reserves and provision is

12  reflected in the huge and abnormal spikes in reserve increases as the Class Period

13  went on.  Downey's fraudulent reporting caused Downey's credit problems to

14  compound and its provision for credit losses skyrocketed from $600,000 in 1Q07 to

15  $9.5 million in 2Q07, a *1,483% increase*.

16      320.  It was not until the quarter ended September 30, 2007 (which would later

17  be restated) that Downey recorded its first unusually large, albeit still inadequate,

18  provision of $81.6 million, a 759% increase from the prior quarter.  This is in stark

19  contrast to the provisions of only $200,000 and $600,000 taken in the quarters ended

20  December 31, 2006 and March 31, 2007, respectively.  Defendants' obvious attempt

21  to reduce Downey's loan loss provision at a time when GAAP, SEC rules and OTS

22  guidance required them to *increase* the ALL and, therefore, also the provision is

23  another fact supporting scienter.

24      321.  As a result of the inadequate ALL on Downey's balance sheet throughout

25  the Class Period, the asset account "loans held for investment, net" was overstated on

26  the balance sheet.  The following chart shows the loans and allowances as improperly

27  reported by defendants in Downey's SEC filings throughout the Class Period for the

28  periods ended September 30, 2006 through December 31, 2007, as well as for the

surrounding periods.  It also shows the percentage by which loans held for investment were reserved:

| ($ in millions) | | | | |
|---|---|---|---|---|
| Filing Date | Loans held for Investment | Allowance for Loan Losses | Loans Held for Investment, Net | Allowance for Loan Losses as a Percentage of Loans Held for Investment |
| 3/31/06 | $15,912.3 | ($44.5) | $15,867.8 | 0.3% |
| 6/30/06 | $15,571.8 | ($51.2) | $15,520.6 | 0.3% |
| 9/30/06 | $14,872.6 | ($60.8) | $14,811.9 | 0.4% |
| 12/31/06 | $13,868.2 | ($60.9) | $13,807.3 | 0.4% |
| 3/31/07 | $13,002.8 | ($60.8) | $12,942.0 | 0.5% |
| 6/30/07 | $12,273.3 | ($69.1) | $12,204.2 | 0.6% |
| 9/30/07 | $11,744.1 | ($142.2) | $11,601.8 | 1.2% |
| 12/31/07 | $11,381.3 | ($348.2) | $11,033.1 | 3.1% |
| 3/31/08 | $11,163.3 | ($546.8) | $10,616.5 | 4.9% |
| 6/30/08 | $11,363.4 | ($732.4) | $10,631.0 | 6.4% |

Exs. 3-4, 6, 10-12, 19-20.

322.    Downey's understatements of the provisions and allowances for credit losses resulted in overstated net income or understatement of net losses. GAAP, as described in FASB Statement of Concepts No. 5, ¶87, states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits."  Downey violated this promulgation.

323.    Downey's improper accounting for the provision for credit losses and the allowance for loan losses violated other fundamental GAAP requirements as well, including: (i) the principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions (FASB Statement of Concepts No. 1, ¶34); (ii) the principle that financial reporting

1   should provide information about the economic resources of an enterprise, the claims
2   to those resources and the effects of transactions, events, and circumstances that
3   change resources and claims to those resources (FASB Statement of Concepts No. 1,
4   ¶40); (iii) the principle that financial reporting should provide information about an
5   enterprise's financial performance during a period (FASB Statement of Concepts No.
6   1, ¶42); (iv) the principle that financial reporting should be reliable in that it represents
7   what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59); (v) the
8   principle of completeness (FASB Statement of Concepts No. 2, ¶79); (vi) the principle
9   that conservatism be used as a prudent reaction to uncertainty to try to ensure that
10  uncertainties and risks inherent in business situations are adequately considered
11  (FASB Statement of Concepts No. 2, ¶95); and (vii) the principle that interim
12  financial reporting should be based upon the same accounting principles and practices
13  used to prepare the annual financial statements (Accounting Principles Board Opinion
14  ("APB") No. 28, ¶10).

15      324.   Furthermore, Downey's recording of negative amortization interest
16  income was misleading in that recording interest income that is likely uncollectible
17  does not adhere to the spirit of GAAP which requires that revenues represent actual or
18  expected cash inflows and that revenues are not realizable unless "[c]ollectibility is
19  reasonably assured." *See* FASB Statement of Concepts No. 6, *Elements of Financial*
20  *Statements*, ¶79; SAB No. 104, Topic 13A.

21      325.   Additionally, the adverse information concealed by defendants during the
22  Class Period and detailed above was in violation of Item 303 of Regulation S-K under
23  the federal securities laws (17 C.F.R. §229.303).

24      326.   Furthermore, Downey's improper accounting for the troubled debt
25  restructurings, the provision for credit losses and the allowance for loan losses were
26  material, given the SEC's guidance on materiality.  SAB Topic 1M, *Materiality*,
27  summarizes GAAP definitions of materiality.  SAB Topic 1M represents the
28  codification of certain Staff Accounting Bulletins, including SAB No. 99, *Materiality*,

1    as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.  SAB Topic 1M says,

2    *inter alia*, "[a] matter is 'material' if there is a substantial likelihood that a reasonable

3    person would consider it important."   It also stresses that materiality requires

4    qualitative, as well as quantitative, considerations.   For example, if a known

5    misstatement would cause a significant market reaction, such reaction should be taken

6    into account in determining the materiality of the misstatement.

**7.    Defendants' Overstatement of Assets Rendered**
**Defendants' Statements Regarding Downey's Capital**
**Position Knowingly False**

10    327.  Capital is synonymous with a company's stockholders' equity.

11    Stockholders' equity and the level of Downey's regulatory capital compliance were

12    critical metrics for analysts and investors because they were indicators of the financial

13    health of the Company and its ability to continue its operations independently over

14    time.  Indeed, analysts touted Downey's capital as a strength and a positive factor

15    which differentiated it from its competitors.  For example, on April 19, 2007, analyst

16    Keefe, Bruyette & Woods reported: "Capital management remains a key issue at

17    Downey.  At the end of the quarter, tangible capital was 9.43%, ***well above peers and***

18    ***well above any regulatory guidelines***."  The July 19, 2007 report went on to note that

19    "we firmly believe that the company has more than adequate capital to weather a

20    further significant downturn in the environment."

21    328.  A company's stockholders' equity is derived from two main sources:

22    money invested in the company and income that a company is able to accumulate over

23    time (retained earnings).  Stockholders' equity equals total assets less total liabilities.

24    Therefore, if a company's assets are overstated and its liabilities remain constant, its

25    stockholders' equity will be overstated.  As alleged in ¶¶260-326, Downey's assets

26    were materially overstated during the Class Period, resulting in an overstatement of its

27    capital.  As a result, defendants' statements at ¶¶257-259 relating to Downey's excess

28    capital and its capital position were false and misleading when issued.

1    329.    Prior to the Class Period, Downey maintained reserves that covered the

2    majority of its non-accrual loans.    If it had continued to do this during the Class

3    Period, Downey's adjusted excess percentage would have been significantly less than

4    its reported excess percentage.    In addition, as detailed in ¶¶110-205, defendants were

5    aware during the Class Period that the loans in their portfolio were not adequately

6    underwritten and were likely to default and, later in the Class Period, that non-accrual

7    loans and non-performing assets were skyrocketing.    As such, Downey's failure to

8    account for the imminent impairment of the loans caused Downey to state that it was

9    more well capitalized than it really was.    Furthermore, the imminent impairment of the

10   loans may have jeopardized the Company's ability to meet regulatory capital

11   requirements.

12   330.    Downey was at greater risk of failure to meet required capital levels

13   because of its concentration in Option ARMs.    The OTS' September 2006 guidance

14   specifically provided that Downey must maintain capital levels commensurate with

15   the risk of a non-traditional mortgage portfolio and the effect of stressed economic

16   conditions on collectibility.    By the fall of 2008, CW25 observed that Downey was

17   trying to raise additional capital to fund loans.    Further, CW1 indicated that in 2007 he

18   was told that Downey did not have the funds to modify all of Downey's troubled

19   loans.    Yet, throughout 2007 and into January 2008, defendant Rosenthal was touting

20   Downey's "strong capital position" in the face of other adverse news.    See ¶¶257-259.

21   Further, the overstatement of stockholders' equity from defendants' failure to properly

22   assess Downey's allowance for ALL and the overstatement of the percentages by

23   which the Company claimed to exceed the regulatory well-capitalized requirements

24   were false and misleading to investors in that they did not paint an accurate or fair

25   picture of Downey's financial health.    This would be borne out in the months

26   following the Class Period.    On July 14, 2008, Downey reported that its regulatory

27   capital position of the bank was enhanced by $62 million as a result of $50 million

28   from its holding company and $12 million from its service company.    Yet, on July 24,

1    2008, Moody's downgraded Downey Savings to junk citing its dwindling capital base

2    and the prospect it could have difficulty tapping the markets for more. Craig Emrick,

3    Vice President and Senior Credit Officer at Moody's, was quoted as follows: "We

4    consider Downey's capital level to be its primary strength and it is being quickly

5    eroded by its operating performance." Indeed, the OTS found that Downey's capital

6    position was inadequate and Downey would admit in its 3Q08 quarterly filing that it

7    had considerable doubt that its capital levels would satisfy the consent order issued by

8    the OTS in September 2008. Shortly thereafter, Downey's Savings and Loan

9    subsidiary was taken over by the FDIC and Downey filed for bankruptcy.

10          **8.    Defendants' Vehement Opposition to and Subsequent**

11                **Failure to Follow Regulatory Guidance Underscores**

12                **Falsity and Scienter**

13          331.   As set forth in ¶¶17-22, *supra*, Regulatory Agencies[17] issued proposed

14    guidance in December 2005, including assessing a borrowers' ability to repay a loan

15    on balances added through negative amortization, mitigating below-market

16    introductory interest rates and lending to subprime borrowers, as well as maintaining

17    loan losses at a level appropriate for portfolio credit quality and maintaining capital

18    levels that reflect the effect of stressed economic conditions on collectability and

19    greater disclosures to borrowers. In March 2006, Downey objected to the guidance of

20    "non-traditional" mortgage products, at least 92% of its portfolio. Ex. 28.

21          332.   In direct contradiction of witness descriptions of defendants' disregard

22    for proper underwriting, Downey opposed the regulatory guidance, claiming that the

23    Company's purportedly prudent underwriting properly offset the risk of its loans and

24    that there was no basis for additional regulation that would require Downey (and

25    _____

26    [17]    "Regulatory Agencies" as used herein refers to the Department of Treasury
       Office of the Comptroller of the Currency, the Board of Governors of the Federal
27    Reserve System, the Federal Deposit Insurance Corporation, the Department of the
       Treasury Office of Thrift Supervision and the Natural Credit Union Administration.

28

1   others) to qualify borrowers assuming the borrower would make only minimum

2   payments. *Id*. Not surprisingly, defendants also objected to concentration limits as a

3   vast amount their portfolio consisted of Option ARMs concentrated in California and

4   balked at the maintenance of capital levels which would reflect the effects of stressed

5   economic conditions. *Id*.

6       333. Specifically, defendants vigorously opposed virtually every proposed

7   safeguard by the OTS and falsely stated that such safeguards were not needed:

8       *[W]hen appropriately underwritten and managed, many*

9       *[nontraditional mortgage] products provide consumers with safe and*

10      *convenient mortgage financing alternatives without creating undue*

11      *risk to insured institutions. . . .*

12                          *       *       *

13      *We agree that prudent underwriting standards are necessary to*

14      *manage and mitigate any credit risks associated with Option ARMs.*

15      *However, we believe that such standards and expectations are already*

16      *covered in existing guidance and regulation, including the real estate*

17      *lending standards set forth in Section 560.101 of the OTS Regulations.*

18      *Consistent with regulatory standards and expectations, Downey*

19      *Savings has adopted and implemented appropriate underwriting*

20      *measures to mitigate credit risk associated with Option ARMs*. . . .

21      *[M]ost customers prefer to pay a higher interest rate in order to reduce*

22      *the level of paperwork in the mortgage process*. . . . Again, we believe

23      that current guidance and regulations set forth appropriate standards and

24      expectations for prudent underwriting standards and risk management

25      practices associated with reduced documentation loans and, in general,

26      regulated financial institutions have implemented appropriate measures

27      to mitigate the risk. . . .

28                          *       *       *

1     For Option ARMs, . . . *the borrower should be qualified based on*
2     *the original loan balance, rather than assuming the borrower makes*
3     *only minimum payments. As noted earlier, such an assumption is*
4     *highly speculative and unfounded based on historical experience*. . . .

5                         *     *     *

6     *We believe that potential payment shock due to early recasting is better*
7     *handled by management through prudent monitoring and loan*
8     *servicing practices, which would include the development of accurate*
9     *and timely reports and strategies to deal with those borrowers that*
10    *constantly choose to make the minimum payment*. . . .

11                        *     *     *

12    *While certain levels of diversification are advisable, we oppose the*
13    *guidance's call for concentration limits, especially for*
14    *"nontraditional"* products. . . .

15    While we believe appropriate capital levels should be maintained
16    for the various loan portfolios, *we are troubled by the guidance's*
17    *suggestion to maintain sufficient capital to reflect the effect of stressed*
18    *economic conditions*.

19    *Id.*

20    334.    Having failed to block approval of the final regulatory guidance, which
21    was published in September 2006, one month before the Class Period, defendants
22    blatantly disregarded it for more than nine months and then knowingly misled
23    investors about their purported "compliance" with the new guidance. *See* ¶22, *infra*.
24    Indeed, at least one analyst, Moors & Cabot, when it had learned of the new potential
25    guidance in December 2005, observed that: (i) Downey would have to raise its start
26    rate; (ii) the volume of Option ARM originations would decrease with the new
27    documentation guidance; (iii) Downey may have issues with concentration limits; and
28    (iv) Downey may be required to increase loan loss reserves on its nontraditional

1   mortgage products (*i.e.*, Option ARMs).  In fact, Downey actually lowered its start

2   rate and failed to take sufficient reserves during the Class Period.

3           **9.      Defendants Further Increased Downey's Risk by**

4                  **Relying on Option ARMs to Hedge Risk**

5           335.   Downey, unlike many of its competitors, did not primarily "hedge"

6   through the use of financial instruments (such as derivatives) which reduce

7   profitability.  Instead, Downey chose to principally manage its interest rate risk by

8   pushing borrowers to utilize Option ARMs.  For example, Downey told investors in

9   its FY06 Form 10-K that:

10          To limit the interest rate risk associated with these 15- to 40-year

11          maturities, we, among other things, principally originate adjustable rate

12          mortgage loans for our own loan portfolio.

13  Ex. 3 at 220.

14          336.   Because the loan interest rates on Option ARMs adjust when interest

15  rates adjust, Option ARMs transfer the risk of changing interest rates from the lender

16  to the borrower.  However, this risk transfer is only effective for the lender if it has

17  ensured, through prudent underwriting, that the borrower will be able to afford the

18  monthly payments should the interest rates rise.  The OTS has issued guidance on this

19  topic, stating: "ARM lending involves a transfer of interest rate risk from the lender to

20  the borrower.  As a tradeoff, the lender must assume the additional credit risk

21  associated with a borrower's potential inability to service the loan if interest rates

22  rise."  Ex. 27 at 824.

