1  COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2  WILLOW E. RADCLIFFE (200087)
   wradcliffe@csgrr.com
3  ELI R. GREENSTEIN (217945)
   egreenstein@csgrr.com
4  100 Pine Street, Suite 2600
   San Francisco, CA  94111
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6         – and –
   STACEY M. KAPLAN (241989)
7  skaplan@csgrr.com
   9601 Wilshire Blvd., Suite 510
8  Los Angeles, CA  90210
   Telephone:  310/859-3100
9  310/278-2148 (fax)

10 Lead Counsel for Plaintiffs

11 [Additional counsel appear on signature page.]

12              UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14                  WESTERN DIVISION

15 In re DOWNEY SECURITIES        )  Master File No.
   LITIGATION                     )    CV-08-03261-JFW(RZx)
16 ─────────────────────────────  )
                                  )  CLASS ACTION
17 This Document Relates To:      )
                                  )  LEAD PLAINTIFF'S OPPOSITION
18       ALL ACTIONS.             )  TO INDIVIDUAL DEFENDANTS'
                                  )  MOTION TO DISMISS SECOND
19 ─────────────────────────────  )  AMENDED CONSOLIDATED
                                     COMPLAINT
20
                                     DATE:        July 13, 2009
21                                   TIME:        1:30 p.m.
                                     COURTROOM:   The Hon. John F.
22                                                Walter

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   JUDICIAL NOTICE ....................................................................... 3

III.  COMPLAINT ALLEGATIONS, INCLUDING NEW
      ALLEGATIONS IN THE SECOND AMENDED COMPLAINT ............... 4

      A.    Defendants Engaged in Predatory Lending Practices – Pushing
            Borrowers into Option ARM Loans that They Could Not
            Afford – While Concealing the Risks, Including Negative
            Amortization that Caused Monthly Payments Based on 1%
            "Teaser" Start Rates to Double or Triple and Caused Borrowers
            to Default on the Payments ............................................................ 4

            1.    During the Class Period, Option ARM Loans – Called
                  "Liar's Loans" – Constituted Between 65% and 85% of
                  Downey's Residential Mortgage Portfolio ............................... 4

            2.    During the Class Period, More than 90% of Downey's
                  Residential Loans Were Issued with No Documentation
                  and/or No Verification of the Borrowers' "Stated
                  Income" – the "No Doc" Loans that SEC Commissioner
                  Christopher Cox Has Since Told Congress Exemplified
                  the Collapse of Lending Standards that Led to the
                  Current Mortgage Crisis ......................................................... 6

            3.    Plaintiffs' Complaint Alleges Specific Examples of
                  Downey's Predatory Lending Practices, Reported by
                  Some of the Borrowers Who Were Devastated by
                  Defendants' "No Doc" and "Stated Income" Option
                  ARMs .................................................................................... 8

      B.    Defendants McAlister, Rosenthal, and Côté Drove Downey's
            Predatory Lending Practices .......................................................... 9

            1.    Even Before the Class Period Began, Downey Board
                  Members and Downey's Chief Lending Officer Realized
                  that Option ARM Loans Were "a Very Horrible Loan"
                  and Tried to Convince Defendants to Stop Selling Them.......... 9

            2.    Defendant-Chairman of the Board, McAlister Rejected
                  All Advice to Stop Selling Option ARMs, Installed His
                  Former Son-in-Law as CEO, His Daughter and Personal
                  Physician as Board Members – and Wrote to the Office
                  of Thrift Supervision to Challenge the Need for Proposed
                  Guidelines on the Loans ......................................................... 10

            3.    When the Office of Thrift Supervision Issued New
                  Guidance Regarding Residential Mortgage Lending in
                  September 2006 Just Before the Start of the Class Period,
                  Defendants Not Only Fought the New Guidance but Also

Page

Defiantly Continued Their Deliberately Reckless Lending Practices..................................................11

C. Defendants Made Unequivocally False Statements Regarding the Extent of Downey's "Subprime" Lending and Misled the Market by Defining "Subprime" Differently than the Rest of the Industry ..........................................................12

D. Despite Downey's Radical Departure from Banking Regulations and Guidelines, Defendants (Falsely) Assured Investors Throughout the Class Period that Downey Complied with All Banking Guidelines and that Downey's Portfolio Was Sound and Adequately Underwritten to Prevent Credit Risk.............14

    1. Defendants Were Fully Aware of Downey's Actual Lending Practices...............................................15

    2. CEO Rosenthal Personally Overrode Downey's Regional Manager's Recommendations Regarding Creditworthiness and Granted "Exceptions" for 50% of Downey's Southern California Loans ...........................17

    3. Even When Board Chairman McAlister Did Acknowledge Downey's Weakening Financial Condition, He Falsely Understated the Situation as "a Little Bit of a Problem, but Not Very Much"..........................19

E. In the Midst of Receiving Hard Numbers Documenting the Mounting Delinquencies and Foreclosures in Downey's Option ARM Portfolio, Defendants Intentionally Concealed Downey's Financial Condition by Lowering Its Reserves and Loan Loss Provision – Artificially Inflating Downey's Income and Earnings by Millions of Dollars During the Class Period .................19

    1. Defendants Knew Downey's Loans Were Impaired and Could Reasonably Estimate the Amount of Loss....................21

    2. Despite What Defendants Knew About Downey's Impaired Loans, Defendants Actually Reduced Downey's Reserves .................................................23

    3. Defendants Actively Concealed Downey's Impaired Loans..................................................................25

F. In 2008, Downey Was Finally Forced to Reveal Its Very Impaired Financial Condition ..................................26

    1. Shortly After the Class Period, the Office of Thrift Supervision Found that Downey "Engaged in Unsafe and Unsound Practices" in Every Fundamental Aspect of Its

Page

Business – Including Asset Quality, Earnings, Liquidity Planning, Management, and Projected Capital Levels ............ 27

2.     Within Months of the Office of Thrift Supervision's Order Prohibiting Downey from Continuing Its Fraudulent Option ARM Lending Practices, Defendant-CEO Rosenthal and Defendant-Board Chairman McAlister Suddenly Resigned and Downey Filed for Bankruptcy ................................................................ 28

IV.   LEGAL STANDARD ................................................................ 29

V.    ARGUMENT ........................................................................... 29

A.    Plaintiffs Plead with Particularity that Defendants Made False and Misleading Statements Regarding Downey's Mortgage Lending Business ..................................................................... 29

1.     Defendants CEO Rosenthal and CFO Côté Made Plainly False Statements to the Market About Downey's Subprime Lending ............................................................ 29

2.     Defendants Chairman McAlister, CEO Rosenthal, and CFO Côté – in Documents that They Signed and Filed with the SEC – Made False Statements to the Market Regarding Downey's Loan Quality and Credit Risk Practices ................................................................................ 31

3.     Defendants Chairman McAlister, CEO Rosenthal, and CFO Côté – in Documents that They Signed and Filed with the SEC – Falsely Inflated Downey's Earnings, Understated Downey's Reserves, and Misrepresented Downey's Capital Position ...................................................... 32

4.     Defendants Chairman McAlister, CEO Rosenthal, and CFO Côté – in Documents that They Signed and Filed with the SEC – Made False Statements Regarding Downey's Compliance with Existing Banking and Accounting Rules and Guidelines ............................................ 35

B.    Plaintiffs' Scienter Allegations Overwhelmingly Plead a Cogent and Compelling Theory of Defendants' (at Least) Deliberately Reckless Conduct ................................................... 36

1.     Defendants McAlister, Rosenthal, and Côté Had Daily Direct Access to Downey's Core (Almost Exclusive) Business – Mortgage Lending – Cogently Supporting Their Scienter ........................................................................... 36

2.     CEO Rosenthal's and Chairman McAlister's Personal Involvement in Overriding Downey's Already Lax

1

2                                                                            **Page**

3                              Standards to Sell Loans Demonstrates the Extent of
                               Defendants' Deliberate Recklessness ........................................38
4
                    3.        Defendants' Pre-Class Period Lending Practices –
5                             Including Defendants' Efforts to Resist Guidance from
                              the Office of Thrift Supervision – and Post-Class Period
6                             Events – Including the Office of Thrift Supervision's
                              Cease and Desist Order to Downey – Confirm
7                             Defendants' Scienter During the Class Period ........................39

8                   4.        Defendants' Blatant Disregard of Both GAAP Standards
                              and Guidance from the Office of Thrift Supervision
9                             Demonstrates Their Determination to Sell Loans
                              Regardless of the Risks Involved ..............................41
10
                    5.        The Number of Witnesses Who Reported Defendants'
11                            Fraudulent Practices – and the Consistent and
                              Corroborating Nature of Their Reports – Strongly
12                            Support Scienter........................................................42

13                  6.        Defendants' Financial and Personal Survival Motives
                              Bolster the Already-Strong Inference of Scienter ..................45
14
          C.        Plaintiffs Plead a Plausible Theory Explaining How
15                  Defendants' Fraudulent Conduct Caused Their Loss .......................47

16        D.        Plaintiffs Amply Plead that Downey's Two Chief Officers and
                    the Chairman of Its Board Exercised Control Over Downey ............48
17
   VI.    CONCLUSION ........................................................................49
18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Barrie v. Intervoice-Brite, Inc.*,

5
     397 F.3d 249,
     *reh'g denied*, 409 F.3d 653 (5th Cir. 2005) ................................................ 44

6

7

*Bell Atl. Corp. v. Twombly*,
     550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................... 47

8

*Berson v. Applied Signal Tech., Inc.*,

9
     527 F.3d 982 (9th Cir. 2008) ................................................................ 30, 38

10

*Bryant v. Avado Brands, Inc.*,

11
     187 F.3d 1271 (11th Cir. 1999) ...................................................................... 3

12

*Crowell v. Ionics, Inc.*,

13
     343 F. Supp. 2d 1 (D. Mass. 2004) ............................................................... 47

14

*Dura Pharms., Inc. v. Broudo*,

15
     544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) ........................... 48

16

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
     316 F.3d 1048 (9th Cir. 2003) ..................................................................... 49

17

18

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
     270 F.3d 645 (8th Cir. 2001) ....................................................................... 45

19

20

*Howard v. Everex Sys., Inc.*,
     228 F.3d 1057 (9th Cir. 2000) ....................................................30, 32, 33, 35

21

22

*In re Burlington Coat Factory Sec. Litig.*,
     114 F.3d 1410 (3d Cir. 1997) ................................................................. 4, 45

23

*In re Cabletron Sys., Inc.*,

24
     311 F.3d 11 (1st Cir. 2002) .......................................................................... 35

25

*In re Countrywide Fin. Corp. Derivative Litig.*

26
     554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................... 33, 34

27

*In re Countrywide Fin. Corp. Sec. Litig.*,
     588 F. Supp. 2d 1132 (C.D. Cal. 2008)..............................................*passim*

28

**Page**

*In re Daou Sys., Inc. Sec. Litig.,*
411 F.3d 1006 (9th Cir. 2005)..............................................................*passim*

*In re Dura Pharms., Inc. Sec. Litig.,*
452 F. Supp. 2d 1005 (S.D. Cal. 2006) .......................................................39

*In re Gilead Scis. Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008),
*cert. denied,* 129 S. Ct. 1993 (2009) ........................................................47

*In re Raytheon Sec. Litig.,*
157 F. Supp. 2d 131 (D. Mass. 2001) .........................................................4

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001)........................................................................39

*In re Wells Fargo Sec. Litig.,*
12 F.3d 922 (9th Cir. 1993)........................................................................42

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001).........................................................3, 31, 36

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008).....................................................................37

*McGann v. Ernst & Young,*
102 F.3d 390 (9th Cir. 1996)......................................................................46

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir. 2008)...................................................................48

*Miller v. Thane Int'l, Inc.,*
508 F.3d 910 (9th Cir. 2007)......................................................................31

*Mizzaro v. Home Depot, Inc.,*
544 F.3d 1230 (11th Cir. 2008)..................................................................39

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. West Holding Corp.,*
320 F.3d 920 (9th Cir. 2003)...............................................................46, 49

**Page**

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003)......................................................................34, 46

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005)........................................................................39, 40

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..............................................................................42

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)........................................................................29, 38

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004)..............................................30, 32, 33, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)....................*passim*

*United States v. Mariscal*,
    285 F.3d 1127 (9th Cir. 2002)............................................................................3

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)............................................................................40

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ..............................................................................................3, 42
    §78t(a)...............................................................................................3, 48
    §78t(d) ..................................................................................................46
    §78t-1.....................................................................................................46
    §78u-4(b)(1) ............................................................................................30

17 C.F.R.
    §240.10b-5..............................................................................................42

Federal Rules of Civil Procedure
    Rule 9......................................................................................................47
    Rule 12(b)(6) ..........................................................................................47

**Page**

Federal Rules of Evidence
     Rule 804(b)(3) .............................................................................. 3


**SECONDARY AUTHORITIES**

Restatement (Second) of Torts
     §548A(b) ................................................................................. 48

## I.     INTRODUCTION

On September 5, 2008, the Office of Thrift Supervision ("OTS") finally insisted that defendant Downey Financial Corporation ("Downey") stop selling Option Adjustable Rate Mortgage loans ("Option ARMs") and reduce its existing portfolio of those loans, calling Downey's banking practices "unsafe and unsound" (¶433; Ex. 2 at 205)[1] – a phrase that defendants now cavalierly scoff as a "term of art." Defs' Br. at 29 n.25.[2] Only two months later, Downey admitted there was "substantial doubt" that it and its subsidiary Downey Savings & Loan Association, F.A. ("Downey Savings") would "continue as going concerns." ¶487. By November 22, 2008, the FDIC had placed Downey in receivership. ¶488. News reports disclosed that Downey lost *$2.9 billion* from loans, including the "risky 'option ARM' mortgages" that are the subject of this litigation. *Id.* Three days later, Downey filed for bankruptcy. *Id.*

The rapid pace of Downey's demise after the OTS put an end to Downey's rampant and aggressive campaign to sell Option ARMs is significant in two ways. It demonstrates both the extent to which Downey's business was dependent upon Option ARMs – and also how highly risky those loans were, especially when sold with deliberately reckless disregard for borrowers' ability to repay them. For example, Downey sold its Option ARMs with low "teaser" introductory rates of 1% interest and the "option" to pay even less than the full monthly interest, concealing that, within as little as one month, *monthly payments could double or triple*. ¶¶8, 204. Further, Downey wrote 90% of its loans either without any documentation ("no doc") or without verifying any of the information stated by borrowers or their brokers ("stated income"). ¶18; Defendants' Request for Judicial Notice ("Defs' RJN"), Exs. A at 37,

---

[1]     All "¶__" references are to the Second Amended Consolidated Complaint.

