|  |  |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**CENTRAL DISTRICT OF CALIFORNIA** | **PRIORITY SEND** |

### CIVIL MINUTES -- GENERAL

| Case No. | **CV 08-3261-JFW (RZx)** | Date: August 21, 2009 |
|---|---|---|

| Title: | In Re Downey Securities Litigation |
|---|---|

**PRESENT:**

      **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
|---|---|
| None | None |

| **PROCEEDINGS (IN CHAMBERS):** | ORDER GRANTING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT [filed 5/18/09; Docket No. 76] |
|---|---|

      On May 18, 2009, Defendants Maurice L. McAlister ("McAlister"), Daniel D. Rosenthal ("Rosenthal"), and Brian E. Cote ("Cote") (collectively, "Individual Defendants") filed a Motion to Dismiss Second Amended Consolidated Complaint ("Motion"). On June 17, 2009, Lead Plaintiff Waterford Township General Employees Retirement System ("Plaintiff" or "Waterford") filed its Opposition. On July 2, 2009, the Individual Defendants filed a Reply. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument. The matter was, therefore, removed from the Court's July 13, 2009, hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.  Factual and Procedural Background**

      On May 16, 2008, Plaintiff Waterford filed a class action complaint on behalf of all purchasers of Downey Financial Corp. ("Downey") securities between October 16, 2006, and March 14, 2008, against Downey and certain of its current and former officers and/or directors. On June 2, 2008, Plaintiff Stephen J. Mihalacki ("Mihalacki") filed a separate putative class action on behalf of all purchasers of Downey securities between October 16, 2006, and March 14, 2008, with virtually identical factual allegations, and alleging the same claims for relief, as the *Waterford* Complaint. On August 14, 2008, the Court consolidated the two actions, appointed Waterford as lead plaintiff, and appointed lead counsel. On September 29, 2008, Plaintiff filed its Consolidated Complaint for Violation of the Federal Securities Law. On November 12, 2008, pursuant to a

stipulation entered into by the parties and approved by the Court, Plaintiff filed its First Amended Consolidated Complaint ("FACC").  On March 18, 2009, the Court issued an order granting the Individual Defendants' motions to dismiss the FACC.  On April 17, 2009, Plaintiff filed its Second Amended Consolidated Complaint for Violations of the Federal Securities Laws ("SACC").

In the SACC, Plaintiff alleges claims for relief for (1) violation of Section 10(b) of the 1934 Act and Rule 10b-5; and (2) violation of Section 20(a) of the 1934 Act.  In short, Plaintiff alleges that the decline in Downey's shareholder value resulted from alleged misrepresentations made to the investing public by Downey's current and former officers and/or directors, and not from the current economic climate.

**II.     Legal Standard**

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") govern the pleading requirements for claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  See *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999); *Cooper v. Pickett*, 137 F.3d 616, 628 n. 2 (9th Cir. 1997); *see also* William W. Schwarzer, A. Wallace Tashima, & James M. Wagstaffe, California Practice Guide, *Federal Civil Procedure Before Trial* § 8:45.10.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The heightened pleading requirements of Rule 9(b) are designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).  In order to provide this required notice, "the complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity."  *Id*. at 672.  Further, "a pleader must identify the individual who made the alleged representation and the content of the alleged representation."  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999).

The PSLRA requires a heightened pleading standard for allegations regarding misleading statements and omissions that is similar to the heightened pleading standard required by Rule 9(b).  "The purpose of this heightened pleading requirement was . . . to put an end to the practice of pleading 'fraud by hindsight.'"  *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084-85 (9th Cir. 2002) (*quoting In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir. 1999)).  The PSLRA specifically provides:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

In addition, the PSLRA requires a heightened pleading standard for state of mind: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see, also, Silicon Graphics*, 183 F.3d at 974 ("We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct"). "To allege a 'strong inference of deliberate recklessness,' [the plaintiff] 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.'" *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir. 2002) (*quoting Silicon Graphics,* 183 F.3d at 974). "[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct." *Silicon Graphics,* 183 F.3d at 976-77.

### III. Discussion

#### A. Violation Of Section 10(b) And Rule 10b-5

Section 10(b) makes it unlawful:

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In a typical section 10(b) or Rule 10b-5 private action, a plaintiff must prove: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005); *Stoneridge Investment Partners, LLC. v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008).

#### 1. The SACC must be dismissed because Plaintiff used a "puzzle-style" pleading.

The PSLRA requires that a securities fraud compliant "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and, "with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). The PSLRA also requires that each element of a Section 10(b) claim be separately pled as to each named defendant. *See, e.g., In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153-

54 (C.D. Cal. 2007) (holding that "the group pleading doctrine can no longer be used in pleading cases under the PSLRA"). The purpose of the PSLRA's pleading requirement is to allow courts to assess whether a securities fraud complaint should be allowed to proceed past the pleading stage. *See*, H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.) (The PSLRA imposes additional strict standards to "discourage frivolous litigation").