23          337.   As discussed in ¶¶110-205, Downey's underwriting was woefully

24  inadequate and did not ensure that borrowers would not default if interest rates were to

25  rise.  As a result, Downey had not effectively transferred interest rate risk but, instead,

26  had simply created additional risk in its portfolio.  Defendants were aware that

27  Downey, by avoiding the additional costs associated with properly hedging against

28  interest rate risk, had left itself extremely vulnerable to increases in interest rates.

Beginning in 2004, the Federal Reserve began to raise interest rates. As a result, by the beginning of 2005, both the MTA and COFI indices (which lag behind the federal funds rate), which the majority of Downey's loans were tied to, began to rise dramatically (this dramatic increase continued to 2007):



338.   The increase in interest rates resulted in higher interest rates when their loans adjusted for borrowers who could not afford the loans in the first place. The increased "shock" payments which were not disclosed to borrowers as set forth in ¶¶176-186, 204-205, necessarily resulted in increased delinquencies, defaults and eventual foreclosures – the risk coming full circle back to Downey.

G.    **False and Misleading Statements in 3Q07 Regarding Troubled Debt Restructurings and the Quality of Downey's Loan Portfolio that Resulted in Nearly $100 Million in Restated Loans**

339.    On November 1, 2007, defendants Rosenthal and Côté signed, certified and filed Downey's 3Q07 Form 10-Q with the SEC which was published to investors. The Form 10-Q contained misrepresentations concerning $99 million in "troubled debt restructurings" (TDRs) which were purported loan modifications through a "portfolio retention effort" as follows:

> *During the current quarter, we modified $99 million of loans through our portfolio retention efforts and $3 million of loans through troubled debt restructurings*.  Most of the modifications related to option ARM loans that were modified into adjustable rate mortgages where the interest rate is fixed for the first five years.

> *                 *                 *

> *We consider a restructuring of a debt a troubled debt restructuring when we, for economic or legal reasons related to the borrower's financial difficulties, grant a concession to the borrower that we would not otherwise grant.  Troubled debt restructurings may include changing repayment terms, reducing the stated interest rate, reducing the amounts of principal and/or interest due or extending the maturity date.  The restructuring of a loan is intended to recover as much of our investment as possible and to achieve the highest yield possible.  All restructured loans were on non-accrual status at September 30, 2007.*

Ex. 12 at 487, 493 (italics in original).

340.    On January 14, 2008, Downey issued a press release entitled "Downey Announces Change in Previously Reported Non-Performing Assets," which stated in part:

- 127 -

1    "***KPMG LLP, our independent registered public accounting firm, did***
2    ***not object to this assessment during its third quarter review***."

3    Mr. McGill continued, "During December 2007, KPMG advised
4    us that upon further review of the modification program, it was likely the
5    loan modifications should be recorded as troubled debt restructurings.
6    ***After reassessing our initial analysis, we determined these modified***
7    ***loans should be accounted for as troubled debt restructurings.  This***
8    ***conclusion was reached because in the current interpretation of***
9    ***GAAP, especially in the current housing market, there is a rebuttable***
10   ***presumption that if the interest rate is lowered in a loan modification,***
11   ***the modification is deemed to be a troubled debt restructuring unless***
12   ***the modified loan can be proved to be at a market rate of interest based***
13   ***upon new underwriting, including an updated property valuation,***
14   ***credit report and income analysis.  We did not perform these additional***
15   ***steps since borrowers who qualified for our retention program were***
16   ***current and we were trying to streamline the process for qualified***
17   ***borrowers to modify their loans*** at interest rates no less than that being
18   offered to new borrowers. . . ***it will result in $99 million of loans being***
19   ***classified as non-performing at September 30, 2007***."

20                               *      *      *

21   Mr. Côté concluded by stating, "***As of year-end 2007, the***
22   ***estimated level of non-performing assets as a percent of total assets***
23   ***increased to 7.8%. . . . As yet, we have not determined the impact this***
24   ***reporting change may have on previously reported financial***
25   ***statements, if any, but we expect to complete this analysis soon***."
26   Ex. 5.

27

28

**H.    Reasons Why Downey's 3Q07 Financial Statements Were Knowingly False**

341.    By 3Q07, Downey could no longer ignore the massive amount of liar's loans in its portfolio, including the $1.4 billion it knew at the end of 2006 was set to recast in 2007, as subsequently disclosed in Downey's 2007 Form 10-K.  Instead of properly reserving for clearly impaired assets, defendants embarked on a different strategy, a "modification program," to modify the loans that were set to recast.  It did so because failure to do so would result in the recasting of these loans and shock payment increases to borrowers who could ill afford the monthly payments.  Rather than treating these "modified" loans as TDRs and classifying them as non-performing assets in accordance with GAAP, defendants mischaracterized these loans as performing assets and failed to take the reserves necessary to cover the increased risk.  Further, contrary to defendants' insinuations that these "modified" loans were given to borrowers who were in a good position to pay the modified loans, they were not.

342.    Downey's "borrower retention program" initiated in 3Q07 purportedly provided borrowers, who were current with their loan payments, a cost-effective means to change from an Option ARM subject to negative amortization to a less-costly financing alternative.  Defendants subsequently admitted in a restatement that these modified loans were TDRs because the interest rates were lower than the interest rates on the original loans and the loans were not re-underwritten to prove the new interest rates were, in fact, market interest rates for borrowers with similar credit quality.

343.    As a result of Downey's failure to classify these loans as TDRs, Downey conceded in a press release dated January 14, 2008 that its reported non-performing assets balance was understated by $99 million, or 30.5%, in the 3Q07 Form 10-Q.  Ex. 5.  As a result, Downey's reported non-performing assets as a percentage of total assets of 2.25% at September 30, 2007 was understated in the 3Q07 Form 10-Q.  Correcting the error, non-performing assets as a percentage of total assets should have

1   been 2.94% at September 30, 2007. Similarly, Downey's reported allowance for loan

2   losses as a percentage of non-accrual loans of 53.84% was overstated in the 3Q07

3   Form 10-Q. Correcting the error, the adjusted allowance for loan losses as a

4   percentage of non-accrual loans was only 39% at September 30, 2007. This means

5   that only 39% of Downey's non-accrual loans were reserved for as of September 30,

6   2007. Even the overstated percentage of nearly 54% was inadequate. This was

7   significantly lower than the percentage had historically been in prior years: 95%,

8   124% and 100% in 3Q04, 3Q05 and 3Q06, respectively. Moreover, the percentage

9   was as high as 134.5% at June 31, 2006, a mere 3-1/2 months prior to the

10   commencement of the Class Period.

11      344.   GAAP, specifically SFAS No. 15, *Accounting by Debtors and Creditors*

12   *for Troubled Debt Restructurings*, which was issued in June 1977, defines a TDR as a

13   restructuring of a debt in which "the creditor for economic or legal reasons related to

14   the debtor's financial difficulties grants a concession to the debtor that it would not

15   otherwise consider." SFAS No. 15, ¶2. "Whatever the form of concession granted by

16   the creditor to the debtor in a troubled debt restructuring, the creditor's objective is to

17   make the best of a difficult situation. That is, the creditor expects to obtain more cash

18   or other value from the debtor, or to increase the probability of receipt, by granting the

19   concession than by not granting it." SFAS No. 15, ¶3.

20      345.   It is clear that defendants were aware of the GAAP governing TDRs

21   because Downey not only reiterated the above in its 3Q07 Form 10-Q, but defendants

22   also filed the SEC filing with this language in italics. *See* ¶339. CW9, a former

23   Downey finance department employee, who worked as an SEC Reporting Analyst at

24   Downey until April 2007, was responsible for preparing internal and external financial

25   reports and supporting schedules for, among other things, non-performing assets.

26   CW9 was also responsible for preparing and filing Forms 10-Q and 10-K with the

27   SEC. Further, CW9 assisted with preparing press release financials and supporting

28   schedules; he described his work as taking the rolled up financials and describing

- 130 -

1    them in paragraph form.  CW9 worked directly with Director of Financial Reporting

2    Steve Tucker and Controller Kent Smith.

3        346.   CW9 explained that drafts of SEC filings were passed out to all

4    executives and finance department managers.  Then, the people within the finance

5    department responsible for confirming the accuracy of the statement (or number

6    associated with the italicized portion) had to go to work to make sure there were no

7    problems with it.  CW9 has personal knowledge that italics were used to flag text that

8    needed further validation, because he was personally instructed by the Director of

9    Financial Reporting (Steve Tucker) and Downey's corporate Controller (Kent Smith)

10   to review all italicized items and provide confirmation regarding the accuracy of the

11   final numbers before the text was sent to the SEC.  CW9 stated that if an italicized

12   item was left in an SEC disclosure after it was filed it meant that either the item was

13   not resolved or Downey failed to catch it at the last minute before it was filed with the

14   SEC.

15       347.   Further, while defendants previously included similar terminology in

16   Downey's FY06 Form 10-K and subsequent FY07 Form 10-K, the terminology was

17   not italicized.  Moreover, Downey did not include a discussion of troubled debt

18   restructurings in either of its 1Q07 or 2Q07 Forms 10-Q filed with the SEC.

19   Defendants' knowledge of the failure to properly account for troubled debt

20   restructurings at 3Q07, which led to their admitted GAAP violations and restatement

21   in January 2008, is bolstered by the internal focus on this issue at the time.

22       348.   Defendants failed to adhere to Downey's stated policy for the loans

23   restructured as part of the borrower retention program for the quarter ended September

24   30, 2007 when Downey failed to classify the modified loans as TDRs.  As a result,

25   defendants admittedly understated Downey's non-performing assets by 30.5%.

26

27

28

349.    GAAP also requires that a creditor in a TDR involving a modification of terms of a receivable account for the TDR in accordance with the provisions of SFAS No. 114, *Accounting by Creditors for Impairment of a Loan*.[18]  *See* SFAS No. 15, ¶30. A loan is impaired when "it is probable[19] that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."  SFAS No. 114, ¶8.  GAAP states that usually "a loan whose terms are modified in a troubled debt restructuring already will have been identified as impaired" because conditions indicating that it is likely that a creditor will be unable to collect all amounts due under the contractual terms specified by the original loan agreement "will have existed before a formal restructuring."  *See* SFAS No. 114, ¶¶8-9.  In other words, the inherent nature of TDRs implicates that the loans were already impaired.

350.    Despite the inherent impairment issue related to these TDRs, Downey failed to maintain adequate reserves.  In Downey's FY07 Form 10-K, defendants disclosed that $39.5 million of the current year provision for credit losses was related to the creation of a specific allowance associated with certain TDRs resulting from the borrower retention program.  Defendants also disclosed the specific methodology used to calculate this reserve for these particular loans.  A specific valuation allowance was "calculated as the difference between the recorded investment of the original loan and the present value of the expected cash flows of the modified loan (discounted at the effective interest rate of the original loan based on an expected life)."  Ex. 4 at 046. However, Downey failed to utilize this same methodology during 3Q07 when Downey modified the loans involved in the borrower retention program.

---

[18]    SFAS No. 114 was issued in May 1993.  Thus, this was not new accounting guidance.

[19]    GAAP defines "probable" as "[t]he future event or events are likely to occur." SFAS No. 5, *Accounting for Contingencies*, ¶3.

351.    Regarding the allowances for the 3Q07, Downey simply stated in its Form 10-Q that unless an individual loan or borrower's relationship warranted separate analysis, the Company generally determined the allowance for credit losses related to loans under $5 million through a statistical analysis of the expected performance of each loan based upon historical trends for similar types of borrowers, loans, collateral and economic circumstances.    As such, Downey did not evaluate the loans related to the borrower retention program on an individual basis and, therefore, the allowance for loan losses as of September 30, 2007 was understated.    Additionally, Downey's allowance of $39.5 million as of December 31, 2007 was inadequate as it only covered 9.4% (less than 10%) of the $420 million of TDRs resulting from the borrower retention program, which were inherently risky loans, as described herein.

352.    Further, contrary to defendants' statements that this borrower retention program was given to qualified borrowers, confidential witnesses explain otherwise. CW1 confirms that modification was the last resort; if a borrower could be refinanced, then they would refinance.    Indeed, Downey was modifying the loans which were set to recast because the loan balances had risen to above the roughly 10%-15% threshold of the original balances (negative amortization) or in some cases the recast period of typically five years had come due.    Additionally, according to CW1, Downey was reluctant to modify loans because doing so would require Downey to inform potential investors of mortgage-backed securities that some of the loans were tainted.

353.    CW2, an escrow administration manager and customer service team lead from August 2001 to February 2008, provides insight into Downey's loan modifications.    In 2007, CW2's department was trained to field calls from borrowers. CW2 recalls that any time an Option ARM borrower called, his department was trained to immediately pull up the borrower's loan information, to instruct the borrower about his recast date, and to offer to transfer to a loan officer to provide alternative loan product information.    In addition, loan officers and branch employees were tasked with sending out letters and making calls encouraging borrowers to

1    restructure loans at recast.  In particular, CW2 recalls that letters were sent to
2    borrowers several weeks before their loans were to recast and follow-up calls were
3    made encouraging loan modification.  Each of the branches was given goals and
4    monetary incentives to modify Option ARM loans.

5        354.    In mid-2007, as increasing numbers of loans were set to recast, including
6    the $1.4 billion in loans defendants would later concede they had projected at the end
7    of 2006, would recast in 2007, in Downey's 2007 Form 10-K.  CW2 recalls that the
8    volume of loan modifications required moving the task to the corporate office.  In the
9    second or third quarter of 2007, a department called the Mod Squad was formed in the
10   corporate office to contend with the mounting loans coming up for recast and the
11   modification campaign undertaken by Downey.  CW2 attended meetings where the
12   role of the Mod Squad was discussed.  John Amador was the manager in charge of the
13   Mod Squad, which took over the letter and follow-up call activities previously
14   conducted in branch offices.  CW2 confirmed that, *at modification, underwriters did
15   not do a complete underwrite and did not re-appraise property values*.

16       355.    In fact, defendants did little underwriting on the modifications because at
17   the time defendants knew that it was highly unlikely that these borrowers could
18   qualify for new loans, particularly under the new regulatory guidance described in Ex.
19   9 which called for more stringent underwriting.  A contributing factor was the
20   downturn in the housing market which sunk median home values in California as
21   described in ¶¶306-308, making it highly likely that the homes that served as collateral
22   for those loans would not appraise to their original value.