[2]     The Individual Defendants' Omnibus Memorandum of Points and Authorities in Support of Motion to Dismiss Second Amended Consolidated Complaint is referenced as "Defs' Br."

B at 168, C at 289, D at 367, E at 444, and F at 526.[3]  As an example, Downey's former Scottsdale, Arizona wholesale operations manager recalled receiving a mortgage loan application from ***a McDonald's employee who claimed to make $8,500 per month*** – and confirmed that it was typical of loans that he would reject but would be approved anyway when management overrode his judgment. ¶154.  Thus, while Option ARMs are not impermissible in all situations, as sold by defendants here, the loans were indeed "unsafe and unsound."  ¶433; Ex. 2 at 205.

Lead plaintiff Waterford Township General Employees Retirement System – on behalf of itself and all persons who purchased or acquired Downey common stock between October 16, 2006 and March 14, 2008 (the "Class Period") – alleges with great particularity in the Second Amended Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint") that three individuals were responsible for Downey's program of predatory lending: former Chief Executive Officer ("CEO") and Vice Chairman of the Board Daniel D. Rosenthal, former Chief Financial Officer ("CFO") Brian E. Côté, and former Chairman of the Board and co-founder Maurice L. McAlister.  For example, in an allegation new to the Complaint, a Downey Regional Manager reported that defendant ***Rosenthal personally granted "exceptions" for 50% of the loans that Downey wrote in Southern California*** – undercutting Downey's already extremely loose underwriting standards.  ¶¶189-191.

Plaintiffs' primary amendments to the Complaint are three.  First, plaintiffs carefully reviewed all of defendants' false statements, selecting only the very most egregious for repleading and cumulated the factual allegations and supporting witness testimony to plead both falsity and scienter with greater clarity.  Second, plaintiffs added corroborating accounts from 14 additional witnesses – including multiple witnesses who report that ***Downey routinely lent to subprime borrowers*** despite

---

[3]     As fully set forth in section II, below, plaintiffs do not oppose Defendants' Request for Judicial Notice, subject to the limits of the Federal Rules of Evidence.

1    defendants' statements to the contrary. ¶¶240-245. Third, plaintiffs attached excerpts
2    of defendants' false statements to the Complaint for the Court's convenience.

3          With these changes, it is simply undeniable that when plaintiffs' amended
4    allegations are accepted as true, they plead falsity with particularity, a cogent and
5    compelling theory of scienter that is at least as strong as any opposing inference, and
6    all other elements required by §§10(b) and 20(a) of the Securities Exchange Act of
7    1934 (the "1934 Act"). In short, the facts alleged state a claim. Defendants' motion
8    to dismiss should be denied.

9    **II.    JUDICIAL NOTICE**

10         Plaintiffs do not oppose Defendants' Request for Judicial Notice, but under
11   settled law, the documents offered may be considered only for the purpose of
12   determining what statements the documents contain, not to prove the truth of those
13   contents. *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) (judicial
14   notice only appropriate as to "undisputed" matters). Courts may judicially notice
15   "***undisputed*** matters of public record," but not "***disputed*** facts stated in public
16   records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis by
17   the court).

18         This is particularly true of public documents filed with the Securities and
19   Exchange Commission ("SEC") in a securities fraud action – since the truth of the
20   contents of the SEC reports is typically central to the dispute. "[A] court, when
21   considering a motion to dismiss in a securities fraud case, may take judicial notice (for
22   the purpose of determining what statements the documents contain and not to prove
23   the truth of the documents' contents) of relevant public documents required to be filed
24   with the SEC, and actually filed." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278
25   (11th Cir. 1999).

26         Importantly, however, to the extent that Downey's SEC reports and other public
27   filings contain statements against defendants' interests, plaintiffs may rely on the truth
28   of those statements in support of Complaint allegations. Fed. R. Evid. 804(b)(3).

Where "[t]he plaintiff's interpretation of the internal documents is at least as plausible as the interpretation offered by defendants," a court must accept plaintiff's interpretation at the pleading stage. *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001), citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).

## III.  COMPLAINT ALLEGATIONS, INCLUDING NEW ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

### A.  Defendants Engaged in Predatory Lending Practices – Pushing Borrowers into Option ARM Loans that They Could Not Afford – While Concealing the Risks, Including Negative Amortization that Caused Monthly Payments Based on 1% "Teaser" Start Rates to Double or Triple and Caused Borrowers to Default on the Payments

The core of Downey's business during the Class Period was residential mortgage lending, primarily with Option ARM loans – a particularly risky loan described fully below.  Despite the known risks of this loan, defendants issued 90% of Downey's residential loans during the Class Period with either no documentation from the borrower or no verification of the borrower's stated income – and CEO Rosenthal routinely granted "exceptions" to Downey's already loose underwriting standards. Thus, as the Complaint fully alleges, far from being a victim of the housing and banking crisis, defendants played a considerable role in creating it.

### 1.  During the Class Period, Option ARM Loans – Called "Liar's Loans" – Constituted Between 65% and 85% of Downey's Residential Mortgage Portfolio

Before Downey filed for bankruptcy and had its assets seized by the United States Government, it was a holding company for Downey Savings, a mortgage lending thrift that originated and invested in billions of dollars of residential mortgages.  ¶8.  Specifically, during the Class Period, residential one-to-four unit loans accounted for over 95% of Downey's loan portfolio.  *See, e.g.*, Defs' RJN, Ex. C at 248, 294 (identifying total residential one-to-four unit loans and total loans held for investment (gross)).  Downey's business was residential lending.

Beginning in the late 1990s, shortly after defendant Rosenthal took over as CEO, Downey began to sell Option ARM loans. ¶¶8, 94. Downey's Option ARMs were adjustable rate mortgage loans with artificially low "teaser" introductory interest rates as low as 1% (one of the lowest in the industry). ¶8. The "option" offered to borrowers was to make monthly payments that were even *less* than the monthly interest accruing on the loan. ¶10. By doing this, however, borrowers would accrue negative amortization – meaning that the unpaid interest would be added to the principal loan amount. *Id.*

The trick for Downey – at borrowers' expense – was that once the negative amortization reached a certain threshold (typically 10%-15% of the principal loan amount), the loan would automatically "recast" – meaning that Downey would rewrite the loans with new terms and a new interest rate. *Id.* In practice, this often left borrowers with monthly payments that were *two or three times* the amount of their original monthly payments. *Id.* Because of the very deceptive nature of the teaser rates and the recasting, Option ARMs were called "liar's loans." ¶8.

In September 30, 2001, Option ARMs were only 16.6% of Downey's total mortgage portfolio. ¶95. By 2005, however, Option ARMs accounted for *91% of Downey's residential "one to four [units]" loan portfolio*. ¶442; Defs' RJN, Ex. A at 37, 65 (identifying total loans subject to negative amortization and total residential one-to-four unit loans). Option ARMs remained a core component of Downey's business throughout the Class Period, representing between *65% and 85%* of Downey's residential loan portfolio throughout the Class Period. ¶442; Defs' RJN, Exs. A at 36, 65, B at 164.

### 2. During the Class Period, More than 90% of Downey's Residential Loans Were Issued with No Documentation and/or No Verification of the Borrowers' "Stated Income" – the "No Doc" Loans that SEC Commissioner Christopher Cox Has Since Told Congress Exemplified the Collapse of Lending Standards that Led to the Current Mortgage Crisis

By definition, payments on adjustable rate mortgages fluctuate as interest rates change. ¶336. According to the OTS, "ARM lending involves a transfer of interest rate risk from the lender to the borrower. As a tradeoff, *the lender must assume the additional credit risk associated with a borrower's potential inability to service the loan if interest rates rise*." *Id.*; Ex. 27 at 824. Downey's Option ARMs presented an additional risk because when the borrowers exercised their "option" to pay less than the full amount of interest, their loans were "recast" to require monthly payments often well beyond the terms and rates to which they had originally agreed. ¶8. Because of the increased risk associated with these loans, the OTS explains that *sound underwriting standards were essential*. Ex. 27 at 824. But, Downey had none.

Instead, Downey sold these loans with little to no verification of borrowers' ability to repay. Some *90% of Downey's residential loans* sold during the Class Period either had *no documentation* or were based on the borrowers' *stated income*, which Downey did not check. Defs' RJN, Exs. A at 37, B at 168, C at 289, D at 367, E at 444, and F at 526. While "no doc" or "stated income" loans are not impermissible in all situations, they were an unsound method for determining borrowers' ability to service Downey's high-risk Option ARM loans. But, it seems that was the point. Thirteen witnesses, including four underwriters and two witnesses with accounting backgrounds, all confirm *Downey's willful blindness about borrowers' ability to repay their loans*. ¶138.

For example, a former Senior Underwriter who worked at Downey's office in Arizona during the Class Period – who also handled loans from Downey's corporate office (daily) and the Southern California office (periodically) and had worked in residential lending for 16 years – reported that Downey's guidelines allowed

1    borrowers with low credit scores and very little proof of income to be approved for

2    Option ARM loans that the borrowers clearly would not be able to afford once the

3    loans adjusted. ¶¶144-145. The Senior Underwriter – confidential witness ("CW") 4

4    – specifically recalled that a self-employed landscaper who claimed that he made

5    $10,000 per month was given a loan. ¶146. The Senior Underwriter joked with an

6    SEC Reporting Analyst in Downey's finance department, CW9, that another guy who

7    mows lawns was just given a million dollar loan. ¶¶62, 146.

8         The lawn mower was not the exception. A former Wholesale Operations

9    Manager who worked at Downey's Scottsdale, Arizona operations center during the

10   Class Period, CW5, saw many such loans. ¶¶58, 154-155. The Wholesale Operations

11   Manager – who had an accounting background and oversaw a staff of 25-35

12   employees – recalls receiving a mortgage loan application for a "stated income"

13   Option ARM loan from a McDonald's employee who claimed to make $8,500 per

14   month. ¶¶58, 154. Similarly, he recalls several applications from nail technicians

15   who "stated" that they made between $10,000 - $12,000 per month. ¶155. Despite

16   the Wholesale Operations Manager's efforts to deny these loans and to bring them to

17   his supervisors' attention, Downey funded many of them. ¶¶154-155. The Manager

18   was so concerned that s/he even went so far as to file Suspicious Activity Reports with

19   the Financial Crimes Enforcement Network, an agency of the United States

20   Department of the Treasury. ¶155 & n.7.

21        Additionally, the Complaint now alleges even more facts from 14 new

22   witnesses. For example, an underwriter who worked at Downey's Cupertino,

23   California branch during the Class Period, CW16, reports that he was well aware that

24   borrowers would not be able to make their loan payments based on the income they

25   earned. ¶¶69, 152. An Account Executive who worked at Downey's San Diego

26   office throughout the Class Period, CW18, recalls that it was very easy for anyone to

27   get a loan from Downey. ¶¶71, 158. The Account Executive – who had anywhere

28   between 30 and 40 brokerage accounts at a time and sold the brokers primarily Option

ARM and portfolio loans – recalls that an underwriter passed through a loan in which a borrower's ***credit report showed him working at McDonalds*** for the past three years even though his ***loan application stated that he was an attorney***. *Id.*  Similarly, a loan funder who worked at Downey's Walnut Creek location during the Class Period, CW26, recalls seeing many loans that shot up a red flag because the borrower's job title and income seemed inconsistent – including a loan application by an auto mechanic with a stated income of $7,000 per month.  ¶¶81, 169.