In the SACC, Plaintiff has placed "the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting" Plaintiff's claims. *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008). For example, Plaintiff has: (1) with respect to each alleged misrepresentation, failed to connect the particularized facts demonstrating that the statement was false or misleading when made; (2) with respect to each of the Individual Defendants, failed to connect the particularized facts demonstrating that each Individual Defendant knew, or was deliberately reckless in not knowing, that a particular statement was false or misleading when made; (3) pled lengthy block quotes with sentences bolded and highlighted, without any explanation as to why any of the sentences were bolded and highlighted or what the bolded and highlighted material means or represents; (4) pled confidential witness statements without connecting those statements to the alleged misrepresentations; (5) added allegations seemingly meant to explain why earlier statements were false without specifying to which particular statements the allegations pertain; and (6) attributed alleged misconduct to all "defendants" without providing particularized facts demonstrating the involvement of any of the Individual Defendants. *See*, SACC, generally. In addition, Plaintiff has added more confidential witness statements, but, as in the FACC, has failed to provide the factual foundation of reliability or personal knowledge for these confidential witnesses or their statements.

Moreover, these pleading deficiencies are compounded by the size of the SACC, which makes it impossible for the Individual Defendants or the Court to determine the basis of the securities law violations being claimed by Plaintiff. The SACC is comprised of 944 pages, including 504 numbered paragraphs and 41 exhibits. Furthermore, Plaintiff often cites to the voluminous exhibits in the SACC, but fails to explain the relevance of the referenced exhibit. These are the very types of pleading deficiencies that have led courts to dismiss securities fraud complaints for failing to comply with the pleading requirements of the PSLRA and Federal Rule of Civil Procedure 8. *See, e.g., Brodsky*, 592 F. Supp. 2d at 1198; *In re Splash Tech. Holdings Sec. Litig.*, 160 F.Supp. 2d 1059, 1074 (N.D. Cal. 2001) ("The structure of the Second Amended Complaint renders it exceedingly difficult to discern precisely which statements are alleged to be misleading."); *Patel v. Parnes,* 253 F.R.D. 531, 553 (C.D. Cal. 2008) (finding that "the specific alleged false and misleading statements are not readily identified in plaintiffs' complaint.").

> 2. **Plaintiff has failed to plead that the Individual Defendants made a material misstatement or omission.**
>
>> a. **Plaintiff has failed to plead that the Individual Defendants made a material misstatement or omission with respect to Downey's financial statements.**

To plead a material misstatement or omission, Plaintiff must include in its SACC "allegations of specific 'contemporaneous statements or conditions' that demonstrate the . . . false or misleading nature of the statements when made." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843,

846 (9th Cir. 2003) (*quoting Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)). As this Court held in its March 18, 2009 Order, facts supporting falsity must be pled with particularity, including the "who, what, when, where, and how" of the alleged fraud allegations. *In re Downey Sec. Litig.*, 2009 WL 736802, *7 (C.D. Cal. Mar. 18, 2009). However, as in the FACC, Plaintiff's allegations in the SACC against Downey generally and the Individual Defendants specifically regarding purported misrepresentations in both financial and non-financial statements fail to reach this standard.[1] Instead, once again, Plaintiff has alleged nothing more than conclusory allegations against "Downey" or "defendants."

  For example, Plaintiff again alleges that Downey's loan loss reserves were understated because Downey's publicly disclosed financial metrics (*e.g.,* negative amortization, recasting of loans, delinquencies and foreclosures, non-accrual loans as a percentage of the reserve allowance, and declining housing prices) and the adjustments to the reserve levels during the Class Period indicate that the reserves were inadequate when set. SACC, ¶¶ 264-338. However, these are the very allegations this Court found inadequate in its March 18, 2009 Order. Plaintiff offers no new factual allegations regarding Downey's loan loss reserves, such as "details about when and to what level the [loans] should have been written down, when and to what level the allowances should have been changed, why the allowance made by the corporation was unreasonable in light of the bad debt experienced, and how many accounts ultimately were uncollectible." *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006). As the court in *Alaska Elec. Pension Fund*, 434 F. Supp. 2d at 823, found:

> Merely alleging that bad debt reserves were inadequate is insufficient because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood.

(internal quotations omitted); *see, also, In re Countrywide Fin. Corp. Derivative Litig. ("Countrywide Derivative")*, 554 F.Supp. 2d 1044, 1070 (C.D. Cal. 2008) (finding that "the setting of loan loss reserves involves a great deal of discretion"). Moreover, as in the FACC, Plaintiff continues to simply assume that Downey ignored the financial metrics in setting its reserves without alleging any particularized facts that Downey did, in fact, ignore its own publicly-disclosed information when setting its reserves. *Cf. Countrywide Derivative*, 554 F.Supp. 2d at 1069-70 (finding that the plaintiff had not adequately pled that the reserves were understated even though the committee that set the reserves was cognizant of exponentially rising negative amortization and delinquency rates).

---

  [1] Moreover, with respect to the Individual Defendants, only those defendants who actually make a false or misleading statement will be liable under section 10(b) or Rule 10b-5. *See In re Hansen Natural Corporation Securities Litigation*, 527 F. Supp. 2d 1142, 1153 n.3 (C.D. Cal. 2007). In the SACC, as in the FACC, there is not a single actionable misrepresentation or omission in the 504 numbered paragraphs of the SACC attributed to the Individual Defendants. In addition, as the Court held in its March 18, 2009 Order, the general allegations against Downey cannot be attributed to the Individual Defendants under the group pleading doctrine, because the group pleading doctrine did not survive the PSLRA. *In re Hansen Natural Corporation Sec. Litig.*, 527 F.Supp. 2d at 1153-54 ("A defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).").