23       356.    Defendants also knew that 86% of these toxic loans had increased
24   balances due to negative amortization and, thus, the LTV ratio of these "modified"
25   loans likely required increased underwriting under Downey's guidelines as well as
26   regulatory guidance.  Purportedly, less than two months after the 3Q07 Form 10-Q
27   was filed, defendants' auditor, KPMG, forced Downey to restate these "modified"
28   loans as troubled debt restructurings, a concession by defendants under GAAP that

1   they knew when Downey's 3Q07 financials were filed with the SEC that they had

2   improperly classified these "modified" loans as performing assets. *See* SFAS No. 15,

3   ¶2, described in ¶¶344-345, herein.  Defendants also restated their non-performing

4   assets by $99 million.  However, even though defendants restated their balance sheet

5   for 3Q07 by $99 million and reclassified all of these modified loans as troubled debt

6   restructurings, they continued to mislead investors by failing to take additional

7   reserves at 3Q07.

8        357.   Perhaps even more egregious is that defendants failed to take adequate

9   provisions for credit losses and loan loss reserves when they filed Downey's original

10   3Q07 Form 10-Q and again when Downey restated its "modifications" to troubled

11   debt restructurings in January 2008.  Had defendants properly accounted for the $99

12   million in Downey's impaired loans and appropriately increased its allowance and

13   provision for credit losses, its net loss would have been drastically worse than

14   Downey reported.

15        358.   Additionally, defendants' statements in Downey's January 14, 2008 press

16   release concerning its fraudulent $99 million loan modification program for TDRs

17   were false and misleading.  Ex. 29.  Defendants falsely attempted to explain the

18   improper accounting by blaming Downey's auditor, KPMG, and by stating that it was

19   the "current interpretation of GAAP" that required defendants to account for the $99

20   million in loan modifications as TDRs.  In fact, the GAAP provisions that Downey

21   violated (intentionally) had been required for decades.  Defendants' attempt to

22   downplay their accounting manipulations as something that was subject to changing

23   GAAP rules was misleading.  Defendants intentionally accounted for the Company's

24   loan modifications in a way that would inflate Downey's financial condition and

25   conceal the severe problems with its loans and credit losses.

1
2

**I.    False and Misleading Statements Regarding Compliance with Interagency Guidance**

3      359.    On September 25, 2006, the OTS published its Final Guidance on
4  Nontraditional Mortgage Lending.  Ex. 9.  For three consecutive quarters following
5  the September 25, 2006 formal publication of the new regulations, defendants misled
6  investors by telling them in Downey's SEC filings that Downey was still "assessing"
7  the impact of the OTS guidance and closely monitoring trends in residential housing
8  and lending markets to make adjustments as appropriate.  For example, Downey's
9  3Q06 Form 10-Q stated: "At this time, ***we are assessing what impact, if any, this new***
10 ***lending guidance [Interagency Guidance on Nontraditional Mortgage Product***
11 ***Risks] will have on our loan underwriting guidelines and production volumes***.  We
12 will continue to closely monitor trends in the residential housing and lending markets,
13 and make adjustments as deemed appropriate."  Ex. 6 at 326.

14     360.    On March 1, 2007 and May 4, 2007, defendants issued substantially the
15 same false statements in Downey's FY06 Form 10-K and 1Q07 Form 10-Q.  *See* Exs.
16 3, 10.

17     361.    Thereafter, on August 1 and November 1, 2007, defendants caused
18 Downey to file Forms 10-Q with the SEC which falsely stated that "as of July 1,
19 2007," the Company's underwriting practices were "***in line with regulatory***
20 ***guidance***" and that "[w]e continue to closely monitor trends in residential housing and
21 lending markets and will make any other adjustments, as deemed necessary."  *See* Ex.
22 11 at 463, Ex. 12 at 491.

23
24
25

**J.    Reasons Why Defendants' Statements Regarding Compliance with Interagency Guidance Were Knowingly Materially False and Misleading When Issued**

26     362.    Defendants' statements in Downey's SEC filings concerning the new
27 OTS final regulatory guidance released on how to properly value, assess and
28 underwrite exotic mortgages, including Option ARM loans, were materially false and

1    misleading.  The new guidelines required, *inter alia*: (i) "strong risk management

2    standards"; (ii) a careful assessment of the borrower's capacity to repay the loan; (iii)

3    appropriate capital and loan loss reserves; (iv) avoidance of concentrations in

4    products; (v) avoiding "over-reliance on credit scores as a substitute for income

5    verification", assets or outstanding liability verification"; and (vi) "ensuring that

6    borrowers have sufficient information to clearly understand loan terms and associated

7    risks prior to making a product or payment choice."  Ex. 9 at 384-385, 387.

8         363.   As an initial matter, Patricia A. McCoy, professor of banking and

9    securities regulation, corporate governance, and consumer finance law at the

10   University of Connecticut School of Law, was invited to testify as an expert before the

11   Senate Committee on Banking, Housing and Urban Affairs.  On March 3, 2009,

12   McCoy testified that Downey "made substantial numbers of hazardous loans in late

13   2006 and in 2007 ***in direct disregard of an interagency guidance*** on nontraditional

14   mortgages issued in the fall of 2006 and subscribed to by OTS that prescribed

15   underwriting ARMs to the fully indexed rate."

16        364.   Defendants had already "assessed" and vigorously opposed this OTS

17   guidance when it sent the OTS a detailed letter on March 29, 2006 vocally objecting

18   and stating that the new guidance was not necessary and claiming it may affect the

19   viability of Downey's business.  *See* Ex. 28; *see also* ¶¶17-22.

20        365.   An analyst at Moors & Cabot, when it had learned of the new potential

21   guidance in December 2005, observed that: (i) Downey would have to raise its start

22   rate; (ii) the volume of Option ARM originations would decrease with the new

23   documentation guidance; (iii) Downey may have issues with concentration limits; and

24   (iv) Downey may be required to increase loan loss reserves on its nontraditional

25   mortgage products (*i.e.*, Option ARMs).  In fact, Downey actually lowered its start

26   rate and failed to take sufficient reserves during the Class Period in order to bolster its

27   balance sheet and earnings.

28

366.    The same regulatory guidance for which defendants were still "assessing [the] impact" also told defendants that "*for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision*."    Thus, in addition to defendants' statements regarding Downey's "underwriting" being misleading based on the lack of any reasonableness test with respect to Downey's underwriting guidelines and practices, Downey was not assessing the ability to repay based on the guidance issued in September 2006, as by its own admission in the Form 10-K, it was not including any balance increase that may accrue from negative amortization (*e.g.*, "we qualify applicants for adjustable rate mortgages using a fully amortizing payment") – the impact being that the vast majority of the loans they were pushing through simply would not pass muster.

367.    Defendants' vigorous opposition to the OTS guidelines in 2006 indicates that defendants were aware that the proposed OTS guidance would negatively impact defendants' improper lending practices.  There was nothing to "assess."  Defendants knew they were not in compliance.  As explained by multiple witnesses in ¶¶110-222, defendants knew that toxic loans on Downey's books were  a product of inadequate underwriting and defendants' practices failed to properly assess credit risk and "appropriate capital and loan loss reserves" under GAAP and regulatory guidance.

368.    Further, defendants' representations that Downey would make necessary adjustments and  that Downey was "in line with regulatory guidance" as of July 1, 2007, were blatantly false.  Defendants knew that Downey was not – its allowances were understated because of the severe impairment of its loan portfolio of toxic mortgages based on inadequate underwriting as detailed by witnesses and known trends described in ¶¶227-314, including defendants' own belated admission in Downey's 2007 Form 10-K that defendants had internally projected in 2006 that $1.4 billion of its toxic loans would recast in 2007.

369.    Defendants also knew that they had already intentionally manipulated and reduced the allowances to levels far lower than the prior quarter, even though the percentages of the loans that were impaired, non-performing and accruing negative amortization interest (all indicators of impaired loans) were increasing drastically. ¶¶227-314.    Further, the restatement of Downey's financial results in 3Q07 is an admission that Downey's loan loss reserves were inadequate after July 1, 2007.  *See* ¶¶339-358.  Defendants also knew that Downey's underwriting was insufficient and that Downey did not adequately assess a borrower's ability to repay Downey's toxic loans.  *See* ¶¶110-205.

**K.    Defendant McAlister's September 17, 2007**
       **Misrepresentations Regarding the Mortgage Crisis and Its**
       **Impact on Downey's Business**

370.    On September 17, 2007, the *Orange County Business Journal*, a journal boasting at least 60,000 subscribers and thousands more on the web and business news wires, published an article entitled, "***Downey Chairman McAlister: Still 'Addicted to Real Estate*.'"   The article reported and repeated statements made by McAlister during a well-publicized speech and gala in Orange County:

> Like other lenders, Downey is feeling the effects of the mortgage and housing downturn, which has hurt profits and seen some borrowers miss payments on loans.
>
> Downey's shares are off about 10% in the past year, though not nearly as bad as other lenders on Wall Street.
>
> ***McAlister called the situation minor***.
>
> "***We have a little bit of a problem, but not very much,***" he said.

371.    The article was not only published in the *Orange County Business Journal* with its at least 60,000 subscribers and thousands more on the web and business news wires," but McAlister's statements were also published and re-published to the market on the internet on several websites, including, for example,

- 139 -

1  *AllBusiness.com*, a business news website with more than 2 million viewers.  *See*

2  http://www.allbusiness.com/banking-institutions-systems-savings/8915945-1.html.

3  The article is also published to the market on Lexis/Nexis and Forbes.com.  *See*

4  https://www.lexis.com.  The article is also published to the market on Lexis/Nexis.  In

5  fact, according to another 2004 article in the same journal entitled "Business Journal

6  Subscribers in Good Company," the periodical boasted about its ubiquitous and

7  widespread presence in the business community: "From Fortune 500 executives to

8  start-up entrepreneurs, the 60,000 readers of the Orange County Business Journal are

9  successful, affluent people.  They're among the county's top decision makers.  ***The***

10  ***Orange County Business Journal is one of their most essential sources of***

11  ***information.  It's a working tool, the one publication that gets clipped, dogeared and***

12  ***passed around the office all week long***."  Ex. 41.  Thus, the statement was

13  incorporated into the market price of Downey's stock and is subject to the fraud-on-

14  the-market presumption of reliance.  Indeed, the widespread dissemination of

15  McAlister's statements is demonstrated by the fact that after the article was published

16  to investors, Downey's stock price soared, increasing 2.25% on September 17, 2007

17  (from $55.05 to $56.29 per share), and another 10.61% in the two days that followed,

18  closing at $62.26 per share rising on September 19, 2007.

19     **L.    Reasons Why Defendant McAlister's September 17, 2007**

20           **Statement Was Knowingly Misleading When Issued**

21        372.    Defendant McAlister's statement that the mortgage downturn was minor

22  and that "*[w]e have a little bit of a problem, but not very much*" was false and

23  misleading.  At the time McAlister made this statement, he was well aware of a

24  collapse in Downey's loan portfolio, future earnings and cash flow internally as a

25  direct result of Downey's huge portfolio of toxic and predatory Option ARMs, as

26  multiple sources confirm had not been properly underwritten or accounted for.  *See*

27  ¶¶110-205.  Multiple percipient witnesses describe (as set forth in ¶¶111, 115-116)

28  McAlister's direct involvement in unsound underwriting.  Further, regulatory

- 140 -

1    guidance described in ¶¶415-417 required that McAlister, as a member of the Board,

2    be informed of the state of Downey's toxic loan portfolio.  Moreover, not only had the

3    secondary market for Downey's toxic loans dried up, the competitors which

4    defendants were trying to keep pace with, for example, Countrywide, had announced

5    on July 24, 2007 a 33% drop in second quarter income and a reduction in earnings

6    citing, *inter alia*, increasingly challenging housing and mortgage markets.  Less than

7    three weeks later, on August 16, 2007, Countrywide announced its plan to borrow

8    $11.5 billion to offset liquidity problems.

9         **M.    The End of the Class Period**

10         373.    Immediately prior to the end of the Class Period, on March 11, 2008, *The*

11    *Motley Fool* issued an article that stated in part:

12         **Peeking over the shoulder**

13              None of this group has been hit harder than Downey, the holding

14         company of Downey Savings & Loan.   Like a typical banking

15         institution, it accepts deposits and makes loans, but it also engages in real

16         estate development, construction, and property management in

17         California and Arizona.  Not two of the sweetest spots to be invested in

18         real estate these days.

19              ***In a recently released report, Downey said its total***

20         ***nonperforming assets (NPAs) had grown from less than 1% a year ago***

21         ***to more than 9%, which would signal a seriously troubled institution***.

22         While it could be said to have a diversified asset base because it is also a

23         savings and loan, should the housing crisis worsen as many expect it

24         will, any signs of trouble at the bank could make its position even more

25         precarious.

26              Yet is the situation as dire as it appears?  Downey also reported

27         that 94% of its loans were current in their payments, which would

28         suggest a seeming discrepancy with the numbers.  ***Not so fast.  Back in***

- 141 -

***January, the bank reported on its earlier efforts to assist borrowers who held option ARM mortgages***.  The program was only offered to borrowers whose loans were current at the time, so the bank initially didn't include them as troubled debt restructurings (TDRs).  However, upon further consideration, its accountants counseled that unless the new loan terms were accompanied by an updated property valuation, credit report, and income analysis, they had to be considered TDRs.  As Downey hadn't performed those additional tasks, it had to reclassify them all as nonperforming assets, even though 94% of them are still current in their payments.

\* \* \*

In August their non performing assets on their portfolio was 1.96% up from .32% only a year ago.  The current trend over the last several months puts their NPA's at almost 3% at years end.  In August their interest rate spread was 2.95% . . . ***NPA's are only going to get worse and interest rate spread is not going to get better either.  They've also booked a huge amount of neg. am income and have lowered loan loss reserves to make their earnings look better than they are in the last two quarters***.

374.   On March 17, 2008, before the market opened, Downey released its monthly selected financial results for the 13 months ended February 29, 2008, reporting $13.4 billion in assets and $75.7 million in home loans.  This was down from $127.4 million for the 13 months ended January 31, 2008.

375.   One year prior, the Company had reported $15.5 billion in assets, with less than 1% of its portfolio in default.  In January 2008, the Company said it lost $109 million in 4Q07 compared to a profit of $52 million a year earlier.  The Company set aside $218 million from earnings to cushion itself against future defaults.

376.   As *Bloomberg* reported on March 17, 2008:

*Downey Financial Corp., the California savings and loan company whose stock has lost 70 percent in 12 months, said nonperforming assets increased to 10.9 percent on Feb. 29 from 9.1 percent a month earlier*.

Loans that have stopped collecting interest would have been about 6.6 percent if Downey hadn't counted modified mortgages that allow some homeowners to restructure debt, the Newport Beach, California-based lender said today in a statement.

377.   On this news, Downey's stock dropped to close at $18.82 per share on March 17, 2008, a decline from $19.14 per share on March 14, 2008, and a decline of 68% from $59.00 per share on October 9, 2007.  The stock subsequently continued to decline as details of the Company's true financial condition were leaked to the market.

378.   Thereafter, on June 1, 2008, in an article entitled "Downey Still Faces More Credit Pressure," *SourceMedia*, *Inc*. reported in part: "Downey recorded a first-quarter loss of $8.89 per share, sharply higher than analysts had estimated. . . .  The analysts calculate that Downey is currently trading at a ratio which implies a 32% default rate and a 50% loss severity rate."