### 3. Plaintiffs' Complaint Alleges Specific Examples of Downey's Predatory Lending Practices, Reported by Some of the Borrowers Who Were Devastated by Defendants' "No Doc" and "Stated Income" Option ARMs

The complaints and pleadings in at least 30 lawsuits corroborate the detailed accounts of witnesses regarding Downey's toxic and heart-breaking lending practices. ¶204.  Although certain of the loans which have resulted in individual lawsuits were written prior to the Class Period, the nature of Downey's continuing lending practices is eye-opening.

For example, Reverend Will Hardeman, a 96-year-old widowed man with vision and hearing difficulties as well as possible dementia, received a loan from Downey in April 2006. *Id.*  Reverend Hardeman had owned his home for 34 years and had a fixed income of $1,300 per month, supplemented by periodic negligible donations for serving as a pastor. *Id.*  On April 21, 2006, Reverend Hardeman received a loan application from Downey for $322,006.50 with a 7.472% adjustable rate and monthly payments of $1,005.39 (increasing to $2,380.40 in 2009). *Id.*  Less than a week later, on April 26, 2006, another set of loan documents was prepared which set forth a loan in the amount of $340,509.10 with an adjustable rate of 8.674% with monthly payments of $2,350 for five years increasing to $2,802.58 and above. *Id.*  The second loan application stated that Reverend Hardeman's monthly income was $5,382. *Id.*  When Downey was notified of the problems on July 25, 2006, it

1 responded that Reverend Hardeman needed to pay the $2,350 monthly payment. *Id.*

2 On September 22, 2006, Downey began foreclosure proceedings. *Id.*

3      Carlos and Gloria Rosales worked as a concrete finisher and an accountant for

4 the *San Diego Union-Tribune*, respectively, earning a combined $2,948 per month.

5 *Id.* On June 16, 2006, they refinanced their home with Downey for $412,000 to

6 reduce their monthly payments because Carlos' work had begun to slow down. *Id.*

7 The Rosaleses were told that the loan would have a fixed interest rate of 6% – but at

8 the time of closing, it was 7.107%. *Id.* The Rosaleses complained, but were told to

9 focus on the teaser payment of $1,397.32, which was based on a start rate of 1.375%.

10 *Id.* The Rosaleses were told that monthly payments would remain at $1,397.32 with

11 maximum annual payment increases of 7.5% for five years. *Id.* They did not

12 understand that interest would be accruing on their loan balance every month and even

13 if they had, they could not afford the higher payments to avoid this scenario. *Id.*

14 Downey accrued negative amortization on the Rosaleses' loan until it reached the

15 threshold at which Downey recast the loan, leaving the Rosaleses, who could not

16 afford the higher payments, to default on their loan. *Id.*

17      These are but two examples. The Complaint contains many more. *Id.*

18 **B.**    **Defendants McAlister, Rosenthal, and Côté Drove Downey's Predatory Lending Practices**

19
20      **1.**    **Even Before the Class Period Began, Downey Board Members and Downey's Chief Lending Officer Realized that Option ARM Loans Were "a Very Horrible Loan" and Tried to Convince Defendants to Stop Selling Them**

21
22
23      Downey's former Chief Lending Officer, John Gatzke, was a member of

24 Downey's Executive Management Group and an officer of the company until he left

25 Downey in July 2006. ¶50. On October 23, 2007, he testified under oath that,

26 although Downey "had been selling the option ARM for 25 years, . . . over the last

27 year before I left everyone wanted to stop selling the option ARM. Pretty much

28

1   denied that we ever sold it.  I mean it was – all of a sudden it had become a very

2   horrible loan." ¶102.

3          Robert J. Corbin was Downey's Director of Wholesale Lending until July 24,

4   2006.   ¶51.   On October 16, 2007, he testified under oath that while he was at

5   Downey, "the Board was not comfortable with the Option ARM product."   ¶105.

6   Indeed, one Board member said to Corbin, "'I would never take that loan.  Why would

7   I take that loan?'"  *Id.*

8          When asked how much Downey was cutting back on the Option ARMs, Chief

9   Lending Officer Gatzke testified, "Well, you're talking about a company that did 15

10  billion dollars two years in a row, and whatever it was that – a large percentage of it,

11  over 90, was option ARMs, and then I was told that they wanted to bring it down to

12  basically a third." ¶108.

13         In fact, however, after Gatzke and Corbin left Downey in July 2006, defendants

14  ***lowered*** the teaser rate for Downey's Option ARMs in order to ***increase*** Downey's

15  portfolio of those loans.  ¶¶88, 109.  Further, Downey's own broker solicitations

16  during the spring of 2007 confirm that defendants were aggressively seeking to

17  originate ***more*** toxic Option ARMs by touting Downey's loose underwriting.  ¶¶109,

18  171-173, 231-233 (*e.g.*, "Easy Downey underwriting," "Unlimited revolving and

19  installment lates [sic] allowed").

20                  **2.      Defendant-Chairman of the Board, McAlister**
                              **Rejected All Advice to Stop Selling Option ARMs,**
21                            **Installed His Former Son-in-Law as CEO, His**
                              **Daughter and Personal Physician as Board Members**
22                            **– and Wrote to the Office of Thrift Supervision to**
                              **Challenge the Need for Proposed Guidelines on the**
23                            **Loans**

24         Defendant  McAlister,  who  co-founded  Downey,  was  the  well-known

25  "mastermind" of Downey's movement to predatory Option ARM loans.  ¶14.  As

26  reported by *The New York Times*, former Downey Board member Dennis Aigner

27  disclosed that "Mr. McAlister, known as Mac, was clearly behind the drive to move

28  into option ARM loans."  *Id.*  The *Times* also reported that no later than 2003, Board

members, including Michael Abrahams and Lester Smull, as well as representatives from the OTS, were already pressuring McAlister to reduce Downey's exposure to Option ARM loans, but McAlister was reluctant to do so. *Id.*

A December 3, 2008 *Forbes* article further corroborates that Board members warned McAlister as early as 2003 that loans with negative amortization were "dodgy":

> Board Members warned him. Employees warned him. Even mortgage brokers – not a class of people winning any citizenship awards this year – thought to double check the math. But Maurice "Mac" McAlister would not be denied. . . . [H]e knew what his own bank needed to compete with the Countrywides of the world: fee-heavy, negative-amortization loans on huge houses in the party-till-you-drop California real estate market.

¶15. *Forbes* also reported that the OTS sent McAlister "letters beseeching Downey to stop lending to deadbeats and start raising capital." ¶16. But, McAlister ignored the OTS. As *Forbes* reported, "Downey investors would have had a tough time stopping McAlister. He never held conference calls with Wall Street analysts. McAlister hired and fired chief executives every 18 months on average, finally picking his former son-in-law [defendant Rosenthal] for the post. Downey's board included his daughter and personal physician." *Id.*

### 3. When the Office of Thrift Supervision Issued New Guidance Regarding Residential Mortgage Lending in September 2006 Just Before the Start of the Class Period, Defendants Not Only Fought the New Guidance but Also Defiantly Continued Their Deliberately Reckless Lending Practices

In 2005, the OTS published proposed lending guidance to curb abusive practices in underwriting, monitoring, and reserving for Option ARMs. ¶17. Defendants issued a formal comment letter on March 29, 2006, vigorously opposing virtually every aspect of the proposed guidance. *Id.*; Ex. 28 at 834. Defendants urged

1   that the proposed restrictions were "unnecessary" because Downey already had

2   adequate controls and procedures in place.  *Id.*  Further, defendants represented that

3   the OTS did not need to strengthen restrictions on "stated income" and "no-doc" loans

4   because those loans "perform as good, or better, than full documentation loans." ¶18;

5   Ex. 28 at 835.

6          Despite defendants' opposition, the OTS did publish its "Final Guidance on

7   Nontraditional Mortgage Lending" on September 25, 2006, requiring Downey to

8   follow strict guidelines for Option ARM lending, underwriting, reporting for reserves,

9   and credit controls. ¶21.  For the following three quarters, defendants told the market

10  either that (a) they were "still assessing" the impact of the new guidance on Downey's

11  business, or (b) they were fully "in-line with regulatory guidance." ¶22. Specifically,

12  on August 1 and November 1, 2007, defendants Côté and Rosenthal represented in

13  Downey's SEC filings that Downey was "in line with regulatory guidance." ¶361;

14  Exs. 11 at 463, 12 at 491.

15          **C.    Defendants Made Unequivocally False Statements**
            **Regarding the Extent of Downey's "Subprime" Lending**
16          **and Misled the Market by Defining "Subprime" Differently**
            **than the Rest of the Industry**

17          There is a strong presumption in the mortgage lending industry that a FICO[4]

18  score of 660 divides prime and subprime borrowers.  ¶227.  FICO scores are a key

19  determinant in classifying borrowers as "prime" and "subprime."  *Id.*  Indeed, the 660

20  standard is used by the Comptroller of the Currency, the Federal Reserve, the FDIC,

21  the OTS, and securities rating agency, Standard & Poor's.  ¶¶228-230.

22          Downey's own 2006 Form 10-K referenced the Interagency Guidelines on

23  Subprime Lending in 2001 (Ex. 3 at 225) – which defined "subprime" borrowers as

24  those with credit risk characteristics that include FICO scores of "660 or below."

---

26  [4]     "Named for the system's creator, Fair Isaac Credit Organization, FICO refers to
27  a method for calculating a borrower's credit worthiness."  *In re Countrywide Fin.
    Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1146 (C.D. Cal. 2008).

1   ¶229; Ex. 8 at 359.  Both the industry and Downey recognized 660 as the subprime

2   threshold.

3       On November 1, 2006, defendants Côté and Rosenthal stated to investors in

4   Downey's SEC report for the third quarter of 2006[5] that Downey had "***ceased*** offering

5   option ARM products to our subprime borrowers." ¶223; Ex. 6 at 328.  Further, on

6   April 18, 2007, in a press release for Downey, defendant Rosenthal stated that

7   subprime lending "represents ***less than 6%*** of our loan portfolio."  ¶224; Ex. 30 at

8   843.

9       Both statements were false.  Eleven witnesses confirm that Downey continued

10   to sell Option ARMs to subprime borrowers well past the third quarter of 2006 – and

11   that subprime lending represented substantially more than 6% of Downey's portfolio.

12   ¶¶234-246.

13       For example, a Senior Underwriter who worked in Downey's Scottsdale,

14   Arizona operations center until it closed on July 21, 2007, CW4, reports that at the

15   time Côté and Rosenthal told investors that Downey had "ceased" offering Option

16   ARMs to subprime borrowers, the statement was absolutely untrue.  The Senior

17   Underwriter – who handled loans in Arizona as well as from the corporate office and

18   Southern California – recalls that at the time of Côté's and Rosenthal's statement,

19   ***most*** of Downey's Option ARM borrowers had FICO scores ***lower than 580*** – and

20   50% were self-employed.  ¶57, 236.

21       A Wholesale Operations Manager who worked at Downey until July 2007,

22   CW5, and a Senior Underwriter who worked at Downey until January 2007, CW6,

23   both confirm that Downey continued to lend to borrowers with FICO scores ***below***

24   ***620***.  ¶¶237-238.

25

26   _____

27   [5]     "3Q06" represents the third quarter of 2006.

28

These witness reports are further corroborated by additional support from new witnesses in the Complaint. ¶¶240-245.  For example, an underwriter who worked at Downey in 2007-2008, CW16, reports that Downey's *underwriting guidelines* called for borrowers to have minimum FICO scores of *620-625*.  ¶240.  A Wholesale Account Executive at Downey's Newport Beach corporate office from 2004 until the Wholesale Department closed in October 2008, CW22, reports that *until the end of 2007*, Downey's minimum FICO score underwriting requirement was *at or below 600*.  ¶¶76, 242.  A Regional Account Executive who worked at Downey until July 2007, CW23, stated that the *average FICO score* for Downey's borrowers was *620*.  ¶¶78, 243.   Yet another former Wholesale Account Executive, who worked in Downey's Los Alamitos, California office for 23 years until Downey closed its Wholesale Lending Department on October 16, 2008, CW25, confirmed that *in 2007 and 2008, Downey was offering Option ARM loans to borrowers with FICO scores of 620 and 640*.  ¶¶80, 244.

**D.    Despite Downey's Radical Departure from Banking Regulations and Guidelines, Defendants (Falsely) Assured Investors Throughout the Class Period that Downey Complied with All Banking Guidelines and that Downey's Portfolio Was Sound and Adequately Underwritten to Prevent Credit Risk**

In Downey's year-end reports to the SEC, defendants McAlister, Rosenthal and Côté represented that, before granting any loans, Downey assessed "the applicant's ability to repay the loan." ¶83.  Moreover, throughout the Class Period, Rosenthal and Côté repeatedly certified financial reports containing statements that falsely assured investors Downey was adequately estimating and reserving for risks and maintaining a "strong capital position." ¶¶251-259.  For example, Rosenthal and Côté opined that "[w]e perform ongoing reviews of loans that display weaknesses and maintain adequate loss allowances for them." ¶253.  Similarly, they represented that "[i]n the opinion of management, . . . the present allowance is considered adequate to absorb estimable and probable credit losses." ¶255.  These statements were all false.