In addition, Plaintiff has not added any new particularized factual allegations to demonstrate that Downey's loan loss reserve levels were understated.[2] As in the FACC, Plaintiffs allegations demonstrate only that Downey kept its reserves relatively constant during the fourth quarter of 2006 and the first quarter of 2007 before increasing its reserves commencing in the third quarter of 2007. SACC, ¶¶ 316-21. However, Plaintiff has failed to allege any facts demonstrating that anything other than changing conditions at Downey and in the market dictated the increases in Downey's reserves in the third quarter of 2007. *See, e.g., Tripp v. Indymac Financial Inc.*, 2007 WL 4591930, *4 (C.D. Cal. Nov. 29, 2007) (holding that the "stronger inference" from a significant increase in loan loss reserves is that the defendants "were simply unable to shield themselves as effectively as they anticipated from the drastic change in the housing and mortgage markets"); *see, also, Countrywide Derivative*, 554 F.Supp. 2d at 1070 fn. 28 (holding that Countrywide's $1.84 billion increase in loan loss reserves, representing an increase of more than 700%, did not satisfy the particularized factual showing required by the PSLRA).

With respect to statements about Downey's capital position and recognition of revenue from negative amortization, Plaintiff, once again, simply re-alleges the allegations of the FACC that the Court found insufficient in its March 19, 2009 Order. *See, e.g.,* SACC, ¶¶ 259, 289 & 328-29. For example, Plaintiff's claims in the SACC that the capital levels reported in Downey's SEC filings were overstated and, thus, false, are premised on the allegation that the loan loss reserves were understated. However, as explained above, Plaintiff's claims about Downey's loan loss reserves are plainly insufficient. In addition, as the Court found in its March 18, 2009 Order, Rosenthal's statements regarding Downey's "strong" capital position, which the Individual Defendants contend were true, are "far too vague to be actionable under the PSLRA." *In re Calpine Corporation*, 288 F.Supp. 2d 1054, 1088 (N.D. Cal. 2003) (holding that words such as "strong", "healthy", and "solid" could not "form a basis for Plaintiffs' Exchange Act claims."). Similarly, Plaintiff merely repeats the allegations contained in the FACC that Downey "secretly" included revenue from unpaid interest on negative amortization loans in reported earnings to inflate net income but, once again, provides no particularized facts that support this conclusion.

> **b.   Plaintiff has failed to plead that the Individual Defendants made a material misstatement or omission with respect to Downey's non-financial statements.**

Plaintiff also repeats its allegations that Downey's statements about underwriting practices, including the implementation of minimum borrower credit requirements and maximum loan-to-value limitations, management of risk through credit approvals and monitoring procedures, and obtaining information about an applicant's income, credit history and ability to repay the loan, were false, but fails to provide any particularized factual allegations evidencing such a systemic disregard for

---

[2] In addition, the statements of the confidential witnesses in the SACC, as in the FACC, do not demonstrate that Downey under-reserved for loan losses. For example, CW1's statements about loan loss reserves in 2007 – when he stopped brokering loans as a third-party broker for Downey in 2006 – and CW8's statements that he "strongly believes that Downey did not adequately reserve" for Option ARM loans in 2006 and 2007 lack specificity and are based on hearsay, rumor, and speculation.

proper underwriting.[3]  *See,* SACC, ¶¶ 83-88, 141, 143, 153 & 156-57.  For example, Plaintiff alleges that Downey misrepresented its underwriting practices because Downey's FICO score minimum was between 580 and 620 at some point during the Class Period.  *See,* SACC, ¶ 143.  However, it is undisputed that Downey disclosed throughout the Class Period that it made loans to borrowers with FICO scores of "620 or below."  Request for Judicial Notice, Exh. D, at 368.[4]  Similarly, Plaintiff alleges that Downey failed to verify borrowers' income and ability to make loan payments because it made "stated income" loans.  *See,* SACC, ¶¶ 141, 143-44, 153 & 169.  However, it is again undisputed that Downey disclosed the extent of its use of stated income loans and the reduced documentation required to underwrite those loans.  Request for Judicial Notice, Exh. C, at 289 (stating that "79% of our residential one-to-four unit loans were underwritten based on borrower stated income and asset verification and an additional 10% were underwritten with no verification of either borrower income or assets").

Plaintiff fails to quote or even paraphrase Downey's underwriting guidelines in its allegations regarding Downey's underwriting practices, and, instead, attempts to support its allegations with a variety of confidential witness statements.  However, these statements, in addition to suffering from foundational issues, often contradict one another.  For example, CW21's statement that "upper management" refused to put underwriting guidelines in writing is contradicted by the statements of CW4, CW6, CW20, CW25, and CW26 that the underwriting guidelines were included in a "Weekly Policy Book," were available by e-mail and on Downey's intranet, and were embedded in the automated system utilized by underwriters in making loans.  *See,* SACC, ¶¶ 111, 122, 129-30, 135-36 &164.  Similarly, with respect to the purportedly large number of exceptions to Downey's underwriting guidelines, CW21's statement about an alleged 50% exception rate is directly contradicted by deposition testimony of Gatzke excerpted in the SACC stating that Downey had a five to six percent exception rate that "was brought down to zero before he left" Downey in July 2006.  *See,*  SACC, ¶¶ 187-203.