379.   On July 13, 2008, in an article entitled "Downey non-performing assets jump to 14.33," *MarketWatch* reported in part: "Downey Financial (dsl) said Sunday that its nonperforming assets hit 14.33% of its total assets in May, up from 10.75% at the end of February.  A year ago, Downey's nonperforming assets were 1.3%."

380.   By the end of July, Downey's President and defendants McAlister and Rosenthal would all have been forced out of Downey.

381.   On September 5, 2008, the OTS issued an Order to Cease and Desist requiring that Downey: (1) not issue dividends or capital distributions or any promises of such; (2) not enter into, renew or extend contractual arrangement relating to

1  compensation or benefits for senior executives or directors; and (3) not incur debt or

2  increase current lines of credit.  In addition, the factual findings stated in part:

3       Based on findings set forth in the Report of Examination of the

4       Holding Company issued on August 7, 2008, the OTS finds that the

5       Holding Company has engaged in unsafe and unsound practices.

6       Specifically, the asset quality, earnings, liquidity planning, management,

7       and projected capital levels of the Holding Company and the Association

8       are not satisfactory and require strengthening.

9  *See* Ex. 2 at 208.

10       382.  On September 6, 2008, in an article entitled "Oversight pressure felt at

11  Downey; Accused of 'unsound practices,' the lender has raised fresh capital and lost

12  its chairman," the *Los Angeles Times* reported:

13       In July, the OTS said Downey had "engaged in unsafe and

14       unsound practices" that had weakened its asset quality, earnings and

15       future capital.

16                 *        *        *

17       The new filing also revealed that Downey had been forced to take

18       drastic steps since July to raise cash.  It sold some real estate assets and

19       pulled money out of one of its subsidiaries.

20       About $70 million of the assets sold were bank-owned interests in

21       the cash flow from some of its shopping centers, said Thomas E. Prince,

22       the current CEO.  Another $40 million was generated by the sale of retail

23       properties.

24       383.  On September 6, 2008, in an article entitled "Downey Financial Is Told

25  to Raise Cash," *The Wall Street Journal* reported in part:

26       The Office of Thrift Supervision, which is the regulatory agency

27       that oversees Downey, issued a cease-and-desist order that formally

28

1  requires the bank to raise capital, name a permanent chief executive, and
2  take other actions including the sale of bank real estate.

3      Downey is the largest U.S. financial institution this year to receive
4  such an action, regarded as one of the most severe of government
5  interventions.

6  384.  On September 12, 2008, in an article entitled "Downey Financial
7  downgraded to 'B-; outlook negative – S&P," Forbes.com reported in part:

8      Standard & Poor's Ratings Services lowered its long-term counterparty
9      credit rating on Downey Financial Corp. to 'B-' with a negative outlook
10     from 'B+' due to its increased concern about the company's asset
11     quality-induced weak financial profile, which continues to erode its
12     franchise and resulted in material regulatory restrictions.

13     Even with the $176 million of new equity Downey has raised for
14     the bank in the past few months, S&P believes that it will be difficult to
15     maintain capital above the new mandated requirements beyond the next
16     quarter-end.  S&P also believes that any future failure to meet these
17     requirements is likely to trigger further regulatory action that could be
18     detrimental to Downey's creditworthiness and debt-holders' interests.

19     The rating agency is also concerned that continued publicity of
20     Downey's problems could lead to material deposit outflows that would
21     overwhelm Downey's liquidity and/or result in further adverse
22     regulatory action.

23  385.  Downey's stock and credit rating plummeted from the effects of
24  defendants' fraud, trading at less than $4.00 per share, and its credit downgraded to
25  junk status.

26  386.  In late September, 2008, Downey put its headquarters on the market in an
27  attempt to raise cash.  Six weeks later, the building was taken off the market.

28

387.   On October 16, 2008, Downey reported that it would shut its wholesale lending department and make reductions in its retail loan department.  Ex. 31.

388.   On October 22, 2008, Downey issued its 3Q08 press release reporting a net earnings loss of $81.1 million or $2.89 per share.  Ex. 32.  Non-performing assets increased by $44 million to over $2 billion.  Downey's stock price plummeted further to below $2.00 per share.

389.   On November 10, 2008, Downey filed its 3Q08 Form 10-Q with the SEC, in which it was forced to admit that it anticipated that it would not be able to satisfy minimum capital ratios required by the OTS consent order and there was substantial doubt that Downey would be able to continue as a going concern.  On this news, the stock went as low as $0.34 per share.

390.   Two weeks later, Downey's assets would be seized, it would be delisted by the NYSE and it would file Chapter 7 bankruptcy.

## VI.   ADDITIONAL ALLEGATIONS SUPPORTING A STRONG INFERENCE OF MOTIVE AND SCIENTER

391.   At all relevant times, defendants McAlister, Rosenthal and Côté acted with scienter in making materially false and misleading statements during the Class Period.  Each of the defendants had actual knowledge that the statements made by him were false and misleading, and/or acted with deliberate reckless disregard when disseminating the false and misleading statements to the market.

### A.   The Magnitude and Nature of the Restatement Reinforces Scienter

392.   Downey conceded in a press release dated January 14, 2008 that its reported non-performing assets balance was understated by $99 million, or 30.5%, in the 3Q07 Form 10-Q.  Ex. 29.  The restatement of non-performing assets meant that only 39% of Downey's non-accrual loans were reserved for as of September 30, 2007.  This was significantly lower than the percentage that Downey had historically

1  reserved for in prior years: 95%, 124% and 100%, in 3Q04, 3Q05 and 3Q06,

2  respectively.

3      393.   The fact that Downey restated its previous financial statements is an

4  admission that: (a) the financial results originally issued during the Class Period and

5  its public statements regarding those results were materially false and misleading; and

6  (b) the financial statements reported during the Class Period were incorrect based on

7  information available to defendants at the time the results were originally reported.

8      394.   As noted by the SEC, "restatements should not be used to make any

9  adjustments to take into account subsequent information that did not and could not

10  have existed at the time the original financial statements were prepared," and "GAAP

11  only allows a restatement of prior financial statements based upon information 'that

12  existed at the time the financial statements were prepared.'"[20]  FASB, the governing

13  body that promulgated the accounting rules regarding restatements of prior financial

14  statements, has defined "restatement" as "the process of revising previously issued

15  financial statements to reflect the correction of an error in those financial statements."

16  *See* SFAS No. 154, ¶2.  FASB has also defined the "errors" that may be corrected

17  through a restatement: "an error in recognition, measurement, presentation, or

18  disclosure in financial statements resulting from mathematical mistakes, mistakes in

19  the application of GAAP, or oversight or misuse of facts that existed at the time that

20  the financial statements were prepared."  *Id.*

21      395.   Accordingly, defendants knew when Downey's 3Q07 Form 10-Q was

22  filed that Downey's non-performance assets were materially understated.

23

24

25  _____

26  [20]      *In re Sunbeam Sec. Litig.*, No. 98 8258 Civ. Middlebrooks, Brief of the United
   States Securities and Exchange Commission as Amicus Curiae Regarding Defendants'
27  Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report at
   11, 13 (S.D. Fla. Feb. 22, 2002) (quoting APB Opinion No. 20, ¶13).

28

**B.**     **SEC Filing Signatures and Sarbanes-Oxley Act**
          **Certifications Are False and Demonstrate Knowledge**

396.     Rosenthal and Côté certified under oath  quarter after quarter during the Class Period that they "are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" . . . and have:

- "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is *made known to us* by others within those entities, particularly during the period in which this report is being prepared";

- Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonableness assurance regarding the *reliability of financial reporting and the preparation of financial statements* for external purposes in accordance with generally accepted accounting principles;

- *Evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

- Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is *reasonably likely to materially affect*, the registrant's internal control over financial reporting; and

1       •   Rosenthal and Côté also certified under oath each quarter that they

2       "disclosed, based on our most recent evaluation of internal control over

3       financial reporting to the registrant's auditors and the audit committee of

4       registrant's board of directors . . ." the following:

5       (a)   ***All significant deficiencies and material weaknesses*** in the design

6 or operation of internal control over financial reporting which are reasonably likely to

7 adversely affect the registrant's ability to record, process, summarize and report

8 financial information; and

9       (b)   ***Any fraud, whether or not material, that involves management or***

10 ***other employees*** who have a significant role in the registrant's internal control over

11 financial reporting.

12     397. As set forth herein, these statements were deliberately false and

13 misleading during the Class Period. The OTS Order, the statements of over 25

14 confidential witnesses, and the other allegations in ¶¶110-205 concerning Downey's

15 predatory lending practices, failure to adequately underwrite loans, deliberate

16 manipulation of its financial results to conceal risk, numerous lawsuits, the financial

17 restatement, and Downey's reckless internal controls over lending and underwriting,

18 all confirm that Downey's controls were intentionally designed in a way that allowed

19 rampant regulatory violations and fraud. The certifications also evidence defendants'

20 knowledge of the misconduct alleged during the Class Period.

21     398. Downey's 3Q06 Form 10-Q was signed by defendants Rosenthal and

22 Côté. Both Rosenthal and Côté also certified the filing pursuant to Sarbanes-Oxley.

23 Ex. 6 at 337-338.

24     399. Downey's FY06 Form 10-K was signed by defendants Rosenthal,

25 McAlister and Côté, as well as officers and directors Cheryl E. Olson, Michael

26 Abrahams, Michael D. Bozarth, Gary W. Brummett, Gerald E. Finnell, James H.

27 Hunter, Brent McQuarrie, Lester C. Smull and Jane Wolfe. Both Rosenthal and Côté

28 also certified the filing pursuant to Sarbanes-Oxley. Ex. 3 at 264.

1    400.    Downey's 1Q07 Form 10-Q was signed by defendants Rosenthal and
2  Côté.  Both Rosenthal and Côté also certified the filing pursuant to Sarbanes-Oxley.
3  Ex. 10.

4    401.    Downey's 2Q07 Form 10-Q was signed by defendants Rosenthal and
5  Côté.  Both Rosenthal and Côté also certified the filing pursuant to Sarbanes-Oxley.
6  Ex. 11.

7    402.    Downey's 3Q07 Form 10-Q was signed by defendants Rosenthal and
8  Côté.  Both Rosenthal and Côté also certified the filing pursuant to Sarbanes-Oxley.
9  Ex. 12.

10    403.    Downey's FY07 Form 10-K was signed by defendants Rosenthal,
11  McAlister and Côté.  Both Rosenthal and Côté also certified the filing pursuant to
12  Sarbanes-Oxley.  Ex. 4.

13    404.    Downey's quarterly Forms 10-Q and year-end Forms 10-K during the
14  Class Period also detail Downey's management, including Rosenthal's and Côté's
15  participation in, evaluation of and responsibility for the internal controls over
16  Downey's financial reporting.  Exs. 3-4, 6, 10-12.

17    405.  Downey's FY06 and FY07 Forms 10-K also indicated that the
18  "[m]anagement of Downey Financial Corp. (Downey) is responsible for establishing
19  and maintaining adequate internal control over financial reporting" and that Rosenthal
20  and Côté as CEO and CFO supervised the designing of the internal control process.
21  Exs. 3-4.

22    **C.    GAAP, SEC Statements and Downey's SEC Filings**
23    **        Confirm Defendants' Scienter**

24    406.    Defendants Rosenthal, McAlister and Côté, because of their positions
25  with the Company, possessed the power and authority to control the contents of
26  Downey's quarterly reports, press releases and statements to the market.  They were
27  provided with copies of the Company's reports and press releases alleged herein to be
28  misleading prior to or shortly after their issuance and had the ability and opportunity

1    to prevent their issuance or cause them to be corrected.  Because of their positions

2    with the Company, and their access to material non-public information available to

3    them but not to the public, defendants knew that the adverse facts specified herein had

4    not been disclosed to and were being concealed from the public and that the positive

5    representations being made were then materially false and misleading.  Defendants are

6    liable for the false and misleading statements pleaded herein.

7        407.   As described in *e.g.*, ¶¶110-118, defendants Rosenthal, McAlister and

8    Côté participated in and had knowledge of the unsound underwriting guidelines that

9    resulted in the loans held in Downey's portfolio.  Further, as detailed in ¶¶415-417,

10   OTS guidelines provided that the defendants be well-informed.

11       408.   Further, defendants Rosenthal and Côté, and Prince as well as other

12   Downey senior executives were  members of Downey's IAR Committee in 2006.

13   During the Class Period, the Downey IAR Committee met quarterly to "review and

14   determine asset classifications and recommend any changes to asset valuation

15   allowances."  The IAR Committee worked in concert with the IAR Department, which

16   conducted "independent reviews to evaluate the risk and quality of all [of Downey's]

17   loan and investment assets."  According to Downey's Forms 10-K for 2006 and 2007,

18   "[w]ith the exception of payoffs or asset sales, the classification of an asset, once

19   established, can be removed or upgraded only upon approval of the IAR Committee or

20   the Director of Internal Asset Review as delegated by the Committee."  Exs. 3-4.

21       409.   According to Downey's public filings, the IAR Committee in conjunction

22   with the Audit Committee was able to "provide for timely recognition of problem

23   assets and an adequate allowance to cover asset and loan-related commitment losses"

24   through the use of an internal asset review system and loss allowance methodology.

25   In addition, by at least 2007, the monitoring process included the use of asset

26   classifications to segregate assets, largely loans and real estate, into various risk

27   categories.  According to Downey's 2007 Form 10-K, Downey used "the various asset

28   classifications as a means of measuring risk for determining the valuation allowance

1    for groups and individual assets at a point in time." Ex. 4.  The six grades that

2    Downey classified the assets into were: pass, watch, special mention, substandard,

3    doubtful and loss.  The IAR Committee devoted four yearly meetings to this specific

4    purpose.

5        410.  Further, defendants were subject to certain consumer protection laws

6    with respect to their lending practices.  Downey's Forms 10-K for 2006 and 2007, for

7    example, specifically note that the Company is subject to the Home Ownership and

8    Equal Protection Act of 1994 which precludes "making unaffordable loans based on

9    the assets of the borrower rather than on the borrower's ability to repay an obligation"

10   and "engaging in fraud or deception to conceal the true nature of the loan obligation

11   from an unsuspecting or unsophisticated borrower." Exs. 3-4.  Thus, defendants were

12   well aware that their predatory lending practices were deceptive and misleading.

13       411.  Additionally, a company's management is responsible for the preparation

14   and presentation of the company's financial statements in accordance with GAAP,

15   while the outside auditors are responsible for expressing an opinion on those financial

16   statements in accordance with their compliance with generally accepted auditing

17   standards.  The American Institute of Certified Public Accountants or AICPA, in AU

18   §110.03 (footnote omitted), indicates that (i) "[t]he financial statements are

19   management's responsibility"; (ii) "[m]anagement is responsible for adopting sound

20   accounting policies and for establishing and maintaining internal control that will,

21   among other things, initiate, authorize, record, process, and report transactions (as

22   well as events and conditions) consistent with management's assertions embodied in

23   the financial statements"; (iii) that a company's "transactions and the related assets,

24   liabilities, and equity are within the direct knowledge and control of management";

25   and (iv) "the fair presentation of financial statements in conformity with generally

26   accepted accounting principles is an implicit and integral part of management's

27   responsibility."