**1.    Defendants Were Fully Aware of Downey's Actual Lending Practices**

The OTS required Downey to "assess the performance of each loan product type . . . and the performance of the portfolio as a whole." ¶120; Ex. 27 at 828-829. Witnesses report that Downey used the Empower underwriting system to track loan information.  ¶121.

Downey's broker approval head secretary, who worked for Downey until October 2008, CW12, reported that top management had access to all portions of the Empower database and also to reports regarding programs and pricing.   ¶127. According to the head secretary, Downey had daily and weekly bulletins explaining products and guidelines.  *Id.*  Additionally, the head secretary recalls that there was a corporate committee (CW12 believes it was called ALCO – which was Downey's acronym for its Assets and Liabilities Committee) that met at least twice a month to discuss these issues.  *Id.*  Rosenthal attended the meetings.  *Id.*  Côté was also a member of the Assets and Liabilities Committee.  *Id.*

A Wholesale Administrative Supervisor who worked at Downey for 12 years until June 2007, CW8, stated that Downey held weekly meetings on either Mondays or Tuesdays called the Pre-Price Meeting – attended by defendant Rosenthal.  ¶¶61, 128.  The Administrative Supervisor ran the reports for those meetings, including Week-to-Date, Month-to-Date, and Year-to-Date reports as well as the Loans Funded, Loans Submitted, Rate Sheets for Downey, Rate Sheets for Competitors, and Assets and Liabilities Committee reports.   ¶128.  Indeed the Administrative Supervisor reported that senior executives had access to all of the reports that the corporate office ran daily.  *Id.*

A Senior Underwriter who worked in Downey's Scottsdale, Arizona operations center until it closed on July 21, 2007, CW4, reports that any senior underwriter could override the Empower system to fund a loan.  ¶¶57, 123.  Indeed, the Empower

1  system had a dropdown menu that allowed the underwriter to choose from a list of

2  justifications if he wanted to make an exception to any loan.  ¶123.

3       Again, the Complaint also contains additional information from new witnesses

4  further corroborating plaintiffs' claims.  An Administrative Assistant for Downey's

5  Broker Support Department who worked for Downey until it closed its Wholesale

6  Loan Department in October 2008, CW14, recalls that the Empower system generated

7  monthly information concerning every account, number of loans, and total sales for

8  any given Account Executive.  ¶¶67, 126.  The Administrative Assistant confirmed

9  that Downey's upper management received reports from the Empower system.  ¶126.

10      Further, a Wholesale Account Executive who worked in Downey's Newport

11 Beach corporate office from 2004 until the Wholesale Department closed in October

12 2008, CW22, reported that after Rosenthal's and McAlister's frequent meetings with

13 the Board, the Account Executive would receive a memorandum with any changes to

14 the business, including underwriting guidelines.  ¶¶76, 133.  The Account Executive

15 explained that any change in the underwriting guidelines had to go through two

16 committees – the Assets and Liabilities Committee, of which both Rosenthal and Côté

17 were members, and the Pricing Committee.  ¶134.

18      Additionally, Rosenthal and Côté were members of Downey's Internal Asset

19 Review Committee during the Class Period.  ¶262.  The Internal Asset Review

20 Committee reported directly to Downey's Board, chaired by McAlister.  ¶¶262-263.

21 During the Class Period, the Committee met quarterly to "review and determine asset

22 classifications and recommend any changes to asset valuation allowances."  ¶262.

23 Classification of an asset could be "removed or upgraded only upon approval of the

24 Internal Asset Review Committee."  *Id.*  Thus, McAlister, Rosenthal, and Côté were

25 fully aware of Downey's loans, assets, and reserves during the Class Period.  *Id.*

26

27

28

### 2. CEO Rosenthal Personally Overrode Downey's Regional Manager's Recommendations Regarding Creditworthiness and Granted "Exceptions" for 50% of Downey's Southern California Loans

Downey's "established" underwriting guidelines and loan rates and terms were already quite "loose" by industry standards – as reported by both former Downey employees as well as brokers that worked with Downey, many of whom had accounting backgrounds and decades of banking industry experience.  ¶¶138-175. Witnesses described Downey's underwriting guidelines as "extremely loose," "one of the loosest lenders in the industry," and concluded that "absolutely anyone could get a loan."  ¶¶143, 169.  Downey even advertised, in April 2007, that "[w]hile other lenders are tightening their guidelines, Downey Savings is taking great strides to ease the loan process."  ¶171.

Great strides was an understatement.  In fact, even with Downey's extremely loose underwriting guidelines, CEO Rosenthal routinely intervened to personally grant "exceptions" so that even more borrowers could "qualify" for loans.  ¶187. Specifically, according to a new witness added to the Complaint – a Regional Manager who worked at Downey during the Class Period, CW21 – *Rosenthal was the sole point person* for regional managers regarding loan exceptions – and Rosenthal virtually gave them a blank check to pass loans through.  ¶191.

The extent of exceptions approved by Rosenthal was extraordinary.  According to the same Regional Manager, CW21, one in ten loans in Northern California was based on an "exception."  ¶189.  In Southern California, *50% of the loans written were based on an "exception*."  *Id.*  Downey's SEC report for 3Q06 states that 89% of Downey's loans were for property in California – with the majority in Southern California. *Id.*

Rosenthal's rampant practice of granting "exceptions" to Downey's already loose underwriting standards was so bad that the same Regional Manager ultimately resigned as a result.  ¶191.  CW21 used Downey's guidelines to review loans

1   submitted by Account Executive Foster – and, in September 2006, denied approval for
2   several loans.  *Id.*  When the Regional Manager saw Foster again later in the fall,
3   Foster explained that he had ***spoken directly to Rosenthal*** and obtained approval for a
4   stack of the very loans that the Regional Manager had already reviewed and found
5   inappropriate for lending based on Downey's underwriting guidelines.  *Id.*  CW21
6   resigned as a result.  *Id.*

7        Another Senior Underwriter who worked in Downey's Scottsdale, Arizona
8   operations center until it closed on July 21, 2007, CW4, confirmed that Rosenthal
9   routinely granted exceptions.  ¶¶192-194.  S/he specifically recalls a series of loans
10  that s/he and the credit manager had denied – and were approved anyway because the
11  Account Executive went ***directly to Rosenthal***.  ¶192.  The Senior Underwriter
12  explained that when exceptions were granted, they were recorded on a Quarterly
13  Errors Report from the Operations Department.  ¶193.  Based on those reports, the
14  Senior Underwriter knew that Arizona's "errors" were at least 25%-30% of total loans
15  – and Southern California had consistently more "errors" than any other region.  *Id.*

16       The same Senior Underwriter also explained that it was commonplace at
17  Downey for a broker to deposit money into a borrower's account just before a loan
18  was approved and then be repaid immediately afterwards.  ¶194.  The Senior
19  Underwriter had worked in the industry for 16 years and knew that all of the banks at
20  which s/he had previously worked required borrowers to submit bank statements for
21  the three months preceding a loan.  *Id.*  Downey required only one month.  *Id.*

22       A Wholesale Operations Manager during the Class Period, CW5, explained that
23  70%-80% of the loans that s/he denied were subsequently approved by upper
24  management.  ¶195.  A Wholesale Administrative Supervisor who worked at Downey
25  during the Class Period, CW8, confirmed that Rosenthal would pass through
26  whomever and whatever he wanted.  ¶200.

27       McAlister also established a standing exception for anyone who lived in
28  Bullhead City, Arizona, where McAlister had a home.  ¶201.  A Senior Underwriter

1  who worked at Downey during the Class Period, CW4, explained that everyone knew

2  that any loan that came from Bullhead City was to be approved without verbal

3  authorization and with no questions asked.  *Id.*  CW21 – a Regional Manager and new

4  witness to the Complaint – confirms that one of the only written underwriting rules at

5  Downey was that all portfolio loans originating in Laughlin (where McAlister had a

6  ranch – nine miles outside of Bullhead City) were to be approved.  ¶202.

### 3. Even When Board Chairman McAlister Did Acknowledge Downey's Weakening Financial Condition, He Falsely Understated the Situation as "a Little Bit of a Problem, but Not Very Much"

By September 17, 2007, even McAlister could not entirely hide the mortgage

crisis.  Pretending that Downey was a victim of the crisis – rather than one of the

banks that created it – McAlister "conceded" that "Downey is feeling the effects of the

mortgage and housing downturn, which has hurt profits and seen some borrowers miss

payments on loans."  ¶370.  He made the statement in well-publicized public remarks

at an event in Orange County – and they were repeated in the *Orange County Business

Journal*.  ¶¶370-371.

Even then, McAlister minimized the situation, calling it minor.  ¶370.  "We

have a little bit of a problem, but not very much."  *Id.*

### E. In the Midst of Receiving Hard Numbers Documenting the Mounting Delinquencies and Foreclosures in Downey's Option ARM Portfolio, Defendants Intentionally Concealed Downey's Financial Condition by Lowering Its Reserves and Loan Loss Provision – Artificially Inflating Downey's Income and Earnings by Millions of Dollars During the Class Period

Reserves or allowances are an amount of money equal to a company's

estimated uncollectible assets.  ¶26.  As the reserve level changes each quarter, any

additional reserve that is required is accounted for as an expense.  ¶264.  Thus,

understating reserves reduces a company's expenses and, accordingly, directly

increases earnings.  *Id.*  As projected losses increase, a company would normally

increase its reserves, taking an increased expense that would reduce earnings.

- 19 -

1  Revealing their fraudulent motive, these defendants actually **decreased** reserves as

2  more and more information about Downey's projected losses became clear.  ¶301.

3    Downey's Internal Asset Review Committee, of which defendants **Rosenthal**

4  and **Côté** were both members, established reserves – and those reserves could be

5  changed "only upon approval of the Internal Asset Review Committee" or as

6  delegated by it.  ¶262.  In turn, the Internal Asset Review Committee reported directly

7  to Downey's Board – of which defendant **McAlister** was Chair – so that the Board

8  could review Downey's reserve levels.  *Id.*

9    Generally Accepted Accounting Principles ("GAAP"), the SEC, and the OTS

10  all establish guidelines for reserving.  GAAP Statement of Financial Accounting

11  Standards ("SFAS") No. 5, ¶8 required that Downey reserve – by taking an expense or

12  "charge to income" – for any asset that was "impaired" and for which the "amount of

13  loss can be reasonably estimated."  ¶267.  Where less certainty existed, GAAP still

14  required that Downey disclose any "reasonable possibility" of loss and estimate the

15  loss or state that estimation was not possible.  ¶268; SFAS No. 5, ¶10.  Similarly, the

16  SEC Staff Accounting Bulletin ("SAB") No. 102 required Downey to establish

17  reserves by considering "[l]evels of and trends in delinquencies and impaired loans."

18  ¶¶270-271.  The OTS singled out negatively amortizing mortgages as **especially risky**,

19  requiring Downey to **establish valuation standards that accounted for "the**

20  **additional risks from negatively amortizing lending**."  ¶273.

21    Indeed, in its quarterly and annual SEC reports throughout the Class Period,

22  Downey itself represented that "[w]e use an internal asset review system and loss

23  allowance methodology [designed to/to] provide for timely recognition of problem

24  assets and an adequate allowance to cover asset and loan-related commitment losses."

25  ¶251.  "We perform ongoing reviews of loans that display weaknesses and maintain

26  adequate loss allowances for them."  ¶253.  The facts below show otherwise.

27

28

### 1. Defendants Knew Downey's Loans Were Impaired and Could Reasonably Estimate the Amount of Loss

Defendants had detailed and specific information about Downey's deeply impaired loans, the extent of delinquencies, non-performing assets, foreclosures, and the fact that Downey's earnings were increasingly reliant on negative amortization income – and did not adequately reserve for estimable losses. ¶¶278, 316. For example, defendants have since admitted that *by the end of 2006*, Downey had *internally projected that $1.4 billion in Option ARM loans would "recast" in 2007*. ¶280. Indeed, in mid-2007, Downey was facing so many loans that had to be "recast" or modified that it moved the task to the corporate office where a special department was created – called the Mod Squad. ¶354. An Escrow Administration Manager who worked at Downey during the Class Period, CW2, confirmed that Downey was aware of the huge volume of loans that needed to be "recast" several months in advance because of internally generated reports. ¶294.

Predictably, foreclosures were not far behind – since recasting meant that Downey would rewrite the terms and rates of the loan, often leaving borrowers with a doubled or tripled monthly payment. ¶10. According to Downey's broker approval head secretary – who worked at Downey throughout the Class Period, CW12 – Downey had six foreclosed properties in 2005, but *over 800 by October 2008*. ¶302.