With respect to Plaintiff's allegations in the SACC that Downey misrepresented the quality of its loans, Plaintiff's allegations continue to be based on nothing more than Plaintiff's own characterization of Downey's Option ARM loans as "toxic" and "horrible" because such loans were inherently bad and uncollectible, and Plaintiff's conclusions that Downey allegedly engaged in predatory lending practices.  *See,* SACC, ¶¶ 93, 102-03, 105, 152, 154, 176-79, 181-86 & 204.  Again, Plaintiff fails to plead any particularized facts supporting these claims, such as why Option

---

[3]  Moreover, Plaintiff's allegations in the SACC – which are, again, simply reiterations of allegations from the FACC – that Downey's statements regarding its compliance with a September 2006 Interagency Guidance on Nontraditional Mortgage Products were false are not adequately alleged because Plaintiff's claims are only supported by its deficient allegations of improper underwriting and loan loss reserves.

[4]  Because the SACC alleges and relies on the contents of Exhibits C, D, M, and V, the Court may "treat such [ ] document[s] as part of the complaint, and thus may assume [their] contents to be true for purposes of a motion to dismiss under Rule 12(b)(6)."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  In addition, Plaintiff did not object to the Individual Defendants' Request to Judicial Notice.  Accordingly, the Individual Defendants' Request for Judicial Notice is **GRANTED** with respect to Exhibits C, D, M, and V.

ARM loans are inherently bad, or any facts demonstrating that Downey engaged in systemic predatory lending practices.[5]

Plaintiff again alleges that Rosenthal's statement in an April 18, 2007 press release that Downey's subprime portfolio "represents less than 6% of our loan portfolio" is actionable because Downey was lending to borrowers with a FICO score of less than 660, which Plaintiff alleges represents the subprime benchmark in the banking industry. SACC, ¶¶ 223-33. However, as this Court found in its March 18, 2009 Order, Rosenthal's statement is not actionable, "because, when viewed in context, Downey had clearly defined subprime borrowers as those with FICO scores of less than 620 in its public filings, including its Form 10-Q for the first quarter of 2007 – filed a mere 16 days after Rosenthal's April 18, 2007 statement – which disclosed that, consistent with Rosenthal's statement, five percent of Downey's borrowers had a FICO score of 620 or below at origination." *In re Downey*, 2009 WL 736802, at *6 (also finding that Downey's use of a 620 FICO score as a subprime benchmark was "widely used in the mortgage industry") (internal citations omitted). In fact, the June 2007 Statement on Subprime Mortgage Lending on which Plaintiff relies to support its allegations that Downey misrepresented how it defined "subprime" specifically states that "the term 'subprime' is not consistently defined in the marketplace or among individual institutions." Request for Judicial Notice, Ex. V, at 1085.

Similarly, Plaintiff continues to rely in the SACC on a statement made by McAlister during a speech that was reported in the September 17, 2007 *Orange County Business Journal*. SACC, ¶ 370. The only new allegation is that McAlister's statement was disseminated to the investing public by *Forbes*. SACC, ¶ 371. However, as this Court found in its March 18, 2009 Order, McAlister's statement "was nothing more than a statement "of hope, opinion, or belief" about Downey's future performance or general market conditions" and is "not actionable under the securities laws." *In re Downey,* 2009 WL 736802, at * 6. Moreover, the statement was not re-published in *Forbes* until October 27, 2008 – over seven months after the end of the Class Period. Request for Judicial Notice, Exh. M.

### 3. Plaintiff failed to plead scienter adequately.

To adequately plead scienter under the PSLRA, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics*, 183 F.3d 970, 975 (9th Cir. 1999). Plaintiffs must plead "at a

---

[5] Similarly, Plaintiff's allegations regarding the September 5, 2008 OTS Order to Cease and Desist fail to demonstrate that the Individual Defendants, or anyone at Downey, made public statements that were false. *See,* SACC, ¶¶ 3 & 12. Moreover, the OTS Order was issued months after the end of the Class Period. Because 12 C.F.R. § 563.171(a) requires the OTS "to conduct a full-scope on-site examination of every savings association at least once during each 12-month period", the OTS presumably conducted "full-scope" examinations of Downey in 2006 and 2007 during the height of the alleged misconduct. However, Plaintiff does not allege in the SACC that OTS issued any Cease and Desist Orders alleging any misconduct by Downey during that time period.

minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In re Silicon Graphics*, 183 F.3d at 979.  To satisfy this pleading requirement,  "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless[,] false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  In addition, the Supreme Court recently described the appropriate method for determining if the "strong inference" requirement for alleging scienter had been met:

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind.  Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In deciding if scienter has been adequately pled, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*, at 322-23 (2007) (citations omitted); *see, also, Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 987 (9th 2009) (holding that the Supreme Court's "decision in *Tellabs* does not materially alter the particularity requirements for scienter claims established in our previous decisions, but instead only adds an additional 'holistic' component to those requirements").

      Plaintiff's allegations in the SACC when considered collectively, do not give rise to a strong inference of scienter.  In fact, "there is a total absence of factual allegations that would permit a strong inference that" the Individual Defendants knew that their representations with respect to Downey "were false or misleading when made" or that the Individual Defendants "acted in deliberately reckless disregard of their truth or falsity."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1089.  "Without corroborating facts, it is impossible to conclude that such allegations rest on more than hind-sight speculation." *Id.* (c*iting In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)).  Considering plausible opposing inferences, as required by *Tellabs*, the inference of scienter is not "as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.  Moreover, the allegations do not satisfy the specificity requirement of Rule 9(b) or of the PSLRA.  The SACC's allegations neither identify what roles each Individual Defendant played in the alleged fraud nor allege facts giving rise to a strong inference of scienter on the part of each Individual Defendant in any context, and, thus, fail to address or correct the deficiencies in the FACC.