28

412.    Downey's management and signatories were responsible for Downey's own financial statements.  While Downey's January 14, 2008 press release in which the Company announced that it improperly failed to account for the modifications to the loans under the borrower retention program as TDRs during the third quarter, Downey stated that its independent auditor, KPMG, "did not object" to Downey's assessment during its third quarter review, auditors do not audit quarterly financial statements.  A quarterly review is substantively less in scope than an audit, and no opinion is rendered during a quarterly review.

413.    The SEC also provides that:

> The fundamental and primary responsibility for the accuracy of information filed with the Commission and disseminated among the investors rests upon management.  Management does not discharge its obligations in this respect by the employment of independent public accountants, however reputable.  Accountants' certificates [*i.e.*, audit opinion] are required not as a substitute for management's accounting of its stewardship, but as a check upon the accounting."

*See* AU §711.01 (footnote omitted).

414.    Lynn E. Turner, the Chief Accountant of the SEC, also testified as to a CFO's responsibility for a company's false financials (in this case, Côté):

> The first, and ultimate, responsibility for the numbers rests squarely on the shoulders of the Chief Financial Officer (CFO).  The CFO is the person who sets the tone and policies for the entire financial organization.  It is the CFO who ensures the quality of the financial information provided to investors – information that is high quality because it is accurate, and provides a complete and balanced picture to investors.

A responsibility which defendant Côté abandoned.

1
2
3

**D.     OTS Regulations Required that Defendants Review Trends that Informed Them of Downey's Risky and Fraudulent Practices**

4     415.   OTS regulations require that executives, including defendants Côté and

5   Rosenthal, and the Board (of which Rosenthal and McAlister were members) receive

6   and review a variety of financial information, indicators and trends.  For example, the

7   OTS Handbook details that, at a minimum, financial reports to the board of directors

8   should include a multiple categories of operational information, including, for

9   example, delinquencies, liquidity reports, foreclosure status reports and

10  documentation detailing loans granted.[21]

11    416.   Management must also "monitor credit quality and compliance with

12  board established policies and procedures" by "implement[ing] a system of internal

13  loan review commensurate with its size, risk, and the complexity of its lending and

14  investment activities."  Ex. 27.  According to the OTS Handbook, "[a]n effective IAR

15  should enable management to identify weaknesses in the loan portfolio and take

16  appropriate corrective actions when necessary, both with respect to individual loans

17  and any weaknesses in the association's loan policies and procedures."  *Id.*  The OTS

18  Handbook loan review section sets forth guidelines for "establishing a prudent internal

19  loan review program."  *Id.*  The program must, for example, promptly identify loans

20  with potential credit weaknesses so that timely corrective action can be taken to

21  minimize losses, assess relevant trends that may affect collectability, evaluate the

22  activities of lending personnel, assess the adequacy of and adherence to internal loan

23  policies, provide information to assess the adequacy of the ALL, and provide

24  management and the board of directors with objective, accurate and timely

25  information on the portfolio's quality.  Ex. 27.

26

27    [21]    The full text of the OTS Handbook sections discussed in this section are included in Ex. 27.

28

1    417.   According to the OTS Handbook, "[a]ccurate and timely management

2 information [systems (MIS)] reports are key to a successful lending operation." Ex.

3 27. The MIS reports should "enable management and the board of directors to assess

4 the performance of each loan product type . . . and the performance of the portfolio as

5 a whole." *Id.* Examples of MIS reports include reports on the volume and

6 significance of underwriting exceptions, summary reports showing trends in

7 outstanding loans, new loan volume, delinquencies and portfolio yield by different

8 product types, credit score distribution reports, past due, nonaccrual, trial balance and

9 collections reports. Management should ensure that MIS reports are used to monitor

10 loan and portfolio performance and are provided to both management and the board.

11 Ex. 27.

12    418.   According to the OTS Handbook section on NegAm Risk Management,

13 "aggressively underwritten NegAm loans without adequate controls raise supervisory

14 concerns." Ex. 27. Accordingly, lenders engaging in NegAm lending programs

15 should closely monitor the quality of NegAm portfolios: "Specifically, lenders should

16 track and monitor all loans with the NegAm option and quantify the borrowers'

17 preferences regarding NegAm loan payments." *Id.* This is because the "choice of

18 making the fully amortizing versus the minimum payment is a borrower option, the

19 exercise of which is a revealing indicator of a borrower's ability to service the loan."

20 *Id.* Additionally, the OTS Handbook specifies that NegAm lenders should track the

21 percentage of borrowers utilizing negative amortization and the associated capitalized

22 interest because if

23        capitalized interest is substantial, its impact on the association's income

24        levels should be analyzed to evaluate the quality of earnings. Excess

25        capitalized interest may also create possible cash flow or liquidity

26        concerns.

27 *Id.* NegAm lenders should also track NegAm loan performance by program and

28 origination year because:

1      Point-in-time delinquency reports for NegAm loans can be misleading

2      and mask immediate problems not reflected in delinquency rates.

3      NegAm delinquency rates are generally only meaningful when combined

4      with an analysis of borrower utilization and capitalized interest levels.  If

5      NegAm utilization and capitalized interest levels are increasing, future

6      credit problems may arise.

7 *Id.*  NegAm lenders should track performance by credit score because tracking

8 portfolio performance using an average credit score "may mask portfolio risk."  Ex.

9 26.

10      419.  The fact that Downey's senior executives and Board, including

11 defendants, received and reviewed this information (or, to the extent they did not,

12 violated the OTS regulations and guidelines) is further evidence of their knowledge

13 and scienter.

14      420.  In addition, because defendants were officers and directors of Downey,

15 which was regulated by the OTS and other regulatory bodies, Downey is charged with

16 knowledge of the OTS regulations and violations.

17      421.  The fact that Downey's senior executives and Board, including

18 defendants Rosenthal, McAlister and Côté, received and reviewed this information

19 (or, to the extent they did not, violated the OTS regulations and guidelines) is further

20 evidence of their knowledge and scienter.

21      **E.**    **Downey's Regulatory Violations and the OTS Consent**

22             **Decree Reinforce Scienter**

23      422.  Downey's failure to comply with guidance and regulations issued by

24 Regulatory Agencies is further evidence of defendants' scienter.  Regulatory

25 Agencies, including the OTS, the OCC, the Federal Reserve and the FDIC, issue

26 guidance and regulations that thrifts, such as Downey, must comply with.  For

27 example, 12 C.F.R. §560.101 requires that real estate lending policies be "consistent

28 with safe and sound banking practices."

1    423.   As discussed in Ex. 9 in 2006 the Regulatory Agencies issued guidance

2    that expressly targeted risk associated with Option ARM loans (90% of Downey's

3    loan portfolio).  That guidance, which Downey did not follow during the Class Period,

4    specifically discussed what constituted "safe and sound" banking practices in the

5    context of Option ARM loans.  According to the September 2006 testimony of

6    Kathryn E. Dick, Deputy Comptroller for the OCC, the "goal in proposing this

7    guidance . . . [was] to ensure that nontraditional mortgage products and the risks

8    associated with them [were] managed properly by the banks that offer[ed] them, so

9    that they [did] not compromise the safety and soundness of financial institutions . . . ."

10    Ex. 38 at 924.  Dick further testified that "[s]upervisory guidance is the key instrument

11    through which we communicate our expectations to bank management and bank

12    examiners . . . ." *Id.*

13    424.   In addition to this specific guidance, the OTS issues a handbook which

14    serves as a "guide to national policies and procedures" and sheds light on what

15    constitutes "safe and sound" banking practices.  According to the OTS, "[t]he

16    Handbook illustrates and describes, for examiners and the thrift industry, certain

17    standards of conduct and prudent operation that OTS views as important to the safe

18    and sound operation of savings associations. These standards should be consistent

19    with the respective fiduciary duties of those individuals associated with them."

20    425.   Defendants acknowledged in Downey's SEC filings that the Company

21    must comply with OTS regulations and guidelines.  For example, Downey's FY07

22    Form 10-K states: "As a federally chartered savings association, the Bank's activities

23    and investments are generally governed by the Home Owners' Loan Act, as amended,

24    and regulations and policies of the Office of Thrift Supervision (OTS).  The Bank and

25    Downey are subject to the primary regulatory and supervisory jurisdiction of the

26    OTS." Ex. 4 at 269.  In Downey's FY06 Form 10-K, defendants admit that

27        [T]he OTS extensively regulates the Bank because the Bank is

28        federally chartered . . . . The Bank must ensure that its lending activities

1     and its other investments comply with various statutory and regulatory

2     requirements.

3  Ex. 3 at 223.

4     426.   During and in the period leading up to the Class Period, Downey violated

5  regulatory agency regulations, guidelines and OTS Handbook sections regarding

6  capital requirements, asset quality and underwriting, TDRs and valuation allowances.

7  Additionally, the OTS Handbook requires that Downey file financial statements in

8  compliance with GAAP. As set forth herein, during the Class Period, defendants

9  violated this guidance by filing financial statements on Downey's behalf that did not

10 comply with GAAP.  Excerpts of pertinent OTS Handbook sections and regulatory

11 agency guidance that Downey violated, by category, are set forth in Ex. 26, attached

12 hereto.

13     427.  The OTS Handbook sections and guidance regarding capital

14 requirements mandate, among other things, that thrifts meet minimum capital

15 requirements and that these requirements are higher for institutions, such as Downey,

16 engaged in risky subprime loan practices.  In determining adequate capital levels, a

17 thrift must consider, among other things, asset quality and risk, quality and experience

18 of management, stability of operating environment (for Downey, mostly Southern

19 California), and reasonable expectations for what may occur in the future.  In addition,

20 the guidelines require that thrifts use excess earnings to adequately ensure against risk

21 by capitalizing instead of issuing excessive dividends.  As set forth herein, during the

22 Class Period, Downey violated regulatory guidelines and regulations by, among other

23 things, misrepresenting the adequacy of its capital levels to the marketplace based on

24 adverse facts that defendants knew or recklessly disregarded regarding the amount of

25 risk in Downey's subprime and Option ARM loan portfolio, the inexperience and high

26 turnover in Downey's senior management team, the instability in the Southern

27 California housing market in which Downey primarily operated, and Downey's

28

1  admitted forecasts in 2006 that by the end of 2007, $1.4 billion of its loans would

2  recast.

3       428.   Regarding asset quality and underwriting, 12 C.F.R. §560.101 requires

4  that lenders prudently underwrite loans.   According to OTS guidelines, prudent

5  underwriting requires, among other things, that thrifts have standards that limit and

6  monitor the amount of exceptions to underwriting standards, have adequate internal

7  controls, and engage in sound portfolio risk management practices.   The guidance

8  specifies that "OTS has long held that no-doc residential real estate lending, as defined

9  above, is unsafe and unsound."   In addition, for non-traditional mortgage products

10 (such as Option ARMs) and for loans subject to negative amortization, the agency

11 regulations and guidance mandate that thrifts such as Downey, which are engaged in

12 such practices, put in place more strenuous underwriting guidelines and risk

13 management practices to compensate for the additional risk inherent in these products.

14 For such portfolios, the regulatory guidance requires that thrifts monitor the number of

15 their loans that actually negatively amortized because "a strong indicator of potential

16 credit risk is the number of an institution's option- ARM loans that actually negatively

17 amortize."

18      429.   As set forth herein, during the Class Period, defendants violated these

19 agency regulations and guidance regarding asset quality and underwriting by, among

20 other things, failing to properly underwrite Downey's loans, granting excessive

21 exceptions to already inadequate underwriting policies, failing to effectively monitor

22 the extreme amount of risk in Downey's portfolio, and failing to adequately react (for

23 example, by increasing allowances for loan losses) to indicators, such as the

24 percentage of its borrowers utilizing negative amortization which informed defendants

25 that the risk in Downey's portfolio was increasing exponentially.   Moreover,

26 defendants engaged in unsafe and unsound banking practices by knowingly allowing

27 unqualified borrowers to assume bank loans as set forth in ¶¶110-205.  For example,

28 CW21 confirms that defendant Rosenthal granted numerous exceptions approving

1    hundreds of millions of dollars of loans that did not meet even Downey's loose

2    underwriting standards.  CW4 confirms that Rosenthal personally overrode denials of

3    loans by Downey's underwriters and credit managers.

4        430.  The OTS guidelines regarding TDRs mandate that, among other things,

5    when a thrift engages in a renegotiation, where the savings association grants

6    concessions that it normally would not accept to the debtor/borrower, that it results in

7    a TDR.  The OTS guidelines specifically require that thrifts such as Downey disclose

8    all TDRs in their financial statements and OTS filings.  During the Class Period, as set

9    forth in ¶¶339-350, Downey violated the OTS guidelines regarding TDRs by

10   improperly failing to account for loans modified in its 2007 borrower retention

11   program as TDRs and, as a result, improperly understated the amount of TDRs in its

12   filings.

13       431.  The OTS guidelines on valuation allowances require that, among other

14   things, that thrifts must maintain allowances for loan losses at adequate levels, taking

15   into account all factors which increase the risk to loan portfolios and that management

16   be conservative in these estimates so that a thrift is adequately protected from risk.  In

17   addition, Kathryn E. Dick testified in September 2006 that safe and sound business

18   practices for lenders include "stress testing of key performance indicators and

19   ensuring that the results are integrated into the process of calibrating reserve and

20   capital levels."

21       432.  During the Class Period, as set forth herein, Downey violated the OTS

22   guidelines regarding valuation allowances by, among other things, maintaining an

23   allowance for loan losses that was wholly inadequate given the huge amount of risk in

24   Downey's loan portfolio that defendants knew or recklessly disregarded, and trends

25   and indicators that informed defendants that the risk was increasing.  And after

26   adamantly opposing stress test guidance for reserves, writing "we are troubled by the

27   guidance's suggestion to maintain sufficient capital to reflect the effect of stressed

28

1   economic conditions" (Ex. 28 at 838), defendants also failed to adequately stress test

2   to ensure that Downey's reserves were adequate.

3        433.   Downey's failure to abide by these guidelines and regulations resulted in

4   OTS issuing an Order to Cease and Desist on September 5, 2008, requiring that

5   Downey: (1) not issue dividends or capital distributions or any promises of such; (2)

6   not enter into, renew or extend contractual arrangement relating to compensation or

7   benefits for senior executives or directors; and (3) not incur debt or increase current

8   lines of credit.  Under the Order, Downey was also forbidden from making any further

9   Option ARM loans and was forced to immediately begin reducing its Option ARM

10  portfolio.  In addition, the factual findings stated in part:

11          Based on findings set forth in the Report of Examination of the Holding

12          Company issued on August 7, 2008, the OTS finds that the Holding

13          Company has engaged in unsafe and unsound practices. Specifically, the

14          asset quality, earnings, liquidity planning, management, and projected

15          capital levels of the Holding Company and the Association are not

16          satisfactory and require strengthening.