Several employees in Downey's Loan Workout Department reported that *Downey did not have adequate reserves to cover its problem loans*. ¶282. For example, in 2007, the Manager of Downey's Loss Mitigation Department, Beth McNally, Account Executive Andrew Sheftel, and Mr. Sheftel's assistant, Summer Smith – all of whom were based in Downey's corporate office – told a mortgage broker who brokered loans with Downey before the Class Period and continued to track them during the Class Period, CW1, that the increases in loan modification and short sale requests were too overwhelming for Downey and that *Downey could not*

1    *modify the loans of all borrowers in trouble*.  *Id.*  The broker confirmed that most of

2    his/her Downey clients were defaulting and foreclosing in record numbers.  *Id.*

3         McAlister, Rosenthal, and Côté had full access to this information.  They would

4    have to have been willfully ignorant in order not to know.  Perhaps most glaring was

5    the dramatic increase in the percentage of Downey's total earnings before taxes that

6    was derived from negative amortization – a figure that Downey specifically tracked

7    throughout the Class Period.  ¶¶284-285.  In 2005, only 36% of Downey's earnings

8    came from negative amortization profits – but quickly increased to *83%* in 1Q06, *93%*

9    in 4Q06, and *117%* in 2Q07.  ¶284.  Prophetically, OTS guidelines warned that "a

10   *strong indicator of potential credit risk* is the number of an institution's option ARN

11   [sic] loans that actually negatively amortize."  ¶283; Ex. 27 at 825.

12         Further, as real estate prices collapsed – especially in California and Arizona

13   which represented 80% of the properties on which Downey wrote loans – defendants

14   knew that there would be greater losses and defaults on those loans.  ¶306.  Indeed, as

15   early as April 18, 2006, Downey's SEC Form 8-K admitted that defendants were

16   beginning to see changes "in the residential market, such as an increased level of

17   unsold homes and relatively flat home prices on a sequential month basis."  ¶308.

18   Thus, defendants knew that borrowers would have greater difficulty paying off their

19   loans when they sold their homes.  ¶309.

20         Based on all of the above information, defendants McAlister, Rosenthal, and

21   Côté knew that many of Downey's assets – its loans – were "impaired" and could

22   reasonably estimate the amount of loss, pursuant to SFAS No. 5, ¶8.  *See* ¶267.  They

23   did not.  Defendants certainly knew that it was "reasonably possible" that Downey

24   would experience contingent losses and could estimate those possibilities – which

25   Downey was also required to do, but did not.  ¶279; *see* SFAS No. 5, ¶10.

26

27

28

### 2. Despite What Defendants Knew About Downey's Impaired Loans, Defendants Actually Reduced Downey's Reserves

What Downey did do is remarkable.  Despite what defendants knew about Downey's serious probabilities and possibilities for extreme loss, defendants Rosenthal and Côté set – and defendant McAlister approved – ***reduced loan loss reserves during the Class Period***.  ¶301.  The Complaint specifically compares Downey's inventory of non-accrual loans (loans on which borrowers were in default, meaning that Downey was not collecting any interest) with Downey's reserves on a quarterly basis over the Class Period.  *Id.*  In 3Q06 – just before the Class Period – Downey's reserves were 100% of its non-accrual loans.  *Id.*  In 4Q06, they went down to 59.8%, in 1Q07, they were 48.1%, and for the rest of the Class Period, Downey's reserves were always ***less than 40% of its inventory of non-accrual loans***.  *Id.*

The point of comparison is not that defendants should have increased Downey's reserves to account for loans that had already defaulted.  The point is that the rate at which Downey's borrowers were defaulting was a very clear red flag showing the combined effect of Downey's aggressive and unfettered lending practices.  That rate of default was a clear trend that SAB No. 102 required defendants to evaluate in establishing appropriate reserves for Downey.  ¶¶270-271 (to establish adequate reserves, company must consider "[l]evels of and trends in delinquencies and impaired loans").  In light of the OTS specific warnings about the heightened risks and responsibilities associated with Option ARM lending (¶273), the trend was particularly significant.

Nonetheless, despite that trend, defendants actually ***reduced*** the provision for credit losses to maintain an artificially low allowance at precisely the time when the allowance (reserves) should have been significantly increasing.  ¶317.  Notably, Downey's allowance only increased $159,000 from 3Q06 to 4Q06 – and it ***decreased*** $185,000 from 4Q06 to 1Q07.  ¶318.  Thus, defendants ***reduced*** Downey's reserves at the very time when they themselves admit that "unsold housing inventory increased,

1    home prices declined, negative amortization balances increased and loan defaults
2    rose."  Defs' RJN, Ex. A at 31.  In defendants' own words, the market trends
3    described "are typically leading indicators of increased losses inherent in the
4    portfolio." *Id.*

5        Accordingly, while defendants technically disclosed some of the problems with
6    Downey's loans, they concealed the extent to which those problems actually impaired
7    Downey's loan portfolio by ***reducing reserves*** – and, thereby, ***artificially inflating***
8    ***earnings***.   Defendants presented Downey as ***surmounting*** the problems they
9    acknowledged.  This was false.

10       The two charts below tell quite a story about defendants' efforts to conceal
11   Downey's true financial condition.  The first chart shows the quarterly increase of
12   Downey's loans that were more than thirty days delinquent as a percentage of
13   Downey's total loans.  ¶290.  The second chart shows Downey's reserves as a
14   percentage of loans on which borrowers were in default and Downey was not
15   collecting any interest.  ¶303.



Loans That are 30+ Days Delinquent as a % of Total Loans



**Allowance for Loan Losses as a % of Non-Accrual Loans**

Thus, in the midst of skyrocketing defaults, foreclosures, and a collapsing housing market, defendants McAlister, Rosenthal, and Côté approved a drastic *reduction* in the amount by which reserves were increased to keep up with projected losses.  ¶317.  In 3Q06, the provision for credit losses – the adjustment to income necessary to bring reserves to the level management deemed sufficient to provide for estimable losses – was $9.6 million.  ¶316.  In 4Q06, it was *only $200,000* and in 1Q07, it was *only $600,000*.  ¶317.  The falsity of those numbers is underscored by the provisions for credit losses that Downey had to take in the following two quarters just to try to catch up: *$9.5* million in 2Q07 and *$81.6* million in 3Q07.  ¶¶319-320.

### 3. Defendants Actively Concealed Downey's Impaired Loans

In a further effort to conceal Downey's true financial condition, defendants McAlister, Rosenthal, and Côté extended Downey's definition of "delinquent" from 90 days to 180 days.  ¶297.  Downey's broker approval head secretary, CW12, who worked for Downey for 15 years including the entire Class Period, believes that this was a tactic used by Downey to make its books look better and that Downey's non-performing assets were much worse than what defendants had been reporting.  *Id.*

Defendants went even further.  In 3Q07, defendants initiated a "borrower retention program" in which they essentially wrote new loans for borrowers who were struggling with Option ARMs.  ¶342.  In Downey's quarterly report to the SEC, defendants Rosenthal and Côté certified that those $99 million in loans were "modified" but continued to be performing assets.  ¶339.  In fact, as defendants eventually admitted in Downey's January 14, 2008 press release, those assets were "non-performing assets," meaning that by classifying them as performing, defendants had understated Downey's non-performing assets by $99 million in 3Q07.  ¶343.  Correspondingly, defendants' concealment of these non-performing assets meant that Downey's reserves were even farther off for 3Q07.  *Id.*

**F.     In 2008, Downey Was Finally Forced to Reveal Its Very Impaired Financial Condition**

The Complaint tracks the loss caused by defendants' fraud with great detail, connecting defendants' string of false statements – both in the SEC reports that they signed, in press releases, and in their spoken statements – with Downey's inflated stock price.  ¶¶444-454.  Because of the false statements, from October 17, 2006 until July 18, 2007, Downey's stock price was artificially inflated at prices in the high $60 range.  *Id.*

The Complaint also pleads defendants' partial disclosures of limited negative news and the simultaneous false statements that defendants made to negate their impact.  ¶¶455-472.  Thus, the Complaint connects specific press releases and SEC reports that revealed increased non-performing assets and decreased assets with losses in Downey's stock price.  *Id.*  But, the Complaint also alleges that between July 18, 2007 and the end of the Class Period, defendants continued to conceal Downey's true financial condition.  *Id.*  For example, on July 18, 2007, when defendants admitted that Downey's provision and allowance for credit losses had both increased, its assets had decreased, and its non-performing assets had increased by $84 million (58.5%), defendant Rosenthal worked to soften the news by (falsely) assuring investors that

Downey "continue[d] to have a very strong capital position." ¶¶455-456.  Again, on October 10, 2007, when defendants admitted that Downey expected to incur operating losses as well as increases in the allowance for loan losses, Rosenthal again continued to mislead the market by falsely assuring investors that "Downey remains well positioned to continue funding quality loans because of our strong capital position and stable source of funds from our retail branch franchise."  ¶¶459-461.

On March 17, 2008, defendants admitted more of the truth about Downey's actual financial condition.  ¶473.  As noted by analyst Credit Suisse, "[h]ighlights include continued balance sheet shrinkage, a noticeable expansion in the net interest margin, and another large increase in [non-performing assets]."  ¶474.  Downey's stock price dropped to a close of $18.82 per share, a decline from $19.14 on March 14, 2008 – and a decline of 68% from $59 per share on October 9, 2007.  ¶476.

### 1.   Shortly After the Class Period, the Office of Thrift Supervision Found that Downey "Engaged in Unsafe and Unsound Practices" in Every Fundamental Aspect of Its Business – Including Asset Quality, Earnings, Liquidity Planning, Management, and Projected Capital Levels

On September 5, 2008, the OTS issued an Order to Cease and Desist requiring that Downey (1) not issue dividends or capital distributions or any promises of such; (2) not enter into, renew, or extend contractual arrangements relating to compensation or benefits for senior executives or directors; and (3) not incur debt or increase current lines of credit. ¶486.  In addition, the factual findings stated in part: "[T]he OTS finds that [Downey] has engaged in unsafe and unsound practices." *Id.*; Ex. 2 at 208.  On September 6, 2008, in an article entitled "Oversight pressure may explain moves at Downey Financial," the *Los Angeles Times* reported in part: "[T]he OTS said Downey had 'engaged in unsafe and unsound practices' that had weakened its asset quality, earnings and future capital."  ¶486.  On September 6, 2008, in an article entitled "Downey Financial Is Told to Raise Cash," *The Wall Street Journal* reported in part: "The Office of Thrift Supervision . . . issued a cease-and-desist order that formally

requires the bank to raise capital. . . .  Downey is the largest U.S. financial institution this year to receive such an action, regarded as one of the most severe of government interventions." *Id.*

On the next trading day, September 9, 2008, Downey's stock plummeted 30.65%, from $3.10 to $2.15 per share.  *Id.*  In the days that followed, Downey's stock price continued to decline from $2.15 to $1.47 per share by September 12, 2008.  *Id.*  On September 12, 2008, Standard & Poor's lowered its long-term counterparty credit rating on Downey to B- with a negative outlook "due to its increased concern about the company's asset quality-induced weak financial profile, which continues to erode its franchise and resulted in material regulatory restrictions."  *Id.*

### 2. Within Months of the Office of Thrift Supervision's Order Prohibiting Downey from Continuing Its Fraudulent Option ARM Lending Practices, Defendant-CEO Rosenthal and Defendant-Board Chairman McAlister Suddenly Resigned and Downey Filed for Bankruptcy

Meanwhile, in July 2008, Downey announced the sudden "retirements" of defendants Rosenthal and McAlister. ¶441.  The *Los Angeles Times* quoted Bert Ely, a veteran banking consultant, who linked McAlister's departure directly to the OTS inquiry: "This is probably what led to McAlister's departure – it was a consequence of that examination by the OTS."  ¶6.

On October 16, 2008, Downey closed its wholesale loan department – the part of Downey that was primarily responsible for origination of residential home loans and the Option ARMs. ¶442.  On November 10, 2008, defendants admitted in an SEC filing that there was "substantial doubt" that Downey and Downey Savings could "continue as going concerns."  ¶487.  On November 22, 2008, the *Los Angeles Times* reported that federal regulators had seized Downey, that it had been placed in receivership with the FDIC, and that U.S. Bank had agreed to purchase almost all of Downey's assets.  ¶488.  On November 25, 2008, Downey filed for bankruptcy.  *Id.*

## IV.   LEGAL STANDARD

In analyzing a motion to dismiss, this Court "must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179, 192 (2007). The Court "must consider the complaint in its entirety," and must not "scrutinize each allegation in isolation but . . . assess all the allegations holistically." *Id.* at 322, 326. A "complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Moreover, the complaint's allegations should be "viewed with a practical and common-sense perspective." *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

## V.   ARGUMENT

### A.   Plaintiffs Plead with Particularity that Defendants Made False and Misleading Statements Regarding Downey's Mortgage Lending Business

#### 1.   Defendants CEO Rosenthal and CFO Côté Made Plainly False Statements to the Market About Downey's Subprime Lending

Defendants Côté and Rosenthal made a false statement to the market on November 1, 2006 regarding Downey's subprime lending practices. ¶223. In an SEC Form 10-Q for Downey's 3Q06, reviewed, signed, and certified by Côté and Rosenthal, defendants stated that "[d]uring the first quarter of 2006, we *ceased offering option ARM products to our subprime borrowers*, but continue to offer them to our prime borrowers." *Id.* Similarly, on April 18, 2007, defendant Rosenthal issued comments in a Downey press release, falsely representing that Downey's "subprime" portfolio "represents *less than 6% of our loan portfolio*." ¶224.