### a. The Individual Defendants' signatures on Downey's public filings do not give rise to a strong inference of scienter.

Plaintiff attempts to again argue that certain of the Individual Defendants' signatures on various Downey public filings gives rise to strong inference of scienter. For example, the SACC repeats the FACC's allegations that the Individual Defendants had "knowledge of the misconduct during the Class Period" because all three Individual Defendants signed Downey's 2006 and 2007 Form 10-Ks, and Rosenthal and Cote signed Downey's Form 10-Qs. SACC, ¶¶ 397-403. However, as this Court found with respect to the FACC, if it were true that simply alleging that the Individual Defendants' signatures appearing on various Downey public filings creates a strong inference of scienter, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546, 555 (5th Cir.2007) (*quoting Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)); *see, also, Communications Workers of America Plan for Employees; Pensions and Death Benefits v. CSK Auto Corp.*, 2007 WL 951968, at *8 (D. Ariz. Mar. 28, 2007) ("Sarbanes-Oxley certifications, by themselves, do not support a strong inference of scienter."). Without allegations that each of the Individual Defendants that signed various Downey public filings knew those public filings contained misstatements, the Individual Defendants' signatures on those public filings alone does not give rise to a strong inference of scienter.[6]

---

[6] In addition, the few statements in the SACC quoting the Individual Defendants do not provide the particularized facts required to plead scienter. In fact, the only statements that are alleged in the SACC are the same statements the Court already found insufficient. *See,* SACC, ¶ 370 (the *Orange County Business Journal* quote from McAlister); ¶¶ 223-24 & 259 (Rosenthal's statements regarding Downey's subprime lending and capital position); ¶ 340 (Cote's statement in a press release regarding the single-quarter restatement of loans modified under Downey's Borrower Retention Program); *see, e.g., In re Downey,* 2009 WL 736802, *6-*7. Accordingly, the SACC provides no new particularized factual allegations as to any of the Individual Defendants that give rise to a strong inference of scienter.

Similarly, Plaintiff's restatement of its prior allegation that the Individual Defendants were on notice of "Downey's insufficient underwriting" because "several of [the individual borrower lawsuits] were filed before or during the Class Period" does not cure its failure to adequately plead scienter. *See,* SACC, ¶ 204. Plaintiff does not allege any facts to support this allegation, and the five unresolved lawsuits by individual borrowers certainly do not demonstrate that any Individual Defendant was aware of Downey's allegedly insufficient underwriting practices. Moreover, Plaintiff again relies on the fact that the OTS Examination Handbook provides that directors and officers should receive and review certain "operational information" as evidence of scienter. SACC, ¶ 415-21, Exh. 27. However, Plaintiff again fails to allege with particularity what information any Individual Defendant received or reviewed, or how that information demonstrates that any particular alleged false statement was made intentionally or with deliberate recklessness.

> **b.    The allegations of the confidential witnesses do not give rise to a strong showing of scienter.**

Statements of confidential witnesses may be considered in determining the adequacy of a complaint under the PSLRA if "the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains adequate corroborating details." *In re Daou Sys.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005); *see, also, Zucco Partners,* 552 F.3d at 995 ("As we have explained in *Daou*, a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements."). That a court may consider a confidential witness's statements, however, does not mean that the information conveyed gives rise to a strong inference of scienter. *Metzler*, 540 F.3d at 1069 n. 13 ("The problem for Metzler is not that the confidential witnesses are inadequately identified – the problem is that these witnesses do not convey information sufficient to support the strong inference of scienter that the PSLRA requires."). Moreover, the statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation. *See, In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at * 5 (D. Ariz. Jul. 5, 2006) ("[C]onfidential witnesses' unreliable or conclusory allegations will not be considered . . .); *Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.").

The majority of Plaintiff's allegations regarding the statements of the confidential witnesses again fails to establish with particularity the requisite foundation for reliability and personal knowledge of those confidential witnesses and, thus, they do not give rise to a strong showing of scienter. Although several confidential witnesses are described in the SACC in more detail than in the FACC (*see, e.g.,* SACC, ¶¶ 54-82), the descriptions still lack "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Downey*, 2009 WL 736802, at *13. For example, CW10 and CW20 have no basis to opine about Downey's underwriting or lending practices after they left the company, and both CW10 and CW20 left Downey before the start of the Class Period. SACC, ¶¶ 63 & 73. Similarly, CW1 was a third-party broker who stopped brokering loans with Downey in early 2006 – well before the Class Period began – but Plaintiff relies on CW1's unsupported opinions that Downey did not conduct reasonableness tests on a borrower's stated income, consider a borrower's ability to repay loans, adequately reserve for loan losses, and disclose to borrowers the details of Option ARMs. SACC, ¶¶ 54, 141-42, 178 & 282. Again, Plaintiff provides insufficient facts demonstrating that CW1 possessed personal knowledge regarding these matters during the Class Period or at any time. Although these are only a few examples of Plaintiff's failure to properly plead the requisite foundation, the Court has found this defect exists in the majority of Plaintiff's confidential witness allegations.