17  Ex. 2.

18      **F.    Turnover and Termination of Top Officers and the Closure**

19          **of Downey's Wholesale Lending Department Reinforces**

20          **Scienter**

21       434.   The timing and number of executives and Board members at Downey

22  who exited during and immediately following the Class Period reinforces scienter.

23       435.   On June 27, 2007, Downey promoted Ed Adams, previously VP,

24  Wholesale Lending Director, to the position of EVP, Residential Lending Director.

25  Adams replaced Ned Altemus, who resigned effective May 25, 2007.

26       436.   On September 27, 2007, Downey announced that defendant Rosenthal

27  was resigning his role as President of Downey.  Ex. 33.  In a Form 8-K filed with the

28  SEC on September 27, 2007, Downey reported:

1          On September 26, 2007, Downey Financial Corp. ("Downey")

2     announced that Mr. Frederic R. McGill, age 61, will be joining Downey

3     as its President effective October 29, 2007.  Mr. McGill will also serve

4     as President of Downey's wholly-owned subsidiary, Downey Savings

5     and Loan Association, F.A. (the "Bank").  Mr. McGill will be assuming

6     the responsibilities of President of Downey and the Bank from Mr.

7     Daniel D. Rosenthal who will be continuing in his role as Chief

8     Executive Officer of Downey and the Bank.

9 Ex. 34.

10     437.   On December 20, 2007, after KPMG had notified defendants about

11 restating Downey's TDRs, Downey announced in a Form 8-K filed with the SEC that

12 Cheryl E. Olson, defendant McAlister's daughter, was resigning from Downey's

13 Board, effective December 31, 2007.  *Id.*

14     438.   On January 25, 2008, on the heels of defendants' announced restatement

15 in a Form 8-K filed with the SEC, Downey announced that Gerald E. Finnell, a former

16 KPMG audit partner, had resigned from Downey's Board effective January 23, 2008.

17 Ex. 35.

18     439.   On June 25, 2008, Downey fired President Frederic R. McGill, who had

19 taken over the position from defendant Rosenthal just nine months earlier.  In a Form

20 8-K filed with the SEC on June 30, 2008, Downey reported: "Effective June 25, 2008

21 the employment of Frederic R. McGill terminated as President of Downey Financial

22 Corp. (the 'Registrant') and Downey Savings and Loan Association, F.A. (the

23 'Bank')."  Ex. 36.

24     440.   The media also reported on McGill's departure – noting that he was

25 Downey's third president in just four years.  On June 30, 2008, in an article entitled

26 "Downey President Leaves, Company Mum on Cause," the *Orange County Register*

27 *Communications* reported: "Downey Financial, a thrift in Newport Beach struggling

28 with rising loan delinquencies, on Monday said President Frederic McGill has left the

1    company.  It gave no reason for his departure. . . .  When McGill was hired in

2    September 2007, he was the third president in four years . . . ."

3        441.  In July 2008, Downey announced the sudden "retirements" of defendants

4    Rosenthal and McAlister.  On July 27, 2008, in an article entitled "Turnover at the

5    Top," *The New York Times* reported: "Downey . . . announced a change in its top

6    management last week as the sour housing market continues to take a toll on banks.

7    Downey said its chief executive, Daniel D. Rosenthal, 55, and Maurice L. McAlister,

8    83, its founder and largest shareholder, were retiring."  As described in ¶6, veteran

9    banking consultants attribute the OTS investigation as the reason for McAlister's

10   departure.  An investigation which would result in a finding of unsafe and unsound

11   practices and an order requiring Downey to raise capital and cease selling Option

12   ARMs.

13       442.  Additionally, the closure of Downey's wholesale loan department on or

14   about October 16, 2008 also reinforces scienter.  The crux of the department was the

15   origination of residential home loans; Option ARMs subject to negative amortization

16   constituted 91% of Downey's loans in 2005, 81% in 2006 and 65% in 2007.

17       443.  The massive turnover of Downey's executives as well as the mass exodus

18   of Board members and executives both during the Class Period and in the period

19   immediately following the Class Period, coupled with the closure of Downey's

20   wholesale loan department, reinforces scienter.

21   **VII.  LOSS CAUSATION/ECONOMIC LOSS**

22       444.  Defendants engaged in fraudulent lending and accounting practices,

23   issued materially false and misleading financial results, and made false

24   misrepresentations about Downey's underwriting practices, loan quality, credit risk

25   exposure, loan loss reserves, and compliance with GAAP, SEC rules and OTS

26   regulations.  Defendants also omitted material facts concerning Downey's unsafe,

27   unsound and predatory lending practices, including exposure to subprime loans, that

28   concealed the true state of Downey's business and its financial condition.

445. Class members who purchased shares at inflated prices during the Class Period suffered economic loss when the price declined as a proximate cause of defendants' fraud. Plaintiff alleges that the artificial inflation was removed from the stock price upon multiple disclosures of adverse facts that are directly or indirectly connected to defendants' misconduct. As alleged in ¶¶455-488, defendants slowly leaked certain bits and pieces of adverse information relating to Downey's financial condition that had been previously concealed during the Class Period.

446. As set forth in ¶¶448-488, defendants' misconduct and misrepresentations and omissions caused the artificial inflation of Downey's stock price beginning on October 16, 2006, when defendants materially misrepresented Downey's business operations and financial condition in its 3Q06 earnings press release.

447. The following chart depicts Downey's stock price and trading volume during the Class Period:



448.    On October 17, 2006, Downey reported its 3Q06 financial results. Downey misled investors regarding its financial results as well as the state of its business and financial condition by, *inter alia*, understating its provision for credit losses and non-performing assets and overstating its income, assets and earnings. In addition, Downey did not disclose problems with asset quality in its loan portfolio caused by, among other things, defendants' predatory lending practices and failure to properly underwrite the Company's risky Option ARM loans. As a result of defendants' deliberate misrepresentations and omissions, Downey's stock traded at an artificially inflated price of $69.43 per share.

449.    On November 1, 2006, Downey filed its 3Q06 Form 10-Q, which, as set forth in ¶¶83-338, 359-369, misrepresented Downey's financial results and its overall financial and business condition. Ex. 6. As a result, Downey's stock remained artificially inflated, trading at $68.27 per share.

450.    On January 18, 2007, Downey issued a press release reporting its FY06 and 4Q06 financial results. In the press release, as set forth in defendants misrepresented Downey's financial results as well as its overall business and financial condition, including the quality of its loan portfolio. Defendant Rosenthal also assured investors that "'despite a challenging business environment . . . we enter the year with a strong capital position which will allow us to take advantage of any opportunities that may arise.'" As a result of defendants' misrepresentations and false assurances, Downey's stock remained artificially inflated, trading at $67.68 per share.

451.    On March 1, 2007, Downey filed its FY06 Form 10-K, which contained misrepresentations regarding Downey's underwriting, truth in lending, compliance with regulatory guidelines, capital, risky loan portfolio, credit losses, non-performing assets, credit and loan loss reserves, review of risk, adequacy of controls and credit policies. *See* ¶¶83-338, 359-369. As a result of defendants' misrepresentations and omissions regarding Downey's business and financial condition, Downey's stock remained artificially inflated, trading at $66.38 per share.

1    452.   On April 18, 2007, Downey issued a press release announcing its net

2    income gains for 1Q07 of $42.9 million.  Regarding subprime loans, defendant

3    Rosenthal stated, "'there has been much publicity this year about credit quality issues

4    associated with subprime lending that has lead to the closing of numerous subprime

5    lenders and the declaring of bankruptcy by others.'"  Ex. 30.  However, defendant

6    Rosenthal went on to tell investors that:

7          Downey has historically been involved in subprime lending and has had

8          very few losses.  Our subprime portfolio has declined and represents less

9          than 6% of our loan portfolio.  We continue to have a strong capital

10         position which will allow us to take advantage of any opportunities that

11         may arise.

12   *Id.*

13    453.   On this news, Downey's stock rose 3.4% from $64.67 to $66.87 per

14    share.  Over the next few days, it continued to rise, increasing an additional 2.9% from

15    $66.87 to $68.81 per share by April 20, 2007.  Downey's stock was artificially

16    inflated by defendants' misrepresentations regarding Downey's subprime holdings

17    and portfolio risk, as well as Downey's finances and lending practices.

18    454.   On May 4, 2007, Downey filed its 1Q07 Form 10-Q which contained

19    numerous materially false and misleading statements regarding Downey's financial

20    results and its overall financial condition, and omitted negative facts known or

21    recklessly disregarded by defendants.  *See* ¶¶83-338, 359-369. As a result of

22    defendants' misrepresentations, Downey's stock remained artificially inflated, trading

23    at $68.01 per share.

24    455.   On July 18, 2007, Downey issued a press release announcing its 2Q07

25    financial results.  The press release disclosed that Downey's provision and allowance

26    for credit losses had both increased, its assets had decreased, and that its

27    nonperforming assets had increased by $84 million, or 58.5%. On this news,

28    Downey's stock fell 2.75% from $63.88 to $62.12 per share, thereby removing some

1    of the artificial inflation from the stock price as some of the relevant truth regarding

2    the risk in Downey's loan portfolio and its inadequate provisions and allowances

3    began to leak out.  In the days that followed, Downey's stock continued to decline

4    another 14.52%, from $62.12 to $53.10 per share by July 26, 2007, further removing

5    artificial inflation from the stock price.

6    456.   Downey's stock price nevertheless continued to remain artificially

7    inflated because defendants continued to conceal much of the material adverse

8    information that they knew or recklessly disregarded regarding Downey's true

9    financial results and its overall business and financial condition.   In addition,

10   defendants continued to assure the market that, despite market conditions, Downey's

11   business was well positioned as a result of its strong capital.  For example, in the July

12   18, 2007 press release, defendant Rosenthal misrepresented to investors that

13          [t]he ongoing softening of the housing market, coupled with a

14          challenging interest rate environment, have contributed to continued

15          declines in our loan portfolio and increases in our non-performing loans.

16          However, we continue to have a very strong capital position which will

17          allow us to take advantage of opportunities as they arise.

18   457.   On August 1, 2007, Downey filed its 2Q07 Form 10-Q, which reported

19   the Company's quarterly financial results, including increases in Downey's non-

20   performing assets and loss provisions and allowances.  On this news, Downey's stock

21   fell 3.01%, from $53.19 to $51.59 per share, thereby removing some of the artificial

22   inflation from the stock as the some of the relevant truth regarding the risk in

23   Downey's loan portfolio leaked into the market.  In the days that followed, Downey's

24   stock price further declined another 5.85%, from $51.59 to $48.57 per share, further

25   reducing the artificial inflation in the stock.  However, Downey's stock remained

26   inflated because, *inter alia*, the 2Q07 Form 10-Q continued to materially misrepresent

27   Downey's financial results and overall business and financial condition.  *See* ¶¶83-

28   338, 359-369.

1     458.  On September 17, 2007, the *Orange County Business Journal*, in an

2 article entitled "Downey Chairman McAlister: Still 'Addicted to Real Estate,'"

3 reported: "Like other lenders, Downey is feeling the effects of the mortgage and

4 housing downturn, which has hurt profits and seen some borrowers miss payments on

5 loans.  Downey's shares are off about 10% in the past year, though not nearly as bad

6 as other lenders on Wall Street.  McAlister called the situation minor.  'We have a

7 little bit of a problem, but not very much,' he said."  On this news, Downey's stock

8 soared, increasing 2.25% on September 17, 2007 from $55.05 to $56.29 per share, and

9 another 10.61% in the days that followed, rising to $62.26 per share by September 19,

10 2007.

11     459.  On October 10, 2007, Downey pre-announced its 3Q07 financial results.

12 Downey announced that it expected to incur an operating loss as well as increases in

13 the allowance for loan losses.  Defendant Rosenthal assured investors, however, that:

14 "Downey remains well positioned to continue funding quality loans because of our

15 strong capital position and stable source of funds from our retail branch franchise."  In

16 addition, on October 10, 2007, Credit Suisse issued a report that stated in part:

17     "Downey announced that it would take an $82 million loan loss

18     provision . . . .  The size of the reserve build was surprising given

19     Downey's relatively low original LTVs. . . . We now forecast

20     substantially higher credit costs (provisioning) should impact Downey

21     through 2008. . . .  [O]ur 12-month price target falls to $60 from $74,

22     owing to higher than expected credit costs.

23     460.  On this news, Downey's stock dropped from $59.37 to $53.12 per share

24 on October 10, 2007, a one-day decline of 10.53%, on volume of 2.4 million, thereby

25 removing some of the artificial inflation from the stock, as some of the relevant truth

26 that Downey's loan portfolio was not as safe as previously represented leaked into the

27 market.  The stock continued to trade at artificially inflated levels, however, as

28

1    defendants concealed, *inter alia*, the extent of Downey's overstated assets, earnings

2    and capital, as well as the fact that a large part of its portfolio consisted of bad loans.

3          461.   On October 17, 2007, Downey issued a press release reporting its

4    financial results for 3Q07.  Downey reported, *inter alia*, a net loss for 3Q07 of $23.4

5    million ($0.84 per share), a $71.9 million increase in provision for credit losses, and

6    increases in delinquencies and foreclosures.  However, defendant Rosenthal assured

7    the market that "'Downey remains well positioned to continue funding quality loans

8    because of our strong capital position and stable source of funds from our retail branch

9    franchise.'"  On this news, Downey's stock fell 3.77% from $47.00 to $45.23 per

10   share, thereby removing some of the artificial inflation in the stock price as some of

11   the relevant truth regarding Downey's risky loan portfolio leaked into the market.

12   Over the next few days, Downey's stock continued to decline, falling another 7.89%,

13   from $45.23 to $41.66 per share by October 19, 2007, further removing some of the

14   artificial inflation from the stock. Downey's stock price remained artificially inflated

15   as a result of, *inter alia*, defendants' continuing misrepresentations regarding the

16   Company's finances and lending practices.  *See* ¶¶83-338, 359-372.

17         462.   On October 31, 2007, Credit Suisse issued a report which stated in part:

18         [W]e were surprised by the substantial build up in early stage

19         delinquencies in Downey's portfolio. . . . [W]e believe that Downey's

20         early stage delinquency trends should result in sizable NPA additions

21         through 2008. . . . As NPAs grow we expect net charge-offs to also rise. .

22         . . Our 2007 EPS estimate falls to $2.23 from $2.36 and our '08 EPS

23         estimate declines to $2.50 from $3.25, while our 12-month price target

24         falls to $52 from $60, owing to higher than expected credit costs.

25         463.   Then, on November 1, 2007, Downey reported its financial results for

26   3Q07 in its Form 10-Q. Downey disclosed that its non-performing assets increased

27   during the quarter by $97 million or 42.5%, that $3.4 billion or 30% of its loan

28   portfolio was projected to recast by the end of 2008, that its delinquencies and

1  allowance for credit losses were rising, and that it had modified $99 million in loans

2  through a borrower retention program. Downey's stock dropped 14.02%, from $40.73

3  to $35.02 per share, thereby removing some of the artificial inflation in the stock price

4  as some of the relevant truth regarding Downey's risky loan portfolio leaked into the

5  market. However, because defendants continued to misrepresent the financial and

6  business condition of the Company including, *inter alia*, properly accounting for loans

7  modified in Downey's borrower retention program and fully disclosing the extent of

8  asset quality problems in Downey's loan portfolio, Downey's stock price remained

9  artificially inflated. *See* ¶¶83-372.