The Complaint alleges these statements were false. Downey's own marketing materials and 11 witnesses confirm that defendants were *still marketing Option ARMs to subprime borrowers well into 2007*. ¶¶231-246. Moreover, according to Downey's 2006 annual report to the SEC, *30% of Downey's loan portfolio was loans*

1   *to subprime borrowers*.  ¶226.  The Complaint alleges that these statements were false

2   based on the established industry standard that FICO scores under 660 are considered

3   "subprime."  ¶¶227-230.

4           There can be no question that these statements are alleged with particularity.

5   They are identified by date, speaker/author, source, and content, amply satisfying the

6   Private Securities Litigation Reform Act ("PSLRA") requirement to "specify each

7   statement alleged to have been misleading" as well as "the reason or reasons why the

8   statement is misleading."   15 U.S.C. 78u-4(b)(1).   Indeed, even before corporate

9   officers were required to "certify" their signatures with Sarbanes-Oxley certifications

10   – as the defendants did here – the Ninth Circuit specifically held that "when a

11   corporate officer signs a document on behalf of the corporation, that signature will be

12   rendered meaningless unless the officer believes that the statements in the document

13   are true."   *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *accord*

14   *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).

15   In short, falsity is plainly alleged.

16           Defendants attempt to avoid liability by asserting that Downey had a different

17   definition of "subprime" which this Court should adopt.   They even assert that this

18   Court should consider different factors such as "weighted FICO score average" and

19   "average loan-to-value ratios."   Defs' Br. at 17-18 & nn.14-15.   Defendants' efforts

20   must fail for two reasons.   First, the Complaint definition of subprime is well-

21   supported by allegations that 660 is the "subprime" threshold used by the U.S. Office

22   of the Comptroller of the Currency, the Federal Reserve, the FDIC, the OTS, and

23   securities rating agency Standard & Poor's.   ¶¶228-230.   Thus, defendants' factual

24   dispute regarding the subprime threshold "must at least await discovery."   *Berson v.*

25   *Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *accord Countrywide*,

26   588 F. Supp. 2d at 1146 ("[T]he CAC adequately alleges that industry custom

27   regarded 660 as the prime-subprime dividing line.").   As the Ninth Circuit has long

28   held, consideration of a subprime standard other than the one alleged in the Complaint

- 30 -

1  would "convert[] a 12(b)(6) motion to a summary judgment motion." *Lee*, 250 F.3d at
2  688.

3      Further, even if this Court were to believe that defendants Côté's and
4  Rosenthal's statements were based on a unique 620 definition of subprime within
5  Downey, their statements would still be actionable as misleading to the market:

6      Some statements, although literally accurate, can become, through their
7      context and manner of presentation, devices which mislead investors.
8      For that reason, the disclosure required by the securities laws is
9      measured not by literal truth, but by the ability of the material to
10     accurately inform rather than mislead prospective buyers.

11  *Miller v. Thane Int'l, Inc.*, 508 F.3d 910, 916 (9th Cir. 2007).[6]

12      **2.    Defendants Chairman McAlister, CEO Rosenthal,
            and CFO Côté – in Documents that They Signed and
13          Filed with the SEC – Made False Statements to the
            Market Regarding Downey's Loan Quality and
14          Credit Risk Practices**

15      Defendants McAlister, Rosenthal, and Côté participated in, approved, signed,
16  and issued false statements in Downey's 2006 and 2007 annual SEC reports,
17  representing that they "assess[ed] . . . the applicant's ability to repay the loan" before
18  making loans. ¶83. Further, throughout the Class Period, defendants Rosenthal and
19  Côté made false statements in Downey's quarterly SEC reports about Downey's
20  capital position, its ongoing review of loans, and its adequate reserves. ¶¶84-89, 251-
21  259.

22      The very essence of the Complaint is that these statements were false. As
23  detailed in sections III.A.2. and III.D.2., multiple witnesses in a position to know
24  report that Downey lent money to almost anyone – on the basis of almost no
25  information. Again, the problem was not just that Downey sold risky Option ARM

26  ─────────────────────
27  [6]     Unless otherwise indicated, emphasis added and citations, footnotes, and
    internal quotation marks omitted throughout.
28

loans, nor just that defendants sold them on a "no doc" or "stated income" basis.  The problem was the utterly wanton way in which defendants administered Downey's underwriting policies and regularly granted exceptions to them.   In light of defendants' actual practices, Downey was not nearly well-enough reserved to cover the liabilities it established.

Again, falsity is plainly alleged.   The false statements are alleged with particularity.  Defendants' liability for statements that they certified is apparent – and supported by the Ninth Circuit's decision in *Howard*.  228 F.3d at 1061; *accord Southland*, 365 F.3d at 365.  The Complaint more than amply alleges the reasons why defendants' statements were false.

Indeed, while statements about assessing applicants' ability to repay loans or management's belief that reserve levels were adequate might be considered "puffery" in some contexts, here the statements go to the very heart of defendants' fraud.  As held by another judge in this district, the Complaint allegations "present the extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws." *Countrywide*, 588 F. Supp. 2d at 1144.  Here, like there, the Complaint "adequately alleges that [the bank's] practices so departed from its public statements that even 'high quality' became materially false or misleading; and that to apply the puffery rule to such allegations would deny that 'high quality' has any meaning." *Id.*

**3.    Defendants Chairman McAlister, CEO Rosenthal, and CFO Côté – in Documents that They Signed and Filed with the SEC – Falsely Inflated Downey's Earnings, Understated Downey's Reserves, and Misrepresented Downey's Capital Position**

Throughout the Class Period, defendants McAlister, Rosenthal, and Côté reviewed and signed Downey's annual SEC reports, which falsely represented Downey's earnings, reserves, and capital position.   ¶247.   Further, defendants Rosenthal and Côté also signed Downey's quarterly SEC reports throughout the Class

- 32 -

1  Period, which were similarly false. *Id.* The specific false numbers claimed are

2  alleged in the Complaint with particularity. ¶248. Again, defendants are responsible

3  for the content of the SEC reports that they signed. *Howard*, 228 F.3d at 1061; *accord*

4  *Southland*, 365 F.3d at 365.

5        The Complaint alleges that defendants' statements about Downey's earnings

6  were false. Despite detailed and specific information about Downey's deeply

7  impaired loans, the extent of delinquencies, non-performing assets, foreclosures, and

8  the fact that Downey's earnings were increasingly reliant on negative amortization

9  income (¶¶278-280, 316), defendants maintained inadequate reserves for Downey and

10 even lowered loan loss reserves during the Class Period. ¶¶282-285, 301-303. By

11 decreasing or failing to adequately increase Downey's reserves, defendants artificially

12 increased Downey's earnings. ¶264.

13        Defendants urge that reserves involve a "highly judgmental component" (Defs'

14 Br. at 9 n.7), citing *In re Countrywide Fin. Corp. Derivative Litig.*, ("*Countrywide*

15 *Derivative*"), 554 F. Supp. 2d 1044, 1070 (C.D. Cal. 2008) for the proposition that

16 "the setting of loan loss reserves involves a great deal of discretion." But, the

17 "particularized facts" showing reserve levels to be "false and misleading" found

18 wanting in *Countrywide Derivative* (554 F. Supp. 2d at 1070) are specifically pled

19 here. There, the "strongest evidence" was a temporary slump in reserves as a

20 percentage of total loans. *Id.* Here, plaintiffs allege a ***specific trend*** of defaults which

21 continued over multiple quarters (¶¶278, 280, 302, 316) contrasted with reduced

22 reserves during the same period of time. ¶¶282-285, 301-303. Further, plaintiffs

23 allege that defendants ***actively concealed*** Downey's impaired loans by changing the

24 definition of delinquent (¶297) and misclassifying non-performing assets as

25 performing ones. ¶¶339, 343. Given those particular allegations, defendants'

26 inadequate reserves cannot be excused as "discretion" or "judgment."

27        While defendants repeatedly assert that plaintiffs do not allege that "Downey

28 refused to consider its own published financial metrics" (Defs' Br. at 8), defendants

1   miss the point.  Here, defendants *considered* Downey's financial metrics (such as

2   delinquencies, for example) and then *actively worked to conceal them* (by changing

3   Downey's definition of delinquent).   As the court recognized in *Countrywide*

4   *Derivative*, defendants' publication of Downey's "financial metrics" cannot save

5   them:

6           The Individual Defendants, unlike the investing public, were members of

7           Board Committees charged with oversight of Countrywide's risk

8           exposures, investment portfolio, and loan loss reserves.  As such, they

9           were in a position to recognize the significance of these red flags, and,

10          accordingly, investigate the extent to which underwriting standards had

11          been abandoned.

12   554 F. Supp. 2d at 1062.  Defendants may have published certain financial metrics,

13   but by concealing others and inadequately reserving for known delinquency trends,

14   they misrepresented Downey's true financial condition.

15          The Complaint allegations are supported by specific numbers, including the

16   charts that show the stark comparison between Downey's mounting delinquent loans

17   and its decreasing reserves for such loans.  ¶¶290, 303.  Requiring even more specific

18   detail in the Complaint would be "asking too much of the plaintiffs, who cannot be

19   expected, at the pleading stage, to describe in detail documents and paperwork that

20   would presumably be kept, if at all, in [the company's] private files."  *Pirraglia v.*

21   *Novell, Inc.*, 339 F.3d 1182, 1193 n.14 (10th Cir. 2003).

22          Indeed, the Ninth Circuit holds that a plaintiff "need not allege each of [the]

23   particular details" related to alleged false accounting.  *In re Daou Sys., Inc. Sec. Litig.*,

24   411 F.3d 1006, 1016-17 (9th Cir. 2005).  Instead, plaintiffs' allegations are sufficient

25   if they "allege enough information so that 'a court can discern whether the alleged

26   GAAP violations were minor or technical in nature, or whether they constituted [a]

27   widespread and significant [alteration of the company's true financial condition].'"

28   *Id.* at 1017.  The First Circuit agrees, rejecting defendants' assertion that plaintiffs

1   must plead "exact dollar amounts" of alleged false accounting, and holding that

2   "courts will allow private securities fraud complaints to advance past the pleadings

3   stage when some questions remained unanswered, provided the complaint as a whole

4   is sufficiently particular to pass muster under the PSLRA." *In re Cabletron Sys., Inc.*,

5   311 F.3d 11, 32 (1st Cir. 2002).

6       Here, the Complaint allegations make clear that defendants' false accounting –

7   inadequate reserves which artificially inflated net income and earnings on Downey's

8   income statement and overstated Downey's assets on its balance sheet – was not

9   "minor or technical." *Daou*, 411 F.3d at 1017.  Rather, it was "widespread and

10  significant." *Id.*  The allegations plead falsity.

11              **4.    Defendants Chairman McAlister, CEO Rosenthal,
                        and CFO Côté – in Documents that They Signed and**
12                      **Filed with the SEC – Made False Statements**
                        **Regarding Downey's Compliance with Existing**
13                      **Banking and Accounting Rules and Guidelines**

14      The Complaint alleges that defendants repeatedly and falsely represented that

15  Downey's underwriting practices were "in line with regulatory guidance." ¶361.  The

16  statements were made by defendants Côté and Rosenthal in Downey's quarterly SEC

17  reports, filed on August 1 and November 1, 2007.  *Id.*; Exs. 11 at 463, 12 at 491.

18  Having signed those reports, defendants are responsible for their content.  *Howard*,

19  228 F.3d at 1061; *accord Southland*, 365 F.3d at 365.

20      The Complaint alleges that the statements are false.  As of September 25, 2006,

21  the OTS had required Downey to carefully assess a borrower's capacity to repay a

22  loan and maintain adequate reserves for loan losses, among other things.  ¶362.

23  Defendants were well aware of the OTS guidelines as they had actively fought their

24  issuance.  ¶364.

25      In addition to all of the many allegations of the Complaint demonstrating that

26  defendants' underwriting practices did not comply with the OTS guidelines, Patricia

27  A. McCoy, professor of banking and securities regulation, corporate governance, and

28  consumer finance law at the University of Connecticut School of Law, ***testified before***

- 35 -

*the Senate Committee on Banking, Housing, and Urban Affairs* that Downey "made substantial numbers of hazardous loans in late 2006 and in 2007 *in direct disregard of an interagency guidance* on nontraditional mortgages issued in the fall of 2006 and subscribed to by OTS that prescribed underwriting ARMs to the fully indexed rate." ¶363.  Defendants limply challenge this allegation by raising factual disputes with both the substance of Prof. McCoy's testimony as well as her qualifications – despite the fact that they were sufficient for the U.S. Senate.  Defs' Br. at 22 n.20.  As with defendants' other factual challenges to the well-pled Complaint allegations, this one also must await trial.  *Lee*, 250 F.3d at 688.