In addition, many of the confidential witness statements are deficient because they lack specificity, and are based on hearsay, rumor, or speculation. *See, e.g., Zucco Partners*, 552 F.3d at 997 fn. 4 ("[A] hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witnesses'

report is not sufficiently reliable, plausible, or coherent to warrant further consideration under *Daou*."). For example, CW4 and CW21 state that two branch office employees "bragged" that they had gone directly to Rosenthal to get exceptions approved, and that all loans for properties near Bullhead City, Arizona, where McAlister resides, were approved "with no questions asked." SACC, ¶¶ 191-92 & 201. However, as the Court found in its March 18, 2009 Order, these statements are based on mere rumor and speculation. Similarly, CW10's statement that Downey's Board "would have known that the market and its loans were going to implode" because people at Downey studied "trends" lacks specificity and is nothing more than sheer speculation. SACC, ¶ 312.

Moreover, the confidential witness statements also lack corroboration, and, in fact, contradict one another. For example, the confidential witness statements conflict with one another regarding Downey's FICO score minimum (SACC, ¶¶ 143, 152-53, 160, 168, 235-45); whether or not Downey's "upper management" refused to put underwriting guidelines in writing (SACC, ¶¶ 111, 122, 129-30, 135-36 & 164); and the exception rate for Downey's loans (SACC, ¶¶ 188-89). These contradictions severely undermine the reliability of the confidential witnesses and, as a result, are insufficient to support a finding of scienter.

Aside from these foundational deficiencies, the confidential witness statements simply "do not convey information sufficient to support the strong inference of scienter that the PSLRA requires." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 fn. 13 (9th Cir. 2008). For example, CW13 states that he personally "follow[ed] trends based on balance sheet and income statements", but he does not address whether or not the Individual Defendants also followed the same information or, if they did, whether it would provide them with knowledge about any alleged misstatements. SACC, ¶¶ 66 & 313. With respect to loan loss reserves, the confidential witness statements do not demonstrate that any Individual Defendant knew or was deliberately reckless in not determining that Downey's reserves were allegedly understated. Instead, Plaintiff only offers the belief of CW1 and CW8 that Downey did not maintain adequate reserves. SACC, ¶¶ 282 & 296.

Similarly, the allegation by CW8 that there were occasions when upper management, including Rosenthal, would approve third-party brokers that CW8 would not approve omits any factual detail regarding the requirements necessary to qualify brokers, instances when unqualified brokers were approved by Rosenthal or others, the identity of these unqualified brokers, the date they were approved, or the reasons why these brokers should not have been approved. SACC, ¶ 200. In addition, allegations by CW12 that "things at Downey really began to get out of control after Rosenthal took the reins of the company" (SACC, ¶ 160); CW17 that he believes Downey's culture "shifted" when Rosenthal took over (SACC, ¶¶ 70 & 161); and CW23 that "things went downhill when Rosenthal took over the Company" (SACC, ¶¶ 78 & 167) lack necessary foundation and, in any event, do not demonstrate any intentional deception by Rosenthal. Moreover, because Rosenthal became President and CEO of Downey in 1998, any alleged changes that coincide with his new position do not demonstrate that he intentionally or otherwise made false statements during the Class Period. Finally, the second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud. *In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083, 1101 ("Calling executives bad managers, or bad forecasters, does not plead fraud.").

### c. Other Allegations

In the SACC, Plaintiff, in disregard of the Court's March 18, 2009 Order, simply re-alleges many of the very allegations that the Court found inadequate under the PSLRA. For example, Plaintiff repeats a laundry list of accounting and reporting rules that were allegedly violated by Downey in accounting for its credit and loan loss reserves. *See, e.g.,* SACC, ¶¶ 261-77. However, as this Court concluded in its March 18, 2009 Order, GAAP violations, by themselves, are an insufficient basis to infer scienter. *See, e.g., In re Cornerstone Propane Partners, L..P. Securities Litigation*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("The majority of circuits have clearly held that standing alone, allegations of violations of GAAP or SEC regulations do not establish scienter."); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F. 3d 385, 390 (9th Cir. 2002) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.").

Such violations, even significant ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state. *See, In re Cornerstone Propane Partners, L.P. Securities Litigation,* 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("Allegations of GAAP violations thus provide some measure of support for the present plaintiffs' ultimate allegation of scienter, but they must be underpinned by other particularized allegations that defendants possessed the requisite mental state."); *In re Daou Sys. Sec. Litig.*, 411 F.3d at 1019 (finding that, without detailed information regarding the alleged GAAP violations, the Court could not determine "whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."). Therefore, Plaintiff has, once again, failed to provide a reasonable basis for the Court to conclude that any of the purported accounting mistakes were anything other than innocent and unintentional. *See In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *5 (D. Ariz. Mar. 9, 2006) ("[E]ven assuming that establishing the obviousness of a GAAP error could in fact establish a strong inference of scienter, Plaintiffs have not alleged sufficient facts to make such a showing.").[7]

Plaintiff also alleges again that a strong inference of scienter can be shown by the Individual Defendants' high-level positions within Downey, their access to non-public information, and their meeting attendance. *See, e.g.,* SACC, ¶¶ 114, 116, 125-28, 131 &

---

[7] Plaintiff also re-alleges that the single-quarter restatement of $99 million of loans modified under Downey's newly-initiated Borrower Retention Program as troubled debt restructurings constitutes an admission of scienter on the part of the Individual Defendants. However, as this Court found in its March 18, 2009 Order, "the restatement of Downey's non-performing assets in the third quarter of 2007 does not demonstrate that any Individual Defendant knew that non-performing assets were understated at the time Downey filed its Form 10-Q for the first quarter of 2007" because "the issuance of a restatement by itself is not an admission that a defendant knew a financial report was false when made." *In re Downey*, 2009 WL 736802, at *12. The SACC does not plead any new particularized facts or offer any confidential witness statements that address the deficiencies found by the Court. Instead, Plaintiff simply relies on the same allegations from the FACC, and, thus, fails to plead scienter for the same reasons discussed in the Court's March 18, 2009 Order.