10      464.   On November 15, 2007, Credit Suisse issued a report which stated in

11  part:

12          Downey reported its October monthly financial data. Monthly highlights

13          include continued balance sheet shrinkage, declining originations,

14          slowing prepayments, a stable net interest margin and an outsized

15          increase in NPAs. Total assets declined to $14.2 billion at the end of

16          October, down 2% from September and down 15% from the year ago

17          month. . . . Credit quality deteriorated significantly during October with

18          NPAs rising to 2.74%, up 20% sequentially. On a dollar basis NPAs

19          rose $64 million during October, the largest single monthly increase.

20      465.   Downey's stock plummeted 6.78%, from $36.60 to $34.12 per share,

21  thereby removing some of the artificial inflation in the stock price as some of the

22  relevant truth regarding Downey's risky loan portfolio leaked into the market. Over

23  the next few days, the stock continued its decline, falling another 12.1%, from $34.12

24  to $29.99 per share, further removing some of the artificial inflation in the stock price.

25  Downey's stock price was trading at artificially inflated levels, however, as

26  defendants concealed, *inter alia*, the extent of their predatory lending practices and

27  deteriorated financial condition from the market.

28

1   466.   On December 14, 2007, Credit Suisse issued a report entitled "Reducing
2   Estimates as NPA Trends Worse Than Expected."  The report stated that:

3   Downey reported its November monthly financial data.  Monthly
4   highlights include balance sheet shrinkage, stable originations, net
5   interest margin expansion and an outsized increase in NPAs.  Credit
6   quality deteriorated significantly during November with NPAs rising to
7   3.65%, up 27% sequentially.  On a dollar basis NPAs rose $105 million
8   during November, the largest single monthly increase. . . .  We now
9   forecast NPAs of approximately 6% in 2008 . . . . [W]e are lowering our
10   price target to $45.

11   467.   Subsequently, Downey's stock fell 6.25%, from $32.98 to $30.92 per
12   share, thereby removing some of the artificial inflation in the stock price as some of
13   the relevant truth regarding Downey's risky loan portfolio leaked into the market.
14   However, Downey's stock remained artificially inflated because defendants failed to
15   disclose, *inter alia*, their predatory lending practices and impaired assets.

16   468.   On January 14, 2008, Downey issued a press release entitled "Downey
17   Announces Change in Previously Reported Non-Performing Assets," reporting
18   changes to previously reported non-performing assets since June 30, 2007.  *See* ¶340.
19   The release revealed that Downey had improperly accounted for loans modified in its
20   3Q07 borrower retention program and that the impact was $99 million in loans being
21   restated as non-performing assets as of September 30, 2007.  As a result of this
22   disclosure, Downey's stock plummeted 12.93%, from $28.08 to $24.45 per share, and
23   continued to fall another 3.97% the following day.  However, because defendants did
24   not disclose the full extent of, *inter alia*, Downey's deteriorated financial condition,
25   including Downey's asset quality problem, Downey's stock remained artificially
26   inflated.

27
28

469.    On January 24, 2008, Credit Suisse reported Downey's "loss of $3.90 per share for Q4," noting that it was "significantly below our estimate and consensus." In addition, Credit Suisse reported:

- The variance to our estimate was a $218 million loan loss provision versus our estimate of $41 million. . . .

- Credit quality continues to dominate Downey's profit picture. NPAs, including performing TDRs, rose to 7.77% in the fourth quarter, up from 2.94% in Q3. While its loan modification program has been successful, it has inflated the overall NPA dollars. . . . [W]e believe that the loan modification increases will surpass those moving out of nonacc[ru]al over the next year.

- We believe that Downey's early stage delinquency trends should result in sizable NPA additions through 2008. 30-59 day delinquent loans rose 85% sequentially to $239.3 million, while 60-89 day delinquencies rose 78% sequentially to $135.2 million.

                                *       *       *

- Our 2008 EPS estimate falls to a loss of $1.50 from breakeven, as a result of significantly higher credit costs, loan provisioning and delinquency inventory, while our 12-month price target falls to $40 from $45.

470.    Downey's stock plummeted 4.74%, from $29.53 to $28.13 per share, and continued to fall the following day by another 4.34%, from $28.13 to $26.91 per share, thereby removing some of the artificial inflation in the stock price as the falsity of Downey's previous financial statements and some of the relevant truth regarding Downey's risky loan portfolio leaked into the market.  However, because the full extent of, *inter alia*, Downey's deteriorated financial and business condition was not revealed, Downey's stock remained artificially inflated.

1  471. On January 23, 2008, Downey issued a press release reporting its

2 financial results for 4Q07 and fiscal year 2007. Downey reported, among other

3 things, a fourth quarter loss of $109 million compared with earnings of $52.1 million a

4 year earlier. The release also quoted Downey president McGill as stating: "The

5 continued weakening of the housing market and its uncertain future unfavorably

6 impacted our borrowers and the value of their loan collateral." That same day, in an

7 article entitled "4Q Earnings: Colonial, Downey, SunTrust – Weak Profits, Strong

8 Gains, Persistent Buzz," *SourceMedia* reported that Downey had said that its outlook

9 for 2008 "is fraught with uncertainty." The story also reported that Downey's "loss of

10 $3.90 a share was far greater than the loss of 6 cents a share analysts had expected."

11 In addition, "Downey's $218.4 million provision rose 168% from the third quarter and

12 exponentially from $200,000 a year earlier, resulting from the company's exposure to

13 subprime mortgages. Downey was a big player in option adjustable-rate mortgages,

14 and borrowers defaulted in droves as interest rates reset on those loans, it said."

15 Additionally, on January 24, 2008, Keefe, Bruyette & Woods issued a report which

16 stated, in part, that it was lowering its earnings estimate for 2008 to negative $1.50

17 EPS from its previous estimate, on December 14, 2007, of positive $1.32 EPS. That

18 same day, Standard & Poor's lowered Downey's rating and Moody's Investors

19 Service reported that it was considering cutting its rating on Downey's credit. On this

20 news, Downey's stock fell 4.74%, from $29.53 to $28.13 per share, thereby removing

21 some of the artificial inflation in the stock price as some of the relevant truth

22 regarding Downey's risky loan portfolio and its failure to adequately reserve leaked

23 into the market. The next day, the stock continued to fall another 4.34%, from $28.13

24 to $26.91 per share, further removing some of the artificial inflation from the stock

25 price. However, because the full extent of the impact and consequences of

26 defendants' improper practices and misconduct on Downey's financial condition had

27 not been revealed, including, *inter alia*, the condition of Downey's loan portfolio, its

28

1   inadequate capital position and its severely impaired financial condition, Downey's

2   stock remained artificially inflated.

3        472.   On February 29, 2008, Downey reported its financial results for 2007 in

4   its Form 10-K.   Specifically, Downey reported that delinquencies were rising,

5   negative amortization had increased, TDRs had risen to $432 million, $527 million of

6   its Option ARMs had recast (compared to a 2006 forecast of $1.4 billion) and it

7   expected the recast trend to increase, non-performing assets had risen dramatically by

8   $931 million in 2007, and assets had plummeted $2.79 billion.   On this news,

9   Downey's stock plummeted 6.26%, from $27.94 to $26.19 per share, thereby

10   removing some of the artificial inflation in the stock price as some of the relevant

11   truth regarding Downey's risky loan portfolio leaked into the market.   Over the days

12   that followed, the stock continued to freefall and, by March 10, 2008, had dropped

13   another 31.5%, from $26.19 to $17.94 per share, further removing some of the

14   artificial inflation in the stock price.   Defendants, however, continued to conceal the

15   full relevant truth about, *inter alia*, the financial and business condition of the

16   Company.

17        473.   On March 17, 2008, before the market opened, Downey released its

18   monthly selected financial results for the 13 months ended February 29, 2008,

19   reporting $13.4 billion in assets and $75.7 million in home loans for the 13 months

20   ended February.  Ex. 40.  This was down from $127.4 million for the 13 months ended

21   January 31, 2008.  One year prior, the Company had reported $15.5 billion in assets,

22   with less than 1% of its portfolio in default.  In January, the Company said it lost $109

23   million in the fourth quarter compared to a profit of $52 million a year earlier.   The

24   Company set aside $218 million from earnings to cushion itself against future

25   defaults.

26        474.   That same day, Credit Suisse reported about Downey:

27

28

- • Highlights include continued balance sheet shrinkage, a noticeable expansion in the net interest margin, and another large increase in NPAs.

- • Credit quality deteriorated in February with "traditional" NPAs rising to 6.63%, up 18% sequentially. Also, the performing troubled debt restructuring (TDR) category expanded to 4.3% from 3.6% in the month, an increase of 18% in dollars. These amounts are already ahead of our previous first quarter estimate.

- • While Downey has ample capital, we believe that the considerable increase in NPAs will likely result in significantly higher losses and credit provisioning as well as higher REO expenses.

*     *     *

- • [We are] lowering our 2008 estimate to a loss of $2.30 from a loss of $1.50.

475.    Also on March 17, 2008, Bloomberg reported: "Downey Financial Corp., the California savings and loan company whose stock has lost 70 percent in 12 months, said nonperforming assets increased to 10.9 percent on Feb. 29 from 9.1 percent a month earlier."

476.    On this news, Downey's stock dropped to a close of $18.82 per share on March 17, 2008, a decline from $19.14 per share on March 14, 2008, and a decline of 68% from $59 per share on October 9, 2007, thereby removing some of the artificial inflation in the stock price as some of the relevant truth regarding Downey's risky loan portfolio and its effect on Downey's financial condition leaked into the market. The stock subsequently continued to decline as additional adverse information concerning the Company's financial condition was leaked to the market.

477.    On April 21, 2008, Downey reported a net loss for 1Q08 of $247.7 million or $8.89 per share on a diluted basis, that its Board had decided to suspend future dividend payments, and a $236.3 million increase in provisions for credit

1    losses.  Downey also reported that its "[n]on-performing assets increased during the

2    quarter by $521 million to $1.562 billion and represented 11.90% of total assets,

3    compared with 7.77% at year-end 2007 and 0.94% a year ago."  On this news,

4    Downey's stock fell 14.37%, from $16.15 to $13.83 per share, thereby removing some

5    of the artificial inflation in the stock price as some of the relevant truth regarding

6    Downey's risky loan portfolio and its effect on Downey's financial condition leaked

7    into the market.

8        478.  On April 23, 2008, Moody's downgraded the bank's financial strength,

9    senior unsecured and long and short term deposit ratings of Downey and placed a

10   negative outlook on all Downey entities, concluding a review that it began January 24,

11   2008.  Moody's reported that a "key factor of the downgrade was the higher level of

12   first quarter 2008 charge-offs in Downey's first lien residential mortgage portfolio."

13   It further stated that "[t]his spike in charge-offs questioned Moody's previous

14   assumption that the company's relatively low loan-to-value ratios at origination could

15   mitigate the severity of losses despite high non-performing levels."  It concluded that

16   "[w]e expect charge-offs will continue to increase and anticipate the related

17   provisioning needs will result in Downey reporting losses through 2008 and possibly

18   into 2009."  On this news, Downey's stock fell 4.02%, from $13.93 to $13.37 per

19   share, thereby removing some of the artificial inflation from the stock as some of the

20   relevant truth regarding Downey's risky loan portfolio and its effect on Downey's

21   financial condition leaked into the market.

22       479.  On May 1, 2008 Downey filed its 1Q07 Form 10-Q, confirming and

23   detailing its losses.  The next day, Downey's stock fell 9.77%, from $15.05 to $13.58

24   per share, thereby removing some of the artificial inflation in the stock price as some

25   of the relevant truth regarding Downey's risky loan portfolio and its effect on

26   Downey's financial condition leaked into the market.  In the days that followed,

27   Downey's stock continued to decline 17.67%, from $13.58 to $11.18 per share by

28   May 8, 2008, further removing some of the artificial inflation in the stock price.

1     480.    On June 3, 2008, in an article entitled "Downey Financial tumbles to near

2   20-yr. low; S&P may cut rating to junk status," Thompson Financial and Forbes.com

3   reported that "S&P said it placed Downey's long-term counterparty credit rating,

4   currently at the lowest investment grade rating of BBB-, on review with negative

5   implications, citing a continued 'rapid' deterioration in credit.  The short-term A-3

6   rating was also being reviewed for possible downgrade."  On this news, Downey's

7   stock fell 8.07%, from $6.32 to $5.81 per share by June 4, 2008, thereby removing

8   some of the artificial inflation in the stock price as some of the relevant truth

9   regarding Downey's risky loan portfolio and its effect on Downey's financial

10   condition leaked into the market.

11     481.    On July 8, 2008, Lehman Brothers cut its rating on Downey and said that

12   it would stop covering Downey's stock due to an uncertain outlook.  Lehman Brothers

13   also reported that Downey "is overwhelmed" by bad mortgages.  On this news,

14   Downey's stock fell 8.47%, from $2.48 to $2.27 per share, thereby removing some of

15   the artificial inflation in the stock price as some of the relevant truth regarding

16   Downey's risky loan portfolio and its effect on Downey's financial condition leaked

17   into the market.  In the days that followed, Downey's stock price continued to drop

18   another 9.25%, to $2.06 per share by July 10, 2008, further removing some of the

19   artificial inflation in the stock price.

20     482.    On July 13, 2008, in an article entitled "Downey non-performing assets

21   jump to 14.33[%]," *MarketWatch* reported in part: "Downey Financial (dsl) said

22   Sunday that its nonperforming assets hit 14.33% of its total assets in May, up from

23   10.75% at the end of February.  A year ago, Downey's nonperforming assets were

24   1.3%."  On July 14, 2008, in an article entitled "Mortgage collapse Turns Downey

25   Into Home Seller," the *San Fernando Valley Business Journal* reported that Downey's

26   website listed 650 homes that it was trying to sell (560 in California) because

27   "borrowers weren't able to pay their mortgages."  The article further reported that in

28   1Q08, Downey had seen $23 million in added expenses to handle homes it took back

1   from borrowers.  When the markets opened after the weekend on July 14, 2008,

2   Downey's stock declined 24.26% from $1.69 to $1.28 per share, thereby removing

3   some of the artificial inflation in the stock price as the relevant truth regarding

4   Downey's risky loan portfolio and its effect on Downey's financial condition

5   continued to leak into the market.

6           483.   On July 24, 2008, Downey issued press releases announcing its earnings

7   results and that defendants McAlister and Rosenthal were stepping down. Ex. 37.  On

8   July 25, 2008, in an article entitled "Downey loses $219 million; Top execs step down

9   at troubled firm.  No spike in customer withdrawals seen," *The Orange County*

10  *Register* reported in part:

11          Downey Financial . . . reported Thursday a loss of $219 million in the

12          second quarter and that its chairman and chief executive have both

13          stepped down. . . .  Its nonperforming assets – dud loans and foreclosed

14          properties – increased by $395 million over the past three months to

15          $1.958 billion.  That's 15.5 percent of its total assets, compared with 7.8

16          percent at year-end 2007 and 1.5 percent a year ago.