As another court in this district has recognized, "[a]s a mortgage lender . . . underwriting practices would be among the most important information looked to by investors." *Countrywide*, 588 F. Supp. 2d at 1185.  Here, material falsity is amply pled.

**B.** **Plaintiffs' Scienter Allegations Overwhelmingly Plead a Cogent and Compelling Theory of Defendants' (at Least) Deliberately Reckless Conduct**

**1.** **Defendants McAlister, Rosenthal, and Côté Had Daily Direct Access to Downey's Core (Almost Exclusive) Business – Mortgage Lending – Cogently Supporting Their Scienter**

There can be no question that these three individual defendants knew about Downey's predatory lending practices, Downey's increasing inventory of impaired loans, Downey's inadequate reserves for those loans, and Downey's growing reliance on negative amortization income.  Simply put, mortgage lending *was* Downey's business – and these three individuals were in charge of Downey.

Indeed, as fully discussed in section III.D.1., detailed fact allegations – including reports from new witnesses – support a compelling inference that McAlister, Rosenthal, and Côté had daily and weekly information regarding every Downey account, the number of loans, and total sales for any given Account Executive.  ¶¶126-127.  Rosenthal and Côté were members of Downey's Assets and Liabilities

1  Committee.  ¶127.  Rosenthal and Côté were also members of Downey's Internal

2  Asset Review Committee, responsible for establishing appropriate reserve levels.

3  ¶262.  That Committee reported directly to the Board, chaired by McAlister.  ¶¶262-

4  263.

5       Thus, at the end of 2006, when Downey internally projected that ***$1.4 billion in***

6  ***Option ARM loans would "recast" in 2007*** (¶280), the most compelling inference is

7  that these three individual defendants knew.  When Downey's earnings from negative

8  amortization shot up from 36% in 2005 to ***83%*** in 1Q06, ***93%*** in 4Q06, and ***117%*** in

9  2Q07 (¶284) – numbers that Downey specifically tracked throughout the Class Period

10  (¶¶284-285) – the most compelling inference is that these three individual defendants

11  knew.  And, when Downey's ***reserve levels went down to less than 40% of its actual***

12  ***inventory of non-accrual loans*** for the final year of the Class Period (¶301), the most

13  compelling inference is that these three individual defendants knew.

14       Loans recasting, negative amortization, and reserve levels were fundamental

15  aspects of Downey's business.  As Judge Posner wrote for the Seventh Circuit,

16  "knowledge is inferable from gravity."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,

17  513 F.3d 702, 704 (7th Cir. 2008).  "When the facts known to a person place him on

18  notice of a risk, he cannot ignore the facts and plead ignorance of the risk."  *Id.*

19       Indeed, as another court within this district held, in upholding a complaint with

20  extremely similar allegations involving Downey's competitor, Countrywide, "[t]he

21  plausible alternative inference is ***willful ignorance***."  *Countrywide*, 588 F. Supp. 2d at

22  1195.  For just that reason, the court in *Countrywide* held that a CEO, CFO, and board

23  member who were involved in managing core mortgage lending operations were

24  liable for false statements related to those operations.  *Id.* at 1192-96.

25       The *Countrywide* holding is consistent with the Ninth Circuit's recent holdings,

26  reaffirming that where a company's CEO and CFO were responsible for the

27  company's day-to-day operations, "it is hard to believe that they would not have

28  known about [business developments] that allegedly halted tens of million of dollars

of the company's work." *Berson*, 527 F.3d at 988. "[A]llegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement . . . in any form along with other allegations . . . ." *South Ferry*, 542 F.3d at 785.

Indeed, reversing a district court's dismissal in a case involving Downey's other primary competitor, Washington Mutual, Inc., the Ninth Circuit held that allegations about management's involvement in a company's business "may ***independently*** satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." *Id.* at 786. Here, the allegations of defendants' specific roles at Downey and their actual access to the relevant information are quite particular – and, as discussed fully below, the Complaint includes even further factual allegations that strongly support defendants' scienter.

### 2. CEO Rosenthal's and Chairman McAlister's Personal Involvement in Overriding Downey's Already Lax Standards to Sell Loans Demonstrates the Extent of Defendants' Deliberate Recklessness

The Complaint pleads substantially more than the defendants' job titles. The Complaint particularly alleges that CEO Rosenthal personally intervened – as much as 50% of the time in Southern California, one of Downey's key markets – to grant "exceptions" so that borrowers could qualify for loans even if they did not meet Downey's already-loose underwriting standards. ¶¶187, 189, 191. Based on the report of a new witness, the Complaint alleges that Rosenthal was the point person for regional managers regarding exceptions – and he virtually gave them a blank check to pass loans through. ¶191. Further, both new and old witnesses confirm that McAlister established a standing exception for any borrower from his home town – no questions asked. ¶¶201-202. These reports are detailed, along with substantial corroborating witness reports, in section III.D.2.

The Eleventh Circuit recently underscored that the direct involvement of senior management is a significant factor contributing to a strong inference of scienter.

1  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008) (specifically
2  distinguishing an "alleged fraud" that "plainly did not require the participation of
3  upper management, let alone the CEO or the CFO of the company").  Scienter is
4  supported by allegations of a "sophisticated . . . accounting fraud[]" that "require[s]
5  the participation of senior management – these frauds simply cannot be carried out by
6  low-level employees acting on their own."  *Id.*

7       The Complaint's particular allegations strongly support scienter – and plainly
8  state a claim.  The Complaint should be upheld.

9       **3.    Defendants' Pre-Class Period Lending Practices –
              Including Defendants' Efforts to Resist Guidance
10             from the Office of Thrift Supervision – and Post-Class
              Period Events – Including the Office of Thrift
11             Supervision's Cease and Desist Order to Downey –
              Confirm Defendants' Scienter During the Class
12             Period**

13       Allegations of defendants' conduct and events before and after the Class Period
14  are relevant to defendants' scienter during the Class Period.  *In re Scholastic Corp.*
15  *Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class data "relevant" to "establish"
16  defendants' knowledge during the Class Period); *In re Dura Pharms., Inc. Sec. Litig.*,
17  452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (post-class period facts relevant to
18  establish elements of fraud).  As the Second Circuit held in ruling that pre-class period
19  facts were relevant to defendants' class period scienter, "[j]ust as our cases have relied
20  on post-class period data to confirm what a defendant should have known during the
21  class period, . . . so the same logic applies here. *Scholastic*, 252 F.3d at 72.

22       Indeed, the rapid pace of Downey's implosion after the OTS finally stopped
23  Downey's predatory lending practices is strong evidence of the fraudulent nature of
24  those practices – and supports a strong inference of defendants' scienter during the
25  Class Period.  As the Fifth Circuit explained, "events following so closely on the heels
26  of [class period events] cast doubt on the viability of those transactions from their
27  inception."   *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005).
28  "[A]llegations of later-emerging facts can, in some circumstances, provide warrant for

1    inferences about an earlier situation. . . . when a company's big deal collapses so fast,

2    something was amiss at the outset." *Id.*

3        Thus, defendants' repeated assertions that certain witness reports should be

4    ignored because the witnesses drew some of their information from events before the

5    Class Period (*see, e.g.*, Defs' Br. at 12) must be rejected.  Witness testimony supports

6    complaint allegations when the witnesses are "described in the complaint with

7    sufficient particularity to support the probability that a person in the position occupied

8    by the source would possess the information alleged." *Daou*, 411 F.3d at 1015

9    (allegations sufficient where witnesses are numbered and job descriptions and

10   responsibilities are described).

11       In this case, the witness in question – CW1 – did work at Downey prior to the

12   Class Period, as the Complaint alleges.  ¶54.  But, the witness' report – regarding

13   Downey's reserve levels – relates to information that s/he learned ***during*** the Class

14   Period from named individuals in Downey's Loss Mitigation Department.  ¶282; *see*

15   section III.E.  According to those individuals, Downey did not have adequate reserves

16   to cover its problem loans.  *Id.*

17       By contrast, defendants attempt to contradict the report of a Regional Manager

18   who worked at Downey ***during*** the Class Period, CW21, that Rosenthal personally

19   granted "exceptions" for 50% of Downey's Southern California loans.  Defs' Br. at

20   19, 34.  But, defendants' challenge is based on a report from Downey's former Chief

21   Lending Officer, John Gatzke, who left Downey ***before*** the Class Period began.  *Id.*;

22   ¶50.  Defendants' assertion is unsupported by the Complaint allegations.

23       Similarly, defendants' assertion that certain witness reports must be ignored

24   because they are based on "hearsay" (*see, e.g.*, Defs' Br. at 12, 34) must also be

25   rejected.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997-98 & n.4 (9th

26   Cir. 2009), held that hearsay reports can be considered when they are "sufficiently

27   reliable" – as opposed to "vague" – because "the rigorous standards for pleading

28   securities fraud ***do not require a plaintiff to plead evidence***." *Id.*  Here, witness

reports of conversations about reserve levels with named employees in the very department of Downey involved in reserves are "sufficiently reliable."

> **4.   Defendants' Blatant Disregard of Both GAAP Standards and Guidance from the Office of Thrift Supervision Demonstrates Their Determination to Sell Loans Regardless of the Risks Involved**

"Violations of GAAP standards can also provide evidence of scienter." *Daou*, 411 F.3d at 1016.  Indeed, "[w]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves." *Id.*  Plaintiffs need not allege all details related to the accounting violation, "but they must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of [earnings]." *Id.* at 1017.

Here, the relevant GAAP violations are alleged with particularity.  ¶¶267-268, referencing SFAS No. 5, ¶¶8, 10; ¶¶270-271. GAAP required Downey to reserve for any asset that was "impaired" where the "amount of loss can be reasonably estimated" or disclose any "reasonable possibility" of loss.  *Id.*  Further, the Complaint alleges that despite these clear standards – and Downey's own representations about its regular asset review and ample reserves (¶253) – Downey actually reduced loan loss reserves during the Class Period despite mounting delinquent loans.  ¶301.

In *Countrywide*, a judge in this district found that similar allegations of alarming increases in negative amortization income, delinquencies, and failing loans set for recast, taken together with allegations of loosening underwriting and lending guidelines, supported a strong inference of scienter and defendants' failure to adequately reserve for loan losses under SFAS No. 5.  588 F. Supp. 2d at 1181. "These increases strongly suggest many of [the bank's] loans were impaired and therefore should have triggered close inquiry into [the bank's] loan-related balance sheet items." *Id.*

Where a complaint alleges defendant understates loan loss reserves by deliberately failing to recognize problem loans (thereby understating the reserve), a plaintiff has stated an actionable claim under §10b and Rule 10b-5. *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993); *accord Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (Where a defendant "characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud.").

Here, defendants not only deliberately failed to recognize problem loans, but also actively worked to conceal them – all the while describing Downey's reserves as "adequate." ¶¶253, 297, 339-343. As described in section III.E., when the number of Downey's "delinquent" loans became a problem, defendants McAlister, Rosenthal, and Côté just changed the definition of "delinquent." ¶297. Further, they mischaracterized $99 million in "modified" loans as performing assets – until they were forced to admit that the loans were really "non-performing assets." ¶¶339-343. Again, the relevant GAAP violations are alleged with particularity. ¶¶344, 349, referencing SFAS No. 15 and No. 114.

### 5. The Number of Witnesses Who Reported Defendants' Fraudulent Practices – and the Consistent and Corroborating Nature of Their Reports – Strongly Support Scienter

The Complaint allegations are based on multiple sources. ¶¶49-82. In addition to information contained in Downey's publicly filed documents and gleaned from plaintiffs' independent investigation, the Complaint is also supported by reports from 30 different witnesses, 14 of whom are new witnesses to this Complaint, as well as sworn deposition testimony in a lawsuit filed by Downey. *Id.*

Defendants' desperate efforts to focus on differences in details cannot detract from the overall force of this body of support for the factual allegations of the Complaint. Taken together, the reports corroborate and reinforce each other, creating an interlocking presentation of defendants' fraud.

Thus, for example, the Complaint allegations are now supported by the new report of Downey's Regional Manager, CW21, detailing Rosenthal's personal involvement in granting "exceptions" for 50% of the loans that Downey wrote in Southern California – a practice so rampant and offensive to this Regional Manager that s/he resigned as a result.  ¶¶189-191.  Those new allegations corroborate earlier allegations by a Senior Underwriter, CW4, and Wholesale Operations Manager, CW5, both employed by Downey during the Class Period, confirming that "exceptions" were the rule at Downey.  ¶¶192-195, 200-202.

As *Tellabs* confirms, this Court's "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  551 U.S. at 326.  "When the allegations are ***accepted as true*** and ***taken collectively***, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id.*  Here, a reasonable person would deem the inference of defendants' scienter absolutely as strong as any opposing inference.  Again, in the words of another judge in this district, "[t]he plausible alternative inference is willful ignorance" (*Countrywide*, 588 F. Supp. 2d at 1195) – for which defendants would also be liable.