133. However, as the Court previously held, the high rank of various Individual Defendants within Downey is insufficient, without more, to infer a strong inference of scienter. *See, e.g., In re Oak Tech. Sec. Litig.*, 1997 WL 448168, at *11 (N.D.Cal. Aug.1, 1997) (allegations of knowledge based on positions within a company are "insufficient to establish [defendants'] liability for alleged misstatements"). Similarly, Plaintiff's allegations that certain of the Individual Defendants were members of various committees, such as the executive, internal asset review, and nominating and corporate governance committees do not support a strong inference of scienter. *See, e.g. In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 944, 956 (C.D.Cal.2003) (dismissing complaint and finding that plaintiff had failed to allege scienter because "asserting that the men are members of Lockheed's executive committee, without describing the duties of the committee or how these defendants participated in it, does not demonstrate active involvement in day-to-day operations"). Moreover, Plaintiff cannot base an inference of scienter on the Individual Defendant's access to unspecified documents and conversations. *See, In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1079-80 (N.D.Cal. 2001) (holding that plaintiffs must allege "the date on which any such communication occurred, how plaintiffs learned of such a communication, the form in which such contact or communication was had, or specifics concerning information provided or received during such contact.*"*). Therefore, as the Court found previously, Plaintiff "must do more than allege that ... key officers had the requisite knowledge by virtue of their 'hands on' positions; a ruling to the contrary would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 844 (N.D.Cal.2000) (internal quotations and citation omitted).

In addition, Plaintiff again alleges that resignations or terminations at Downey, including those of Rosenthal and McAlister, support a strong inference of scienter. *See,* SACC, ¶¶ 434-41. However, as the Court found in its March 18, 2009 Order, resignations or terminations by themselves do not support a strong inference of scienter. *See, e.g., In re U.S. Aggregates, Inc. Securities Litigation*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("[A]fter a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team. Plaintiff can point to no particularized allegation refuting the reasonable assumption that Defendant [ ] was fired simply because the errors that lead to the restatement occurred on his watch or because he failed to adequately supervise his department."). Instead, a resignation or termination provides evidence of scienter only when it is accompanied by additional evidence of the defendant's wrongdoing. *See, e.g., Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1188 (C.D. Cal. 2007) (finding support for scienter where officer resigned specifically to avoid cooperating with internal investigation). Although given the opportunity to do so, Plaintiff has once again failed to allege any facts that suggest the resignations or terminations were connected to any purported wrongdoing or fraudulent activity.

Plaintiff attempts to allege that the Individual Defendants' "exponentially increasing bonuses" support scienter. SACC, ¶ 219-20. However, general allegations that "executive-level bonuses were 'based in part' on [a company's] financial performance . . . are inadequate to meet the heightened pleading requirements of *Silicon Graphics* and *Tellabs*." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009). For bonuses to support an inference of scienter, the allegations in the complaint must demonstrate a strong

correlation – including comparisons to previous years' bonuses – between the bonuses and the company's "bottom line". *Id.* However, Downey's 2008 Proxy Statement, which is attached to Plaintiff's SACC as Exhibit 14, demonstrates that Downey's performance was only one of three factors considered in determining executive bonuses. SACC, ¶ 219, Exh. 14. In addition, Plaintiff fails to address how the different amounts of Rosenthal's bonuses over the years, both before and during the Class Period, demonstrate that he intentionally engaged in any misconduct during the Class Period. Moreover, Plaintiff's allegations that bonuses support scienter are particularly weak with regards to Cote, who only received one bonus (in 2006), and McAlister, who was not a Downey executive and, thus, did not receive any bonus. SACC, ¶ 220 n. 11.

### d. The lack of stock sales negates any inference of scienter.

As the Court previously held, a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (holding that despite sales of $84 million in shares, the defendants still retained such a large percentage of their holdings – 92 percent – that an inference of scienter was functionally negated); *In re Silicon Graphics*, 183 F.3d at 987-88 (no scienter where despite over $13.8 million in stock sales, the defendants still retained over 90 percent of their holdings); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) ("while allegations of insider sales are not required in securities fraud cases, the lack of **any** tangible, personal benefit here further weighs against the Officer Defendants having scienter") (internal citations omitted).

In this case, any inference of scienter is negated by the complete lack of stock sales by the Individual Defendants during the class period. In fact, McAlister, who beneficially owned more than 5.6 million shares of Downey stock, did not sell a single share during the Class Period. As a result, McAlister suffered losses of over $300 million by the end of the Class Period and over $400 million by the date of Downey's bankruptcy filing. Likewise, Rosenthal, who beneficially owned 100,000 shares of Downey stock, did not sell any shares during or subsequent to the Class Period, and his holdings declined by approximately $5.5 million by the end of the Class Period. Therefore, as the Court found in its March 18, 2009 Order, the substantial losses suffered by McAlister and Rosenthal due to their decision not to sell any stock during the class period negates any inference of scienter that may have been raised by other allegations of the SACC. *Tripp v. Indymac Financial Inc.*, 2007 WL 4591930, *4 (C.D. Cal. Nov. 29, 2007) (holding that "the Individual Defendants retained such a large percentage of their stock that an inference of scienter is functionally negated").