17          484.   Upon these announcements, on July 24, 2008, Downey's stock declined

18  34.07%, from $2.73 to $1.80 per share, thereby removing some of the artificial

19  inflation from the stock as some of the relevant truth regarding Downey's risky loan

20  portfolio and its effects on Downey's financial condition continued to leak into the

21  market. During the next full trading day, on July 28, 2008, Downey stock fell an

22  additional 10.8%, from $1.80 to $1.73 per share, further removing some of the

23  artificial inflation in the stock price.  Also on July 28, 2008, Standard & Poor's

24  lowered its counterparty credit rating on Downey, stating that Downey's asset quality

25  was "greatly strained" and that "credit deterioration continues to be rapid and

26  unabated."  It added that "Downey's concentration in California and its exposure to

27  the more at-risk 2006-07 vintage mortgages might result in continued asset quality

28

problems and heightened losses." That same day, the *San Fernando Valley Business Journal* reported:

> Many of Downey's borrowers were in the Alt-A category and took out option adjustable-rate mortgages that allow credit card-style minimum payments. Two-thirds of the foreclosures in the fourth quarter were from adjustable loans, according to Washington, D.C.-based Mortgage Bankers Association. Defaults in Downey's loans have helped put 15.5% of its assets, mostly mortgages, into the "non-performing" category, according to the company.

485. On August 11, 2008, Downey filed its 2Q08 Form 10-Q, confirming and detailing its losses. Ex. 20. The filing also revealed that the OTS had issued a regulatory order forcing Downey to limit asset growth, suspend dividend payments, any new executive severance or compensation, and any new issuances of debt without prior non-objection of the OTS, and to provide prior notice of any additions or changes to directors or senior executive officers. In addition, Downey disclosed that under the order it was "subject to higher regulatory assessments and FDIC deposit insurance premiums than those prevailing in prior periods." The next day, August 12, 2008, Downey's stock fell 25.24%, from $2.10 to $1.57 per share, thereby removing some of the artificial inflation in the stock price as some of the relevant truth regarding Downey's risky loan portfolio and its effect on Downey's financial condition leaked into the market. On August 13, 2008, in a story entitled "OTS Limits Downey's Options; Some see curbs adding to capital challenge," *SourceMedia* disclosed that the order "was issued by the Office of Thrift Supervision on July 15, according to a source close to Downey."

486. On September 5, 2008, the OTS issued an Order to Cease and Desist requiring that Downey: (1) not issue dividends or capital distributions or any promises of such; (2) not enter into, renew, or extend contractual arrangement relating to compensation or benefits for senior executives or directors; and (3) not incur debt or

increase current lines of credit. In addition, the factual findings stated in part: "[T]he OTS finds that [Downey] has engaged in unsafe and unsound practices." Ex. 2. On September 6, 2008, in an article entitled "Oversight pressure may explain moves at Downey Financial," *The Los Angeles Times* reported in part: "[T]he OTS said Downey had 'engaged in unsafe and unsound practices' that had weakened its asset quality, earnings and future capital." On September 6, 2008, in an article entitled "Downey Financial Is Told to Raise Cash," *The Wall Street Journal* reported in part: "The Office of Thrift Supervision . . . issued a cease-and-desist order that formally requires the bank to raise capital. . . . Downey is the largest U.S. financial institution this year to receive such an action, regarded as one of the most severe of government interventions." On the next trading day, September 9, 2008, Downey's stock plummeted 30.65%, from $3.10 to $2.15 per share, thereby removing some of the artificial inflation from the stock as some of the relevant truth regarding defendants' unsafe and unsound lending practices and resulting lack of capital was revealed to the market. In the days that followed, Downey's stock price continued to decline 31.63% from $2.15 to $1.47 per share by September 12, 2008, further removing some of the artificial inflation in the stock price. Also on September 12, 2008, Standard & Poor's lowered its long-term counterparty credit rating on Downey to B- with a negative outlook "due to its increased concern about the company's asset quality-induced weak financial profile, which continues to erode its franchise and resulted in material regulatory restrictions."

487. On November 10, 2008, Downey filed its 3Q08 Form 10-Q, stating, among other things, that there was "substantial doubt" that it and subsidiary Downey Savings could "continue as going concerns." That day Downey's stock fell 2.69%, from $1.49 to $1.45 per share, thereby removing some of the artificial inflation from the stock as the some of the relevant truth regarding defendants' unsafe and unsound lending practices and resulting lack of capital was revealed to the market. The

1    following day, Downey' stock price continued to decline 68.28%, from $1.45 to $0.46

2    per share, further removing some of the artificial inflation in the stock price.

3        488.    On November 22, 2008, in an article entitled "Downey, PFF seized by

4    regulators; The Southland thrifts, felled by bad home loans, will continue to operate

5    under U.S. Bank of Minneapolis," *The Los Angeles Times* reported that federal

6    regulators had seized Downey, that it had been placed in receivership with the FDIC

7    and that U.S. Bank had agreed to purchase almost all of Downey's assets.  The article

8    further disclosed that the actions were necessary because "Downey lost $547.7 million

9    in the first nine months of 2008, largely because of risky 'option ARM' mortgages –

10   adjustable-rate loans that let borrowers pay so little each month that their loan

11   balances rose."  The story further disclosed that Downey's total estimated losses from

12   loans was $2.9 billion.  Over the next two days, Downey's stock plummeted 83.33%

13   from $0.18 to $0.03 by November 25, 2008, thereby removing the artificial inflation

14   in the stock price as the market realized the full effect of defendants' unsafe and

15   unsound practices on Downey's financial condition.  On November 25, 2008, Downey

16   filed for bankruptcy.

17   **VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**

18          **FRAUD-ON-THE-MARKET DOCTRINE**

19       489.    At all relevant times, the market for Downey common stock was an

20   efficient market for the following reasons, among others:

21          (a)    Downey stock met the requirement for listing, and was listed and

22   actively traded on the NYSE, a highly efficient and automated market;

23          (b)    As a regulated issuer, Downey filed periodic public reports with

24   the SEC and NYSE;

25          (c)    Downey regularly communicated with public investors via

26   established market communication mechanisms, including through regular

27   dissemination of press releases; and

28

1        (d)     Downey was followed by several securities analysts employed by

2 major brokerage firms who write reports which were distributed to the sales force and

3 certain customers of their respective brokerage firms.  Each of these reports was

4 publicly available and entered the public marketplace.

5        490.   As a result of the foregoing, the market for Downey common stock

6 digested current information regarding Downey from all publicly available sources

7 and reflected such information in Downey's stock price.  Under these circumstances,

8 all purchasers of Downey common stock during the Class Period suffered similar

9 injury, and a presumption of reliance applies.

10 **IX.    NO STATUTORY SAFE HARBOR EXISTS FOR**

11 **       DEFENDANTS' STATEMENTS**

12        491.   The statutory safe harbor provided for forward-looking statements under

13 certain circumstances does not apply to any of the false statements pleaded in this

14 Complaint.  The specific statements pleaded herein either were not identified as

15 "forward-looking statements" when made or were not accompanied by meaningful

16 cautionary statements identifying important factors that could cause actual results to

17 differ materially from those in the purportedly forward-looking statements.  To the

18 extent that the statutory safe harbor does apply to any forward-looking statements

19 pleaded herein, defendants are liable for those false forward-looking statements

20 because at the time each of those forward-looking statements was made, the particular

21 speaker knew that the particular forward-looking statement was authorized and/or

22 approved by an executive officer and/or Board member of Downey who knew that

23 those statements were false and misleading.

24                           **FIRST CLAIM FOR RELIEF**

25        **For Violation of Section 10(b) of the 1934 Act and Rule 10b-5**

26       **Against Individual Defendants Rosenthal, Côté and McAlister**

27        492.   Plaintiff incorporates ¶¶1-491 by reference.

28

493.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

494.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Downey common stock during the Class Period.

495.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Downey common stock.  Plaintiff and the Class would not have purchased Downey common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' misleading statements.

### SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act

### Against Individual Defendants Rosenthal, Côté and McAlister

496.    Downey, as well as those it controlled, and the Individual Defendants were primary violators of §10(b) of the Exchange Act.  However, due to the bankruptcy stay as to Downey, all claims against Downey are stayed.  The Individual defendants, however, are still liable as control persons of Downey and its officers, employees and directors as well as each other for causing the §10(b) violations alleged herein.

497.    Plaintiff incorporates ¶¶1-496 by reference.

- 183 -

498.    Defendants acted as controlling persons of Downey within the meaning of §20(a) of the 1934 Act.  By reason of (i) their positions with the Company, their responsibilities (including their preparation of the Company's press releases and SEC filings and their signatures on Downey's SEC filings during the Class Period as alleged); (ii) McAlister's, Rosenthal's and Cote's participation in setting underwriting guidelines and loan loss reserves; and (iii) McAlister's ownership of approximately 20% of Downey stock which he obtained at a fraction of the Class Period high trading price of over $74 a share, defendants had the power and authority to cause and did cause Downey and its employees, officers and directors to engage in the wrongful conduct complained of herein.    Downey controlled defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## X.    CLASS ACTION ALLEGATIONS

499.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Downey common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

500.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Downey has nearly 28 million shares of common stock outstanding, owned by hundreds, if not thousands, of persons.

501.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

1          (c)     whether defendants' statements omitted material facts necessary to

2  make the statements made, in light of the circumstances under which they were made,

3  not misleading;

4          (d)     whether defendants knew or deliberately disregarding that their

5  statements were false and misleading;

6          (e)     whether the price of Downey common stock was artificially

7  inflated; and

8          (f)     the extent of damage sustained by Class members and the

9  appropriate measure of damages.

10     502.   Plaintiff's claims are typical of those of the Class because plaintiff and

11  the Class sustained damages from defendants' wrongful conduct.

12     503.   Plaintiff will adequately protect the interests of the Class and has retained

13  counsel who are experienced in class action securities litigation.  Plaintiff has no

14  interests which conflict with those of the Class.

15     504.   A class action is superior to other available methods for the fair and

16  efficient adjudication of this controversy.

17  **XI.   PRAYER FOR RELIEF**

18     WHEREFORE, plaintiff prays for judgment as follows:

19     A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ.

20  P. 23;

21     B.    Awarding plaintiff and the members of the Class damages, including

22  interest;

23     C.    Awarding plaintiff's reasonable costs and attorneys' fees; and

24     D.    Awarding such equitable/injunctive or other relief as the Court may deem

25  just and proper.

26  **XII.  JURY DEMAND**

27     Plaintiff demands a trial by jury.

28

1   DATED: April 17, 2009

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   S:\CasesSD\Downey Financial\CPT00058340_2nd Amended.doc

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLOW E. RADCLIFFE
ELI R. GREENSTEIN

_Willow E. Radcliffe_

WILLOW E. RADCLIFFE

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
STACEY M. KAPLAN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

Lead Counsel for Plaintiffs

SULLIVAN, WARD, ASHER &
PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

Additional Counsel for Plaintiff

### Description of Exhibits

1. Testimony before Congress of Chairman Christopher Cox of the SEC, dated October 23, 2008.

2. Order to Cease and Desist from the U.S. Office of Thrift Supervision to Downey Financial Corp., dated September 5, 2008.

3. Excerpts of Downey Financial Corp.'s Form 10-K for the fiscal year ending December 31, 2006, filed with the SEC on March 1, 2007.

4. Excerpts of Downey Financial Corp.'s Form 10-K for the fiscal year ending December 31, 2007, filed with the SEC on February 29, 2008.

5. Press release from Downey Financial Corp., dated January 14, 2008.

6. Excerpts of Downey Financial Corp.'s Form 10-Q for the third fiscal quarter of 2006, filed with the SEC on November 11, 2006.

7. Press release from Downey Financial Corp., dated April 18, 2007.

8. Release from the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision titled "Expanded Guidance for Subprime Lending Programs."

9. Release from the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and the Office of Thrift Supervision titled "Interagency Guidance on Nontraditional Mortgage Product Risks," dated September 28, 2006.

10. Excerpts of Downey Financial Corp.'s Form 10-Q for the first fiscal quarter of 2007, filed with the SEC on May 4, 2007.

11. Excerpts of Downey Financial Corp.'s Form 10-Q for the second fiscal quarter of 2007, filed with the SEC on August 1, 2007.

12. Excerpts of Downey Financial Corp.'s Form 10-Q for the third fiscal quarter of 2007, filed with the SEC on November 1, 2007.

13. A list of additional related lawsuits filed against Downey Financial Corp..

14. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2007, filed with the SEC on March 14, 2008.

15. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2005, filed with the SEC on March 6, 2006.

16. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2004, filed with the SEC on March 15, 2005.

17. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2003, filed with the SEC on March 15, 2004.

18. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2002, filed with the SEC on March 6, 2003.

19. Downey Financial Corp.'s Form 10-Q for the first fiscal quarter of 2008, filed with the SEC on May 1, 2008.

20. Downey Financial Corp.'s Form 10-Q for the second fiscal quarter of 2008, filed with the SEC on August 11, 2008.

21. Press release from Downey Financial Corp., dated January 18, 2007.

22. Press release from Downey Financial Corp., dated July 18, 2007.

23. Press release from Downey Financial Corp., dated October 10, 2007.

24. Press release from Downey Financial Corp., dated October 17, 2007.

25. Press release from Downey Financial Corp., dated January 23, 2008.

26. Regulations from the Office of Thrift Supervision.

27. Selected sections from the Examination Handbook of the Office of Thrift Supervision.

28. Letter from Downey Savings to the Chief Counsel's Office of the Office of Thrift Supervision, dated March 29, 2006.

29. Press release from Downey Financial Corp., dated January 14, 2008.

30. Press release from Downey Financial Corp., dated April 18, 2007.

31. Press release from Downey Financial Corp., dated October 16, 2008.

32. Press release from Downey Financial Corp., dated October 22, 2008.

33. Press release from Downey Financial Corp., dated September 27, 2007.

34. Downey Financial Corp.'s Form 8-K dated December 19, 2007, filed with the SEC.

35. Downey Financial Corp.'s Form 8-K dated January 22, 2008, filed with the SEC.

36. Downey Financial Corp.'s Form 8-K dated June 25, 2008, filed with the SEC.

37. Press release from Downey Financial Corp., dated July 24, 2008.

38. Testimony before the U.S. Senate of Kathryn E. Dick, Deputy Comptroller of the Office of the Comptroller of the Currency, dated September 20, 2006.

39. Excerpts of Downey Financial Corp.'s Proxy Statement for the year 2006, filed with the SEC on March 9, 2007.

40. Press release from Downey Financial Corp., dated March 17, 2008.

41. Article titled "Business Journal Subscribers in Good Company" from *AllBusiness.com*, dated August 23, 2004.