Further, issues of "the credibility of witnesses" and "any genuine issues of fact" must be saved for the jury.  *Tellabs*, 551 U.S. at 328.  Thus, for example, the Complaint's overwhelmingly strong allegations regarding Downey's inadequate reserves cannot be undermined by defendants' multiple-footnote effort to inject a factual dispute.  The Complaint alleges – based on Downey's own admissions about the volume of loans that it knew would have to be "recast" (¶¶280, 354), witnesses who confirmed what Downey knew (*e.g.*, ¶294), Downey's dramatically increasing profits from negative amortization (¶¶284-285), and statements directly from employees in Downey's Loss Mitigation Department (¶282) – that Downey's reserves were inadequate during the Class Period.  ¶301.  As fully set forth in section III.E., a comparison of two charts – showing the rapid increase in Downey's delinquent loans

1   and the simultaneous *decrease* in Downey's reserves – paints a revealing picture of

2   Downey's financial model during the Class Period.

3       In a footnote in their brief, relying on an assertion raised in a footnote of

4   another brief, defendants now assert that there is some logical explanation for the

5   decrease in Downey's reserves despite defendants' knowledge of an increasing trend

6   in Downey's borrowers' delinquencies, based on Downey's accounting methodology.

7   *See* Defs' Br. at 10 n.8.  Not surprisingly, defendants offer *no support whatsoever* for

8   their counter-intuitive proposition.  Indeed, even if what they say were literally correct

9   when considered in isolation from all other factors, it would not change the reality that

10   as defendants continued to learn that Downey's non-accrual loans (loans on which

11   Downey was not receiving any money) were dramatically increasing, they knew that

12   the risk that other loans would become non-accruing was increasing, requiring an

13   increase in reserves.  That defendants themselves recognized this is supported by the

14   fact that, as conditions deteriorated, they simply *changed the definition of delinquent*

15   from 90 days to 180 days.  ¶297.

16       Even if defendants' assertion were plausible, it would still be premature.

17   Resolution of fact questions is not appropriate at the pleading stage.  *Tellabs*, 551 U.S.

18   at 328.  Disputed accounting issues require trial resolution; plaintiffs' allegations must

19   be accepted at the pleading stage.  The Fifth Circuit held that "[b]ecause the

20   accounting questions in this case are disputed, dismissal was not appropriate." *Barrie*

21   *v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257, *reh'g denied and opinion modified on*

22   *other grounds*, 409 F.3d 653 (5th Cir. 2005).  The Eighth Circuit agrees:

23       [W]hether [the accounting issues] were handled within the parameters of

24       good faith decision-making or whether the decisions amounted to

25       recklessness will surely be the focus of any trial of this case. . . . The

26       strong-inference pleading standard does not license us to resolve

27       disputed facts at this stage of the case.

28

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001). Similarly, the Third Circuit has long held that the possibility of a defendant's valid defense is not enough to affirm dismissal: "it is a factual question whether [defendants'] accounting practices were consistent with GAAP" and "since the claim at issue was dismissed at the pleading stage, *we are required to credit plaintiffs' allegations rather than defendants' responses*." *Burlington*, 114 F.3d at 1421.

Here, a remarkably strong inference of scienter is supported by literally dozens of interlocking witness reports. Plaintiffs' theory of scienter is cogent. It is compelling. It is at least as strong as any competing inference. Under the *Tellabs* standard, the Complaint should be upheld.

### 6. Defendants' Financial and Personal Survival Motives Bolster the Already-Strong Inference of Scienter

Defendants here had ample motive to perpetrate fraud. Defendants' bonuses were "determined based solely on the consolidated net income of Downey for the prior fiscal year as compared to the consolidated net income target for Downey established by the Board for the year." ¶219. In English, "how much more money did Downey make?" Thus, as the Complaint demonstrates, the bonus system motivated defendants to sell loans at any costs – under whatever standards worked. In return, Downey's CEO bonus went from $126,000 in 2002 to more than $940,000 in 2005-2006. ¶220; Exs. 14-18, 39. The CFO's bonus dramatically increased from $13,241 in 2002 to more than $445,000 in 2005 and Côté received a bonus equal to more than a third of his salary in 2006 based on his partial employment during that year. *Id.* McAlister received more than $560,000 in 2006 and more than $700,000 in 2007 – a noticeable increase from his less-than-$430,000 received in 2002. *Id.* This motive supports scienter. *Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference.").

Further, defendants Rosenthal and Côté had the additional very real motive of keeping their positions with the company. As *Forbes* reported, "McAlister hired and

1  fired chief executives every 18 months on average." ¶16.  Thus, defendants in this

2  case had an even more "especial cause to think that they would lose their jobs if they

3  failed to produce results" than the defendants in *Pirraglia*. *See* 339 F.3d at 1191.

4  When Rosenthal took the helm as Downey's CEO and President in 1998, he was not

5  only McAlister's former son-in-law, he was also the fifth CEO in ten years. ¶43;

6  *Pirraglia*, 339 F.3d at 1191 & n.12 (refusing to infer a lack of motive from the fact

7  that defendants did not sell their stock because where former executive of company

8  had been fired for failing to improve company's revenue, defendants had motive to

9  think they would be terminated if they did not produce results).  Here, the motive

10  allegations cogently bolster an already-strong inference of scienter.

11       In the face of allegations showing defendants ***actually knew*** their statements

12  were false (*see* sections III.C., III.D., and III.E.), defendants weakly claim that they

13  should be excused from liability because they did not sell their stock. *See* Defs' Br. at

14  43-44.  But, as they must, even defendants concede that "stock sales are not required

15  to plead securities fraud." *Id.* at 43.  The Ninth Circuit agrees: "a party that introduces

16  fraudulent information into the securities market does no less damage to the public

17  because that party did not trade stocks." *McGann v. Ernst & Young*, 102 F.3d 390,

18  396 (9th Cir. 1996); *accord No. 84 Employer-Teamster Joint Council Pension Trust*

19  *Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("[T]he lack of

20  stock sales by a defendant is not dispositive as to scienter.").  Even if the other motive

21  allegations were not as strong as they are, the Supreme Court has confirmed that "the

22  absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

23       In this case, defendants had a reason not to sell.  Stock sales during the Class

24  Period would have constituted violations of §20A of the 1934 Act and subjected

25  defendants to potentially criminal liability based on the adverse non-public

26  information in their possession throughout the Class Period. *See* 15 U.S.C. §78t(d).

27  Selling their stock on the market was no longer an option because they

28  "simply . . . waited too long to sell, such that by the time it became apparent that full

1   disclosure would be necessary, massive trades would expose them to potential

2   criminal liability." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004).

3   **C.   Plaintiffs Plead a Plausible Theory Explaining How Defendants' Fraudulent Conduct Caused Their Loss**

4       Loss causation is amply pled.  ¶¶444-488.  Indeed, the Complaint pleads loss

5   causation in extraordinary detail.  Like the loss causation allegations recently upheld

6   by the Ninth Circuit, the Complaint allegations here "offer[] 'sufficient detail to give

7   defendants ample notice of [their] loss causation theory, and to give us some

8   assurance that the theory has a basis in fact.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d

9   1049, 1056 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1993 (2009).  "Therefore, under

10   either [Federal Rule of Civil Procedure] 8 or Rule 9, [plaintiffs] have sufficiently

11   pleaded loss causation.  *Id.*

12       Following the Supreme Court, the Ninth Circuit requires "enough fact to raise a

13   reasonable expectation that discovery will reveal evidence – or the lack thereof –"

14   supporting plaintiffs' loss causation theory.  *Id.* at 1058.  "So long as the complaint

15   alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6)

16   dismissal is inappropriate." *Id.* at 1057.  "This is not 'a probability requirement . . . it

17   simply calls for enough fact to raise a reasonable expectation that discovery will

18   reveal evidence of' loss causation." *Id.*, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

19   544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 941 (2007).

20       Indeed, the Ninth Circuit emphasized that district courts should not weigh

21   competing loss causation theories at the pleading stage. *Id.* "[S]o long as the plaintiff

22   alleges facts to support a theory that is not facially implausible, the court's skepticism

23   is best reserved for later stages of the proceedings when the plaintiff's case can be

24   rejected on evidentiary grounds." *Id.*

25       Here, as detailed in section III.F., plaintiffs' Complaint correlates defendants'

26   specific false statements with the artificial inflation of Downey's stock price – and

27   defendants' partial disclosures with the elimination of that inflation, causing loss.

28

1  ¶¶444-488.  Partial disclosures of fraud satisfy loss causation pleading requirements.

2  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 n.6 (9th Cir.

3  2008) ("[T]here is no prohibition against [plaintiffs] alleging loss causation through a

4  series of disclosures by the Defendants.").  Nothing more is required.

5  Defendants weakly assert that the market reacted to "Downey's 'poor financial

6  health'" rather than to disclosure of defendants' fraud.  Defs' Br. at 46.  But,

7  revelation of a company's poor financial health – which had been previously

8  concealed by defendants' fraud, as here – is precisely what the Ninth Circuit approves

9  as amply alleging loss causation.  *Daou*, 411 F.3d at 1026.  Defendants' admissions of

10  their fraud are not required.  *Id.*  Indeed, in *Daou*, the Ninth Circuit reversed a district

11  court that required an explicit admission of defendants' particular fraud, holding that a

12  plaintiff satisfies *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L.

13  Ed. 2d 577 (2005) and adequately pleads loss causation by alleging that "the price of

14  [defendant company's] stock fell precipitously after defendants began to reveal figures

15  showing the company's ***true financial condition***."  411 F.3d at 1026.  *Daou* follows

16  the Restatement of Torts, which states that "loss [is] . . . sustain[ed] when the facts ***as***

17  ***to the finances of the corporation*** become generally known."  Restatement (Second)

18  of Torts §548A(b), cited with approval in *Dura*, 544 U.S. at 344.

19  Loss causation is more than amply pled here.  The Complaint should be upheld.

20  **D.    Plaintiffs Amply Plead that Downey's Two Chief Officers**
   **and the Chairman of Its Board Exercised Control Over**
21  **Downey**

22  Defendants are liable under §20(a) for controlling Downey.  That the CEO,

23  CFO and Chairman of the Board have control over the operations of a company is

24  obvious – even without the detailed factual allegations within the Complaint

25  demonstrating that these particular individuals signed the relevant SEC filings (*see*

26  section V.A.) and exercised unusual control over the company.  *See, e.g.*, sections

27  III.B.2. and III.D.2.  With those allegations, control is manifest.

28

- 48 -

1      To plead control person liability, "it is not necessary to show actual
2 participation or the exercise of power." *Am. West*, 320 F.3d at 945. Indeed,
3 "[w]hether [the defendant] is a controlling person is an intensely factual question,"
4 inappropriate for resolution at the pleading stage. *Id.* The Complaint amply alleges
5 that McAlister, Rosenthal, and Côté controlled Downey.

6 **VI.   CONCLUSION**

7      For the reasons stated above, defendants' motion to dismiss should be denied.
8 If the Court finds deficiencies in the Complaint, plaintiffs respectfully request leave to
9 amend to address those concerns. Leave to amend should be liberally granted.
10 *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). To
11 date, plaintiffs have only had one such opportunity and have worked to meaningfully
12 address the Court's concerns.

13 DATED: June 17, 2009           Respectfully submitted,

14                            COUGHLIN STOIA GELLER
15                             RUDMAN & ROBBINS LLP
                           WILLOW E. RADCLIFFE
16                            ELI R. GREENSTEIN

17                                /S/ Willow E. Radcliffe
18                            WILLOW E. RADCLIFFE

19                            100 Pine Street, Suite 2600
                           San Francisco, CA  94111
20                            Telephone:  415/288-4545
                           415/288-4534 (fax)
21

22                            COUGHLIN STOIA GELLER
                            RUDMAN & ROBBINS LLP
23                            STACEY M. KAPLAN
                           9601 Wilshire Blvd., Suite 510
24                            Los Angeles, CA  90210
                           Telephone:  310/859-3100
25                            310/278-2148 (fax)

26                            Lead Counsel for Plaintiffs

27

28

1

2

3

4

5

6

7   S:\CasesSD\Downey Financial\BRF00059551.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN, WARD, ASHER &
PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Additional Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 17, 2009.

/S/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:willowr@csgrr.com

# Mailing Information for a Case 2:08-cv-03261-JFW-RZ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  rabadou@btkmc.com

- **Saro H Balian**
  sbalian@mofo.com

- **Eli R Greenstein**
  egreenstein@csgrr.com

- **Stacey M Kaplan**
  skaplan@csgrr.com

- **Dan E Marmalefsky**
  dmarmalefsky@mofo.com,skay@mofo.com

- **James Oliva**
  joliva@mofo.com

- **Willow E Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Darren J Robbins**
  e_file_sd@csgrr.com

- **David C Walton**
  davew@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)