### 4. Plaintiff failed to plead loss causation adequately.

Under the PSLRA, Plaintiff must demonstrate loss causation by showing that "the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The analysis of loss causation "is governed by the decisions of the Supreme Court in *Dura Pharmaceuticals* and of the Ninth Circuit in *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir.2005)." *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, *6 (N.D.Cal. July 30, 2007). "*In Dura Pharmaceuticals*, the Supreme Court held that the fact that a purchase price was

inflated, by itself, does not establish causation of economic loss." *Id.* "Instead, the Supreme Court reaffirmed the principle that a securities plaintiff must allege both cause and loss." *Id.*; *see, also, Dura*, 544 U.S. at 345, 125 S.Ct. 1627 (securities fraud actions do not exist "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"). "In *Daou Systems*, the Ninth Circuit described the loss causation inquiry as considering whether 'the misrepresentations or omissions caused the harm.'" *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278 at *6 (*quoting Daou Systems*, 411 F.3d at 1025). "In that case, the court found a lack of loss causation: 'if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages.'" *Id.* (*citing Daou Systems*, 411 F.3d at 1026). "The court concluded that a loss suffered in an earlier period could not be considered causally related to the alleged fraudulent conduct because that stock drop occurred when 'the true nature of Daou's financial condition had not yet been disclosed.'" *Id.* (*citing Daou Systems*, 411 F.3d at 1027). As the Fourth Circuit recently held in affirming the dismissal of a complaint on loss causation grounds:

> [T]he drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by the founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.

*Teachers' Retirement System of La. v. Hunter*, 477 F.3d 162, 187-88 (4th Cir.2007); *see, also, Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 534 F.3d 1049, 1063 (9th Cir. 2008) ("Plaintiffs adequately pled loss causation in *Daou* because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.").

In this case, the Court dismissed the FACC on the independent grounds that Plaintiff failed to plead loss causation adequately. The Court found that:

> Plaintiff alleges that Downey's earnings releases and financial reports during the class period and Downey's January 14, 2008 press release regarding the restatement of $99 million in loans modified under its newly-initiated Borrower Retention Program as troubled debt restructurings caused Downey's stock price to fall between October 16, 2006 and July 28, 2008. However, the public disclosures referenced in the FACC do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to Downey's "poor financial health" rather than any alleged fraud. *Id.*

*In re Downey Sec. Litig.*, 2009 WL 736802, at *15. Plaintiff has made no effort to remedy these deficiencies in the SACC. Instead, Plaintiff merely recites Downey's stock price on various dates from October 16, 2006, to November 25, 2008, without identifying any corrective disclosures that drove the stock price down. SACC, ¶¶ 448-88. In fact, the only allegations Plaintiff has added to the SACC relate to activities after the Class Period and a conclusory statement that stock price declines following various public filings "remov[ed]

some of the artificial inflation from the stock price as some of the relevant truth . . . began to leak out."  *See,* SACC, ¶¶ 455 & 478-88.  However, this type of conclusory allegation fails to provide the Individual Defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Dura Pharms.*, 544 U.S. at 347.

      **B.    Violation of Section 20(a)**

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator.  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  As discussed above, Plaintiff has failed to state a claim for a primary violation of the securities law.

In addition, Plaintiff has failed to plead that the Individual Defendants exercised the requisite control for a Section 20(a) claim. Plaintiff has again failed to make any particularized allegations that the Individual Defendants exercised control over Downey or any person in an effort to induce them to engage in acts that violated the securities laws, or the times, dates, and places that such control allegedly occurred.  Instead, the SACC again merely alleges that the Individual Defendants, by reason of their position in Downey, their participation in setting underwriting guidelines and loan loss reserves, and their ownership of Downey stock, had the power to cause Downey to engaged in the alleged conduct.  SACC, ¶ 498.  However, these boilerplate allegations are insufficient to state a claim for control person liability.  *In re Digital Island Sec. Litig.*, 223 F.Supp.2d 546, 561 (D.Del.2002), *aff'd* 357 F.3d 322 (3d Cir.2004) ("the court concludes that the plaintiffs unsupported allegations regarding management responsibilities fail to allege with the requisite specificity that the individual defendants played a role in the alleged nondisclosures").  "[E]ven a CEO is not automatically a 'controlling person' under Section 20(a)." *Id.* (*citing Paracor Fin. Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir.1996) (concluding that the plaintiff must allege that the CEO exercised direct or indirect control over the transaction in question.)); *see, also, In re Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) ("[F]or Plaintiff to establish Garn's control person liability, Plaintiff must provide factual support that Garn was in a position to control a primary violator.").

**IV.**    **Conclusion**

For all the foregoing reasons, the Individual Defendants' Motion is **GRANTED.**  The SACC is **DISMISSED without leave to amend** as to each of the Individual Defendants, and this action is **DISMISSED with prejudice** as to each of the Individual Defendants.  Plaintiff has demonstrated that it is unable to correct the deficiencies in its original Complaint, and the Court has no reason to believe that Plaintiff would be able to remedy these material defects if it was given yet another opportunity to do so.  *In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F.Supp. 2d at 1102.  "Additionally, dismissal with prejudice is necessary to promote the goal of the PSLRA, which is to 'raise the pleading standards to eliminate abusive securities litigation.'" *Id.* (*quoting Silicon Graphics*, 183 F.3d at 977).

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.